Trone et al v. Peanut Corporation of America Doc. 24

John D. O'Connor (SBN 54238)
O'CONNOR AND ASSOCIATES
One Embarcadero Center
Tenth Floor, Suite 1020
San Francisco, California 94111
Telephone: (415) 693-9960
Facsimile: (415) 981-0222

Attorneys for Plaintiffs
RICHARD ROE, RICHARD ROE II,
and DON NELSON

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD ROE, RICHARD ROE II, DON A. NELSON, Individuals,<br><br>Plaintiffs,<br><br>vs.<br><br>JOHN DOE, MARK CUBAN, an individual; and DALLAS BASKETBALL, LTD., a partnership, and DOES 1 through 10,<br><br>Defendants. | Case No.: 3:09-CV-682 PJH<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' SPECIAL MOTION TO STRIKE**<br><br>Date: April 22, 2009<br>Time: 9:00 a.m.<br>Courtroom: 5, 17th Floor |



Dockets.Justia.com

# TABLE OF CONTENTS

**TABLE OF CONTENTS** .......... ii

**TABLE OF AUTHORITIES** .......... iii

**PRELIMINARY STATEMENT** .......... 1

**I. STATEMENT OF ISSUES TO BE DECIDED** .......... 1

**II. STATEMENT OF RELEVANT FACTS** .......... 1

**III. LEGAL AUTHORITY AND ARGUMENT** .......... 10

**A. Defendants' False, Factual Statements Regarding the Parties' Purely Private Contract Dispute Was Not Made in Connection with a Public Issue Subject to California's ANTI-SLAPP Statute Protections** .......... 11

**B. The Substantial Evidence that Defendants Knowingly Published False Factual Statements Which Tend to Injure Plaintiff in His Business Establish a Probability of Prevailing on His Complaint** .......... 13

**C. Although Nelson Is Not A Public Figure, the Clear and Convincing Evidence of Defendants' Knowing Defamation Provides a Sufficient Prima Facie Factual Showing of Defendants' Constitutional Malice** .......... 16

**D. The Clear and Convincing Evidence of Defendants' Actual Malice in Making The Clearly Defamatory Accusations Supports the Imposition of Sanctions Against Them for Filing this Frivolous Motion to Strike** .......... 20

**III. CONCLUSION** .......... 21

## TABLE OF AUTHORITIES


**CASES**

***Barry v. Time, Inc.***
584 F.Supp. 1110 (N.D. Cal. 1984) ........ 18, 19

***Brewer v. Memphis Publ'g Co., Inc.***
656 F.2d 1238 (5th Cir. 1980) ........ 17

***Cepeda v. Cowles Magazine & Broadcasting Co.***
392 F.2d 417 (9th Cir. 1968) ........ 18

***Chuy v. Philadelphia Eagles Football Club***
431 F.Supp. 254 (E.D. Pa. 1977) ........ 18

***Curtis Publishing Co. v. Butts***
388 U.S. 130 (1967) ........ 17

***Equilon Enterprises, LLC v. Consumer Cause, Inc.***
29 Cal.4th 53 (2002) ........ 11

***Gertz v. Robert Welch, Inc.***
418 U.S. 323, 351 (1974) ........ 16, 18

***Hailstone v. Martinez***
169 Cal.App. 4th 728 (2008) ........ passim

***Hall v. Time Warner, Inc.***
153 Cal.App.4th 1337 (2007) ........ 11

***McGarry v. University of San Diego***
154 Cal.App.4th 97 (2007) ........ 18

***Metabolife International, Inc. v. Wornick***
264 F.3d 832 (9th Cir. 2001.) ........ 14

***Milkovich v. Lorain Journal Co.***
497 U.S. 1, (1990) ........ 14

***New York Times v. Sullivan***
376 US 254*(1964)* ........ 14, 16, 19

***Scholz v. RDV Sports, Inc.***
710 So.2d 618 (Fla. 1998) ........ 18

***Sipple v. Foundation for Nat Progress***
71 Cal.App.4th 226 (1999) ........ 12

***Taus v. Loftus***
40 Cal.4th 683 (2007) ........ 14

***Time, Inc. v. Firestone***
424 U.S. 448 (1976) ........ 18, 19

***Time, Inc. v. Johnston***
448 F.2d 378 (4th Cir. 1971) .......... 18

***Waldbaum v. Fairchild Publications, Inc.***
627 F.2d 1287 (D.C. Cir. 1980) *cert. denied* 449 U.S. 898 (1980). .......... 18

***Weinberg v. Feisel***
110 Cal.App.4th 1122 (2003) .......... 12

***Wilbanks v. Wolk***
121 Cal.App.4th 883 (2004) .......... 11

**STATUTES**

California Code of Civil Procedure Section 425.16 .......... 1, 20, 21

Federal Rules of Civil Procedure, Rule 11 .......... 20, 21

## PRELIMINARY STATEMENT

This is an action for damages suffered by plaintiff Don A. Nelson as a direct result of unprivileged, knowingly false and defamatory statements made by or on behalf of defendants Mark Cuban and Dallas Basketball, Ltd. about a private dispute between the parties which defendants widely published throughout the greater San Francisco Bay Area, Northern California and elsewhere. Since defendants and their counsel are well aware of the indisputable evidence negating the basis of their motion, defendants' Special Motion to Strike the Complaint pursuant to California Code of Civil Procedure Section 425.16[1] has not been brought in good faith and should not only be denied, but sanctions imposed pursuant to §425.16 (c) and Rule 11.

## I. STATEMENT OF ISSUES TO BE DECIDED

1. Whether defendants' knowingly false, defamatory statements in connection with a private contract dispute with plaintiff fails to implicate Section 425.16; and, only if not,
2. Whether defendants' own testimony and documents which evidence their knowledge that the defamatory, factual statements about plaintiff were false when published demonstrate that the complaint is legally sufficient and supported by a sufficient prima facie factual showing to sustain a favorable judgment in plaintiff's favor.

***Hailstone v. Martinez***, 169 Cal.App. 4th 728, 735 – 736 (2008).

## II. STATEMENT OF RELEVANT FACTS

The issue presented by this motion is whether the defamatory statements made by defendant Mark Cuban during his on-air radio interview are entitled to the additional, procedural protection of California Code of Civil Procedure Section 425.16. The relevant facts demonstrate that there is no substantial basis for defendants' motion and that the motion should be denied.

Plaintiff Don A. Nelson ("Nelson") has been, at various times, General Manager and/or Head Coach for several basketball franchises in the National Basketball Association ("NBA") including the Dallas Mavericks, Golden State Warriors, New York Knicks and Milwaukee Bucks. (O'Connor Decl., para. 22 and Exhibit 20 (Arbitration Transcript) pages 99 – 102.)

---

[1] Unless stated otherwise, all further statutory references are to the California Code of Civil Procedure.

On or about February 17, 1997, Nelson executed an Employment Agreement to become the General Manager of the Mavericks basketball franchise, which Agreement was subsequently amended on five occasions. (O'Connor Decl., para. 7 and Exhibit 5.) Originally having been employed solely as the General Manager, Nelson later agreed with the Mavericks to expand his duties to those of both Head Coach and General Manager and later yet also to serve as a Consultant. (O'Connor Decl., para. 8 and Exhibit 6, page 1.)

On or about July 1, 2003, Nelson and the Mavericks entered into a Fifth Amendment to the Employment Agreement which provided, in part, that Nelson shall be employed by the Mavericks as Coach and General Manager through June 30, 2006, and thereafter only as a Consultant of the team from July 1, 2006 through June 30, 2011 and shall receive $200,000 per year from the Mavericks for that five year Consultancy period. (O'Connor Decl., para. 8 and Exhibit 6.) The Fifth Amendment to the Employment Agreement, which incorporated the initial 1997 Agreement, included a non-competition, or loyalty, provision during the term of his five year Consultancy period. (O'Connor Decl., para. 8 and Exhibit 6, page 1; and para. 7 and Exhibit 5, page 5.) This "non-competition" clause did not restrict Nelson from taking another job once his contract or employment ended, and was not a "non-compete" that purported to restrict Nelson's employment after the employment ended. (O'Connor Decl., para. 7 and Exhibit 5, page 5; and para. 19 and Exhibit 17, page 5.)

In March 2005, Nelson and defendant Mark Cuban (the Owner of the Mavericks) had agreed that Nelson step down as Coach, but that Nelson would still be paid as if he were coaching. (O'Connor Decl., para. 3 and Exhibit 1 (Cuban Deposition) 112:11 – 113:7; 118:5 – 17; 121:23 – 122:3; and para. 5 and Exhibit 3 (Nelson Deposition) 189:19 – 192:13.) No mention was made of the five year Consultancy period. The contract was never amended to remove the Consultancy part of the contract. In March 2005, Cuban wrote an email to Floyd Jahner (the CFO of the Mavericks) telling him that the contract was not changed after Nelson stepped down. (O'Connor Decl., para. 10 and Exhibit 8, page 2.) Cuban wrote the email to Jahner on March 19, 2005, and stated: *"No changes . . . just a job reassignment. His contract doesn't change".* (O'Connor Decl., para. 10 and Exhibit 8, page 2.)

On June 26, 2006, just as the Consultancy portion of Nelson's agreement was about to begin, Jahner wrote an email to Cuban confirming his understanding that effective July 1, 2006, Nelson would begin to receive his Consultant's salary of $200,000 per year. (O'Connor Decl., para. 9 and Exhibit 7, page 2.) Cuban responded to Jahner: *"he [Nelson] no longer gets the consultant salary if I remember correctly"*. (O'Connor Decl., para. 9 and Exhibit 7, pages 1-2.)

On June 27, 2006, Jahner wrote Cuban back and reminded Cuban that back in 2005, Cuban had sent Jahner an email stating that Nelson was to receive the $200,000 per year for five years for working as a Consultant beginning July 1, 2006. (O'Connor Decl., para. 9 and Exhibit 7, page 1.) In other words, even though Nelson and Cuban had agreed in 2005 that Nelson step down as Coach, the contract had not been amended to remove the five year Consultancy term and compensation. In Jahner's June 27, 2006 email to Cuban, Jahner told Cuban: *"I have an email from you back in March 2005 that states his dollars stay the same and no changes to the contract."* (O'Connor Decl., para. 9 and Exhibit 7, page 1.) Thus, in 2005, the contract had not been amended in any way affecting the Consultant's salary or duties, and Cuban knew it.

Despite the clear contractual language in the Fifth Amendment requiring the Mavericks to pay Nelson his Consultant's salary, and despite Jahner reminding Cuban that Cuban had previously admitted that Nelson was to receive the Consultant's salary, Cuban responded to Jahner on June 27, 2006 and stated: *"we didn't agree that we would pay the 200k. So lets not pay it"*. (O'Connor Decl., para. 9 and Exhibit 7, page 1.) Jahner pressed Cuban again and asked Cuban: *"If Nellie doesn't remember this can I have him email/discuss with you?"* (O'Connor Decl., para. 9 and Exhibit 7, page 1.) Cuban responded: *"Just see what he comes back with. If he questions, we can go from there."* (O'Connor Decl., para. 9 and Exhibit 7, page 1.) Per Cuban's direction, Jahner instructed his assistant, Lisa Tyner, to remove Nelson from the payroll after June 30, 2006 (O'Connor Decl., para. 11 and Exhibit 9.)

In July 2006, just as the "consultancy" portion of the Agreement began, per Cuban's directions, the Mavericks breached the Fifth Amendment to the Employment Agreement by failing and refusing to pay Nelson his Consultant's salary when it first became due at the first bi-monthly pay period on July 15, 2006. (O'Connor Decl., para. 11 and Exhibit 9.) When Nelson

realized he had not received the first bi-monthly payment of his Consultant's salary, he called and complained to Jahner around July 26, 2006. (O'Connor Decl., para. 10 and Exhibit 8, page 3.) Jahner told Nelson, "*Mark Cuban says he doesn't owe you any money. … He doesn't owe you any consultant's money. … There was no agreement.*" (O'Connor Decl., para. 5 and Exhibit 3 (Nelson Deposition) 235:21 – 236:9; 239:20 – 240:2..) Jahner immediately notified Cuban that Nelson had called to complain he did not receive his check. (O'Connor Decl., para. 10 and Exhibit 8, page 3.) Cuban responded to Jahner and stated: *"Have his attorney call and state his case."* (O'Connor Decl., para. 10 and Exhibit 8, page 3.) At his deposition, Cuban candidly admitted that this statement meant he wanted Nelson ***"to beg for his money"***. (O'Connor Decl., para. 3 and Exhibit 1 (Cuban Deposition) 156:16 – 162:25.) Later that same evening, Cuban instructed Jahner to *"pay him [Nelson] the blood money . . . damn"*. (O'Connor Decl., para. 10 and Exhibit 8, page 1.)

Although Jahner had now been instructed to pay Nelson his Consultant's salary, the Mavericks did not do so. Instead, the very next day, July 27, 2006, acting on behalf of the defendants, Jahner called Nelson and initiated negotiations with Nelson to resolve the Consultancy issue and to get Nelson to accept something less than $200,000 per year. (O'Connor Decl., para. 12 and Exhibit 10; para. 3 and Exhibit 1 (Cuban Deposition) 173:24 – 176:4; 190:1 – 15; and para. 4 and Exhibit 2 (Jahner Deposition) 75:13 – 78:13.) Jahner told Nelson that "*Mr. Cuban agrees with you that he does owe you the money. But doesn't want to pay you … all the money*." (O'Connor Decl., para. 5 and Exhibit 3 (Nelson Deposition) 239:20 – 240:11.) According to Jahner's email report back to Cuban later that day, Nelson *"wouldn't agree to anything less [than $200,000 per year] but [he] was open to a lump sum payment"*. (O'Connor Decl., para. 12 and Exhibit 10.) The email report further stated that Jahner thought Nelson *"would agree to a $500,000 lump sum settlement"*. (O'Connor Decl., para. 12 and Exhibit 10.) Cuban responded: *"Agree, do it."* (O'Connor Decl., para. 12 and Exhibit 10.)

Nelson told Jahner he was agreeable to accepting an immediate $500,000 lump sum payment (instead of $1,000,000 paid over five years) for Cuban to "*buy the contract out and split ways and end our relationship*." (O'Connor Decl., para. 5 and Exhibit 3 (Nelson Deposition)

241:14 – 242:21; and para. 12, Exhibit 10.) Nelson said he wanted a "walk away." (O'Connor Decl., para. 22 and Exhibit 20 (Arbitration Transcript) 323:3 – 7; 314:22 – 315:1) Jahner then called Nelson back and said, "*Mr. Cuban agreed, we'll send the documents out.*" (O'Connor Decl., para. 5 and Exhibit 3 (Nelson Deposition) 242:22 – 243:2.) The Mavericks were to prepare the formal documentation of the settlement agreement consisting of the $500,000 payment to Nelson and the mutual walk away. (O'Connor Decl., para. 13 and Exhibit 11; para. 14, Exhibit 12.)

Although Nelson and defendants' CFO Jahner had reached an oral agreement for a $500,000 "walk away", the Mavericks' proposed written agreement, delivered around July 31, 2006, denominated the Sixth Amendment to the Employment Agreement, continued to obligate Nelson to provide consulting services to the Mavericks for the full five year term, but for half the money. (O'Connor Decl., para. 14 and Exhibit 12; and para. 15, Exhibit 13, page 2.) Nelson objected to the written proposal because it wasn't as agreed and the parties were unable to reach an agreement on the formal written resolution document. (O'Connor Decl., para. 5 and Exhibit 3 (Nelson Deposition) 247:1–23; and para. 22 and Exhibit 20(Arbitration Transcript) 313:1–315:6.)

On August 4, 2006, John O'Connor wrote Cuban a letter formally notifying him that the Mavericks had breached Nelson's Consultancy agreement by not paying Nelson his Consultant's salary on July 15 and July 30, 2006. (O'Connor Decl., para. 17 and Exhibit 15.)

Despite Cuban's admitted obligation to pay Nelson during the term of the consulting period under the contract, defendants continued to breach the Employment Agreement by failing to pay any portion of the amounts due and owing on July 15, July 30, or August 15. (O'Connor Decl., para. 19 and Exhibit 17, page 7.) As is evident from the above, defendants' failure to pay amounts due and owing under the contract was a deliberate decision to deny Nelson the benefits of the contract. As Cuban has admitted, he wanted Nelson ***"to beg for his money".*** (O'Connor Decl., para. 3 and Exhibit 1 (Cuban Deposition) 156:16 – 162:25.)

It was only after this substantial and continuing breach by defendants and manifestation of their malice that at the very end of August 2006, Nelson accepted an offer from the Golden State Warriors to be their Head Coach. (O'Connor Decl., para. 18 and Exhibit 16.) O'Connor first

talked to the Warrior's about the coaching job on August 3, 2006, after the Mavericks persisted in the breach, and on August 4, 2006, sent the "breach" letter to the Mavericks. (O'Connor Decl., para. 16 and Exhibit 14; para. 17 and Exhibit 15; para. 6 and Exhibit 4 (O'Connor Deposition) 54:7 – 56:2.) These initial talks died two days later, but were resumed later that month. (O'Connor Decl., para. 6 and Exhibit 4 (O'Connor Deposition) 83:2 – 24.) By the time of these talks, the defendants were already in breach of the Fifth Amendment by not paying Nelson. Thus, Nelson was "free" to go anywhere. [Significantly, on July 31, 2008, in his Interim Award, the Arbitrator found that the Mavericks had been in breach of contract for nonpayment of Consultant's pay, and that Nelson had been free to take another job. (O'Connor Decl., para. 19 and Exhibit 17, pages 7-8.)]

On September 21, 2007, defendant Cuban appeared on the "Murph & Mac" show on San Francisco radio station KNBR 680 to promote his appearance on the television show "Dancing with the Stars." (Amanda Bush Decl., para. 2 and Exhibit 1.) During the course of his interview, defendant Cuban made factual assertions about Nelson.

On the Murph & Mac show, Cuban was asked about the dispute with Nelson. Cuban answered with a description of what happened that was false in several particulars. First, he stated that the contract dispute was initiated by Nelson. Secondly, he stated that Nelson did so fraudulently, when, in Cuban's words *"he tried to rip me off"*.

According to Cuban, the dispute arose after Nelson, on Nelson's own volition, asked Cuban to pay a lump sum up front on the promise that Nelson would continue working for five years.

The relevant portions of the Transcript of the radio broadcast (pp. 10-12) read:

> **"Cuban:** Yeah … and you know what, I will give you guys the scoop here. … I'll tell you why …. because imagine that you guys get a Christmas bonus every year, and you went in and said, Boss, I know I have a five year deal, and I get a Christmas bonus of 200 K every year. … I'll tell you what, if you pay me half of that just up front in cash, then you won't have to pay me anymore, and we're all set. You don't have to pay me my Christmas bonuses the next five years. And then I find out you are getting ready to take that money and quit your job. Would you be mad?
>
> • • •

**“M&M**:  I got you …It’s a labor/management dispute as …

**“Cuban**:  No, it’s not even.  He tried to rip me off.

**“M&M**:  All right… Like you feel like you were being deceived?

**“Cuban:** Oh, yeah.  He came in and said, “You know what, Mark, you know,  pay me - - you owe a consulting fee of 200 K a year for the next five years.  Give me half of it up front, we’ll call it even.  And, you know, we will go on, and that will - - and everybody will still be friends, and we’ll do - - the consulting deal will stay in force with its non-compete clause and everything.”

And then the next thing I know he’s taking a job with the Warriors.  Now, we ended up not paying him that because I heard about the job before I wrote the check, but I was more than a little bit pissed, so…

• • •

“**Cuban**:  … But, instead, he tried to get his advance bonus payments and take off with them, and that really made me mad.”

In other words, rather than the nonpayment of Nelson’s Consultant’s pay having been initiated by Cuban, as it was in June 2006, Cuban falsely stated that the matter was begun by Nelson’s scheme *“to rip me off”*.  According to Cuban, Nelson was scheming to *“rip off”*  Cuban by promising to work five years, when in fact Nelson had planned from the outset to take a job with the Warriors.

In fact, all Nelson had wanted originally was for the Mavericks to pay him his Consultant’s salary.  The discussion about a lump sum settlement payment occurred only after Cuban and the Mavericks had willfully breached the contract, and were demanding that Nelson accept less than called for by the contract.  So, rather than it being Nelson’s scheme and idea to accept less, it was Cuban’s and the Mavericks’.  Defendants were trying to rip off Nelson, not vice versa.

Moreover, Cuban notes that Nelson was trying to “deceive” him, when in fact it was Cuban who had tried to deceive Nelson into believing the contract no longer called for Consultant’s pay, even after Jahner reminded Cuban he still owed it.

Of course, as the record shows, Nelson, contrary to Cuban’s public statement, did not initiate this at all, nor did he ever even speak with Cuban during the pertinent time period.

Thus, the overall description of the supposed meeting and conversation was wholly fictitious, bearing no general resemblance to the truth.  No meeting occurred around this time

between Nelson and Cuban, and the gist of Cuban's description was false.

So, in summary, Cuban's statements, in addition to being false in the description of a fictitious meeting, were also willfully false in several particulars. First, it was defendants who attempted to defraud Nelson, not vice versa. In 2003, Cuban agreed that Nelson would be owed the Consultant's salary starting on July 1, 2006 and sent the CFO an email stating the same. Cuban also signed a Fifth Amendment stating the same. Yet in June 2006, Cuban instructed the CFO to not pay it even after being reminded by the CFO that Cuban previously admitted it was owed and that Cuban had emailed the CFO in 2005 stating that there were no changes to the contract. When the CFO first talked to Nelson about the missing payment, the CFO relayed this false assertion, "*Mark Cuban says he doesn't owe you any … consulting money*." (O'Connor Decl. para. 5 and Exhibit 3 (Nelson Deposition) 236:7 – 9) After relaying Nelson's complaint, Cuban told the CFO to tell Nelson to have his attorney call and state his case. Cuban admits he wanted Nelson **to beg for his money.** This is clearly a situation where the defendants were not only in breach of the agreement, but were attempting to defraud Nelson by claiming the agreement did not provide for a Consultant's salary, when they knew it did.

Second, it was defendants who initiated negotiations to resolve the dispute over the Consultancy agreement, not vice versa, forcing Nelson to take less than admittedly owed. (O'Connor Decl. para. 22, Exhibit 20 (Arbitration Transcript) 157:12 - 17; and para. 12, Exhibit 10.) The CFO not only admitted he did so, but he sent an email to Cuban stating he did so. (O'Connor Decl. para. 12, Exhibit 10.)

Third, the oral agreement reached in the telephone conversation between Nelson and the CFO was for a $500,000 walk away *settlement,* not an agreement for Nelson to accept half the money but remain obligated for the entire five year period. Even the CFO's email to Cuban refers to a *settlement* and highlights the advantages to defendants of making an immediate lump sum payment of $500,000 versus the $875,000 present value of five $200,000 payments over five years.

Fourth, Nelson always intended to honor his Consulting agreement with the Mavericks, but thereafter the Mavericks breached the agreement by not paying Nelson on 7/15/06, 7/30/06

and 8/15/06. Nelson had reached an oral agreement with the Mavericks for the $500,000 "walk away" settlement, but then the written proposal from the Mavericks contradicted the oral agreement. The evidence establishes that it was the defendants, not Nelson, who never intended to adhere to the oral agreement reached between Nelson and the CFO.

In short, the evidence establishes that the Mavericks' conduct was fraudulent, dishonorable and in breach of contract, while Cuban's public statement was quite specific and detailed in his assertions that Nelson tried to defraud Cuban, was dishonorable, and intended to breach his contract.

The facts stated by Cuban were not opinions and did not purport to be opinions or arguments, but rather, the real factual "scoop," as the Transcript shows.

The Mavericks' and Cuban's own emails show their assertions to be false, and that Cuban knew they were false. The Arbitrator's Interim Award affirms this.

On July 31, 2008, the Arbitrator issued an Interim Award stating that the Mavericks had breached the contract by not paying the Consultant's salary to Nelson; that Nelson had been free to take the Warriors coaching job; and that deferred compensation and interest in the amount of $6,276,638.46 was owed to Nelson. (O'Connor Decl., para. 19 and Exhibit 17, page 10.)

On September 10, 2008, the Arbitrator issued a Final Award consistent with the interim award, which included attorneys' fees and costs. (O'Connor Decl., para. 20.) After this award, the Mavericks' lawyer wrote Nelson's attorneys admitting that an appeal of the Arbitrator's decision would not be successful, but that Cuban would appeal the award because he could make more money than the post-judgment interest he was paying. (O'Connor Decl., para. 22 and Exhibit 19, page 1.)

On November 19, 2008, the Texas State District Court in Dallas confirmed the Final Award of the Arbitrator and entered Final Judgment in favor of Nelson and against the Mavericks in the amount of $6,306,185.85 in damages, plus $816,352.42 in attorneys' fees, plus post judgment interest from September 10, 2008, until the judgment is satisfied. The matter is now on appeal by Dallas Basketball to the Texas State Appellate Court. (O'Connor Decl., para. 21.)

## III. LEGAL AUTHORITY AND ARGUMENT

There is substantial evidence that defendants repeatedly and knowingly published provably false statements of fact regarding a private contract dispute between plaintiff, on the one hand, and defendants, on the other hand. These unprivileged statements, imputing dishonesty and fraudulent intent to plaintiff in his business dealings, clearly damaged plaintiff in his occupation and constitute defamation *per se*. As such, defendants' statements do not implicate California Code of Civil Procedure Section 425.16 protection and, even if so, the complaint is legally sufficient and supported by a sufficient, prima facie factual showing to support plaintiff's claim.

In ***Hailstone v. Martinez***, 169 Cal.App.4th 728, 734 (2008), the California court of appeal noted the limited purpose of a motion under Section 425.16:

> "'*Section 425.16* was enacted in 1992 to provide a procedure for expeditiously resolving "nonmeritorious litigation meant to chill the valid exercise of the constitutional right of freedom of speech and petition in connection with a public issue."' [*Citation omitted.*]"

The ***Hailstone*** court proceeded to succinctly summarize the two-step analysis the court must apply to determine defendants' motion at pp. 735-736:

> "The court first decides whether the defendant has made a threshold showing that the challenged cause of action is one 'arising from' protected activity. (*City of Cotati v. Cashman, supra*, 29 Cal.4th at p. 76.) The moving defendant must demonstrate that the act or acts of which the plaintiff complains were taken 'in furtherance of the [defendant's] right of petition or free speech under the United States or California Constitution in connection with a public issue … .' (§ 425.16, *subd. (b)(1)*; see *Equilon Enterprises v. Consumer Cause, Inc., supra,* 29 Cal.4th at p. 67.) If the court concludes that such a showing has been made, it must then determine whether the plaintiff has demonstrated a probability of prevailing on the claim. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88 [124 Cal.Rptr. 530, 52 P.3d 703].)
>
> "To establish the requisite probability of prevailing, the plaintiff need only have ' " 'stated and substantiated a legally sufficient claim.'"' (*Navellier v. Sletten, supra,* 29 Cal. 4th at p. 88.) '"Put another way, the plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.'"' (*Id*. At pp. 88-89.) The plaintiff need only establish that his or her claim has minimal merit to avoid being stricken as a SLAPP. [*Citation Omitted.*]"

Under the facts and circumstances of this case, defendants' statements were not made in connection with a "public issue" since the contract dispute involved only the parties and did not

implicate any matter of importance to a significant segment of society. Further, even if defendants are able to satisfy the first part of the test, plaintiff's claim is both legally sufficient and is supported by substantial facts. This court is respectfully requested to deny defendants' special motion to strike.

### A. Defendants' False, Factual Statements Regarding the Parties' Purely Private Contract Dispute Was Not Made in Connection with a Public Issue Subject to California's ANTI-SLAPP Statute Protections

Initially, defendants bear the burden to demonstrate that their false, factual statements were made in furtherance of their Constitutional right of petition or free speech in connection with a public issue as defined in the statute. ***Equilon Enterprises, LLC v. Consumer Cause, Inc.***, 29 Cal.4th 53, 67 (2002). Defendants evidently contend that the mere fact that plaintiff is and has long been a head coach and/or general manager of various professional basketball franchises grants to any person who publishes a false statement about him the added protections of Section 425.16 regardless of whether the subject of the statement involves any public controversy or issue. Defendants' simple contention is not supported by the cases cited.

In ***Hall v. Time Warner, Inc.***, 153 Cal.App.4th 1337 (2007), Marlon Brando, a well known celebrity whose lifestyle engendered widespread public interest in his personal life, left a substantial bequest to a former housekeeper and, following up on the public discussion of that bequest, an investigative news program interviewed the housekeeper at her retirement home. In requiring the housekeeper to satisfy the requirements of Section 425.16, the court found that the public investigative news team was legitimately contributing to the ongoing public debate. Here, on the other hand, defendants point out the general public interest in sports, but have presented no evidence that any significant segment of society has any interest in Nelson's personal life sufficient to expose his private activities to public scrutiny.

In further support of their position, defendants cite ***Wilbanks v. Wolk***, 121 Cal.App.4th 883 (2004), but the ***Wilbanks*** court found that the Wolk's statements regarding Wilbanks' questionable business activities did not, in and of themselves, implicate a public issue, but were accorded the additional preliminary protection because the statements contributed to the public

interest in consumer protection. In contrast, defendants' false statements regarding Nelson and their private business relationship have no implications for consumer protection, but relate only to the private contract dispute between Nelson and the defendants.

The type of controversy involving a public figure which is entitled to the preliminary, procedural protections afforded by Section 425.16 is typified by ***Sipple v. Foundation for Nat Progress***, 71 Cal.App.4th 226 (1999). Defendants had published allegations that Sipple, a nationally known political consultant who successfully used domestic violence issues to promote his clients, was himself accused of committing domestic violence. Thus the alleged statements were directly related to the issues which made plaintiff a public figure.

Also instructive is ***Weinberg v. Feisel***, 110 Cal.App.4th 1122 (2003), in which Feisel accused Weinberg of stealing parts of his valuable collection of tokens at a trade show, an accusation repeatedly denied by Weinberg. Feisel used his position to publish his accusation repeatedly among the community of token collectors in meetings and in the regular publications of a collectors' organization. Feisel's contention that the suspected criminal conduct of Weinberg was a matter of public concern was rejected by the court which found that it was essentially nothing more than a private dispute made public.

Whether or not an asserted statement is made about a "public issue" is not specifically defined in the statute, but case law provides some guidance. ***Hailstone v. Martinez***, *supra*, 169 Cal.App.4th 728, 736, teaches:

> "*Section 425.16* does not define 'an issue of public interests.' Nevertheless, the statute requires the issue to include attributes that make it one of public rather than merely private, interest. *(Weinberg v. Feisel* (2003) 110 Cal.App.4th 1122, 1132 [2 Cal.Rptr. 3d 385].) A few guiding principles can be gleaned from decisional authorities. For example, 'public interest' is not mere curiosity. Further, the matter should be something of concern to a substantial number of people. Accordingly, a matter of concern to the speaker and a relatively small, specific audience is not a matter of public interest. Additionally, there should be a degree of closeness between the challenged statements and the asserted public interest. The assertion of a broad and amorphous public interest is not sufficient. Moreover, the focus of the speaker's conduct should be the public interest, not a private controversy. Finally, a defendant charged with defamation cannot, through his or her own conduct, create a defense by making the claimant a public figure. Otherwise private information is not turned into a matter of public interest simply by its communication to a large number of people. (*Weinberg v. Feisel, supra, 110 Cal.App.4th at pp. 1132-1133*.)"

***Hailstone*** involved accusations that a Teamsters Union business agent had been "double dipping" into union funds by receiving reimbursement of identical expenses. The court held that the fiscal fidelity of plaintiff, the union local's business agent and a trustee of its benefits funds, was a matter of significant concern to the 10,000 members of the union local – a significant, definable, segment of society, and thus constituted a matter of public interest.

The contractual dispute between Nelson and defendants does not qualify as one of public interest. Even if the dispute may have attracted the curiosity of some segment of society, there was nothing about the dispute or the issues involved which had any impact on a significant segment of society or affected the rights and obligations of persons other than the disputants. This was a purely private dispute.

Plaintiff acknowledges that he is well known as a head coach and general manager of professional basketball teams; however, defendants have not sustained their burden to demonstrate that Nelson has sought or acquired notoriety among the general public for non-basketball related conduct or activity. Similarly, defendants have not sustained their burden to demonstrate that Nelson's personal, non-basketball related interests have ever been an issue of public interest or concern to any substantial segment of society.

Defendants have not sustained their burden by demonstrating that the false and defamatory statements made by them were made in the furtherance of their Constitutional right of free speech on a public issue and their motion should be denied.

### B. The Substantial Evidence that Defendants Knowingly Published False Factual Statements Which Tend to Injure Plaintiff in His Business Establish a Probability of Prevailing on His Complaint

Even if the court determines that defendants have met their burden of showing that Section 425.16 applies to this action, the complaint is both legally and factually sufficient to state a claim for relief against defendants and this motion should be denied.

Although the statute appears to require that plaintiff establish a *probability* that he will prevail on the claim, the California Supreme Court has held that the courts are not to weigh the evidence in making this determination, but only to determine whether, at an early stage of the

litigation, there is sufficient prima facie factual basis to go forward with the litigation. ***Taus v. Loftus***, 40 Cal.4th 683, 714 (2007). Thus plaintiff's burden is only to show that the claim is legally sufficient and that there is sufficient evidence to establish a prima facie case with respect to the claim. ***Ibid.*** As the Ninth Circuit characterized this standard, "[t]his burden is 'much like that used in determining a motion for nonsuit or directed verdict,' which mandates dismissal when 'no reasonable jury' could find for the plaintiff. [*citations omitted*.]" ***Metabolife International, Inc. v. Wornick***, 264 F.3d 832 (9th Cir. 2001.) In this case, there is clear legal and undisputed evidentiary support for plaintiff's defamation claim against defendants.

A defamation claim requires (a) a publication that is (b) false, (c) defamatory, and (d) unprivileged, and that (e) has a natural tendency to injure or that causes special damages. ***Taus v. Loftus***, 40 Cal.4th at p. 720. Additionally, if defendants prevail in rendering plaintiff a "public figure" for purposes of this motion, plaintiff must also demonstrate that the defamatory conduct was accomplished with "actual malice" which may be demonstrated by evidence that defendant made the statements with knowledge that the statement was false, and/or with a reckless disregard for the truth. ***New York Times v. Sullivan***, 376 US 254*(1964*).

Obviously, there is no question that defendants' statements about plaintiff were published. In support of their motion, defendants have attached what they characterize as a certified transcript of a taped recording of the radio broadcast in which defendant Cuban made the statements at issue in this action.

Defendants' primary contention is that Cuban's comments were mere hyperbole or non-actionable opinion. Even opinions, however, can be the basis for defamation where the opinion implies or is based upon asserted untrue facts. ***Milkovich v. Lorain Journal Co.***, 497 U.S. 1, (1990). Defendants' contention is directly contradicted by the text of the broadcast. The essence of Cuban's false statements is contained at page 10, line 16 through page 12, line 21 of defendants' Transcript. During the interview, Cuban made the following factual assertions concerning the contract dispute between plaintiff and defendants:

1. That Nelson attempted to defraud defendants;

2. That Nelson initiated discussions with defendant Cuban to amend his contract with defendants;

3. That Nelson offered to accept an up front, lump sum payment equal to one half of his five year, contractual consultant's fee, but would remain a consultant to defendants for the full five 5 years and would not accept employment with another basketball franchise; and,

4. That Nelson made this offer with the intent to induce defendants to pay him the money and with the intention of accepting a coaching position with another team.

There was nothing about these statements or the interview which indicated that defendants meant these statements to be satire, hyperbole, or anything other than a substantially true if casual summary of the contract dispute between plaintiff and defendants. These assertions were not only provably false, but since defendants were directly involved in the discussions described, were made with knowing falsity.

The evidence produced by plaintiff is sufficient to demonstrate that the true facts, known to defendants at the time of the radio interview were that:

1. defendants initially breached their contract with Nelson by failing and refusing to pay the amounts they knew were due under the consultancy agreement;

2. defendants approached Nelson and suggested that the contract be amended by forcing Nelson into accepting less than owed;

3. plaintiff agreed to accept one half of his consultant's fee to buy out the remainder of his contract with defendants in full settlement of the matter;

4. plaintiff did not discuss any coaching or management position with another professional basketball franchise until after the breaches by and discussions with defendant; and,

5. defendants were attempting to defraud Nelson, not the reverse.

Defendants' knowingly false statements directly and negatively reflected upon the plaintiff's honesty and trustworthiness in his business dealings. Such factual statements bear directly upon plaintiff's business reputation and have a strong natural tendency to cause harm.

Accordingly, there is a sufficient legal basis for plaintiff's claim and a sufficient prima facie basis to go forward. On that basis, defendants' Special Motion to Strike should be denied.

### C. Although Nelson Is Not A Public Figure, the Clear and Convincing Evidence of Defendants' Knowing Defamation Provides a Sufficient Prima Facie Factual Showing of Defendants' Constitutional Malice

Despite the clear and convincing evidence in support of plaintiff's legally sufficient defamation claim, defendants contend that plaintiff is a public figure and must additionally prove defendants' actual malice by clear and convincing evidence. ***New York Times v. Sullivan***, 376 US 254 (1964). Under the circumstances of this dispute, Nelson was neither an all purpose public figure nor a limited public figure required to demonstrate that defendants' statements were made with actual malice; however, as previously explained, defendants' own documents and testimony clearly demonstrate that they knew that the defamatory statements were false at the time of the radio broadcast.

In ***Gertz v. Robert Welch, Inc.***, 418 U.S. 323, 351 (1974), the Supreme Court further explained the criteria for determining whether a person is a public figure at p. 345:

> "Hypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare. For the most part those who attain this status have assumed roles of special prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment."

At page 351 of the decision, the ***Gertz*** court further acknowledged that not all persons who may be "public figures" for one purpose should be treated as a public figure for all purposes:

> "Respondent's characterization of petitioner as a public figure raises a different question. That designation may rest on either of two alternative bases. In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In

either case such persons assume special prominence in the resolution of public questions."

Glossing over this standard, defendants make the completely unsupported assertion that plaintiff is an all purpose public figure with no supporting facts or analysis relating to Nelson as an individual rather than as a member of an amorphous class of people involved in sports. Nelson is a basketball coach and general manager. He does not profess to be nor has he ever sought public attention in any other field. Defendants present no evidence that Nelson has ever injected himself into public or political controversies unrelated to his profession nor that he has "assumed roles of special prominence in the affairs of society" or has a "position of such persuasive power and influence" in society to properly be classified as an all purpose public figure. There is no basis to find plaintiff to be an "all purpose" public figure.

Plaintiff acknowledges that there are a number of cases which appear to hold that a coach can obtain the status of a limited public figure for purposes of matters involving his or her duties and/or scope of notoriety. Nelson does not dispute that he might be considered a limited purpose public figure if his claims arose from statements related to his management of the team, his interaction with players, tactical decisions during games or other performance based issues, but the basis of this action does not relate to any matter of public controversy nor does it relate to any aspect of his position for which it can fairly be said that he has voluntarily injected himself by virtue of his public position. Instead, defendants' published falsehoods at issue in this action relate only to the private contract dispute for which Nelson did not seek publicity nor seek to resolve by resort to public attention[2].

The cases defendants string cite only emphasize that a sports personality's status as a limited public figure relates to public issues arising from his or her performance or his or her duties: ***Curtis Publishing Co. v. Butts***, 388 U.S. 130 (1967)[plaintiff college football coach was alleged to have conspired with others to "fix" the outcome of a major college football game]; ***Brewer v. Memphis Publ'g Co., Inc.***, 656 F.2d 1238, 1258 (5th Cir. 1980)["public figure"

---

[2] In the articles defendants attach in support of this motion, plaintiff's comments on the topic are minimal.

determination was based upon plaintiffs' association with Elvis Presley]; ***Time, Inc. v. Johnston***, 448 F.2d 378 (4th Cir. 1971) [article related specifically to plaintiff's basketball playing career]; ***Cepeda v. Cowles Magazine & Broadcasting Co.***, 392 F.2d 417 (9th Cir. 1968) [article criticizing baseball player's value to the team]; ***Scholz v. RDV Sports, Inc.***, 710 So.2d 618 (Fla. 1998) [Fired professional basketball coach complaining about comments derogating his value to the team and performance as a coach]; ***Barry v. Time, Inc.***, 584 F.Supp. 1110 (N.D. Cal. 1984) [head coach of a college basketball team was accused of permitting illegal payments to be made to a star basketball player.]; ***Grayson v. Curtis Publ'g Co.***, 436 P.2d 756 (Wash. 1967) [referee accusing head college basketball coach of on-court misconduct]; ***Chuy v. Philadelphia Eagles Football Club***, 431 F.Supp. 254 (E.D. Pa. 1977) [a team doctor's statement that a serious disease disqualified a professional football player from further pursuing his career. (*Note*, the jury had already determined that the alleged statement was not defamatory in any event.)]; and, ***McGarry v. University of San Diego***, 154 Cal.App.4th 97 (2007)[a college football coach fired for public misbehavior in performance of his duties].

A useful analytical framework was applied to determine whether a person is a limited public figure in ***Barry v. Time, Inc.***, *supra*, 584 F.Supp. 1110. Based on ***Gertz*** and its progeny, Judge Patel of this court applied a two step process to determine whether the plaintiff was a limited public figure. To make this determination, the court first determined whether there was a true public controversy and only then determined whether the extent and nature of plaintiff's participation in that issue merited "public figure" status. To determine whether the claims arise out of a public controversy, the court took into consideration that (1) an essentially private dispute that attracts the public interest is not necessarily a public issue [citing ***Time, Inc. v. Firestone***, 424 U.S. 448, 454 – 455 (1976)]; and, (2) the dispute must involve a real controversy which affects the general public or some segment of it in an appreciable way beyond the immediate participants with foreseeable and substantial ramifications for nonparticipants [citing ***Waldbaum v. Fairchild Publications, Inc.***, 627 F.2d 1287 (D.C. Cir. 1980) *cert. denied* 449 U.S. 898 (1980).]

The ***Barry*** court found that the claim arose out of a continuing controversy at the University of San Francisco over potential recruiting violations which affected the reputation of the University and, by association, impacted the University community as a whole. Further, the local controversy was part of a larger, national debate regarding the continuing benefits and abuses of college athletics and questionable ethical decisions by those supporting the programs. These were issues of significant public concern and alleged statements were directly related to plaintiff's involvement in these public issues.

In sharp contrast to ***Barry***, the comments made by Cuban related only to the contract dispute between plaintiff and defendants and the amounts, if any, owed by one or the other under that agreement. It had no potential for affecting anyone beyond the direct participants and did not implicate any larger issues of public concern. Apparently, the sole basis asserted by defendants for denominating the contract dispute as a public controversy is that it received significant attention from the press in Dallas; however, the Supreme Court has unequivocally held that mere interest by the press is insufficient to convert a private matter a public controversy. ***Time, Inc. v. Firestone***, *supra*, 424, U.S. 448, 454 – 455. Since the statements arose from a purely private matter, there is no basis for finding Nelson to be a "public person" required to demonstrate Constitutional malice in support of his claims at this early, procedural stage. Indeed the press interest may have resulted from Cuban's controversial, outspoken public persona.

Nevertheless, even if this court finds that the contract dispute between plaintiff and defendants was a "public controversy" and that Nelson is therefore a limited public figure, he has presented sufficient, clear and convincing evidence of defendants' actual malice in making the defamatory statements with knowledge that it was false or reckless disregard of whether it was false or not. ***New York Times v. Sullivan***, 376 U.S. 254, 279 – 280.

Defendants' own sworn testimony and authenticated internal communications establish that they consciously acted to deny Nelson the benefits of his contract and that Nelson rejected any demand that he accept only half of the pay while fully performing all obligations under the consulting phase of his contract. Instead, the evidence shows that defendants indisputably knew that Nelson wanted a walk-away settlement of the contract obligations and that he only accepted

another position after their repeated breach of his contract. Defendants willfully breached the contract, falsely claiming the money was not owed.

Actual malice has been demonstrated on a special motion to strike on much less convincing evidence. In ***Hailstone v. Martinez***, *supra*, 169 Cal.App.4th 728, Hailstone was required to show actual malice in order to prevail on defendant's Section 425.16 motion to strike. The court held that Hailstone's own declaration that Martinez knew that some of the accusations of misconduct against Hailstone were false was sufficient to meet his burden of showing actual malice. Plaintiff Nelson evidentiary support relies not upon his own declaration, but upon the prior, sworn testimony of defendants as well as their own, internal documents and communications. The evidence of defendants' malice is clear, convincing, and indisputable.

Plaintiff has demonstrated a substantial legal basis for his defamation claims arising out of defendants' publication of false, factual statements about him with a direct tendency to injure him in his business reputation. Further there is a substantial factual basis for plaintiff's claims in that there is clear and convincing evidence that defendants published their false, defamatory, factual statements with knowledge of their falsity and the defendants' prior ill will toward plaintiff on contract related matters. Accordingly, plaintiff's claims are legally sufficient and supported by sufficient prima facie showing of facts to support a judgment in his favor. Since plaintiff has more than met his burden under Section 425.16, this court is respectfully requested to deny defendants' motion.

**D. The Clear and Convincing Evidence of Defendants' Actual Malice in Making The Clearly Defamatory Accusations Supports the Imposition of Sanctions Against Them for Filing this Frivolous Motion to Strike**

Section 425.16 (c) provides, in pertinent part:

> "If the court finds that a special motion to strike is frivolous or is solely intended to cause unnecessary delay, the court shall award costs and reasonable attorney's fees to a plaintiff prevailing on the motion, pursuant to Section 128.5."

This court has authority to issue sanctions against a party and its attorneys for filing and maintaining a frivolous motion under Federal Rules of Civil Procedure, Rule 11. Plaintiff Nelson hereby moves the court to impose such sanction against defendants and their attorneys of record

since defendants' own testimony and documents clearly show both the falsity of the factual statements made during the radio broadcast and defendants' knowledge of the falsity at the time they were made by their own prior testimony. In light of that evidence, there was no good faith basis in fact or in law for defendants' Special Motion to Strike and this court should impose sanctions for reasonable attorney's fees and costs in amounts as will be later addressed, to oppose this motion.

## III. <u>CONCLUSION</u>

A Special Motion to Strike a defamation action under California Code of Civil Procedure Section 425.16 is a procedural device intended to permit an early evaluation of actions which may have a chilling effect on defendants' exercise of Constitutional right to freedom of expression in connection with a **<u>public issue</u>**, but the comments by defendants related only to the private contract dispute between plaintiff and defendants and do not implicate any public issue or interest. On that basis alone, this court should deny defendants' motion to strike.

Even if the complaint is subject to Section 425.16 evaluation, plaintiff has clearly sustained his burden by showing that the complaint is both legally sufficient and supported by sufficient facts in accordance with California law. In fact the testimony and evidence provided by defendants, themselves, in an earlier proceeding clearly demonstrate both the falsity of the facts and defendants "actual malice."

In light of the sufficiency of the complaint and defendants' knowledge that there is no substantial basis for the motion, plaintiff Nelson respectfully requests this court to deny defendants Special Motion to Strike the Complaint and to impose sanctions in accordance with Section 425.16 (c) and FRCP, Rule 11.

Dated: April 1, 2009

O'CONNOR & ASSOCIATES

By________________________
John D. O'Connor
Attorneys for Plaintiffs
RICHARD ROE, RICHARD ROE II, AND
DON A. NELSON