Trone et al v. Peanut Corporation of America Doc. 24 Att. 3

# EXHIBIT 3
# TO DECLARATION OF O'CONNOR

Dockets.Justia.com

ARBITRATION NO. 1310016794

DON NELSON, CONFIDENTIAL ATTORNEYS' EYES ONLY

Claimant/Counterrespondent,
vs. CIVIL ARBITRATION PENDING BEFORE JAMS

DALLAS BASKETBALL LIMITED d/b/a DALLAS MAVERICKS,

Respondent/Counterclaimant.

---

VIDEOTAPED DEPOSITION OF DON A. NELSON
San Francisco, California
Friday, June 6, 2008
Volume 1

Reported by:
DANA M. FREED
CSR No. 10602
JOB No. 89866

Page 1

ARBITRATION NO. 1310016794

DON NELSON, CONFIDENTIAL ATTORNEYS' EYES ONLY
Claimant/Counterrespondent,
vs. CIVIL ARBITRATION PENDING BEFORE JAMS
DALLAS BASKETBALL LIMITED d/b/a DALLAS MAVERICKS,

Respondent/Counterclaimant.

---

Videotaped Deposition of DON A. NELSON, Volume 1, taken on behalf of the defendants DALLAS BASKETBALL LIMITED d/b/a DALLAS MAVERICKS, at 450 Sansome Street, Suite 1550, San Francisco, California, beginning at 9:35 a.m. and ending at 4:50 p.m. on Friday, June 6, 2008, before DANA M. FREED, Certified Shorthand Reporter No. 10602.

Page 2

APPEARANCES:

For the Claimant/Counterrespondent DON NELSON:
O'CONNOR AND ASSOCIATES
BY: JOHN D. O'CONNOR
Attorney at Law
One Embarcadero Center
Tenth Floor, Suite 1020
San Francisco, California 94111
415.693.9960
FIGARI & DAVENPORT
BY: DON COLLELUORI
Attorney at Law
3400 Bank of America Plaza
901 Main Street
Dallas, Texas 75202-3796
214.939.2007

For the Respondent/Counterclaimant DALLAS BASKETBALL LIMITED d/b/a DALLAS MAVERICKS:
FISH & RICHARDSON P.C.
BY: THOMAS M. MELSHEIMER
GEOFFREY S. HARPER
Attorneys at Law
5000 Bank One Center
1717 Main Street
Dallas, Texas 75201
214.747.5070

Videographer:
JOSEPH MOURGOS
SARNOFF COURT REPORTERS & LEGAL TECHNOLOGIES
450 Sansome Street, Suite 1550
San Francisco, California 94111
415.274.9977

Page 3

INDEX


| WITNESS | PAGE |
|---|---|
| DON A. NELSON | |
| EXAMINATION BY MR. MELSHEIMER | 7 |


EXHIBITS


| DEPOSITION NO. | | PAGE |
|---|---|---|
| 29A | Email from Randall Schmidt with attached Amended and Restated Employment Agreement | 156 |
| 50 | Email from Robert R. Rowell to John O'Connor dated August 3, 2006 | 6 |
| 51 | Email from Robert R. Rowell to John O'Connor dated August 29, 2006 with attached Employment Agreement of Don A. Nelson | 6 |
| 52 | (Withdrawn) | 6 |
| 53 | Document entitled Employment Agreement of Don A. Nelson | 6 |
| 54 | Emails sent between Pat Russell and Mark Cuban dated August 19, 2004 | 48 |


Page 4

EXHIBITS
(Continued)

| DEPOSITION NO. | | PAGE |
|---|---|---|
| 55 | Claimant and Counterrespondent Don Nelson's (1) Amended Statement of Claim and (2) Reply to Dallas Basketball Limited's Original Counterclaim | 59 |
| 56 | Email from Keith Grant to Mark Cuban dated October 26, 2004 | 183 |
| 57 | Emails chain sent between Pat Russell and Mark Cuban dated March 7, 2005 | 187 |
| 58 | Email from Del Harris to Mark Cuban dated March 20, 2005 | 192 |
| 59 | Email sent from Pat Russell to Mark Cuban dated April 11, 2005 | 197 |
| 60 | Emails sent between Mark Cuban and Pat Russell dated September 20, 2005 | 226 |
| 61 | Document entitled Sixth Amendment to Employment Agreement | 246 |
| 62 | Emails between Don A. Nelson and Mark Cuban dated February 22, 2007 | 268 |
| 63 | Article from the Monterey County Herald in April of 2007 | 277 |

04:29



San Francisco, California
Friday, June 6, 2008
9:35 a.m. - 4:50 p.m.
(Deposition Exhibit Nos. 50-53 were marked.)
09:35 THE VIDEOGRAPHER: Good morning. Here begins Media No. 1 of the deposition of Don Nelson in the matter of Nelson versus Dallas Mavericks. This case is in arbitration with No. 1310016794. Today's date is June 6, 2008 and the time is 9:35 a.m. This
09:36 deposition is taking place at 450 Sansome Street, 15th Floor, San Francisco, California and is being taken on behalf of the respondents. The videographer is Joseph Mourgos appearing on behalf of Sarnoff Court Reporters and Legal Technologies located
09:36 in Irvine, Los Angeles, San Francisco, San Diego, California or Las Vegas, Nevada.
Will all counsel, parties, and the deponent please take notice that as part of the videotaping of this deposition, very high quality microphones are
09:36 being used. These microphones are very sensitive. If any party, attorney, or the deponent wishes to make a statement or have a conversation off the record, they should state that they are going off the record and gain concurrence from all parties. The videographer
09:36 will then stop recording. All recorded comments made



by any party, attorney, or the deponents during this deposition will be assumed to be on the record and will be transcribed.
Would counsel please identify themselves and
09:37 state whom you represent?
MR. COLLELUORI: Don Colleluori representing Mr. Nelson along with John O'Connor.
MR. MELSHEIMER: Tom Melsheimer on behalf of the Mavericks and along with me is Jeff Harper.
09:37 THE VIDEOGRAPHER: Would the reporter please swear in the witness?

DON NELSON,
having been first duly sworn, was examined and testified as follows:

EXAMINATION
BY MR. MELSHEIMER:
Q Mr. Nelson, good morning.
09:37 A Good morning.
Q Can you tell us when you first had contact with the Golden State Warriors about the possibility of becoming their coach for the 2006, 2007 season?
A I think it was sometime in August.
09:37 Q August 2006?



A Yes.
Q Who initiated the contact?
A Chris Mullin.
Q What was the nature of the contact, email,
09:38 telephone, in person?
A Telephone.
Q He called you?
A Yes.
Q What did he say?
09:38 A Well, at that time it was, we had had prior conversations. But at that time, I think they had made a decision to make a coaching change.
Q Okay. Well, let's -- let's see if we can focus on that. So you think that this conversation
09:38 with Chris Mullin -- he's the general manager of the Warriors; is that right?
A I think he's president of basketball operations.
Q President of basketball operations?
09:38 A I don't really know his title.
Q Called you --
He called you sometime in August of 2006 to talk about the coaching job for the Warriors?
A Yes, because that was on the island of Maui,
09:39 I remember.

A He is.
Q Communicates a lot by email, doesn't he?
A I don't. So guess what? There is no communication. I don't email.
02:19 Q Well, you emailed in Exhibit 57, didn't you?
A About two of them. Right? My secretary did those.
MR. MELSHEIMER: We've got to change the tape.
02:19 THE VIDEOGRAPHER: This marks the end of Media No. 2 in the deposition of Don Nelson. We are off the record at 2:19 p.m.
(Recess taken.)
THE VIDEOGRAPHER: We are back on the record
02:30 at 2:30 p.m. And this marks the beginning of Media No. 3 in the deposition of Don Nelson. Please continue.
BY MR. MELSHEIMER:
Q Mr. Nelson, I want to turn your attention to
02:31 when you decided to step down as coach and general manager of the Mavericks in 2005. All right?
A Yes, sir.
Q Who first brought up the topic of you stepping down in favor of Avery Johnson as coach?
02:31 A Who brought up the topic?



Q Yes, sir. Whose idea was it?
A Well, I think it was more mutual, probably, than anything. But I think Del and I --
Q Who is Del?
02:31 A Del Harris, my assistant coach. We had a couple hours together where we was talking and, you know, Mark wasn't having a very good time, I wasn't having a very good time. And we thought Avery was ready.
02:32 And, you know, thought it might be good to talk to Mark about, you know, does he want to do something? And that's how it started. And Del said, "Well, I'll go talk to him."
So he talked to him the next night at the
02:32 Sneaker -- whatever they call that, Tux and Sneakers. And he approached Mark and from what Del told me, he said, you know, "Things aren't going along real well here and, you know, what do you think? Should we work something out?"
02:32 And I think Cuban was receptable (sic) to it and said something to Del about, or Del said, or he asked Del, "When do you want to do something?"
And Del said, "How about next year? Let Avery take the team over."
02:33 And Mark said, "How about now?"



And so he said, "I'll go ask him."
So he came over and asked me and I said, "What's the matter with tomorrow morning?" It was really that simple.
02:33 Q How was the agreement for you to step down memorialized, if it was?
A Well, Del basically said, you know, "Nellie wants to be paid."
And Mark's response was, "He'll get every
02:33 penny just as if he were coaching the team. He'll get paid on time every penny just as if he were coaching the team."
And that's the message Del delivered to me.
Q And that was pretty exciting to you, wasn't
02:33 it?
A Yeah. I said great. Let's do it tomorrow morning. And that's what we did. Mark, Del and I met the next morning.
Q Where did you meet?
02:34 A In my office. And he basically said the same thing. It was a very short meeting. I thanked him for a great opportunity and some great years together. It was time to move on.
And he said, "You will receive your money on
02:34 time, just as if you were coaching the team." And



that's all that was said. And I went out -- practice was in session. I went out said good-bye to the team and press conference and all happened in one day.
Q Did you have any conversations with Mr. Cuban
02:34 at that meeting about the $200,000 consultancy salary?
A No.
Q That was not discussed?
A Nothing was discussed.
Q The only -- the only thing you remember,
02:34 which I think you've said it to us twice now, is that Mr. Cuban said you would be paid as if you were coaching the team?
A On time.
Q Okay. And your -- okay. Let me ask you to
02:35 take a look at this. 57 (sic). She's got to mark it, sorry.
(Deposition Exhibit No. 58 was marked.)
BY MR. MELSHEIMER:
Q Before we get to that, Mr. Nelson. Is
02:35 Del Harris a pretty good friend of yours?
A Yes, he is. One of my best friends.
Q Honest guy?
A Honest guy.
Q Trustworthy?
02:35 A Yes, sir.

Q You don't have any -- in your mind, it's completely a mystery?
A I have no idea.
Q As to what happened between March of 2005 and
03:23 June of 2006?
A After we split, supposedly going to be friends, and I stepped down, Avery took over, what in the world could have happened. I wish somebody would tell me.
03:23 Q So the end of June 2006, you're now operating under the -- end of June 2006, what are your -- what is your understanding of what you're supposed to do and what is your understanding of what you're going to get?
03:24 A I just finished the draft at the end of June and I was, what is he doing here draft? I was going to go to the summer league, watch our team, be there to help Avery, you know, if he wanted to talk ball or whatever and then scout the other teams. I was
03:24 denied. I went myself, I paid my own way because I thought it was important that I stay up on the knowledge of that, of young kids. So I stayed for 10 days on my own, paid my own hotel, paid my own airfare, and went to Maui. And basically, what
03:24 happened happened.



Q I'm not sure you answered my question.
A I didn't know what your question was.
Q What did you understand your duties to be at the end of June 2006, and what were you going to get
03:25 in performance of those duties?
A It was to be a consultant. When called upon, give my opinion, scout younger players, you know, help wherever needed.
Q Were the Mavericks obligated to consult with
03:25 you?
A Were they obligated to consult with me?
Q Were they obligated to ask you to do anything? Or did they simply have the option to ask you to help?
03:25 A Oh, they had the option.
MR. COLLELUORI: Objection; legal conclusion.
BY MR. MELSHEIMER:
Q They had the option?
A Yes.
03:25 Q It wasn't an obligation on their behalf?
A No.
Q You were to be paid $200,000 for five years?
A Yes.
Q Was it your understanding that you would be
03:25 paid that 200,000 and you would still have the various



restrictions and obligations that you had under your previous agreements with the Mavericks?
MR. COLLELUORI: Objection; legal conclusion. You can answer.
03:26 THE WITNESS: Way back when we were friends and signed that original first contract between Mark and I that had the consultant contract in it, it was never a demand on my time. It was basically that I could just do that, you know, the consulting by phone.
03:26 I didn't have to be in the office. I didn't have to go anywhere. It was a gift to me from him that he wanted me around the organization and wanted my opinion and that's what the consultant agreement was.
It wasn't, you know, that I had to earn the
03:26 money or anything. It was just be available if we call you, we're probably not even going to bother you, but if we call you, you know, give us your opinion and whatever. So it was, whatever they asked, you know, I was willing to do.
03:27 BY MR. MELSHEIMER:
Q You expected to receive a consulting salary payment in July -- July 15, 2006. Right?
A July, yes.
Q When you didn't get it, what did you do?
03:27 A I called the comptroller.



Q Who was that? Was that Mr. Jahner?
A Yes.
Q What did you tell him?
A I said, "I didn't receive my check. Where is
03:27 it?"
Q What did he say to you?
A He said, "Mark Cuban says he doesn't owe you any money." Yeah, "He doesn't owe you any consulting money."
03:28 Q All right. Now, was this -- I'm going to ask you to look at --
MR. HARPER: 11. All right.
BY MR. MELSHEIMER:
Q All right. Let me ask you to take a look at
03:29 Exhibit 11, Mr. Nelson, in your binder.
A Sure. Okay.
Q And if you will turn to the last page of -- the second-to-the-last page of that document which is -- has the word "redacted" -- second-to-the-last
03:29 page, has the word "redacted" on top, stamped. And it's an email from Mark Cuban to Mr. Jahner and Robert Hart, Subject: Nellie, dated Wednesday July 26, 2006, 4:00. Do you see that?
A Yes.
03:29 Q Skip two lines below that, it says, On

Wednesday, July 26th, Floyd Jahner wrote and he says, "I got a call from Nellie regarding his check and the $200,000 that we did not include in his compensation. He states this was not discussed in the negotiations at the time of his departure. He asked if we had any of this in writing. Then when asking what he should do next, he briefly alluded to turning this over to his attorney. I told him I would talk to you. He asked me to call back. In case you want to discuss directly with Nellie, his new number is." And he gives the number.

Now, is that an accurate recollection of the conversation that you remember having with Floyd Jahner on July 26, 2006?

A No.

Q All right.

A I remember me calling him and --

Q Well, let's, let's stop for a second. Do you remember it being on or around July 2006? Do you have any reason to doubt that?

MR. HARPER: 26.

MR. MELSHEIMER: 26th, is what it said.

MR. HARPER: I thought you said July 22.

THE WITNESS: Whenever the check didn't come. When was that, the 1st? Was the check due on the 1st?



I called a couple days later.

BY MR. MELSHEIMER:

Q The check was due on the 15th. Mr. Jahner's email says that you had a discussion today, which was July 26th. Are you saying you don't believe it was that day?

THE WITNESS: I don't recall. I called shortly after. It could have been. I mean, I -- it was shortly after.

MR. MELSHEIMER: Okay.

THE WITNESS: I didn't receive my check. I probably had to hear from my accountant.

BY MR. MELSHEIMER:

Q Let's -- just so the record is clear on this. Are you disputing that you had a conversation with Mr. Jahner on or about July 26, 2006?

A No, I'm disputing the way it went down.

Q Okay. I'm going to let you talk about that --

A Yeah.

Q -- but I just want to set the date. You have got for reason to doubt it was on or around the 26th?

A No, I have no idea.

Q Now, what is wrong about his recitation in this email, Exhibit 11, of that conversation?



A Was there a conversation before this?

Q I'm asking you.

A Well, I don't know. That's why I'm kind of screwed up. I thought there was a conversation before, closer to the 17th or 18th. Are you saying this is the first time we talked?

Q Well --

A I don't really know.

Q And I'm not trying to be funny. I don't know because I don't get to really say anything. So all I know is this email says that he got a call from you. The email's dated July 26th. If you remember it being on a different date or whatever, please, please tell us. But --

A Well, I could give you the scenario of what I remember.

MR. COLLELUORI: Just tell him what you remember. That's probably easiest.

BY MR. MELSHEIMER:

Q Just tell us what you remember about your communications with Mr. Jahner about your consulting check.

A Okay. I called -- and I don't know the date. Sometime after the 15th. And I said, you know, "Where's my check?"



And he said, Mr. Cuban says he doesn't owe you any money. There was no agreement.

And I said -- excuse the French -- "You tell Mr. Cuban he's a fucking liar."

He says, "I'll tell him that and I'll get right back to you."

Maybe a day goes by. Maybe two. Called me back. And he said, "Mr. Cuban agrees with you that he does owe you the money. But he doesn't want to pay you the money." He said, "Or, he doesn't want to pay you all the money."

I said, "Well, what does he want to do? Do you want to make a settlement?" And that's where the settlement came in. That's what happened. I don't know about when all this and, you know, when the attorney got involved. I think there was a conversation before this that I had with him.

Q So do you remember having more than one conversation with Mr. Jahner?

A Oh, yeah.

Q Mr. Cuban, per Mr. Jahner, admitted that you were owed the money. Is that your testimony?

A That's correct.

Q So I want to make sure I understand why you called him an F'ing liar. You didn't talk about the

consulting agreement in your March meeting; correct?
A That's correct.
Q Okay. And did you understand that it was Mr. Cuban's position that he doesn't remember there being any conversation about that and that that's why he didn't believe the money was owed. Do you understand that that's his position, that that was his position?
A I didn't understand that. But it doesn't matter to me. It was in the contract. He said he would honor the contract.
Q And --
A Nothing was discussed that day.
Q I understand that. But I'm just trying to -- I'm trying to get what you understood. And so you were, it was communicated to you pretty quickly, if I understand your testimony correctly, that Mr. Cuban was going to -- understood what his obligations were under the agreement. Right? That's what Mr. Jahner told you?
A Yes.
Q Okay. The only issue was going to be what form that money was going to be paid. Right?
A Correct.
Q There were discussions about a buyout or



a lump sum payment. Right?
A Yes.
Q You didn't reject that idea, did you?
A No.
Q You thought that was a pretty good idea?
A Absolutely.
Q Now, it's your testimony that the lump sum was first raised by Mr. Jahner. Is that what you're telling us?
A Yes, sir.
Q Okay. So what -- you didn't understand that that lump sum agreement was a buyout of your contract, did you, sir?
A Yes.
Q That's what you thought?
A Yes. He was going to buy the contract out and split ways and end our relationship.
Q Who told you that?
A That was what I said.
Q Okay. That's what you said?
A Mr. Jahner, yes.
Q What did Mr. Jahner say Mr. Cuban's proposal was with respect to the lump sum?
A He said he would tell Mr. Cuban, get back -- or talk to Mr. Cuban, get back to me, called me back



and said Mr. Cuban agrees, we'll send the documents out.
Q Okay. So you got sent to you documents related to this lump sum payment; correct?
A I did.
Q Okay. Let's take a look at that.
A Let's do.
Q You are kind of liking this?
A No, not really.
Q You sound like you are. That's the first time you said let's do something?
A Well, let's go home.
Q You want this to be over. You got -- I got farther to go than you. Okay?
A I understand.
Q Let's see here.
MR. HARPER: First email is 37.
MR. MELSHEIMER: Do we have a copy of 37? Oh, you've got it. I'm sorry.
BY MR. MELSHEIMER:
Q Would you look at Exhibit 37? Previously marked Exhibit 37. Do you recognize that as an email between -- from Mr. Jahner to you?
A Yeah.
Q Regarding an update of this negotiation of



the lump sum payment?
A It doesn't say that here, but.... I can't remember.
Q You don't remember this?
A I don't. This went to my phone.
Q Maus19@aol.com. That's not your phone, that's an email account.
A That probably went to the computer here -- oh, no, I wasn't here then. We were in Maui. That probably went to my home in Dallas.
Q Okay.
A Because of the computer.
Q Of course.
A I've never seen this, so....
Q You've never seen this email?
A No.
Q Okay.
A But anyway, what are you thinking it's saying here?
Q Well, it sounds like he's saying that Robert -- that's Robert Hart -- got off the plane and had some family function he had to attend tonight. He said he'd review the draft ASAP, which will hopefully be tomorrow and then I will get it to you at this email address. You don't have any recollection of --

A No, I have none.
Q -- this exchange?
Take a look at Exhibit 38. Look at the bottom there.
03:39 MR. COLLELUORI: That's 39.
THE WITNESS: Oh.
MR. COLLELUORI: You skipped one.
BY MR. MELSHEIMER:
Q Exhibit 38. Look at the bottom email.
03:39 That's you, isn't it?
A Yeah.
Q It says, "I got your message. Thanks for communicating."
A Huh. Maybe it got on my phone then. I don't
03:39 know.
Q Okay.
A That's the only way I do emails is on my phone.
Q When you say "phone," you have a BlackBerry,
03:39 is that what it is?
A Yeah, I had one.
Q Right.
A So I was probably getting them there. I can't remember.
03:39 Q Okay. Well, it says -- and then he responds



back to you, "Nellie, Robert completed the amendment this morning and I have attached that file. Please print three copies, sign all three and return to my attention." Do you see all that?
03:39 A Yeah.
Q Okay. Now, let me show you what we'll mark as the next exhibit. And I'm sorry, we only have one copy for a reason?
MR. HARPER: I'm an idiot.
03:40 MR. MELSHEIMER: I may have another copy now that I think about it.
MR. HARPER: I just took it out of your book.
MR. MELSHEIMER: That's where you got it. Okay. All right.
03:40 MR. HARPER: Tell them not to put this on the record.
MR. COLLELUORI: We all need to stop talking so she can mark the exhibit.
MR. HARPER: Sorry.
03:41 (Deposition Exhibit No. 61 was marked.)
BY MR. MELSHEIMER:
Q Do you recognize what's been handed to you as a draft of the sixth amendment to your employment agreement?
03:41 A I don't. But --



Q This is Exhibit 61. Is that right?
A Yes.
Q Do you recall reviewing Exhibit 61 in your negotiations with Mr. Jahner and the Mavericks with
03:41 respect to this lump sum payment?
A With a one lump payment?
Q Yes, sir.
A That's not what this is.
Q It's got a schedule attached. But what I'm
03:41 asking you is, do you recall reviewing Exhibit 61?
A I didn't review it. I received it and thank God I didn't sign it, but almost just signed it and mailed it back. But, you know, I said, I better have my attorney look at this. Thank God I did. Because
03:42 it's not what we had talked about, which was an agreement to part ways and both go our own way.
Q Okay. So we can agree it's certainly not an agreement where you would be relieved of your future obligations with the Mavericks?
03:42 A Then why in the world would I sign it?
Q That's not what 61 is, is it?
A I know. That's why I didn't sign it. It's not what we talked about.
Q Well, one of the reasons you didn't sign it
03:42 is because you were secretly negotiating with the



Golden State Warriors?
A That's not true.
Q Well, in any event, at this time, as of July 31, 2006, you were still negotiating with the
03:42 Mavericks about this consulting salary. Right?
A What's the date on this?
Q Well, the email that's dated on Exhibit 38 is July 31, 2006.
A Okay.
03:43 Q So this either came to you on July 31 or August 1st. And I understand you didn't sign it because it wasn't the agreement. You didn't believe it was the agreement. But certainly, you understood that at least at this point you were still negotiating
03:43 with the Mavericks about the terms of payment of your consultant's salary. Right?
A I didn't -- no, I didn't even read it. I sent it to my attorney to read.
Q But you didn't tell them you wanted the
03:43 Mavericks, on July 31st or August 1st -- you didn't say, hey, we're done talking about this deal, you didn't say that?
A I didn't say anything.
Q Right. So as far as Mr. Jahner knew and
03:43 Mr. Hart knew, they were still in the process of

04:45 normally doesn't charge me. If he does, I buy him a dinner or just give him, you know, a lump sum every once in a while.

Q Do you know what they say about getting what you pay for?

A I understand.

Q But in any event, you don't recall when you engaged him to speak on your behalf in connection with the Golden State Warriors job?

04:45 A I don't remember.

Q Mr. Nelson, I appreciate your time today. I think we're finished.

MR. COLLELUORI: We'll reserve ours.

THE WITNESS: Okay. Can I buy you one?

04:46 MR. MELSHEIMER: You can. Yeah, in fact we have some time. We're off the record.

THE VIDEOGRAPHER: This concludes today's deposition of Don Nelson. The number of media used was four. We're off the record at 4:46 p.m.

04:50

Page 285

I, DON A. NELSON, do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made such corrections as noted herein, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct.

EXECUTED this________day of________, 2008, at____________________,_________________________.
(City) (State)

_____________________________
DON A. NELSON

Page 286

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated:

_____________________________
DANA FREED
CSR No. 10602

Page 287