John D. O'Connor (SBN 54238)
O'CONNOR AND ASSOCIATES
One Embarcadero Center
Tenth Floor, Suite 1020
San Francisco, California 94111
Telephone: (415) 693-9960
Facsimile: (415) 981-0222

Attorneys for Plaintiff
DON A. NELSON

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD ROE, RICHARD ROE II, DON A. NELSON, Individuals,<br><br>Plaintiffs,<br><br>vs.<br><br>JOHN DOE, MARK CUBAN, an individual; and DALLAS BASKETBALL, LTD., a partnership, and DOES 1 through 10,<br><br>Defendants. | Case No.: 3:09-CV-682 PJH<br><br>**SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S SPECIAL MOTION TO STRIKE** |

Plaintiff Nelson hereby submits this Memorandum regarding the supplemental discovery conducted on the issue of malice.

A. <u>Discovery of Cuban E-Mails to the Press</u>

On Nelson's request to Produce Documents propounded by plaintiff, Defendants produced e-mails from Defendant Mark Cuban to the press, two of which are bombshells, constituting ironclad evidence of Cuban's premeditation and deliberation, as it were, regarding his false radio statements accusing Nelson of fraud. These statements were embellished with the false provenance of Cuban's fabricated "eyewitness" accounts of a supposed conversation of Nelson initiating the fraud.

In each of these two e-mails, sent to the press in July of 2007, Cuban reveals his malicious state of mind. July of 2007 was shortly before his radio interview of September, 2007, and just

shortly after the Club submitted its massive Arbitration Counterclaim (Supp. O'Connor Decl., Exh. 110).

These e-mails show a raging hostility and a practiced falsity that belies Cuban's present claim of merely negligent unpreparedness for the interview. (Supp. O'Connor Decl., Exh. 105, p. 129:19 to p. 130:10.) These e-mails are virtually identical to his false statements on the air two months later.

These and other e-mails to the press also show Cuban's ill-will and hostility to Nelson, depicting Nelson as a cash-hungry, "sleezy [sic]" and "unethical" "mother fucker." Such ill-will, although not dispositive of constitutional malice, is a decided factor under ***Harte-Hanks Communications, Inc. v. Connaughton***, 491 U.S. 657, 667 (1989), which can give rise to an adverse influence of malice. See also, ***Suzuki Motor Corp. v. Consumers Union***, 330 F.2d 1110, 1135-36 (9th Cir. 2003).

B. Testimony of Dallas Basketball CFO Floyd Jahner

At his deposition of May 20, 2009, Jahner admitted that Nelson committed no fraud or deceit during the key settlement negotiations. (Supp. O'Connor Decl., Exh. 104, p. 43:18 to p. 44:18.) Jahner admitted knowing very early in the negotiations that Nelson was looking for a termination or buy-out of his contract, not a continued obligation, directly contrary to Cuban's statement to the press in 2007. (Supp. O'Connor Decl., Exh. 104, p. 40:15-24.) The e-mail traffic produced previously (O'Connor Decl., Exh. 7) shows that Cuban was monitoring closely the negotiations, and that Cuban knew that Jahner had initiated these discussions, as he previously admitted in testimony (Supp. O'Connor Decl., Exh. 105, p. 62:14 to p. 63:2.) Common sense tells us that Nelson was unlikely to have concocted a fraudulent scheme for a settlement discussion which was foist upon him as the Club and Cuban tried to pay Nelson less than owed.

C. Deposition Testimony of Mark Cuban

Clearly attempting to foil Plaintiff's discovery, Mark Cuban, during his deposition of May 20, 2009, testified in manifest bad faith, issuing an absurd string of "I don't recall" and "It depends" answers to most questions (See Supp. O'Connor Decl., Exh. 105.)

When asked about the factual basis for his defamatory comments on the KNBR radio interview, Cuban simply repeated the phrase "general circumstances" without being able to recall or identify what they were. (Supp. O'Connor Decl., Exh. 105, p. 138:17 to p. 140:10)

These disingenuous answers give rise to inferences harming Cuban's credibility and, especially at this preliminary stage, to inferences of malice. Cuban was also asked about the fabricated conversation with Nelson, to whom he can't recall speaking that summer. Cuban himself has admitted previously, even though he monitored by email, that he had no involvement in the buyout negotiations (Supp. O'Connor Decl,. Exh. 105, p. 62:14 to p. 63:2.) Finally, Cuban testified, clearly deceptively, that Cuban considered "Mark" and "Mavs" to be one and the same entity (Supplement O'Connor Decl., Exh. 105, p. 125:2 to p. 126:17). The trier of fact, however, could infer both a lack of credibility and a desire to hide the fact that he was falsely giving eye-witness provenance for his claim of Nelson's fraud.

Cuban had testified in the past that he didn't pay Nelson his consultant's salary because of "uncertainty" over whether the consulting contractual obligations of both parties were over (Supp. O'Connor Decl., Exh. 105, p. 25:4 to p. 26:10.) Nelson's counsel wished to explore this further, because this admission of uncertainty would tend to show Cuban's malice. After all, on radio interview he spoke as if there were no question but that Nelson owed five years of service, concealing the possibility (which Cuban had raised) that no obligation was owed at all. But Cuban claimed he couldn't recall at all whether he had been "uncertain", notwithstanding his numerous adamant past statements under oath (Supp. O'Connor Decl., Exh. 105, p. 26:17 to p. 28:1.) Perhaps most importantly, Cuban offered a lame excuse for the falsity in his radio interview: he wasn't prepared for the questions on Nelson. (Supp. O'Connor Decl., Exh. 105, p. 129:19 to p. 130:10.)

The text of the radio interview in fact quotes Cuban to say he was expecting these questions (Bush Decl., Exh. 1). More importantly, the two July, 2007, e-mails discussed in Section A, above, show that rather than being caught unprepared, Cuban had a practiced defamation at the ready with which to smear Nelson. The recent deposition also sheds light on his knowledge that Nelson wanted termination of his contract, not a continuing obligation of five

years to an owner with whom he was feuding. More significantly, Cuban admitted in his depositions that he had no knowledge that Nelson had ever represented to him or anyone else during this time period that Nelson intended to perform five more years, or fulfill the non-compete covenant. (Supp. O'Connor Decl., Exh. 105, p. 86:23 to p. 87:9).

Meanwhile, in prior testimony, Cuban admitted that the parties disagreed about this issue. (Supp. O'Connor Decl., Exh. 106, p. 217:14-20) This comports with Jahner's testimony of a frank divergence on the issue of termination/buyout (sought by Nelson) versus the Club's position seeking a continuing obligation. No one was deceived by these frank differences.

Jahner sent an e-mail to Cuban on July 27, 2006 that he felt Nelson was amenable to a "$500,000 lump sum settlement" (emphasis supplied). (O'Connor Decl. Exh. 10) Use of the word "settlement" implies the desire to get out of the contract, not a representation to stay in it. Cuban, knowing this, disputed that he understood "settlement" in its customary meaning. (Supp. O'Connor Decl., Exh. 105, p. 100:19 to p. 101:11) The trier of fact may not believe that Cuban understood the term in the way other than he admits it should be understood, implicitly admitting the possibility that Nelson was seeking termination.

Moreover, Cuban has admitted several times in the past of knowledge that Jahner initiated lump-sum settlement talks (Supp. O'Connor Decl., Exh. 105, p. 66:6 to p. 67:3 and Exh. 106 p. 175:19-25, and p. 90:1-10). If Cuban had admitted knowledge of Jahner's initiation, he would be forced as well to admit knowledge of the falsity of his radio interview suggesting otherwise.

D. Case Law

In addition to Harte-Hanks, *supra*, the Ninth Circuit's opinion in ***Church of Scientology of California v. Flynn***, 744 F.2d 694, 696 (9th Cir. 1984) is on point. There the Court held that merely the arrangement of true facts in a way suggesting an overall false meaning could give rise to constitutional malice. In Harte-Hanks, in addition to relying on evidence of actual ill-will, the Court, per Justice Blackmun, *supra* at 491 U.S. 657, 667-668, noted that the defendant relied on one witness, knowing that there were other witness who contradicted him. This "avoidance of the truth", together with hostility, was enough to support constitutional malice. In this case, Cuban

admitted no knowledge that Nelson in the summer of 2006 ever promised to comply with a five-year non-compete. (Supp. O'Connor Decl., Exh. 105, p. 86:23 to p. 87:9)

E. Conclusion

At this preliminary stage, all inferences must be granted in favor of the responding party. See ***Masson v. New Yorker Magazine***, 501 U.S. 496, 520 (1991). Certainly there is more than ample evidence from which the trier of fact may determine that Cuban he had requisite constitutional malice in accusing Nelson of fraud.

Dated: June 3, 2009

O'CONNOR & ASSOCIATES

By ______________________
John D. O'Connor
Attorneys for Plaintiff
DON A. NELSON