UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RICHARD ROE, RICHARD ROE, II and DON A. NELSON,

Plaintiffs,

v.

JOHN DOE, MARK CUBAN, DALLAS BASKETBALL, LTD and DOES 1 through 10,

Defendants.

_______________________________________/

No. C 09-0682 PJH

**ORDER GRANTING DEFENDANTS' SPECIAL MOTION TO STRIKE; AND GRANTING PLAINTIFF'S MOTION TO STRIKE**

Before the court is defendants Mark Cuban ("Cuban") and Dallas Basketball, Ltd.'s (collectively "defendants") special motion to strike, which plaintiff Don Nelson ("Nelson") opposes. Also before the court is Nelson's motion to strike defendants' reply brief or, in the alternative, all evidence presented for the first time in the reply brief. The court finds these matters suitable for resolution without oral argument pursuant to Civil Local Rule 7-1(b). Having carefully read the parties' papers submitted initially and pursuant to the court's request for supplement briefing, and considered the relevant legal authority, defendants' special motion to strike is GRANTED, and Nelson's motion to strike is GRANTED, for the reasons stated below.

**BACKGROUND**

Nelson is a former employee of the Dallas Mavericks ("Mavericks"), a basketball franchise in the National Basketball Association ("NBA"). First Amended Complaint ("FAC") ¶ 7. From December 1997 to August 2006, Nelson was employed by the Mavericks in

Dockets.Justia.com

various capacities, including general manager, head coach and consultant. Id. In early 2000, Cuban became the controlling owner of the Mavericks and its organization entity Dallas Basketball, Ltd. Id.

On or around July 1, 2003, Nelson and the Mavericks agreed to enter into a "Fifth Amendment to the Employment Agreement" (the "contract"), which provided that Nelson would perform head coaching and general manager services for the Mavericks through June 30, 2006, and thereafter perform five years of consulting services at $200,000 per year. FAC ¶ 8; John O'Connor ("O'Connor") Decl., Exh. 6. The contract, which incorporated the initial 1997 Employment Agreement as well as the four other previous agreements, included a "non-competition" clause, which states that during the term of employment Nelson "shall not perform, directly or indirectly, any duties or provide any consultative or related services for any professional or amateur basketball organization or related entity, nor directly or indirectly, control or otherwise be involved in any business which is competitive with the [Mavericks]." O'Connor Decl., Exhs. 5-6.

In March 2005, Nelson and Cuban orally agreed that Nelson would step down as head coach of the Mavericks, but would continue to be paid as if he were still coaching. FAC ¶¶ 10-11. Nelson's contract, however, was not amended to reflect this agreement. Id. Nor was it amended to remove the consulting portion. In June 2006, prior to the commencement of Nelson's five-year consulting services, Cuban inquired into whether the Mavericks were obligated to honor the consulting portion of Nelson's contract. Id. ¶ 11. Cuban was subsequently informed by his staff that the Mavericks were under a legal obligation to pay Nelson for consulting services starting July 1, 2006 and continuing through June 30, 2011. Id. Cuban, nevertheless, ordered that Nelson's consulting salary be withheld. Id.

On July 15, 2006, the Mavericks did not pay Nelson his consulting salary. FAC ¶ 11, 18. On or around July 26, 2006, Nelson complained to the Mavericks Chief Financial Officer, Floyd Jahner ("Jahner"), about the Mavericks' failure to pay his consulting salary. Id. ¶ 12. Jahner informed Nelson that it was Cuban's position that the March 2005 oral

agreement released the Mavericks from any obligation to pay Nelson for consulting services. Id.; O'Connor Decl., Exh. 9. Nelson informed Jahner that Cuba's position was incorrect. FAC ¶ 12. Jahner then told Nelson that while Cuban admitted that the Mavericks were obligated to honor the contract, Cuban nonetheless did not want to pay Nelson the full amount owed. Id. ¶ 13.

Following Jahner's inquiry into whether he would be willing to take less money than required under the contract, Nelson stated that he would agree to a "walk away" settlement, ending the consulting portion of the contract for an immediate payment of $500,000, half the money owed under the contract. FAC ¶¶ 13-14. According to Nelson, Jahner orally agreed to this proposal. Id. ¶ 15. However, on July 31, 2009, Jahner sent Nelson a document entitled, "Sixth Amendment to Employment Agreement," which incorporated the previous five agreements, including the non-competition clause, and provided that the Mavericks would pay Nelson $500,000 in exchange for five years of consulting services. Id. ¶ 15; O'Connor Decl., Exh. 13. Nelson rejected this offer, and no settlement was ever reached. FAC ¶ 16.

On August 3, 2006, Nelson's attorney spoke with the president of the Golden State Warriors ("Warriors"), an NBA franchise located in Oakland, California, about the head coaching position on behalf of Nelson. O'Connor Decl., Exh. 4. On August 4, 2006, Nelson, through his attorney, formally claimed that the Mavericks were in breach of his contract for failing to pay his consulting salary on July 15 and 30, 2009. FAC ¶¶ 11, 18. On August 15, 2006, the Mavericks, again, did not pay Nelson his consulting salary. Id. On August 30, 2006, Nelson accepted the head coaching position with the Warriors, signing a three-year contract starting with the 2006-2007 season. Id. ¶ 19. Upon learning of Nelson's agreement with the Warriors, the Mavericks not only continued to withhold Nelson's consulting salary, but also began to withhold deferred compensation owed to Nelson for services performed between June 30, 1998 and June 30, 2006. Id. ¶¶ 20-21.

In April 2007, Nelson filed a claim against the Mavericks in arbitration seeking to obtain compensation owed under the contract. FAC ¶ 22. According to Nelson, his

arbitration claim, and the Mavericks' subsequent counterclaim, "received great national and worldwide attention and publicity." Id. ¶ 23. On or around September 21, 2007, while the dispute over Nelson's contract was ongoing, Cuban appeared on the Murph & Mac radio show, broadcast by KNBR 680 throughout the San Francisco Bay Area, to promote his upcoming appearance on the television show "Dancing With The Stars." Id. ¶¶ 24-25. The relevant portions of the radio interview read as follows:

> **Murph:** We are waiting for Mark Cuban on his radio tour promoting Dancing with the Stars. I am going to ask him about . . . his lawsuit with [Nelson] for knowing inside information on the team.
>
> . . .
>
> **Murph:** We love [Nelson], everybody loves [Nelson] here. You hate [Nelson]. Give us some Cuban/[Nelson] updates. Are you guys still battling it out in the courts right now?
>
> **Cuban:** Yeah. And, you know what, I will give you guys the scoop here. . . . I'll tell you why, because imagine that you guys get a Christmas bonus every year, and you went in and said, 'Boss, I know I have a five-year deal, and I get a Christmas bonus of 200 K every year. I'll tell you what, if you pay me half of that just up front in cash, then you won't have to pay me anymore, and we're all set. You don't have to pay me my Christmas bonus the next five years.' And then I find out you are getting ready to take that money and quit your job. Would you be mad?
>
> . . .
>
> **Murph:** I got you. . . . It's a labor/management dispute . . .
>
> **Cuban:** No, it's not even. He tried to rip me off.
>
> . . .
>
> **Mac:** Like you feel like you were being deceived?
>
> **Cuban:** Oh, yeah. He came in and said, 'You know what, Mark, pay me . . . you owe a consulting fee of $200 K a year for the next five years. Give me half of it up front, we'll call it even. And, you know, we will go on, and . . . everybody will still be friends, and . . . the consulting deal will stay in force with its non-compete clause and everything.' And then the next thing I know, he's taking a job with the Warriors. Now, we ended up not paying him that because I heard about the job before I wrote the check, but I was more than a little bit pissed . . .
>
> **Murph:** Hey, did you . . . sue him for inside knowledge?
>
> **Cuban:** Well, no, . . . I sued him for the non-compete.
>
> **Murph:** Okay.
>
> . . .
>
> **Cuban:** . . . I wouldn't have sued him . . . if he would have just come in [and] said, you know what, I am going to take this other job, Mark. I want to keep on coaching. You know I would really appreciate it if you would let me go. I would

let him go. But, instead, he tried to get his advance bonus payments and take off with them, and that really made me mad.

**Murph:** I got you. So what's the status right now?

**Cuban:** You know what, I don't even know the latest. We were supposed to have a mediation . . . But, you know . . . business is business. If [Nelson] were here, I'd have a beer with him. I like the guy personally. . . . And it's just I just didn't like the way that was handled, and I thought he tried to rip me off.

Amanda Bush Decl., Exh. 1.[1]

Nelson alleges that Cuban falsely described the details of the contract dispute in a way intended to put him in disrepute, shame and obloquy, including depicting Nelson as engaging in false, fraudulent and deceptive business practices, and as attempting to "rip off" and "deceive" Cuban and the Mavericks, thereby defaming him in his trade, business and profession." FAC ¶¶ 25-28. Specifically, Nelson alleges that Cuban defamed him by agreeing with one of the radio host's that he was "deceived" by Nelson, and by twice stating that Nelson tried to "rip [him] off." Id. ¶¶ 26, 29. Nelson asserts, on information and belief, that Cuban's statements were "broadcast on other radio stations and were published nationwide." Id. ¶ 25.

More particularly, Nelson alleges that Cuban described the details of the dispute falsely, in a way intended to put him in disrepute, shame and obloquy, by stating that: the dispute arose from Nelson's false representations and fraudulent practices; Nelson had approached Cuban representing that he intended to work with the Mavericks for the full five years remaining on his contract; Nelson had stated that he intended on working the remaining five years with all contract provisions intact, including the non-compete clause; Nelson acted deceptively, falsely and fraudulently in seeking an immediate advance payment of $500,000 in full satisfaction of the $1,000,000 owed under the contract ($200,000 per year for five years); Nelson did not intend to work the full five years or

[1] Nelson attached, as Exhibit A to the FAC, a transcript of the portion of the interview containing the alleged defamatory statements made by Cuban. However, because the transcript submitted by defendants provides more background context and is substantially similar in all material respects to the transcript attached to the FAC, and because Nelson did not object or otherwise question the veracity of the transcript submitted by defendants, the court will cite to the transcript submitted by defendants.

adhere to the contract, including the non-competition clause; Nelson acted deceptively, falsely and fraudulently in seeking to obtain money for work he did not intend on performing, and that this request was at Nelson's initiative and not the result of any action by Cuban; and Nelson, at the time of this request, intended to accept employment with the Warriors. FAC ¶ 28.

Nelson further alleges that Cuban's statements were false in the following ways: the discussion of the parties' contractual obligations was commenced by defendants, not Nelson; the suggestion that Nelson take a reduced payment was initiated by defendants, not Nelson; there were no discussions between Cuban and Nelson on the subject of the contract dispute; the discussions regarding the contract dispute were a result of a breach of contract and intended future breach of contract by defendants, not by a breach or intended breach of contract by Nelson; Nelson did not seek payments on the representation that he would work for five years, or work for any length of time, in exchange for a reduced advance payment; Nelson sought a reduced payment as a settlement of an obligation that the Mavericks were breaching rather than in exchange for five years of work; Nelson never represented that he would fulfill the "non-compete" portion of his contract, rather he represented that he would "walk-away" from the contract for a reduced payment; at the time Nelson made the settlement offer, he did not have an employment offer from the Warriors; Nelson did not negotiate and accept a job with the Warriors until Cuban was already in breach of the contract; Nelson did not try to "rip off" or "deceive" Cuban; Cuban withheld paying Nelson $500,000 because he proposed a "walk-away" settlement, not because Cuban discovered that he was taking the Warriors job; and Cuban attempted to force Nelson to perform services for less than the contractually stated amount. FAC ¶ 29.

Finally, Nelson alleges, on information and belief, that on or around July 31, 2008, defendants defamed him by causing several false and defamatory statements, embodied in written e-mails from Cuban, to be published in public newspapers in the United States and the world via the Internet. FAC ¶ 32. Nelson alleges that these e-mails, in essence, "accused Nelson of lying to Cuban and the [Mavericks], attempting to deceive and defraud

Cuban and the [Mavericks], and obtain money for services he did not intend to perform." Id. According to Nelson, "[t]he gravamen of [Cuban's] statements was to the effect that Nelson had attempted to deceive, rip-off and defraud [Cuban] and the [Mavericks], and that Nelson, in his contractual dealings . . . had been less than truthful." Id. Nelson alleges that the "specific publications of such defamatory statements of which [he] is presently aware include, on information and belief, statements to the Associated Press, to the Fort Worth Star-Telegram and to the Gannett newspapers." Id. ¶ 33.

On September 17, 2008, Nelson commenced the instant action in the Superior Court of California, County of Alameda against defendants alleging one cause of action for defamation. On September 19, 2008, Nelson filed a first amended complaint. Defendants removed the case on the basis of diversity jurisdiction on February 17, 2009. On February 23, 2009, defendants filed a special motion to strike. On April 1, 2009, Nelson filed an opposition. A reply was filed on April 8, 2009.

On April 15, 2009, Nelson filed a motion to strike the reply brief. In his motion to strike, Nelson requested leave of court to conduct discovery on the issue of actual malice. On April 20, 2009, the court issued an order, stating that Nelson and defendants were entitled to conduct limited discovery on the issue of actual malice. The parties were directed to complete discovery by May 22, 2009, and to submit supplemental briefing on the issue of actual malice. On June 3, 2009, Nelson filed a supplemental opposition to defendants' motion to strike, and on June 12, 2009, defendants filed a supplemental reply.

## DISCUSSION

### I. Nelson's Motion to Strike Reply Brief

On April 15, 2009, Nelson moved the court for an order striking defendants' reply brief or, in the alternative, all evidence presented for the first time in the reply brief, arguing that defendants improperly introduced new evidence. Specifically, Nelson objects to the numerous "articles concerning the contractual dispute" cited by defendants in footnote two of their reply brief.

" 'It is well accepted that raising of new issues and submission of new facts in [a] reply brief is improper.' " Schwartz v. Upper Deck Co., 183 F.R.D. 672, 682 (S.D. Cal. 1999) (citing Provenz v. Miller, 102 F.3d 1478, 1483 (9th Cir. 1996) ("We agree with the Seventh Circuit, which held that '[w]here new evidence is presented in a reply to a motion for summary judgment, the district court should not consider the new evidence without giving the [non-]movant an opportunity to respond.' " )); see also Contratto v. Ethicon, Inc., 227 F.R.D. 304, 309 n. 5 (N.D. Cal. 2005). Because the facts in footnote two of defendants' reply brief constitute new evidence raised for the first time in reply, the court will not consider this evidence in ruling on defendants' special motion to strike. The court, however, will not strike defendants' reply brief in its entirety. Nelson offers no justification for this request. To the extent that Nelson's motion contains a section entitled, "Plaintiff's Sur-Reply Opposition To Defendants' Motion to Stike [sic]," this portion of the motion is STRICKEN. Surreplies are not authorized without first obtaining leave of court. See Civ. L.R. 7-3(d) (once a reply brief is filed, no additional memoranda may be filed without court approval).

II. Defendants' Special Motion to Strike

Defendants seek to strike Nelson's claim for defamation pursuant to California's Anti-Strategic Lawsuit Against Public Participation ("anti-SLAPP") statute, Cal.Code Civ. Proc. § 425.16.

A. Standard

"[D]efendants sued in federal courts can bring anti-SLAPP motions to strike state law claims and are entitled to attorneys' fees and costs when they prevail." Verizon Delaware, Inc. v. Covad Communications Co., 377 F.3d 1081, 1091 (9th Cir. 2004). An anti-SLAPP motion to strike "may be filed within 60 days of the service of the complaint or, in the court's discretion, at any later time upon terms it deems proper." Cal.Code Civ. Proc. § 425.16(f).

Under the anti-SLAPP statute, "a cause of action shall be subject to a special motion to strike if (1) the cause of action arises from an act in furtherance of the defendant's constitutional right of petition or free speech in connection with a public issue, and (2) the

plaintiff is unable to establish a probability of prevailing on the merits of the claim." Hall v. Time Warner, Inc.,153 Cal.App.4th 1337, 1345 (2007) (citing Cal.Code Civ. Proc. § 425.16(b)(1)). The anti-SLAPP statute "establishes a procedure by which the trial court evaluates the merits of the lawsuit using a summary-judgment-like procedure at an early stage of the litigation." Schaffer v. City and County of San Francisco,168 Cal.App.4th 992, 998 (2008). The anti-SLAPP statute was enacted to stem "a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech." Cal.Code Civ. Proc. § 425.16(a). The purpose of the statute "is to curtail the chilling effect meritless lawsuits may have on the exercise of free speech and petition rights, and the statute is to be interpreted broadly to accomplish that goal." Schaffer,168 Cal.App.4th at 998 (citing Cal.Code Civ. Proc. § 425.16(a)); see also Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1109 (9th Cir. 2003) (The purpose of the anti-SLAPP statute is "to allow early dismissal of meritless first amendment cases aimed at chilling expression through costly, time-consuming litigation.").

A court considering a motion to strike under the anti-SLAPP statute must engage in a two-part inquiry. First, a defendant must make an initial prima facie showing that the plaintiff's suit arises from an act in furtherance of the defendant's rights of petition or free speech. Hall, 153 Cal.App.4th at 1345; Vess, 317 F.3d at 1110. To evaluate this showing, the court must consider "the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." Cal.Code Civ. Proc. § 425.16(b)(2); Martinez v. Metabolife Int'l, Inc., 113 Cal.App.4th 181, 186 (2003).

Second, if the moving party makes the prima facie showing, the burden shifts to the plaintiff to demonstrate a probability of prevailing on the challenged claims. Hall, 153 Cal.App.4th at 1345; Vess, 317 F.3d at 1110. To satisfy this burden, the plaintiff must show that "the complaint is legally sufficient and supported by a prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." Metabolife Intern., Inc. v. Wornick, 264 F.3d 832, 840 (9th Cir. 2001); Wilson v. Parker, Covert & Chidester, 28 Cal.4th 811, 821 (2002). "This burden is much like that used in

determining a motion for nonsuit or directed verdict, which mandates dismissal when no reasonable jury could find for the plaintiff." Metabolife, 264 F.3d at 840. In order to avoid being stricken as a SLAPP, a plaintiff need only establish that his or her claim has minimal merit. Hailstone v. Martinez, 169 Cal.App.4th 728, 735 (2008) (citing Soukup v. Law Offices of Herbert Hafif, 39 Cal.4th 260, 291 (2006)). Nevertheless, a plaintiff must adduce competent, admissible evidence, and cannot simply rely on his or her pleadings, even if verified. Hailstone, 169 Cal.App.4th at 735.

"In deciding the question of potential merit, the trial court considers the pleadings and evidentiary submissions of both the plaintiff and the defendant; though the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim." Wilson, 28 Cal.4th at 821 (citation omitted and emphasis in original). "[A] defendant's anti-SLAPP motion should be granted when a plaintiff presents an insufficient legal basis for the claims or 'when no evidence of sufficient substantiality exists to support a judgment for the plaintiff.' " Metabolife, 264 F.3d at 840.

B. Analysis

1. Constitutionally Protected Activity

A cause of action arises from protected activity within the meaning of § 425.16(b)(1) only if the defendant's act underlying the cause of action, and on which the cause of action is based, was an act in furtherance of the defendant's right of petition or free speech in connection with a public issue. Hall, 153 Cal.App.4th at 1346 (citing City of Cotati v. Cashman, 29 Cal.4th 69, 78 (2002)). Section 425.16(e) describes four categories of conduct that constitute protected activity under the statute. The two categories that are potentially applicable to the present action are "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest" or "any other conduct in furtherance of the exercise of the constitutional right of

petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." See Cal.Code Civ. Proc. § 425.16(e)(3), (4).

"A statement or other conduct is 'in connection with an issue of public interest' or 'in connection with a public issue or an issue of public interest' if the statement or conduct concerns a topic of widespread public interest and contributes in some manner to a public discussion of the topic." Hall, 153 Cal.App.4th at 1347 (citations omitted) (citing Wilbanks v. Wolk, 121 Cal.App.4th 883, 898 (2004)). "An issue of public interest" has been defined as "any issue in which the public is interested." Nygard, Inc. v. Uusi-Kerttula, 159 Cal.App.4th 1027, 1042 (2008); see also Hailstone, 169 Cal.App.4th at 736 (2008) (noting that while the precise boundaries of a public issue have not been defined, in each case where it was determined that a  public issue existed, the subject statements either concerned a person or entity in the public eye, conduct that could directly affect a large number of people beyond the direct participants or a topic of widespread, public interest).

Applying these standards, the court concludes that the allegedly defamatory statements on which Nelson's defamation claim is predicated constitute conduct in furtherance of Cuban's right of free speech in connection with an issue of public interest. The challenged statements arose in the context of an on-air interview between radio co-hosts and Cuban regarding a contract dispute between defendants and Nelson, a topic of significant interest to the public and the media. As the head coach and/or general manager for several NBA franchises, Nelson occupied a high-profile position and is clearly well-known within the professional basketball community. Furthermore, as conceded by Nelson, the contract dispute "received great national and worldwide attention and publicity," and thus was of concern to a substantial segment of the public, including players on the Mavericks, players and coaches of other NBA franchises and fans of the NBA. This publicity is evidenced by multiple articles referencing the contract dispute, including several articles containing quotes from Nelson and Cuban commenting on the dispute. See e,g, Exhs. 2-10, attached to Defs.' Special Mtn. to Strike (various media articles referencing the contract dispute, including articles published by the Los Angeles Times and Associated

Press, among others). Accordingly, given the widespread public interest in this dispute, the court finds that Cuban's statements were made in connection with an issue of public interest. Cal.Code Civ. Proc. § 425.16(e)(4); see Carlisle v. Fawcett Publications, Inc., 201 Cal.App.2d 733, 746-47 (1962) (a public interest attaches to people who by their accomplishments, mode of living, professional standing or calling, create a legitimate and widespread attention to their activities). The court also finds that the broadcasting of Cuban's statements contributed to the public discussion of the topic by eliciting Cuban's view of the dispute during the midst of the controversy.

To the extent that Nelson argues that the contract dispute was a private dispute, and therefore not converted into a matter of public interest, the court disagrees. As acknowledged by Nelson, "he is well-known as a head coach and general manager of professional basketball teams," and his contract dispute with defendants "received great national and worldwide attention and publicity." As such, Nelson's contract dispute with defendants was not a private matter; rather, it was a topic of widespread concern to a substantial number of people, and therefore it was a matter of public interest. Indeed, the challenged statements made by Cuban were prompted by the public's interest in the dispute.

In sum, defendants have sustained their burden of making an initial prima facie showing that Nelson's suit arises from an act in furtherance of Cuban's right of free speech. That is, defendants have made a prima facie showing that the challenged speech was made in connection with an issue of public interest within the meaning of section 425.16(e).

2. Probability of Prevailing on the Merits

Because defendants have made a prima facie showing that Nelson's defamation claim arose from acts in furtherance of Cuban's right of free speech in connection with an issue of public interest, the burden shifts to Nelson to demonstrate a probability that he will prevail on his claim in order to defeat defendants' special motion to strike. Hall, 153 Cal.App.4th at 1345; Vess, 317 F.3d at 1110. As noted above, Nelson's burden is to make

a prima facie showing of facts that would, if proved at trial, support a judgment in his favor. Metabolife Intern., 264 F.3d at 840; Wilson, 28 Cal.4th at 821.

Nelson maintains that Cuban's statements were materially false and defamed him in his trade, business and profession. Specifically, Nelson contends that Cuban made the following provably false factual assertions: (1) Nelson attempted to defraud defendants; (2) Nelson initiated discussions with Cuban to amend his contract; (3) Nelson offered to accept a lump sum payment equal to half of his five-year contractual consultant's fee, but would remain a consultant to the Mavericks for the full five years and would not accept employment with another basketball franchise; and (4) Nelson made this offer with the intent to induce defendants to pay him the money and with the intention of accepting a head coaching position with the Warriors.

Defendants, for their part, argue that there is no reasonable probability Nelson can prevail on his defamation claim. They argue that the challenged statements do not amount to actionable defamation for two reasons. First, defendants argue that the statements were either true or mere opinion, non-actionable rhetoric, or hyperbole. Second, defendants argue that Nelson, as a public figure, cannot prove that the statements were published with actual malice by clear and convincing evidence.

a. Elements of a Defamation Claim

"Defamation is an invasion of the interest in reputation. The tort involves the intentional publication of a statement of fact that is false, unprivileged, and has a natural tendency to injure or which causes special damage." Smith v. Maldonado, 72 Cal.App.4th 637, 645 (1999). Defamation in written form is called libel, which is defined as "a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." Cal. Civ.Code, § 45. Defamation in its oral form is called slander, which is defined as a "false and unprivileged publication, orally uttered, and also communications by radio" which, *inter alia*: "[t]ends directly to injure [a person] in respect to his office,

profession, trade or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, trade, profession, or business that has a natural tendency to lessen its profits[.]"  Cal. Civ.Code § 46(3).

i. Proof of Falsity Required

There can be no recovery for defamation without a falsehood.  Baker v. Los Angeles Herald Examiner, 42 Cal.3d 254, 259 (1986); see also Nygard,159 Cal.App.4th at 1048 (The *sine qua non* of recovery for defamation is the existence of a falsehood.).  Thus, to state a defamation claim that survives a First Amendment challenge, plaintiff must present evidence of a statement of fact that is provably false.  Milkovich v. Lorain Journal Co., 497 U.S. 1, 20 (1990); Nygard,159 Cal.App.4th at 1048.  Statements of opinion are not actionable.  McGarry v. University of San Diego, 154 Cal.App.4th 97, 112 (2007); see also Campanelli v. Regents of University of California, 44 Cal.App.4th 572, 578 (statements of opinion rather than fact are not actionable "[e]ven if they are objectively unjustified or made in bad faith."); Ferlauto v. Hamsher, 74 Cal.App.4th 1394, 1401 (1999) (rhetorical hyperbole, vigorous epithets, lusty and imaginative expressions of contempt, and language used in a loose, figurative sense are not actionable because they cannot reasonably be interpreted as stating actual facts about an individual); Information Control Corp. v. Genesis One Computer Corp., 611 F.2d 781, 784 (9th Cir. 1980) (apparent statements of fact may be deemed opinions "when made in public debate, heated labor dispute, or other circumstances in which an 'audience may anticipate efforts by the parties to persuade others to their positions by use of epithets, fiery rhetoric or hyperbole . . .' ").  This rule "provides assurance that public debate will not suffer for lack of imaginative expression or the rhetorical hyperbole which has traditionally added much to the discourse of our Nation." Nygard,159 Cal.App.4th at 1049 (quotation marks omitted).

However, a statement that implies a false assertion of fact, even if couched as an opinion, can be actionable.  Milkovich, 497 U.S. at 18-19.  Expressions of opinion thus do not "enjoy blanket constitutional protection."  Franklin v. Dynamic Details, Inc., 116

Cal.App.4th 375, 384 (2004). "If a statement of opinion implies a knowledge of facts which may lead to a defamatory conclusion, the implied facts must themselves be true." Ringler Associates Inc. v. Maryland Casualty Co., 80 Cal.App.4th 1165, 1181 (2000). An opinion loses its constitutional protection and becomes actionable when it is "based on implied, undisclosed facts" and "the speaker has no factual basis for the opinion." Ruiz v. Harbor View Community Association, 134 Cal.App.4th 1456, 1471 (2005). Ultimately, "the dispositive question is whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact." Franklin, 116 Cal.App.4th at 385; Rosenaur v. Scherer, 88 Cal.App.4th 260, 280 (2001). In making this determination, courts must be cautious not to inhibit vigorous public debate about public issues, and should err on the side of allowing free-flowing discussion of current events. Rosenaur, 88 Cal.App.4th at 280.

California courts use a totality of the circumstances test to determination whether a statement is fact or opinion. Campanelli, 44 Cal.App.4th at 578. In reviewing the questioned statements, the court must assume the role of the average reader and decide the natural and probable effect on the reader of the statement. Id. The words themselves must be examined to see if they have a defamatory meaning, or if the sense and meaning fairly presumed to have been conveyed to those who read it have a defamatory meaning. Id. Statements cautiously phrased in terms of apparency are more likely to be opinions. Id.; see also Information Control, 611 F.2d at 784 ("Where the language of the statement is 'cautiously phrased in terms of apparency' or is of a kind typically generated in a spirited legal dispute in which the judgment, loyalties and subjective motives of the parties are reciprocally attacked and defended in the media and other public forums, the statement is less likely to be understood as a statement of fact rather than as a statement of opinion.").

In addition to the language, the context of a statement must be examined. Campanelli, 44 Cal.App.4th at 578. The court must look at the nature and full content of the communication and to the knowledge and understanding of the audience to whom the publication was directed. Id. When the statements are made in the arena of a public

debate or controversy, the court must examine the whole record. Id. The issue of whether a communication was a statement of fact or opinion "is a question of law to be decided by the court." Baker, 42 Cal.3d 254, 260.

In sum, the test to be applied in determining whether an allegedly defamatory statement constitutes an actionable statement of fact requires that the court: (1) examine the statement in its totality in the context in which it was uttered or published; (2) consider all the words used, not merely a particular phrase or sentence; (3) give weight to cautionary terms used by the person publishing the statement; and (4) consider all of the circumstances surrounding the statement, including the medium by which the statement is disseminated and the audience to which it is published. Information Control, 611 F.2d at 784.

Applying this test, the court concludes that the challenged statements may not serve as the predicate for a defamation claim under California law. Having reviewed the content of the allegedly defamatory statements from the standpoint of the average listener, including the manner in which the statements were phrased, the context in which the statements arose, the medium by which the statements were disseminated and the knowledge and understanding of the audience to whom the publication was directed, the court finds that the statements are non-actionable statements of opinion, rather than verifiable statements of fact.

Cuban's characterization of the contract dispute can only be regarded as statements of opinion. The allegedly defamatory statements made by Cuban were phrased in terms of how he "felt" and what he "thought." The statements thus expressed Cuban's belief, not a general truth. For example, Cuban's affirmative response to the question "Like you feel like you were being deceived?" and his statement "I thought [Nelson] tried to rip me off" are significant qualifiers because they gave the audience a reason to construe Cuban's statements as opinion rather than fact. Cuban's acknowledgment that he "felt" deceived by Nelson and that he "thought" he was being ripped off by Nelson connote subjective judgments, and therefore constitute mere opinion, not factual assertions.

In addition, the challenged statements were made during the midst of a contentious debate concerning a bitter legal dispute following Nelson's resignation as head coach of the Mavericks, and his decision to accept the head coaching position with the Warriors, a competitor of the Mavericks, in lieu of providing consulting services for the Mavericks. The statements were made on a sports talk show to an audience that would be expected to be familiar with Nelson, Cuban and the ongoing contract dispute, as well as generally sympathetic to Nelson's position given that the radio program is broadcast throughout the San Francisco Bay Area – home of the Warriors. In this context, the audience was likely to understand that the statements made by Cuban were made for the purpose of persuading others to his position by the use of rhetorical hyperbole, especially, where, as here, the radio hosts prefaced their comments about the topic by stating that: "We love [Nelson], everybody loves [Nelson] here. You hate [Nelson]"; and concluded by stating: "Listen, we are all on Nelson's side always, but nice to get [Cuban's] side of the story." A reasonable audience presented with one side of a story, in the context of a heated contract dispute, would be inclined to conclude that the story being told represented the subjective view of the particular speaker, not objective fact. See Gardner v. Martino, 563 F.3d 981 (9th Cir. 2009) (a radio talk show program that contains elements of drama, hyperbolic language, opinionated and arrogant host, and heated controversy reduce the audience's expectation of learning an objective fact).

In sum, the court concludes that, under the totality of the circumstances, the average listener would naturally and probably view Cuban's statements as a hyperbolic characterization that expressed his opinion of the contract dispute, not assertions of objective fact. Accordingly, the court finds that Cuban's statements were not defamatory and Nelson is therefore unlikely to prevail on the merits.

ii. Public Figure

Even assuming Cuban's statements are actionable falsehoods, not opinion, Nelson has another sizable hurdle to clear. Since public figures must prove by clear and convincing evidence that an allegedly defamatory statement was made with knowledge of

falsity or reckless disregard for truth, a threshold determination in a defamation action is whether the plaintiff is a public figure. Ampex Corp. v. Cargle, 128 Cal.App.4th 1569, 1577 (2005) (citing New York Times Co. v. Sullivan, 376 U.S. 254, 279-280 (1964)); see also McGarry, 154 Cal.App.4th at 113-14. There are two classes of public figures: (1) the “all purpose” public figure who has achieved such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts; and (2) the “limited purpose” public figure, an individual who voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. Ampex, 128 Cal.App.4th at 1577; McGarry, 154 Cal.App.4th at 113. The rationale for treating public figures differently from private citizens is that: (1) “ ‘public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy’ ”; and (2) “public figures have invited the attention and comment they receive and must accept certain necessary consequences of their choice, including the risk false and injurious statements will be made about them.” Gallagher v. Connell, 123 Cal.App.4th 1260, 1272 (2004); see also Khawar v. Globe Intern., Inc., 19 Cal.4th 254, 263 (1998) (The Supreme Court “imposed the actual malice requirement on defamation actions by public figures and public officials for two reasons: They have media access enabling them to effectively defend their reputations in the public arena; and, by injecting themselves into public controversies, they may fairly be said to have voluntarily invited comment and criticism.”).

The elements that must be present in order to characterize a plaintiff as a limited purpose public figure are: (1) there must be a public controversy, which means the issue was debated publicly and had foreseeable and substantial ramifications for non-participants; (2) the plaintiff must have undertaken some voluntary act through which he or she sought to influence resolution of the public issue; and (3) the alleged defamation must be germane to the plaintiff’s participation in the controversy. Gilbert v. Sykes, 147 Cal.App.4th 13, 24 (2007). Unlike the all purpose public figure, the limited purpose public figure loses certain protection for his or her reputation only to the extent that the allegedly

defamatory communication relates to his role in a public controversy. McGarry, 154 Cal.App.4th at 113.

While Nelson acknowledges that he is a well-known head coach and general manager for several NBA franchises, he nonetheless maintains that he is not a public figure. The court disagrees. Because Nelson voluntarily entered the public arena as a basketball coach and/or general manager for several NBA franchises, and because the challenged statements arose out of the performance of the public role he voluntarily undertook, the court concludes that Nelson is a limited public figure for purposes of the statements made by Cuban on the Murph & Mac show. McGarry, 154 Cal.App.4th at 115 (concluding that college football coach was a limited public figure for purposes of allegedly defamatory statements that dealt exclusively with his performance of the public role he voluntarily undertook); Curtis Pub. Co. v. Butts, 388 U.S. 130, 155 (1967) (noting that one of the plaintiffs, a well-known football coach and athletic director, was a limited public figure by "position alone").[2] As noted above, the record indicates that the contract dispute was highly publicized, garnering national attention, and that both Nelson and Cuban made statements to the media regarding the controversy, including the challenged statements at issue in this action. Thus, the court finds it proper to impose the actual malice requirement on Nelson. As a head coach and/or general manager for several NBA franchises, Nelson invited the attention and comment he received and enjoys significantly greater access to the channels of effective communication, and hence has a more realistic opportunity to effectively defend his reputation in the public arena than other individuals normally enjoy.

Accordingly, because the court concludes that Nelson is a limited purpose public figure, he bears the burden of establishing a probability that he can produce clear and convincing evidence that the allegedly defamatory statements were made with actual

[2] The court notes that while defendants argue that Nelson is a general purpose public figure, the court is not convinced, based on the evidence in the record, that Nelson is a general purpose public figure "for all purposes and in all contexts." Gertz v. Robert Welch, Inc., 418 U.S. 323, 352 (1974) ("[A]bsent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life.").

malice, i.e., with knowledge of their falsity or with reckless disregard of their truth or falsity. Ampex, 128 Cal.App.4th at 1578.

iii. Actual Malice

Where the plaintiff in a defamation action is a public figure, he or she must plead and prove actual malice. Vogel v. Felice, 127 Cal.App.4th 1006, 1017 (2005). In the context of a special motion to strike pursuant to the anti-SLAPP statute, a limited purpose public figure such as Nelson must establish a probability that he can produce clear and convincing evidence that the allegedly defamatory statements were made with knowledge of their falsity or with reckless disregard of their truth or falsity. Ampex, 128 Cal.App.4th at 1578.

"The reckless disregard test requires a high degree of awareness of the probable falsity of the defendant's statement. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." Ampex, 128 Cal.App.4th at 1579 (quotation marks omitted). This is a subjective test that focuses on the "defendant's attitude toward the veracity of the published material, as opposed to his or her attitude toward the plaintiff." Id.

"To meet the clear and convincing standard, the evidence must be such as to command the unhesitating assent of every reasonable mind." Ampex, 128 Cal.App.4th at 1579 (quotation marks omitted); McGarry, 154 Cal.App.4th at 114. "This heightened standard of proof must be taken into account in deciding a defendant's motion to strike a claim for defamation under section 425.16." Walker v. Kiousis, 93 Cal.App.4th 1432, 1446 (2001).

Having reviewed the evidence submitted by the parties, the court concludes that Nelson has not carried his burden on the question of actual malice. Nelson has neither pleaded actual malice nor produced sufficient evidence of actual malice to withstand defendants' special motion to strike, i.e., established a probability that he can produce clear and convincing evidence that the allegedly defamatory statements were made with actual malice. First, as to pleading, the court finds that the FAC is legally insufficient on its face because it fails to plead that Cuban made the allegedly defamatory statements with actual

malice as that term is defined in the context of defamation claims asserted by limited purpose public figures.  The FAC does not plead a knowing and reckless falsehood.  It alleges only that Cuban's statements about Nelson were "materially false," that "Cuban described the details of the dispute falsely," and that "the entirety of the statement by Cuban, taken as a whole, was false and defamatory."  In fact, the FAC only contains the conclusory boilerplate allegation that Cuban and the Mavericks acted "falsely, maliciously, fraudulently and oppressively."  Such allegations are insufficient to state a cause of action in a case where actual malice is required.  See Vogel, 127 Cal.App.4th at 1017-18.

Second, as to evidence, the court finds that Nelson did not sustain his burden to establish a probability that he can produce clear and convincing evidence that the allegedly defamatory statements were based on facts he either knew were false or believed were likely to be false.  Nelson did not produce sufficient direct evidence, such as a declaration from Nelson or deposition testimony indicating that Cuban actually believed his statements to be false or that he had a high degree of awareness of the probable falsity of his statements.  In fact, the deposition testimony produced by Nelson indicates that Cuban's statements reflected his general understanding of the contract dispute, not that his statements were based on facts he either knew were false or believed were likely to be false.  O'Connor Supp. Decl., Exhs. 104-105.  Nor are the e-mails produced by Nelson, O'Connor Supp. Decl., Exhs. 101-103, sent from Cuban to the press in July 2007, sufficient to show that Cuban made the challenged statements based on facts he either knew were false or believed were likely to be false.  Rather, the e-mails show that Cuban made similar statements about the contract dispute prior to his appearance on the Murph & Mac show.

In addition, Nelson did not produce sufficient circumstantial evidence from which to infer actual malice.  To the extent that Nelson argues that actual malice can be inferred from Cuban's ill-will and hostility towards him, as evidenced by the e-mails sent from Cuban to the press in July 2007 wherein Cuban questions Nelson's ethics, refers to him as a "mother fucker," and describes him as being "sleazy," about "cash and nothing else," and as having no "scruples," O'Connor Supp. Decl., Exhs. 102-103, the court disagrees.  Even

assuming that these statements raise an inference of ill-will, personal spite or bad motive, they are insufficient to demonstrate the requisite malice required to withstand defendants' special motion to strike. These remarks do not permit the conclusion that Cuban entertained serious doubts about the veracity of his statements or that he lacked reasonable grounds to believe the statements were true. Instead, they simply reflect Cuban's attitude toward Nelson regarding the contract dispute. See Ampex, 128 Cal.App.4th at 1579 (actual malice will not be inferred solely based on evidence of ill-will, personal spite or bad motive); Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 685-86 (1989) ("the actual malice standard is not satisfied merely through a showing of ill will or malice in the ordinary sense of the term").

In short, even construing the evidence in the light most favorable to Nelson, the court concludes that the evidence, at most, tends to suggest that Cuban's statements were an inaccurate characterization of the contract dispute, which is insufficient to demonstrate actual malice. See Kashian v. Harriman, 98 Cal.App.4th 892, 931 (2002) (To show malice it is not sufficient to show that the objectionable statements were inaccurate, or even unreasonable; rather, a plaintiff must show willful falsity or recklessness.). As such, Nelson failed to establish a probability that he can produce clear and convincing evidence that the allegedly defamatory statements were made with knowledge of their falsity or with reckless disregard of their truth or falsity such as to command the unhesitating assent of every reasonable mind.

Accordingly, because Nelson failed to sustain his burden to demonstrate a probability of prevailing on the merits, defendants' special motion to strike is GRANTED.[3]

---

[3] Finally, to the extent that the FAC makes a vague reference to other allegedly defamatory statements that defendants caused to be published on or around July 31, 2008, the court finds that Nelson has failed to sufficiently allege actual malice or produce any evidence on this issue to withstand defendants' special motion to strike. The FAC neither specifically identifies the allegedly defamatory statements made by defendants nor alleges that such statements were made with actual malice. See Vogel, 127 Cal.App.4th at 1017-18, n. 3 (defamation must be pleaded with particularity; each allegedly defamatory statement must be specifically identified if not set forth verbatim in the complaint). Nor did Nelson produce any evidence in support of these alleged defamatory statements in response to defendants' special motion to strike.

## CONCLUSION

For the reasons stated above, defendants' special motion to strike is GRANTED, and Nelson's motion to strike is GRANTED. Because § 425.16 makes no provision for amending the complaint once the court grants a special motion to strike, the FAC is STRICKEN with prejudice. See Simmons v. Allstate Ins. Co., 92 Cal.App.4th 1068, 1073-74 (2001) (explaining that permitting leave to amend after a special motion to strike is granted would "frustrate the Legislature's objective of providing a quick and inexpensive method of unmasking and dismissing such suits"). The case management conference scheduled for July 2, 2009 is VACATED. The Clerk shall close the file.

**IT IS SO ORDERED.**

Dated: June 30, 2009

PHYLLIS J. HAMILTON
United States District Judge