Trone et al v. Peanut Corporation of America Doc. 77

Marc Van Der Hout
NATIONAL LAWYERS GUILD
180 Sutter Street, 5th Floor
San Francisco, CA 94104
phone: (415) 981-3000
fax: (415) 981-3003
ndca@vblaw.com
(California Bar # 80778)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| TASH HEPTING, GREGORY HICKS, CAROLYN JEWEL and ERIK KNUTZEN on Behalf of Themselves and All Others Similarly Situated,<br>Plaintiffs,<br>vs.<br><br>AT&T CORP., AT&T INC. and DOES 1-20, inclusive,<br>Defendants. | No. C-06-00672-VRW |

**BRIEF OF AMICI CURIAE**
**CENTER FOR CONSTITUTIONAL RIGHTS AND**
**THE AMERICAN CIVIL LIBERTIES UNION**

Shayana Kadidal
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012-2317
phone: (212) 614-6438
fax: (212) 614-6499

J. Ashlee Albies
NATIONAL LAWYERS GUILD
P.O. Box 42604
Portland, OR 97242

Ann Beeson
Jameel Jaffer
Melissa Goodman
Scott Michelman
Catherine Crump
National Legal Department
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004-2400
(212) 549-2500



Dockets.Justia.com

**TABLE OF CONTENTS**

STATEMENTS OF INTEREST .......... 1

I. INTRODUCTION .......... 3

II. COURT DOCUMENTS ARE PRESUMPTIVELY PUBLIC .......... 5

III. ANY REDACTIONS TO PROTECT TRADE SECRETS MUST BE THE MINIMUM NECESSARY TO ACCOMPLISH THAT PURPOSE .......... 7

IV. THERE ARE EXTENSIVE PUBLIC INTERESTS IN DISCLOSURE OF THE KLEIN DOCUMENTS .......... 10

V. CONCLUSION .......... 13

**TABLE OF AUTHORITIES**

## Federal Cases

*Arar v. Ashcroft*, 414 F. Supp. 2d 250 (E.D.N.Y. Feb 16, 2006) ...................................... 1
*Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165 (6th Cir. 1983) .................. 5
*Detroit Free Press v. Ashcroft*, 195 F. Supp. 2d 937........................................................ 2
*Diversified Group, Inc. v. Daugerdas*, 217 F.R.D. 152 (S.D.N.Y. 2003) ......................... 6
*Doe v. Ashcroft*, 334 F. Supp. 2d 471 (S.D.N.Y. 2004)..................................................... 2
*Foltz v. State Farm Mut. Auto Ins. Co*., 331 F.3d 1122 (9th Cir. 2003)......................... 6, 7
*Gannett Co. v. DePasquale*, 443 U.S. 368 (1979)............................................................. 5
*Globe Newspaper Co. v. Superior Ct*., 457 U.S. 596 (1982).............................................. 5
*Rasul v. Bush*, 542 U.S. 466 (2004)...................................................................................... 1
*Haddad v. Ashcroft*, 221 F. Supp. 2d 799 (E.D. Mich. 2002) ........................................... 2
*Hartford Courant v. Pellegrino*, 380 F.3d 83 (2d Cir. 2004) ............................................ 5
*Huminski v. Corsones*, 396 F.3d 53 (2d Cir. 2004) ........................................................... 9
*IDX Systems Corp. v. Epic Systems Corp*., 285 F.3d 581 (7th Cir. 2002).......................... 8
*Imax Corp. v. Cinema Technologies*, 152 F.3d 1161 (9th Cir. 1998)............................... 8
*In re Application of the Herald Co*., 734 F.2d 93 (2d Cir. 1984) ...................................... 9
*In re Gabapentin Litigation*, 312 F. Supp. 2d 653 (D.N.J. 2004)...................................... 5
*In re San Juan Star Co*., 662 F.2d 108 (1st Cir. 1981) ...................................................... 7
*NLRB v. Robbins Tire & Rubber Co*., 437 U.S. 214 (1978)............................................ 10
*North Jersey Media Group v. Ashcroft*, 205 F. Supp.2d 288 (D.N.J. 2002), *rev'd*, 308 F.3d 198 (3d Cir. 2002)........................................................................................................... 3
*O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc*., 399 F. Supp. 2d 1064 (N.D. Cal. 2005) ........................................................................................................................ 8
*Oregonian Pub. Co. v. United States District Court*, 920 F.2d 1462 (9th Cir. 1990) ........ 5
*Press Enterprise Co. v. Superior Ct*., 478 U.S. 1 (1986)................................................ 6, 7
*Publicker Indus. v. Cohen*, 733 F.2d 1059 (3d Cir. 1984)................................................. 5
*Religious Technology Center v. Netcom On-Line Communication Services, Inc*. 923 F.Supp. 1231 (N.D. Cal. 1995)........................................................................................... 9
*Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980).......................................... 5
*Rushford v. New Yorker Magazine, Inc*., 846 F.2d 249 (4th Cir. 1988) ............................ 5
*San Jose Mercury News v. United States District Court*, 187 F.3d 1096 (9th Cir. 1999) .. 5
*Seattle Times Co. v. Rhinehart*, 467 U.S. 20 (1984)......................................................... 8
*Seattle Times Co. v. United States District Court*, 845 F.2d 1513 (9th Cir. 1988)............ 6
*United States v. Amodeo*, 44 F.3d 141 (2d Cir. 1995) ................................................... 5, 6
*United States v. United States District Court* (*Keith*), 407 U.S. 297 (1972) ...................... 1
*Warner Communications, Inc*., 435 U.S. 589 (1978) ....................................................... 5
*Westmoreland v. CBS*, 752 F.2d 16, 23 (2d Cir. 1984)...................................................... 5

## State Cases

*DVD Copy Control Assn., Inc. v. Bunner*, 116 Cal. App. 4th 241 (Cal. Ct. App. 6th Dist. 2004) ........................................................................................................................ 8

### Federal Statutes

Title III (1968 Wiretap Act), 18 U.S.C. §§ 2510-22 .......... 3
Foreign Intelligence Surveillance Act, 50 U.S.C. §§ 1801-62 .......... 3
18 U.S.C. § 2511(2)(f) .......... 3
47 U.S.C. § 605 .......... 12
50 U.S.C. § 1809 .......... 4
Consolidated Appropriations Resolution, 2003, Pub. L.108-7, 117 Stat. 11 (Feb. 20, 2003) .......... 11

### Federal Legislative Materials

152 Cong. Rec. S2301-01 .......... 12
S. 2455, 109th Cong., 2d Sess. ("Terrorist Surveillance Act of 2006") .......... 11-12
S. 2453, 109th Cong., 2d Sess. ("National Security Surveillance Act of 2006") .......... 11

### State Statutes

Cal Civ. Code §§ 3426-3426.11 .......... 8
Cal. Civ. Code § 2019(d) .......... 9

### Federal Rules

FRCP 26(c) .......... 7
FRCP 26(c)(7) .......... 9, 13

### Treatises

WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 2035 .......... 7

**STATEMENTS OF INTEREST**

The Center for Constitutional Rights ("CCR") is a national not-for-profit legal, educational, and advocacy organization dedicated to advancing and protecting the rights guaranteed by the United States Constitution and the Universal Declaration of Human Rights. Founded in 1966 by attorneys who represented civil rights movements and activists in the South, CCR has over the last four decades litigated significant cases in the areas of constitutional and human rights. Among these is the landmark warrantless wiretapping case *United States v. United States District Court (Keith)*, 407 U.S. 297 (1972). On January 17, 2006, CCR filed a challenge to the NSA's warrantless wiretapping program, *Center for Constitutional Rights v. Bush*, No. 06-cv-313 (S.D.N.Y.).

CCR represents many clients whose rights have been violated by detention and intelligence gathering practices instituted in the wake of the terrorist attacks of September 11, 2001, including, among others: representatives of a potential class of hundreds of Muslim foreign nationals detained in the wake of September 11 and labeled as "of interest" to the investigation of the attacks, *Turkmen v. Ashcroft*, No. 02-CV-2307 (E.D.N.Y.); hundreds of men detained without charge as "enemy combatants" at the Guantánamo Bay Naval Station, *Rasul v. Bush,* 542 U.S. 466 (2004); and a Canadian citizen stopped while changing planes at JFK Airport in New York while on his way home to Canada, and sent to Syria, where he was tortured and detained without charges for nearly a year, *Arar v. Ashcroft*, 414 F. Supp. 2d 250 (E.D.N.Y. Feb 16, 2006). The clients in all of these cases are individuals, now located overseas, who have been accused at some point of some association—however attenuated or unsubstantiated by evidence—with terrorism, and thus fit the profile for targets of the warrantless surveillance carried out by the president and challenged in *CCR v. Bush*.

The American Civil Liberties Union (ACLU) is a nationwide, nonprofit, nonpartisan organization with more than 500,000 members dedicated to the principles of liberty and equality embodied in the Constitution. Since September 11, 2001, as part of its mission to ensure that governmental actions taken in the name of national security do not erode fundamental civil liberties, the ACLU has filed multiple legal challenges to new government surveillance authorities that unwarrantedly infringe constitutional rights. For example, the ACLU has filed constitutional challenges to section 215 of the Patriot Act, *see Muslim Comm. Ass'n of Ann Arbor v. Ashcroft,* No. 03-cv-72913 (E.D. Mich. filed July 30, 2003), section 505 of the Patriot Act, *see Doe v. Ashcroft,* 334 F. Supp. 2d 471 (S.D.N.Y. 2004) (striking down the national security letter statute amended by section 505 as unconstitutional), and to the National Security Agency's (NSA) warrantless surveillance program, *see ACLU v. NSA,* No. 06-cv-10204 (E.D. Mich. filed Jan. 17, 2006). The ACLU has also played a pivotal role in educating the public about the civil liberties implications of post-September 11th national security policies, particularly with regard to domestic surveillance. Through the Freedom of Information Act (FOIA), the ACLU has sought and disseminated information about surveillance powers granted or expanded by the Patriot Act and about surveillance conducted by the Federal Bureau of Investigation's Joint Terrorism Task Forces, the Defense Department, and the NSA. Through FOIA and other litigation, the ACLU has also challenged excessive government secrecy with regard to other national security-related programs and policies.

Together the ACLU and CCR brought successful challenges to the post-9/11 policy of closing off immigration court deportation proceedings to members of the press and public, *Haddad v. Ashcroft*, 221 F. Supp. 2d 799 (E.D. Mich. 2002), *consolidated with Detroit Free Press v. Ashcroft*, 195 F. Supp. 2d 937 and 195 F. Supp. 2d 948 (E.D. Mich. 2002) (granting

injunctive relief), *affirmed*, 303 F.3d 681 (6th Cir. 2002); *North Jersey Media Group v. Ashcroft*, 205 F. Supp.2d 288 (D.N.J. 2002) (granting nationwide injunctive relief), *rev'd*, 308 F.3d 198 (3d Cir. 2002).

## I. INTRODUCTION

The President recently admitted to the nation that, pursuant to a secretly issued executive order, the National Security Agency (NSA) has for over four years engaged in a program of widespread electronic surveillance of telephone calls and emails, without warrants from any court, in some cases targeting persons within the United States and/or obtaining the contents of communications of persons within the United States (hereinafter, the "Program"). On January 17 of this year, amici CCR and ACLU brought separate lawsuits challenging the legality of the NSA Program and seeking injunctive relief against it. *See Center for Constitutional Rights, et al. v. Bush, et al.*, 06-cv-313 (GEL) (S.D.N.Y.); *American Civil Liberties Union, et al. v. National Security Agency/Central Security Service, et al.*, No. 2:06-CV-10204 (ADT) (E.D. Mich.).

Such electronic surveillance without court orders is contrary to clear statutory mandates provided in the Foreign Intelligence Surveillance Act (FISA), 50 U.S.C. §§ 1801-62, and Title III of the Omnibus Crime Control and Safe Streets Act 1968 (the Wiretap Act), 18 U.S.C. §§ 2510-22. Congress has provided that FISA and specified provisions of the criminal code are the "*exclusive* means by which electronic surveillance ... and the interception of domestic wire, oral, and electronic communications may be conducted." 18 U.S.C. § 2511(2)(f) (emphasis added). Yet the President declined to pursue these "exclusive means," and instead unilaterally and secretly authorized electronic surveillance without judicial approval or Congressional authorization.

The lawsuits brought by amici allege that the Program violates FISA, exceeds the constitutional powers of the President under Article II of the Constitution, and violates the First and Fourth Amendments to the Constitution. Moreover, participation in the Program—by government officials or civilians operating under color of law—is a felony under FISA. *See* 50 U.S.C. § 1809 (making it a crime to "(1) engage[] in electronic surveillance under color of law except as authorized by statute; or (2) disclose[] or use[] information obtained under color of law by electronic surveillance, knowing or having reason to know that the information was obtained through electronic surveillance not authorized by statute").

In the instant case, Plaintiffs have lodged under seal documents provided by a former AT&T employee, Mark Klein (the "Klein Documents"), and requested that the documents be unsealed pursuant to Local Rule 79-5(d). Defendants have opposed unsealing. Klein himself has issued a widely-disseminated public statement describing the contents of the documents. *See Wiretap Whistleblower's Statement*, Dkt. 43, Exh. J (posted Apr. 7, 2006). Amici believe that there are extensive public interests in unsealing the Klein Documents and making them a part of the public record in this case. There is a strong presumption in the law in favor of public access to both the proceedings in civil cases and documents filed with the court in such cases, especially when those documents affect the Court's deliberative process in matters that will result in a public decision, such as the pending Motion for Preliminary Injunction. Moreover, to the extent that portions of the Klein Documents contain trade secrets, at most only those portions should remain sealed, and the rest should be released to the public with the minimum redactions necessary to preserve any such trade secret interest.

## II. COURT DOCUMENTS ARE PRESUMPTIVELY PUBLIC

The Supreme Court has repeatedly stated that openness has a positive effect on the truth-determining function of judicial proceedings.[1] Numerous Courts of Appeals have accordingly held that the First Amendment mandates public access to civil proceedings,[2] and that this constitutional right of access extends not only to the proceedings themselves but also to documents filed in connection with the proceedings. *See Oregonian Pub. Co. v. United States District Court*, 920 F.2d 1462, 1464 (9th Cir. 1990) (brief filed in relation to plea agreement); *Hartford Courant v. Pellegrino*, 380 F.3d 83, 91-93 (2d Cir. 2004) (civil docket sheets); *Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 253 (4th Cir. 1988) (summary judgment papers and exhibits); *In re Gabapentin Litigation*, 312 F. Supp. 2d 653 (D.N.J. 2004) (same).

Where documents form a part of the court's deliberative process—that is, where they are essential to a decision the court has been called on to make—the courts have consistently found that the documents are subject to this qualified First Amendment public right of access.[3] The

---

1 *See Gannett Co. v. DePasquale*, 443 U.S. 368, 383 (1979) ("Openness in court proceedings may improve the quality of testimony, induce unknown witnesses to come forward with relevant testimony, cause all trial participants to perform their duties more conscientiously"); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 596 (1980) (open trials promote "true and accurate fact-finding") (Brennan, J., concurring); *Globe Newspaper Co. v. Superior Ct.*, 457 U.S. 596, 606 (1982) ("public scrutiny enhances the quality and safeguards the integrity of the factfinding process"); *see also Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165, 1179 (6th Cir. 1983)

2 The rationale of the Supreme Court's criminal proceeding access cases applies equally to criminal and civil proceedings. *See Huminski v. Corsones*, 396 F.3d 53, 82 (2d Cir. 2005); *Rushford v. New Yorker Mag., Inc.*, 846 F.2d 249, 253 (4th Cir. 1988); *Westmoreland v. CBS*, 752 F.2d 16, 23 (2d Cir. 1984); *Publicker Indus. v. Cohen*, 733 F.2d 1059, 1071 (3d Cir. 1984); *Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165, 1178-79 (6th Cir.) (*Gannett*'s beneficial "fact-finding considerations" militate in favor of openness "regardless of the type of proceeding," civil or criminal), *cert. denied* 465 U.S. 1100 (1984).

3 Courts have also recognized a common law right of access to public records generally, including judicial documents. *See Nixon v. Warner Communications, Inc.*, 435 U.S. 589 (1978); *San Jose Mercury News v. United States District Court*, 187 F.3d 1096, 1102 (9th Cir. 1999); *United States v. Amodeo*, 44 F.3d 141, 146 (2d Cir. 1995). This lesser right of access has been

Klein Documents at issue here are covered by this presumption of openness. They are already filed with the court (in contrast, for example, to unfiled discovery materials). They are an essential part of a motion that would grant a public form of relief (a preliminary injunction) to the Plaintiffs. Unless this Court finds that AT&T is entitled to their return, the public is entitled to see them so that it will know what went into the Court's adjudicative process on a matter that will result in a public outcome (the issuance *vel non* of a preliminary injunction). *Cf. Seattle Times Co. v. United States District Court*, 845 F.2d 1513, 1516-17 (9th Cir. 1988) (pretrial documents "important to a full understanding of the way in which the judicial process and the government as a whole are functioning.").

Under the qualified First Amendment right of access applicable to the Klein Documents, access "cannot be closed unless specific, on the record findings are made demonstrating that 'closure is essential to preserve higher values and is narrowly tailored to serve that interest'" *Press Enterprise Co. v. Superior Ct.*, 478 U.S. 1, 13-14 (1986). "The interest is to be articulated [by the sealing court] along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." *Id.* at 14. Narrow tailoring mandates

---

invoked primarily in the context of documents that become part of the court record through the discovery process.

In evaluating common law claims for public access to documents unearthed through the discovery process, some courts have isolated out a separate category of "judicial documents," that is, "'item[s] filed [with the court that are] relevant to the performance of the judicial function and useful in the judicial process.'" *Amodeo*, 44 F.3d at 145; *Diversified Group, Inc. v. Daugerdas*, 217 F.R.D. 152, 158-59 (S.D.N.Y. 2003) ("The presumption [in favor of access] is given great weight where the requested documents were introduced at trial or were otherwise material to a court's disposition of a case on the merits"). For such "judicial documents," the standards from the First Amendment analysis essentially apply unchanged. *See Foltz v. State Farm Mut. Auto Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003) (distinguishing discovery documents filed with nondispositive motions from those filed with summary judgment motion, and applying "compelling reason" standard to evaluate claims for closure).

consideration of alternatives to full closure. *Id*. This strict First Amendment standard is applicable to Defendants' efforts to keep the Klein Documents under seal.

## III. ANY REDACTIONS TO PROTECT TRADE SECRETS MUST BE THE MINIMUM NECESSARY TO ACCOMPLISH THAT PURPOSE

From the limited parts of the motions papers that are public, it appears that AT&T is claiming that the Klein Documents should be kept under seal largely because their contents constitute trade secrets.[4] A few observations about such claims are in order.

The Klein Documents were acquired by EFF independently, from a third party who is not a party to this lawsuit. Because they were not acquired through the discovery process, this Court's broad powers to seal documents in the course of supervising the discovery process do not apply. Where sensitive documents are produced in discovery, courts have generally issued protective orders upon a finding of "good cause," as allowed by FRCP 26(c).[5] However, "the rule does not authorize the court to limit use by a party of confidential information of another party if the party has obtained it by some method other than discovery." Wright & Miller, Federal Practice & Procedure § 2035 at 484; *see also In re San Juan Star Co.*, 662 F.2d 108, 118-19 (1st Cir. 1981) (Coffin, J.) (Court's Rule 26 powers to supervise discovery process are irrelevant to dispute over access to documents obtained outside discovery). Indeed the Supreme Court has stated that the First Amendment protects efforts to disseminate information "gained through means independent of the court's processes," even where it is "identical" to "information obtained through use of the discovery process," and a protective order covers the latter. *Seattle*

[4] Dkt. 39, ¶ 4 ("AT&T considers the information in the Confidential Documents highly confidential and proprietary, and such information has value generally unknown to the public or AT&T's competitors").

[5] *See, e.g.*, *Foltz*, 331 F.3d at 1135 ("'good cause' suffices to warrant preserving the secrecy of sealed discovery material attached to nondispositive motions."). It appears AT&T seeks to apply this standard. *See* Motion of AT&T, Dkt. 38, at 2 line 13.

*Times Co. v. Rhinehart*, 467 U.S. 20, 34 (1984). The Court stated that efforts to restrict dissemination of information obtained "through means independent of the court's processes" should be analyzed as a prior restraint—that is, analyzed under the strict First Amendment standards outlined in Part II of this brief, above. *Id.*

The fact that Mr. Klein has published and widely disseminated a statement describing the contents of the Documents will undoubtedly limit the extent to which the contents of the Documents will constitute trade secrets under the applicable law (here, Cal Civ. Code §§ 3426-3426.11).[6] Indeed, it is very unlikely that AT&T will be able to prove that the entire 100-odd pages of the Klein Documents constitute trade secrets such that they cannot be disclosed even with redactions. Courts have generally insisted that a party asserting a trade secret interest identify the information that constitutes a trade secret with great specificity. *See Imax Corp. v. Cinema Technologies*, 152 F.3d 1161 (9th Cir. 1998) (in case involving alleged trade secret under California code, claimant must "describe the subject matter of the trade secret with *sufficient particularity* to separate it from matters of general knowledge in the trade or of special knowledge of those persons ... skilled in the trade"; claim that the trade secret included "every dimension and tolerance that defines or reflects" the basic design of a device was too broad (citations and internal marks omitted)); *IDX Systems Corp. v. Epic Systems Corp.*, 285 F.3d 581, 583 (7th Cir. 2002) (party asserting misappropriation "has been both too vague and too inclusive, effectively asserting that all information in or about its software is a trade secret. ... unless the

[6] *See O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 399 F. Supp. 2d 1064, 1069 (N.D. Cal. 2005) ("an injunction based on a trade secret no longer secret is generally not permitted under the UTSA" unless to stop ongoing commercial advantage by misappropriator); *DVD Copy Control Assn., Inc. v. Bunner*, 116 Cal. App. 4th 241, 254-55 (Cal. Ct. App. 6th Dist. 2004) (even where defendant was the one who posted alleged trade secret to internet, "we can conceive of no possible justification for an injunction against the *disclosure* of information if the information were already public knowledge [due to defendant's posting] ... that which is in the public domain cannot be removed ... under the guise of trade secret protection").

plaintiff engages in any serious effort to pin down the secrets a court cannot do its job."); *Religious Technology Center v. Netcom On-Line Communication Services, Inc.* 923 F. Supp. 1231, 1252 (N.D. Cal. 1995) ("secret aspect ... must be defined with particularity"; court rejected trade secret claims to "the entire [documents] themselves"). This approach is consistent with the underlying statute creating the trade secret rights asserted here, *see* Cal. Civ. Code § 2019(d) (in any misappropriation action, "the party alleging the misappropriation shall identify the trade secret with reasonable particularity"). It is also consistent with the idea that a judge considering sealing a document "must consider alternatives and reach a considered conclusion that closure is a preferable course to follow to safeguard the interests at issue," *In re Application of the Herald Co.*, 734 F.2d 93, 100 (2d Cir. 1984); *Huminski v. Corsones*, 396 F.3d 53, 86 (2d Cir. 2004), and with the requirement that any request for sealing under Loc. R. 79-5(d) consist of a "narrowly tailored proposed sealing order."

To the extent that portions of the Klein Documents contain genuine trade secrets (that is, trade secrets protected by statute[7]), at most only those portions should remain sealed, and the rest should be released to the public with only the narrowest redactions necessary to protect any statutorily-protected trade secret interests.

[7] Rule 26(c) allows protective orders to issue to cover both trade secrets and other information that does not quite rise to the level of a trade secret. *See* FRCP 26(c)(7) (exposure of "a trade secret or other confidential ... information" constitutes good cause for issuance of protective order). However, only the general equitable powers of the court, not its powers to supervise the discovery process, may be brought to bear to seal documents obtained outside the discovery process, and those equitable powers are limited by the First Amendment's restrictions on prior restraints. Generally, protection of full-blown trade secrets recognized by statute would constitute a compelling interest that would support narrowly-tailored closure, but lesser "confidential information" would likely not be.

## IV. THERE ARE EXTENSIVE PUBLIC INTERESTS IN DISCLOSURE OF THE KLEIN DOCUMENTS

Since its disclosure, the NSA program has been a subject of extraordinary public interest and debate.[8] The public plainly has a right to know, at least in general terms, what surveillance policies the executive branch has adopted, particularly because those policies have been adopted in contravention of duly enacted law. *See NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978) ("an informed citizenry [is] vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed.").

Mr. Klein's public statement described technology which allowed the NSA to conduct "vacuum cleaner" surveillance. Dkt. 43 at 33 (Exh. J). If true this would tend to show that the NSA Program is not in fact a targeted program directed at specific individuals the NSA suspects of involvement with terrorism, as the administration has repeatedly claimed, but is rather akin to a data-mining program—for example a program using voice recognition technology and computers to scan every phone call and email for certain words. Although the media have also reported that some form of data mining is a major component of the Program, this data mining aspect of the Program remains largely secret—administration officials have either denied that any such aspect of the Program exists or evaded answering questions about it.[9] These denials are

---

8 *See* Eric Lichblau, *Judges on Secretive Panel Speak Out on Spy Program*, New York Times, March 29, 2006; David Sarasohn, *Editorial: No-Questions Wiretapping, There's no need to consult judges or Constitution*, The Oregonian, March 10, 2006; Anna Johnson, *Lawyers Group Says Bush Exceeds His Powers*, Associated Press, Feb. 13, 2006; Emily Bazelon, *Legalize It? Should the Law Make Room for Warrantless Wiretapping? The Debate Has Already Begun,* Boston Globe, Feb. 19, 2006; *Bob* Barr, *Presidential Snooping Damages the Nation*, Time, Jan. 9, 2006; Tom Daschle, *Power We Didn't Grant*, Washington Post, Dec. 23, 2005; Richard Posner, *Our Domestic Intelligence Crisis*, Washington Post, Dec. 23, 2005.

9 *See* Assistant Attorney General William Moschella, *Written Response to Senate Judiciary Committee's Questions of Feb. 13, 2006*, Mar. 24, 2006 (Q: "Are there other programs that rely on data mining or other automated analysis of large volumes of communications that feed into or

unsurprising, for such a data-mining program would be very similar to Admiral Poindexter's plans for a "Total Information Awareness" program. The revelation of the TIA program's existence created a massive public uproar and Congress specifically withdrew funding for it in 2003. *See* Consolidated Appropriations Resolution, 2003, Pub. L.108-7, 117 Stat. 11, Division M, §111(b) (Feb. 20, 2003). If the Klein Documents reveal that the NSA Program is indeed a "vacuum cleaner" seeking to replicate TIA under a different name, Congress and the American people have a right to know that as soon as possible.

The public's need for access to all available information about the NSA surveillance program is particularly imperative because Congress is currently considering legislation which would modify FISA in order to (putatively) legalize the NSA Program. See S. 2453, 109th Cong., 2d Sess. ("National Security Surveillance Act of 2006") (Specter bill); S. 2455, 109th Cong., 2d Sess. ("Terrorist Surveillance Act of 2006") (DeWine bill). The more detailed of the two bills, S. 2455, includes provisions mandating telephone company cooperation with warrantless wiretapping on the Attorney General's say-so, *id.* § 2(e), as well as criminal sanctions for whistleblowers, *id.* § 8. Congress is admittedly working on these proposals in a

---

otherwise facilitate either the warrantless surveillance program or the FISA warrant process?" A: "It would be inappropriate to discuss in this setting the existence (or non-existence) of specific intelligence activities or the operations of any such activities."); Alberto Gonzales, *Letter to Arlen Specter*, Feb. 28, 2006, at 4, 3 ("in all my testimony at the [Feb. 6] hearing I addressed ... only the ... Terrorist Surveillance Program. I did not and could not address ... any other classified intelligence activities."; "I am not in a position to provide information here concerning any other intelligence activities beyond the [NSA wiretapping program]."), *available at* http://www.washingtonpost.com/wp-srv/nation/nationalsecurity/gonazles.letter.pdf; Charles Babington and Dan Eggen, *Gonzales Seeks to Clarify Testimony on Spying; Extent of Eavesdropping May Go Beyond NSA Work*, Washington Post, Mar. 1, 2006, at A8 ("'It seems to me [Gonzales] is conceding that there are other NSA surveillance programs ongoing that the president hasn't told anyone about,'" quoting Bruce Fein).

relative vacuum of information about the Program.[10] But the central operating premise of all the legislative proposals is that the NSA Program those proposals seek to codify is essentially a targeted surveillance program. Both are at their core oversight bills mandating disclosure of targets of the program, *id.* § 6(c)(1); in fact, the title of the DeWine bill is the "Terrorist Surveillance Act of 2006." Making the Klein Documents public would ensure that Congress is not in the dark as to the nature of the Program or the telephone companies' complicity with it.[11]

Other segments of the public have unique interests in disclosure of the Klein Documents. Persons who routinely engage in communications where confidentiality is essential—as is the case for most attorneys and investigative journalists—may wish to institute protective measures to ensure the confidentiality of their communications in light of the contents of the Documents.[12] Although the management of AT&T wishes to keep the Klein Documents from public view,

---

[10] 152 Cong. Rec. S2301-01, 2006 WL 680674 (Cong. Rec.) (March 16, 2006) (Sen. Biden: "At present, our knowledge of the National Security Agency program is severely limited."); Hearing Before the House Judiciary Committee, *Oversight Hearing on The United States Department of Justice* (April 6, 2006) (Rep. Sensenbrenner: "to properly determine whether or not the program was legal and funded—because that's Congress' responsibility—we need to have answers. And we're not getting them."); *id.* (Rep. Sensenbrenner: "Well unfortunately, General Gonzales, I am afraid that you have caused more questions to be put out for debate within the Congress and in the American public as a result of your answers that you've just given, as well as the answers to my questions this morning. Now that concerns me. And I think I can speak in a bipartisan manner that we're your partners in this area. We have not been treated as partners, for whatever reason. ... You had a chance today to put some of these questions to rest, and I'm afraid that there are more questions that will be posed out there because of the answers that you have not given.").

[11] Federal regulators charged with enforcement of the Communications Act of 1934 may also have an interest in the contents of the Documents. *See* 47 U.S.C. § 605 ("[N]o person receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception....").

[12] This is true whether or not they are AT&T subscribers. AT&T peers telecommunications traffic for other telecom providers. Thus, subscribers to other telecom services may have the confidentiality of their communications broken when their calls or emails are routed through AT&T's circuits. (AT&T subscribers obviously have an interest in knowing whether they are being spied upon by their own telephone company.)

shareholders of AT&T have an interest in access to the Documents in order to evaluate whether a breach of fiduciary duty has taken place and determine whether or not to bring derivative suits to challenge management before the corporation suffers further from management's decision to cooperate with the Program.[13]

## V. CONCLUSION

Given that much of the content of the Klein Documents has been disseminated widely to the public, that the Documents themselves are not classified,[14] and that the applicable standards favor open access with only the narrowest redactions necessary to protect any genuine trade secret interests, amici urge the Court to release the Documents to the public with such redactions as soon as possible.

Respectfully submitted,

/s/

Marc Van Der Hout
NATIONAL LAWYERS GUILD
180 Sutter Street, 5th Floor
San Francisco, CA 94104
phone: (415) 981-3000
fax: (415) 981-3003
ndca@vblaw.com
(California Bar # 80778)

---

[13] If the allegations in the complaint are true, AT&T management has assumed an enormous financial risk on behalf of its shareholders by its active cooperation with the NSA in carrying out this program of unlawful surveillance. *See* Complaint, ¶ 99 (liquidated damages of $100/day/plaintiff under FISA); ¶ 109 (same under 1968 Wiretap Act); ¶ 118 ($1000/violation under Communications Act); ¶ 125 ($1000/plaintiff). Given the number of AT&T subscribers in the potential class (upwards of 20 million individuals), damages could easily mount into the hundreds of millions of dollars. Moreover, liability under FISA and the Wiretap Act is cumulative (because the statutes provide for a minimum liquidated damages amount *per day* of violation), and may be continuing to mount if the alleged violations are still occurring.

[14] *See* Letter from Anthony Coppolino to Cindy Cohn and Lee Tien, Dkt. 43, Exh. E.

Shayana Kadidal
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012-2317
phone: (212) 614-6438
fax: (212) 614-6499

J. Ashlee Albies
NATIONAL LAWYERS GUILD
P.O. Box 42604
Portland, OR 97242

Ann Beeson
Jameel Jaffer
Melissa Goodman
Scott Michelman
Catherine Crump
National Legal Department
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004-2400
(212) 549-2500

April 24, 2006

**CERTIFICATE OF SERVICE**

I hereby certify that on April 24, 2006, I electronically filed the foregoing notice of motion and proposed brief of amici curiae with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have caused the foregoing documents to be mailed and where possible emailed to the non-CM/ECF participants indicated on the attached Manual Notice List.

/s/

Marc Van Der Hout
NATIONAL LAWYERS GUILD
180 Sutter Street, 5th Floor
San Francisco, CA 94104
phone: (415) 981-3000
fax: (415) 981-3003
ndca@vblaw.com
(California Bar # 80778)

# Mailing Information for Case 3:06-cv-00672-VRW

**3:06-cv-672 Notice will be electronically mailed to:**

**Kevin Stuart Bankston**
bankston@eff.org

**Bradford Allan Berenson**
bberenson@sidley.com
vshort@sidley.com

**Cindy Ann Cohn**
cindy@eff.org
wendy@eff.org
barak@eff.org

**Bruce A. Ericson**
bruce.ericson@pillsburylaw.com

**Jeff D Friedman**
JFriedman@lerachlaw.com
RebeccaG@lerachlaw.com

**Eric A. Isaacson**
erici@lerachlaw.com
jackiew@lerachlaw.com

**Reed R. Kathrein**
reedk@lerachlaw.com
e_file_sd@lerachlaw.com
e_file_sf@lerachlaw.com

**Edward Robert McNicholas**
emcnicholas@sidley.com
vshort@sidley.com

**Corynne McSherry**
corynne@eff.org

**Maria V. Morris**
mariam@mwbhl.com
e_file_sd@lerachlaw.com
e_file_sf@lerachlaw.com

**Kurt Opsahl**
kurt@eff.org

**Shana Eve Scarlett**
shanas@lerachlaw.com
e_file_sd@lerachlaw.com
e_file_sf@lerachlaw.com

**Jacob R. Sorensen**
jake.sorensen@pillsburylaw.com

**Tze Lee Tien**
tien@eff.org

**Theresa M. Traber, Esq**
tmt@tvlegal.com

**James Samuel Tyre**
jstyre@jstyre.com
jstyre@eff.org

**Bert Voorhees**
bv@tvlegal.com

**Richard Roy Wiebe**
wiebe@pacbell.net

**3:06-cv-672 Notice will NOT be electronically mailed to:**

**David W. Carpenter**
Sidley Austin Brown & Wood LLP
Bank One Plaza
10 South Dearborn Street
Chicago, IL 60600

**David L. Lawson**
Sidley Austin Brown & Wood
172 Eye Street, N.W.
Washington, DC 20006