Trone et al v. Peanut Corporation of America
Doc. 87

# Exhibit A

# Part 1

Dockets.Justia.com

Receipt Number
536867

62

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

AMERICAN CIVIL LIBERTIES UNION; AMERICAN CIVIL LIBERTIES UNION FOUNDATION; AMERICAN CIVIL LIBERTIES UNION OF MICHIGAN; COUNCIL ON AMERICAN-ISLAMIC RELATIONS; COUNCIL ON AMERICAN-ISLAMIC RELATIONS MICHIGAN; GREENPEACE, INC.; NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS; JAMES BAMFORD; LARRY DIAMOND; CHRISTOPHER HITCHENS; TARA MCKELVEY; and BARNETT R. RUBIN,

Plaintiffs,

v.

NATIONAL SECURITY AGENCY / CENTRAL SECURITY SERVICE; and LIEUTENANT GENERAL KEITH B. ALEXANDER, in his o capacity as Director of the National Security Agency and Chief of the Central Security Service,

Defendants.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Case No.

Hon

Case: 2:06-cv-10204
Assigned To : Taylor, Anna Diggs
Referral Judge: Whalen, R. Steven
Assign. Date : 01/17/2006
Description: CMP
AMERICAN CIVIL LIBERTIES UNION, ET AL V. NATIONAL SECURITY AGENCY, ET AL (TAM)

FILED
JAN 17 2006
CLERK'S OFFICE-DETROIT-PSG
U.S. DISTRICT COURT

ANN BEESON
*Attorney of Record*
JAMEEL JAFFER
MELISSA GOODMAN (*admission pending*)
CATHERINE CRUMP (*admission pending*)
National Legal Department
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004-2400
(212) 549-2500

MICHAEL J. STEINBERG
KARY L. MOSS
American Civil Liberties Union Fund of Michigan
60 West Hancock Street
Detroit, MI 48201-1343
(313) 578-6814

## PRELIMINARY STATEMENT

1. This lawsuit challenges the constitutionality of a secret government program to intercept vast quantities of the international telephone and Internet communications of innocent Americans without court approval (hereinafter "the Program"). The National Security Agency / Central Security Service ("NSA") launched the Program in 2001 and the President of the United States ratified it in 2002.

2. Plaintiffs are a group of prominent journalists, scholars, attorneys, and national nonprofit organizations who frequently communicate by telephone and email with people outside the United States, including in the Middle East and Asia. Because of the nature of their calls and emails, and the identities and locations of those with whom they communicate, plaintiffs have a well-founded belief that their communications are being intercepted under the Program. The Program is disrupting the ability of the plaintiffs to talk with sources, locate witnesses, conduct scholarship, and engage in advocacy.

3. By seriously compromising the free speech and privacy rights of the plaintiffs and others, the Program violates the First and Fourth Amendments of the United States Constitution. It also violates constitutional separation of powers principles, because it was authorized by President George W. Bush in excess of his Executive authority and contrary to limits imposed by Congress. In response to widespread domestic surveillance abuses committed by the Executive Branch and exposed in the 1960s and 1970s, Congress enacted legislation that provides "the *exclusive means* by which electronic surveillance . . . and the interception of domestic wire, oral, and electronic communications may be conducted." 18 U.S.C. § 2511(2)(f) (emphasis

added). Plaintiffs respectfully seek a declaration that the Program is unlawful, and a permanent injunction against its use.

## JURISDICTION AND VENUE

4. This case arises under the United States Constitution and the laws of the United States and presents a federal question within this Court's jurisdiction under Article III of the United States Constitution and 28 U.S.C. § 1331. The Court also has jurisdiction under the Administrative Procedures Act, 5 U.S.C. § 702. The Court has authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.* The Court has authority to award costs and attorneys' fees under 28 U.S.C. § 2412. Venue is proper in this district under 28 U.S.C. § 1391(c).

## PARTIES

5. The American Civil Liberties Union ("ACLU") is a 501(c)(4) non-profit, non-partisan organization that engages in public education and lobbying about the constitutional principles of liberty and equality. The ACLU has more than 500,000 members and has members in every state, including Michigan. The ACLU sues on its own behalf and on behalf of its staff and members.

6. The American Civil Liberties Union Foundation ("ACLUF") is a 501(c)(3) organization that educates the public about civil liberties issues and employs lawyers who provide legal representation free of charge in cases involving civil liberties. The ACLUF sues on its own behalf and on behalf of its staff.

7. The American Civil Liberties Union of Michigan ("ACLU of Michigan") is a 501(c)(4) non-profit, non-partisan organization that engages in public education and lobbying about civil rights and civil liberties in the state of Michigan. The

ACLU of Michigan has approximately 15,000 members. The ACLU of Michigan sues on its own behalf of on behalf of its members.

8. The National Association of Criminal Defense Lawyers ("NACDL") is a 501(c)(6) non-profit organization based in Washington, D.C. whose direct membership is comprised of more than 13,000 criminal defense lawyers. The NACDL has members in every state, including Michigan. The NACDL sues on its own behalf and on behalf of its members.

9. The Council on American-Islamic Relations ("CAIR") is a 501(c)(4) non-profit organization based in Washington, D.C. and is the largest Islamic civil liberties organization in the United States. CAIR has chapters and members nationwide and members in over 25 countries. CAIR sues on its own behalf and on behalf of its staff and members.

10. The Council on American-Islamic Relations Michigan ("CAIR-Michigan") is a 501(c)(3) organization and represents the interest of the American Muslim community living in the state of Michigan. CAIR-Michigan sues on its own behalf and on behalf of its members.

11. Greenpeace, Inc. ("Greenpeace") is a non-profit advocacy organization based in Washington, D.C. dedicated to combating the most serious threats to the planet's biodiversity and environment. Greenpeace has approximately 250,000 members nationwide, including members in Michigan. Internationally, Greenpeace has a presence in 39 other countries and more than 2.5 million members. Greenpeace sues on its own behalf, and on behalf of its staff and members.

12. James Bamford is an award-winning author and journalist. He is one of the world's leading experts on U.S. intelligence and the National Security Agency and he has published numerous books and articles on those topics. Mr. Bamford lives in Washington, D.C.

13. Larry Diamond is a Senior Fellow at the Hoover Institution at Stanford University. He is a leading expert on governance and development in Iraq, Asia, Africa and Latin America. Professor Diamond lives in Stanford, California.

14. Christopher Hitchens is a prominent reporter and bestselling author who has written numerous articles and books on topics including U.S policy in the Middle East and Islamic fundamentalism. Mr. Hitchens lives in Washington, D.C.

15. Tara McKelvey is a senior editor at The American Prospect, and has written numerous articles and books on topics including U.S. policy in the Middle East. Ms. McKelvey lives in Washington, D.C.

16. Barnett R. Rubin is Director of Studies and Senior Fellow at the New York University Center on International Cooperation. Professor Rubin is an internationally renowned scholar on conflict and peace, with a particular focus on Afghanistan, South Asia, and Central Asia, and has written numerous books and articles about Afghan history, politics, and development. Professor Rubin lives in New York.

17. Defendant National Security Agency / Central Security Service ("NSA") is the agency of the United States government responsible for administering the warrantless surveillance program challenged in this case.

18. Defendant Lieutenant General Keith B. Alexander is the Director of the NSA. Defendant Lieutenant General Alexander has ultimate authority for supervising and implementing all operations and functions of the NSA.

## LEGAL FRAMEWORK

19. The First Amendment provides in relevant part that "Congress shall make no law . . . abridging the freedom of speech, or of the press."

20. The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

21. Congress has enacted two statutes that together supply "the *exclusive means* by which electronic surveillance . . . and the interception of domestic wire, oral, and electronic communications may be conducted." 18 U.S.C. § 2511(2)(f) (emphasis added). The first is Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"), 18 U.S.C. § 2510 *et seq.*, and the second is the Foreign Intelligence Surveillance Act, 50 U.S.C. § 1801 *et seq.* ("FISA").

### Title III

22. Congress enacted Title III in response to the U.S. Supreme Court's recognition, in *Katz v. United States*, 389 U.S. 347 (1967), that individuals have a constitutionally protected privacy interest in the content of their telephone calls. Through Title III, Congress created a statutory framework to govern the surveillance of wire and oral communications in law enforcement investigations.

23. In its current form, Title III authorizes the government to intercept wire, oral, or electronic communications in investigations of certain enumerated criminal offenses, *see* 18 U.S.C. § 2516, with prior judicial approval, *see id.* § 2518. In order to obtain a court order authorizing the interception of a wire, oral, or electronic communication, the government must demonstrate "probable cause for belief that an individual is committing, has committed, or is about to commit" one of the enumerated criminal offenses. *Id.* § 2518(3)(a). It must also demonstrate, among other things, "probable cause for belief that particular communications concerning [the enumerated] offense will be obtained through [the] interception," *id.* § 2518(3)(b), and that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous," *id.* § 2518(3)(c).

24. Every court order authorizing surveillance under Title III must include a provision requiring that the interception be "conducted in a such a way as to minimize the interception of communications not otherwise subject to interception under this chapter." *Id.* § 2518(5).

25. While Title III generally permits surveillance only with prior judicial authorization, the statute includes a provision that allows for warrantless surveillance in "emergency situation[s]" – where, for example, a "situation exists that involves . . . immediate danger of death or serious physical injury to any person." *Id.* § 2518(7)(a). Where an emergency situation exists and "there are grounds upon which an order could be entered . . . to authorize . . . interception," the statute permits specified executive officials to authorize warrantless surveillance "if an application for an order approving

the interception is made in accordance with this section within forty-eight hours after the interception has occurred, or begins to occur." *Id.* § 2518(7)(b).

26. Title III specifies civil and criminal penalties for surveillance that is not authorized. *See id.* §§ 2511 & 2520.

27. As originally enacted, Title III provided that "[n]othing contained in this chapter. . . shall limit the constitutional power of the President to take such measures as he deems necessary to protect the Nation against actual or potential attack or other hostile acts of a foreign power, to obtain foreign intelligence information deemed essential to the security of the United States, or to protect national security information against foreign intelligence activities. Nor shall anything contained in this chapter be deemed to limit the constitutional power of the President to take such measures as he deems necessary to protect the United States against the overthrow of the Government by force or other unlawful means, or against any other clear and present danger to the structure or existence of the Government." *See* 18. U.S.C. § 2511(3) (1976). As discussed below, Congress repealed this provision in 1978.

**Foreign Intelligence Surveillance Act**

28. In 1978, Congress enacted FISA to govern the use of electronic surveillance against foreign powers and their agents inside the United States. The statute created the Foreign Intelligence Surveillance Court, a court composed of seven (now eleven) federal district court judges, and empowered this court to grant or deny government applications for electronic surveillance orders in foreign intelligence investigations. *See* 50 U.S.C. § 1803(a).

29. Congress enacted FISA after the U.S. Supreme Court held, in *United States v. United States District Court for the Eastern District of Michigan*, 407 U.S. 297 (1972), that the Fourth Amendment does not permit warrantless surveillance in intelligence investigations of domestic security threats. FISA was a response to that decision and to the Report of the Senate Select Committee to Study Government Operations with Respect to Intelligence Activities, S.Rep. No. 94-755, 94th Cong., 2d Sess. (1976) ("Church Committee Report"), which found that the executive had engaged in warrantless wiretapping of numerous United States citizens – including journalists, activists, and Congressmen – who posed no threat to the nation's security and who were not suspected of any criminal offense. The Church Committee Report warned that "[u]nless new and tighter controls are established by legislation, domestic intelligence activities threaten to undermine our democratic society and fundamentally alter its nature."

30. When Congress enacted FISA, it amended Title III to provide that the procedures set out therein and in FISA "shall be the *exclusive means* by which electronic surveillance . . . and the interception of domestic wire, oral, and electronic communications may be conducted." 18 U.S.C. § 2511(2)(f) (emphasis added). FISA provides that no one may engage in electronic surveillance "except as authorized by statute," *id.* § 1809(a)(1), and it specifies civil and criminal penalties for electronic surveillance undertaken without statutory authority, *see id.* §§ 1809 & 1810. The Senate Judiciary Committee explained that "[t]he basis for this legislation is the understanding concurred in by the Attorney General – that even if the President has an 'inherent' Constitutional power to authorize warrantless surveillance for foreign intelligence

purposes, Congress has the power to regulate the exercise of this authority by legislating a reasonable warrant procedure governing foreign intelligence surveillance." S. Rep. 95-604(I), reprinted at 1978 U.S.C.C.A.N. at 3917. The Committee further explained that the legislation was meant to "spell out that the executive cannot engage in electronic surveillance within the United States without a prior Judicial warrant." *Id.* at 3906.

31. FISA defines "electronic surveillance" broadly to include:

a. "the acquisition by an electronic, mechanical, or other surveillance device of the contents of any wire or radio communication sent by or intended to be received by a particular, known United States person who is in the United States, if the contents are acquired by intentionally targeting that United States person, under circumstances in which a person has a reasonable expectation of privacy and a warrant would be required for law enforcement purposes";

b. "the acquisition by an electronic, mechanical, or other surveillance device of the contents of any wire communication to or from a person in the United States, without the consent of any party thereto, if such acquisition occurs in the United States . . .";

c. "the intentional acquisition by an electronic, mechanical, or other surveillance device of the contents of any radio communication, under circumstances in which a person has a reasonable expectation of privacy and a warrant would be required for law enforcement purposes, and if both the sender and all intended recipients are located within the United States"; and

d. "the installation or use of an electronic, mechanical, or other surveillance device in the United States for monitoring to acquire information, other than from a wire or radio communication, under circumstances in which a person has a reasonable expectation of privacy and a warrant would be required for law enforcement purposes." 50 U.S.C. § 1801(f).

32. FISA defines "contents" to include "any information concerning the identity of the parties to such communication or the existence, substance, purport, or meaning of that communication." 50 U.S.C. § 1801(n). It defines "United States person" to include United States citizens and lawful permanent residents. *Id.* § 1801(d).

33. In order to obtain an order from the FISA Court authorizing electronic surveillance, the government must demonstrate, among other things, probable cause to believe that "the target of the electronic surveillance is a foreign power or an agent of a foreign power" and that "each of the facilities or places at which the electronic surveillance is directed is being used, or is about to be used, by a foreign power or an agent of a foreign power." *Id.* § 1805(a)(3).

34. While FISA generally prohibits surveillance without prior judicial authorization, it, like Title III, includes a provision that allows for warrantless surveillance in "emergency situation[s]." *Id.* § 1805(f). Where an emergency situation exists and "the factual basis for issuance of an order under this subchapter to approve such surveillance exists," the statute permits the Attorney General to authorize warrantless surveillance "if a judge having jurisdiction under section 1803 of this title is informed by the Attorney General or his designee at the time of such authorization that

the decision has been made to employ emergency electronic surveillance and if an application in accordance with this subchapter is made to that judge as soon as practicable, but not more than 72 hours after the Attorney General authorizes such surveillance." *Id.*

35. FISA also allows the Attorney General to authorize electronic surveillance without a court order for up to one year if the Attorney General certifies in writing under oath that the electronic surveillance is directed solely at the property or means of communication used exclusively by a foreign power, that "there is no substantial likelihood that the surveillance will acquire the contents of any communication to which a United States person is a party," and that there are minimization procedures in place. *Id.* § 1802.

36. Finally, FISA permits electronic surveillance without a court order for fifteen days after a formal declaration of war. *Id.* § 1811 ("Notwithstanding any other law, the President, through the Attorney General, may authorize electronic surveillance without a court order under this subchapter to acquire foreign intelligence information for a period not to exceed fifteen calendar days following a declaration of war by the Congress.").

37. FISA requires the Attorney General to report to the House and Senate Intelligence Committees twice a year regarding "all electronic surveillance" authorized under FISA. *Id.* § 1808(a). Statistics released annually by the Justice Department indicate that, between 1978 and 2004, the government submitted almost 19,000 surveillance applications to the FISA Court. The FISC denied four of these applications;

granted approximately 180 applications with modifications; and granted the remainder without modifications.

## FACTUAL BACKGROUND

### The Program

38. According to published news reports, in the fall of 2001 the NSA launched a secret surveillance program ("the Program") to intercept, without prior judicial authorization, the telephone and Internet communications of people inside the United States. President Bush ratified the Program in 2002. Since then, the President has reauthorized the Program more than 30 times.

39. Under the Program, the NSA engages in "electronic surveillance" as defined by FISA and Title III.

40. Under the Program, the NSA intercepts vast quantities of the international telephone and Internet communications (hereinafter collectively "communications") of people inside the United States, including citizens and lawful permanent residents.

41. Under the Program, the NSA also intercepts some purely domestic communications, that is, communications among people all of whom are inside the United States.

42. Under the Program, the NSA intercepts the communications of people inside the United States without probable cause to believe that the surveillance targets have committed or are about to commit any crime.

43. Under the Program, the NSA intercepts the communications of people inside the United States without probable cause to believe that the surveillance targets are foreign powers or agents thereof.

44. Under the Program, the NSA intercepts the communications of people inside the United States without obtaining authorization for each interception from the President or the Attorney General.

45. Under the Program, NSA shift supervisors are authorized to approve NSA employees' requests to intercept the communications of people inside the United States.

46. Under the Program, the NSA accesses communications in at least three ways.

47. First, the NSA uses NSA-controlled satellite dishes to access communications that are transmitted via satellite. Some of these NSA-controlled satellite dishes are located within the United States.

48. Second, the NSA works with telecommunications companies to access communications that pass through switches controlled by these companies. These switches, which are located inside the United States, serve as primary gateways for communications going into and out of the United States. The switches connect to trans-oceanic fiber optic cables that transmit communications to other countries.

49. Third, the NSA works with Internet providers and telecommunications companies to access communications transmitted over the Internet.

50. Under the Program, the NSA intercepts, retains, and analyzes communications in at least three ways.

51. First, the NSA obtains names, telephone numbers and Internet addresses from the cell phones, computers, and other information found in the possession of persons deemed suspicious. The NSA intercepts the telephone numbers and Internet addresses associated with these people, as well as numbers and emails associated with anyone who communicates with them, and continues to identify additional telephone numbers and Internet addresses in an expanding network of people with fewer and fewer links to the original suspect. Through this method, the NSA intercepts the contents of the communications of as many as a thousand people inside the United States at any one time.

52. Second, the NSA intercepts communications to and from particular countries, including Iraq and Afghanistan. The intercepted communications include calls and emails between people inside the United States and people in those other countries.

53. Third, the NSA engages in wholesale datamining of domestic and international communications. It uses artificial intelligence aids to search for keywords and analyze patterns in millions of communications at any given time. One purpose of this datamining is to identify individuals for targeted surveillance.

54. Under the Program, the NSA does not obtain judicial review before or after intercepting the communications of people inside the United States.

55. The NSA has submitted information obtained through the Program to the Foreign Intelligence Surveillance Court in order to support applications for surveillance orders under FISA.

**Plaintiffs' Allegations**

56. Plaintiffs and their staff and members (hereinafter "plaintiffs") routinely communicate by email and telephone with people outside the United States, including people in the Middle East and Asia.

57. Some of the plaintiffs, in connection with scholarship, journalism, or legal representation, communicate with people whom the United States government believes or believed to be terrorist suspects or to be associated with terrorist organizations.

58. Plaintiffs communicate about subjects that are likely to trigger scrutiny by the NSA under the Program.

59. Some of the plaintiffs conduct research on the Internet concerning topics that are likely to trigger scrutiny under the Program.

60. Because of the nature of plaintiffs' communications and the identities and locations of those with whom they communicate, plaintiffs have a well-founded belief that their domestic and international communications are being intercepted by the NSA under the Program.

61. The Program is substantially impairing plaintiffs' ability to obtain information from sources abroad, to locate witnesses, to represent their clients, to conduct scholarship, and to engage in advocacy.

62. The Program is inhibiting the lawful, constitutionally protected communications of plaintiffs and others not before the Court.

**American Civil Liberties Union and American Civil Liberties Union Foundation**

63. The ACLU is a 501(c)(4) non-profit, non-partisan organization that engages in public education and lobbying about the constitutional principles of liberty and equality. The ACLU has more than 500,000 members. The ACLU's activities include lobbying Congress on legislation that affects civil liberties, analyzing and educating the public about such legislation, and mobilizing ACLU members and activists to lobby their legislators to protect civil rights and civil liberties.

64. The ACLUF is a 501(c)(3) organization that educates the public about civil liberties and that employs lawyers who provide legal representation free of charge in cases involving civil liberties.

65. Since September 11, a core priority of the ACLU and the ACLUF has been to publicize and oppose violations of civil liberties effected in the name of national security. This work frequently requires ACLU and ACLUF staff and members to communicate by email and telephone with people and organizations outside the United States. The international communications of ACLU and ACLUF staff and members concern a range of subjects that are likely to trigger scrutiny under the Program.

66. For example, in November and December 2002, ACLU staff traveled to Pakistan to interview men whom the Immigration and Naturalization Service had arrested and held after the terrorist attacks of September 2001 as "special interest" detainees but subsequently deported without having been charged with any terrorism related offense. In preparation for this trip, ACLU staff communicated by telephone and email with people and organizations in Pakistan and India. For example, Marsha Zeesman, the ACLU's Director of Campaigns and Special Projects, and Emily Whitfield, the ACLU's

Media Relations Director, communicated by telephone and email on multiple occasions with staff of the Human Rights Commission of Pakistan, an organization based in Karachi. Whitfield also communicated by email with Ash-har Quraishi, Cable News Network's correspondent in Pakistan; with Carlotta Gall, a New York Times correspondent in Pakistan; and with David Rohde, a New York Times correspondent in India. Some of the communications of ACLU staff concerned individuals whom the Justice Department's website describes as "linked to the September 11th investigation."

67. In January 2004, the ACLUF filed a petition with the United Nations Working Group on Arbitrary Detention on behalf of some of the men whom the INS had held as "special interest" detainees. The drafting of the petition required ACLUF attorney Omar Jadwat and other ACLUF employees to communicate by telephone and email with former detainees living in Pakistan, Egypt, and Jordan.

68. Since March 2005, ACLUF attorneys and staff have been investigating instances in which the CIA has transferred – "rendered" – foreign nationals to detention and interrogation in facilities operated by the CIA outside U.S sovereign territory and to countries and intelligence services that are known to employ torture and other forms of cruel, inhuman or degrading treatment. In connection with this research, ACLUF attorneys and human rights advisors have communicated by telephone and email with individuals whom the CIA has alleged are associated with terrorist organizations. ACLUF attorneys and staff have also communicated by telephone and email with attorneys representing these individuals.

69. ACLUF attorneys currently represent Khaled El-Masri, a German citizen residing in Neu-Ulm, Germany, whom the CIA rendered to a CIA-run prison in

Afghanistan in January 2004. ACLUF human rights advisor Steven Watt regularly communicates by telephone and email with Mr. El-Masri and with Mr. El-Masri's German attorney, Manfred Gnjidic. In addition, as part of the ACLU's research into the extraordinary rendition program, Mr. Watt regularly communicates by telephone with attorneys based in Sweden and Egypt representing Ahmed Agiza and Mohammed Alzery, whom the CIA rendered from Sweden to Egyptian custody in December 2001, and with the Italian attorney representing Abu Omar, whom the CIA rendered from Italy to Egyptian custody in February 2003.

70. ACLUF attorneys also currently represent a number of individuals who were detained and abused by United States forces at Abu Ghraib prison in Iraq and at other detention facilities in Iraq and Afghanistan. ACLUF attorney Omar Jadwat and ACLUF human rights advisor Jamil Dakwar regularly communicate by telephone and email with individuals in Iraq and Afghanistan, including plaintiffs in the litigation, concerning the treatment of prisoners held by United States forces in those countries. Some of these communications concern individuals who remain in the custody of United States forces.

71. Because of the content of their communications and the identities and locations of individuals with whom they are communicating, ACLU and ACLUF staff have a well-founded belief that their communications are being intercepted by the NSA under the Program.

72. The Program substantially impairs the ability of the ACLU and ACLUF to engage in communication that is vital to their respective missions. The Program requires ACLU and ACLUF staff and members to minimize the sensitive information

they include in their communications because of the risk that such information will be intercepted. In addition, ACLU and ACLUF staff and members believe that individuals abroad are more reticent in communicating with them because of the possibility that their communications are being intercepted by the NSA under the Program.

73. Attorneys at the ACLUF have represented to many of their clients that their telephone and email communications with ACLUF attorneys are confidential and covered by the attorney-client privilege. The willingness of ACLUF clients to consult with ACLUF attorneys and to provide information to ACLUF attorneys is based in part on that assurance. The Program is inhibiting candid communication between ACLUF attorneys and their clients and is thereby compromising the ability of ACLUF attorneys to effectively represent their clients.

**American Civil Liberties Union of Michigan**

74. The ACLU of Michigan is the Michigan affiliate of the ACLU and is dedicated to defending the civil liberties of Michigan residents. Its activities include lobbying the Michigan legislature on proposed bills that affect civil liberties, educating the Michigan public about such legislation and mobilizing ACLU of Michigan members and activists to lobby their representatives to protect civil rights and civil liberties.

75. Since September 11, 2001, a core priority of the ACLU of Michigan has been to publicize and oppose violations of civil liberties affected in the name of national security. For example, the Michigan ACLU established a "Safe and Free Project" devoted to post-9/11 civil liberties issues and hired a staff attorney for the project. It opposed state legislation that it believed unnecessarily sacrificed civil liberties in the name of national security. It mobilized its members to lobby local government bodies

across the state, resulting in the enactment of sixteen local resolutions opposing provisions of the USA PATRIOT Act that pose the most serious threats to civil liberties. The manner in which post-9/11 measures impact Arab-Americans is especially important to the Michigan ACLU affiliate because southeast Michigan has the highest concentration of Arab-Americans in the country.

76. The ACLU of Michigan has many members who regularly communicate with people outside the United States, including in the Middle East and Asia. Because of the nature of these communications, the identities of the individuals with whom they communicate, and the locations of individuals with whom they communicate, ACLU of Michigan members have a well-founded belief that their communications are being intercepted by the NSA under the Program. The Program is inhibiting ACLU of Michigan members from communicating freely and candidly in their personal and professional communications.

<u>Noel Saleh</u>

77. Noel Saleh is a member of the ACLU of Michigan who resides in Wayne County, Michigan. He is a United States citizen. He is a licensed attorney in the State of Michigan and served as the staff attorney for the American Civil Liberties Union of Michigan's "Safe and Free Project" from 2002 to 2004.

78. Mr. Saleh has been a community activist for Arab causes both in the United States and in the Arab World. Since 1989 he has served on the board of ACCESS, the Arab Community Center for Economic and Social Services. Currently, he is the Chair of the ACCESS Board of Directors. As part of his role as an ACCESS Board member, Mr. Saleh is frequently called upon to comment on current affairs and events

affecting the Arab American community.

79. Mr. Saleh has friends and family in Lebanon, Jordan and the Occupied Palestinian Territories with whom he frequently communicates by phone and by email. Prior to becoming aware of the Program, Mr. Saleh communicated with family members about various political topics and their opinions on current events including Israeli repression of Palestinians under occupation, Palestinian Right of Return and statehood, Islamic fundamentalists, terrorism, Osama bin Laden, al Qaeda, and America's role in each of these areas.

80. Because of his frequent communications with numerous people in the Middle East and other foreign countries about topics likely to trigger monitoring, Mr. Saleh has a well-founded belief that his communications are currently being intercepted by the NSA under the Program.

81. The likelihood that his communications are being intercepted by the NSA under the Program impinges on Mr. Saleh's ability to communicate freely and candidly in his international calls and emails. Since learning of the Program in news reports, he has refrained from talking about or emailing friends and family abroad about topics that might trigger monitoring.

82. The Program also interferes with Mr. Saleh's efforts to promote peace and justice in this country. Before he became aware of the Program, he felt free to engage in free and open communication with people in other countries about critical issues of the day. He gained unique insight from these conversations into U.S. foreign policy that he could not gain from the media in this country. Because of the NSA Program, he is less willing to engage in substantive discussions with people abroad and

therefore is not able to either gain these unique insights or share them with others.

Mohammed Abdrabboh

83. Mohammed Abdrabboh is a member of the ACLU of Michigan and has been a member of the ACLU of Michigan's Board of Directors since 2002. He is a United States citizen and a licensed attorney in the State of Michigan, with a practice in immigration, criminal defense and civil rights law, in Wayne County, Michigan. Mr. Abdrabboh serves as a Commissioner on the Michigan Civil Rights Commission, to which he was appointed by the Governor in May 2003. Mr. Abrabboh also teaches a course on civil liberties and national security at the University of Michigan at Dearborn.

84. Mr. Abdrabboh frequently communicates by telephone and email with family in the West Bank, Gaza, and Jerusalem. After law school, Mr. Abdrabboh worked for Al Haq, a human rights organization in the West Bank. He frequently communicates with friends and acquaintances he met while working there. He also communicates a number of times per month by telephone and email with friends and acquaintances in Saudi Arabia.

85. Approximately ninety-percent of Mr. Abdrabboh's clientele come from countries in the Middle East. As part of his immigration practice, he regularly represents individuals who live in the Middle East and are seeking to enter the United States, and as part of his representation he must conduct all communications with them through telephone and email. The nature of Mr. Abdrabboh's law practice requires him to communicate regularly by telephone and email with people in Lebanon, the West Bank and Gaza. His practice also requires that he occasionally communicate with individuals by telephone and email in Jordan, Afghanistan and Yemen. These communications are

essential in providing effective representation to his clients.

86. As part of his criminal defense practice, Mr. Abdrabboh has represented and continues to represent people the government has suspected of allegedly having some link to terrorism or terrorist organizations.

87. Because of the nature of his communications, the identities and locations of people with whom he communicates, Mr. Abdrabboh has a well-founded belief that his communications are being intercepted by the NSA under the Program.

88. The Program has inhibited communications between Mr. Abdrabboh and his family and friends because he is less candid about his political views and avoids saying things that are critical of the U.S. government over the telephone or through email.

89. The Program has inhibited communications between Mr. Abdrabboh and his clients, both foreign and domestic. Since learning of the Program, Mr. Abdrabboh has limited his communications about sensitive or privileged matters over the telephone or by email for fear the government is monitoring the communication. Instead, he has tried to limit such communications to in-person meetings, which has greatly impaired his ability to quickly get information he needs for the purpose of representing clients. Mr. Adbrabboh also believes that some of his clients have now stopped giving him sensitive information over the telephone. In one instance, a client who now lives in Afghanistan refused to share information over the telephone with Mr. Adbrabboh that was necessary to his representation in an immigration matter because the client feared the communication was being monitored by the government.

Nabih Ayad

90. Nabih Ayad is a member of the ACLU of Michigan. He is a licensed

attorney whose practice includes immigration, criminal defense and civil rights cases, in Wayne County, Michigan. Since 2002, he has served on the Lawyers Committee of the ACLU of Michigan, a committee that makes recommendations to the Board of Directors about which cases to pursue.

91. In his immigration practice, Mr. Ayad represents individuals throughout the Middle East and South Asia including individuals from Lebanon, Syria, Jordan, Egypt, United Arab Emirates, Iraq, Iran and Saudi Arabia. The government has attempted to deport some of his clients because of suspected ties to terrorism. For example, the government suspected some of his clients of supporting, or having ties to, the military wing of Hezbollah, a group that has been designated a terrorist organization by the Department of State. Mr. Ayad has also represented individuals from Lebanon, Liberia, and Trinidad who seek political asylum in this country. He successfully prevented 130 immigrants from Lebanon and Yemen accused of visa fraud from being deported through an expedited removal process. In the course of his immigration practice, Mr. Ayad is required to communicate by phone or through email with clients, clients' families and associates, and witnesses in the countries mentioned above.

92. Mr. Ayad has represented criminal defendants from Middle Eastern countries who have been accused of terrorism-related crimes. For example, he represented one individual from Jordan with suspected ties to the Taliban who came into this country with $12 million of counterfeit checks. He represented a man for Yemen who case was dismissed at the preliminary examination after he was wrongfully accused of attempting to blow up a federal building in Detroit. He also represented individuals from Lebanon who were accused of smuggling weapons oversees to Hezbollah. Through

the course of his criminal defense work, it is necessary to prepare a defense by communicating with clients, clients' families, witnesses and others in the client's home countries.

93. Mr. Ayad is a naturalized U.S. Citizen who was born in Lebanon. He has family and friends in Lebanon and Germany with whom he communicates by phone and email. When speaking with friends and family in the past, he discussed current events in the Middle East including the war in Iraq and terrorism.

94. Because of the nature of his communications, the identities of the some of the people with whom he communicates and the subject matter of conversations, Mr. Ayad has a well-founded belief that his communications are being intercepted by the NSA under the Program.

95. The Program has already inhibited communications between Mr. Ayad and individuals in the Middle East and Asia that are necessary to provide effective legal representation to his clients. Because of the Program, Mr. Ayad will not have certain kinds of conversations by phone or email for fear that the government might be monitoring his communications. For example, he will no longer communicate by phone or email about important strategic matters and about certain evidence in terrorist-related immigration or criminal cases. In addition, because of the program Mr. Ayad will even avoid discussing certain political topics with family and friends abroad for fear that such conversations will trigger monitoring.

**Council on American-Islamic Relations**

96. Plaintiff CAIR is a non-profit and non-partisan grassroots organization dedicated to enhancing the general public's understanding of Islam, protecting civil

liberties, empowering American Muslims and building coalitions that promote social justice and mutual understanding. CAIR is the largest Islamic civil liberties organization in the United States with more than 30 affiliated sister chapters throughout the United States and Canada representing the interests of over seven million American Muslims.

97. CAIR's Communications Department works in conjunction with local, national and international media outlets to ensure that an accurate portrayal of Islam and Muslims is presented to the general public. CAIR's daily news release service reaches individuals and international media outlets on a daily basis. Because of its communications work, CAIR has become a respected and credible source for journalists and other media professionals worldwide. CAIR representatives are regularly interviewed by CNN, BBC World Service, FOX News, The Washington Post, The New York Times, and The Los Angeles Times, as well as media outlets throughout the Muslim world, such as Al-Jazeera, Al-Arabiya, the Middle East Broadcasting Company (MBC), GEO TV (Pakistan), Al-Ahram, and other international print and broadcast outlets.

98. Because of its advocacy work, CAIR makes international telephone calls and write emails to journalists worldwide.

99. CAIR's international media communications are vital to its organizational goals of enhancing understanding of Islam, facilitating inter-cultural understanding, ensuring fair and accurate portrayals of Islam and Muslims in the media, and serving as a bridge between American and the Muslim world. CAIR's communications with members of the American Muslim community are also an essential part of its organizational success. Many members of the American Muslim community

communicate, both electronically and otherwise, to their families abroad.

100. CAIR's international media communications cover a range of subjects that are likely to trigger NSA scrutiny under the Program. These subjects include Islam, extremism, post-9/11 policies, surveillance, terrorism and counterterrorism, the war in Iraq and the American Muslim community.

101. CAIR's Communications Department drafts press releases, edits opinion articles and coordinates public education campaigns related to CAIR's mission and vision. In this role, CAIR's Communications Department receives calls from journalists from all over the world who seek information or official comment from the American Muslim perspective on issues related to CAIR's press releases or official positions.

102. The Program substantially impairs the ability of CAIR to engage in communications that are vital to its mission and the ability of the American Muslim community to freely communicate abroad without the fear of being placed under unlawful surveillance.

103. As a civil rights organization, CAIR also communicates confidential information about pending civil rights cases via international telephone calls and emails.

104. For example, after two high-profile individuals, musician Cat Stevens (known as Yusuf Islam since his conversion to Islam) and world-renowned academic Tariq Ramadan, named one of TIME Magazine's Top 100 Innovators, were denied admission to the United States; CAIR personally spoke with and emailed each of the individuals abroad.

105. The members of the American Muslim community, many of whom are

members of CAIR, are engaged in efforts of commerce, education and social services with individuals and institutions in the Muslim world. The work of the American-Muslim community in being able to engage freely in commerce, education and social services in the Muslim world is a vital part of building bridges between America and the Muslim world and thus, is integral to America's national security and vital interests. The Program substantially impairs the ability of the American Muslim community to engage in communications that are vital to America's national interests.

106. The communications of CAIR, its members and the American Muslim community with individuals and journalists abroad are an integral part of the mission and vision of CAIR, specifically related to building bridges of understanding between America and the Muslim world. The possibility that the American Muslim community's international electronic communications are being intercepted by the NSA impinges their ability to communicate freely and candidly in their international communications.

**CAIR-Michigan**

107. CAIR-Michigan is a non-profit and non-partisan grassroots organization dedicated to enhancing the general public's understanding of Islam, protecting civil liberties, empowering American Muslims and building coalitions that promote social justice and mutual understanding.

108. Because of its advocacy and civil rights work, CAIR-Michigan makes international telephone calls and writes emails to journalists worldwide related to the large American Muslim population within the state of Michigan.

109. CAIR-Michigan's media communications are vital to its organizational goals of enhancing a better understanding of Islam, facilitating inter-cultural

understanding and ensuring fair and accurate portrayals of Islam and Muslims in the media. CAIR-Michigan's communications are also essential to the organization's communication with its members in the American Muslim community in Michigan; many of whom communicate, both electronically and otherwise, to their families abroad.

Nazih Hassan

110. Nazih Hassan is a member of CAIR-Michigan who resides in Washtenaw County, Michigan. He was born in Lebanon in 1969, and became a legal permanent resident of the United States in 2001. From 2002 to 2003, he served as the president of the Muslim Community Association of Ann Arbor. He has served as chair on MCA' Board of Directors from mid-2005 to the present. Mr. Hassan works as a technology consultant.

111. Mr. Hassan has friends and family in Lebanon, Saudi Arabia, France, Australia and Canada with whom he frequently communicates by telephone and email. Among the people with whom he communicates by phone and email are his friends Islam Almurabit and Rabih Haddad.

112. Mr. Haddad is a native of Lebanon who was educated in the United States and lived in Ann Arbor, Michigan for more than 3 years. Mr. Haddad was an active member and popular volunteer teacher at the mosque to which Mr. Hassan belongs. Mr. Haddad co-founded Global Relief Foundation (GRF) in 1993, a humanitarian organization which the federal government has accused of having provided material support for terrorism. In December 2001, Mr. Haddad was arrested for an immigration violation on the same day that the offices of GRF were raided. Mr. Haddad was held for about a year before being deported to Lebanon. As one of the two media