# Exhibit A

# Part 2

coordinators for the Free Rabih Haddad Committee, Mr. Hassan drafted press releases, spoke to the media and organized public demonstrations against the detention of Mr. Haddad. Mr. Hassan visits Rabih Haddad when he returns to Lebanon for vacations.

113. Islam Almurabit, the former executive director of Islamic Assembly of North Americh, lived in Ann Arbor for approximately 7-8 years. In 2003, after the IANA offices were raided in Ypsilanti, Mr. Almurabit was visited by the FBI and accused of being a supporter of extremism. Rather than face continual harassment by the FBI, Mr. Almurabit left the United States in 2004 or 2005 and moved to Saudi Arabia.

114. Prior to becoming aware of the NSA Program, Mr. Hassan would speak with or communicate with family members about various political topics and their opinions on current events including Islam and the war in Iraq, Islamic fundamentalists, terrorism, Osama bin Laden, al Qaeda, the war in Afghanistan and the riots in France and Australia. Mr. Hassan would also participate in online discussion groups or bulletin boards about the war in Afghanistan on foreign websites in order to learn what people from other countries were thinking and to voice objections to those who favored extremism.

115. Because of his activism in the United States, his friendship with Islam Almurabit and Rabih Haddad, and his frequent communications with numerous people in the Middle East and other foreign countries about topics likely to trigger monitoring, Mr. Hassan has a well-founded belief that his communications are currently being intercepted by the NSA under the Program.

116. The likelihood that his communications are being intercepted by the NSA under the Program impinges on Mr. Hassan's ability to communicate freely and

candidly in his calls and emails. Since learning of the NSA Program in news reports, he has refrained from talking about or emailing friends and family abroad about any topic that might trigger monitoring. He has not called his friends Islam Al-Murabit or Rabih Haddad or engaged in email communications with them about anything political for fear that such communications would somehow be taken out of context or misconstrued as support for extremism. Finally, he no longer visits websites or discussion groups where some people advocate extremism, even though his purpose in participating in the discussion groups previously had been to oppose extremism.

117. The Program also interferes with Mr. Hassan's efforts to promote peace and justice in this country. Before he became aware of the NSA Program, he felt free to engage in free and open communication with people in other countries about critical issues of the day. He gained unique insight from these conversations into U.S. foreign policy that he could not gain from the media in this country. Mr. Hassan used these communications in his political work in the United States to educate Americans about the consequences of U.S. policy abroad. Because of the Program, he is no longer engaging in substantive discussions with people abroad and therefore is not able to either gain these unique insights or share them with others.

**Greenpeace**

118. Plaintiff Greenpeace is an advocacy organization dedicated to combating the most serious threats to the planet's biodiversity and environment. Since 1971, Greenpeace has been at the forefront of environmental activism through non-violent protest, research, lobbying, and public education. Greenpeace has approximately 250,000 members and seven offices in the United States. Greenpeace is associated with

international Greenpeace entities, which have a presence in 39 other countries and more than 2.5 million members.

119. As part of its international environmental advocacy, Greenpeace leaders and staff engage in international communications, via telephone and email, on a daily basis. Individuals contacted include staff members of Greenpeace offices in other countries, representatives of multinational organizations, governmental officials, scientific experts, and Greenpeace members. Greenpeace communicates by telephone and email with people in the Netherlands, England, Germany, Canada, Mexico, Australia, Brazil, India and Japan.

120. Greenpeace is aware that it has been targeted for surveillance in the past by the NSA. For example, in 1992 British intelligence officials revealed to the London Observer that in the 1990s the NSA had used the word "Greenpeace" as a keyword to intercept communications outside the United States. Government documents recently obtained under the Freedom of Information Act (FOIA) reveal that Greenpeace has been the subject of surveillance by the FBI and Joint Terrorism Task Forces, whose internal documents contend that the organization is associated with "suspicious activity with a connection to international terrorism." Documents obtained through the FOIA also indicate that the FBI has used confidential informants to obtain information about Greenpeace activities.

121. Greenpeace's recent activities also make the organization a likely target for government surveillance. In the past several years, Greenpeace has repeatedly engaged the Bush administration through public protest and activism. In 2001, Greenpeace held public demonstrations outside the personal residences of President Bush

and Vice President Cheney, attacking the administration's environmental and energy policies. Greenpeace has also actively publicized the Bush administration's ties to the oil industry, particularly to ExxonMobil. Seventeen Greenpeace activists were arrested in 2001 in connection with a protest aimed at disrupting a "star wars" missile test at Vandenberg Air Force Base. In 2002, Greenpeace protestors chained themselves to gas pumps at ExxonMobil stations in New York and Los Angeles, carrying banners that called on the Bush administration to stop favoring the oil industry over the environment. In 2003, there were several European protests against the war in Iraq by Greenpeace activists, including one at Rota Naval Air Base in Spain. More recently, a team of international Greenpeace experts exposed the United States' military's failure to secure and contain nuclear waste facilities in Iraq.

122. Because of the nature of Greenpeace's international communications, Greenpeace's recent activities, and the U.S. government's past surveillance of Greenpeace, Greenpeace has a well-founded belief that its international communications are currently being intercepted by the NSA under the Program.

123. Greenpeace's telephone calls, emails, and other Internet communications with individuals and organizations abroad are vital to its organizational goal of addressing environmental problems of global magnitude. This mission requires free and open communication with international colleagues, members, experts, and leaders of governments and industry.

124. The Program substantially impairs the ability of Greenpeace to engage in communications that are vital to its mission. Knowledge of the Program requires Greenpeace staff to minimize the sensitive information they include in their international

electronic communications and to be more circumspect and less candid in their communications to members and others. Greenpeace also believes that people abroad are more reticent in communicating with Greenpeace because of the likelihood that their conversations will be monitored by the NSA under the Program. Greenpeace fears that the Program will enable the U.S. government to disrupt Greenpeace's lawful activities by taking preemptive action against legitimate, and peaceful, protests.

**National Association of Criminal Defense Lawyers**

125. The National Association of Criminal Defense Lawyers (NACDL) is a District of Columbia non-profit organization whose membership is comprised of over 13,000 lawyers and 28,000 affiliate members representing every state. The NACDL was founded in 1958 to promote study and research in the field of criminal law; to disseminate and advance knowledge of the law in the area of criminal practice; and to encourage the integrity, independence, and expertise of defense lawyers in criminal cases.

126. NACDL is concerned with the erosion of due process and the rights of criminal defendants and suspects generally, but particularly so with respect to the impact of the "War on Terror" upon the criminal justice system, due process, and the protections afforded by the Fourth, Fifth, and Sixth Amendments.

127. NACDL has been active with respect to those issues. NACDL has filed amicus briefs in a considerable number of cases involving the infringement of rights precipitated by the War on Terror, including in the Courts of Appeal, the Foreign Intelligence Surveillance Court of Review, and the Supreme Court. NACDL has been involved as amicus in all of the cases involving the rights of detainees, either U.S. citizens or those held at Guantanamo Bay, Cuba, in the lower and appeals courts.

128. NACDL also has at least three committees that address these issues: its Select Committee on Military Tribunals, its International Law Committee, and its Ethics Committee. Its Amicus Curiae Committee has also been intensively involved in these issues.

129. At least fifty NACDL members currently represent or have represented terrorism suspects, and many of these members regularly communicate with people outside the United States. Because of the nature of these communications, the identities of the individuals with whom they communicate, and the locations of individuals with whom they communicate, NACDL members have a well-found belief that their communications are being intercepted by the NSA under the Program. The Program is inhibiting communications that are necessary for NACDL members to provide effective legal representation to their clients.

<u>Joshua L. Dratel</u>

130. Joshua L. Dratel is a nationally recognized criminal defense lawyer in New York City. Mr. Dratel is a member of NACDL's Board of Directors and Co-Chair of its Select Committee on Military Tribunals. He is also co-editor of The Torture Papers: The Legal Road to Abu Ghraib (Cambridge University Press: 2005).

131. Mr. Dratel currently represents a number of individuals who have been accused by the federal government of terrorism-related crimes. For example, Mr. Dratel is lead counsel for David Hicks, whom the United States government has detained as an enemy combatant at Guantanamo Bay since 2001, and who is being prosecuted by the U.S. military commission. Mr. Dratel also represents Lynne Stewart, a criminal defense lawyer accused of providing material support for terrorism. Mr. Dratel also represents

Mohamed El-Mezain in a federal prosecution charging material support for terrorism, and Wadih El-Hage, a defendant in *United States v. Usama Bin Laden* (the Embassy Bombings case), in Mr. El-Hage's pending appeal of his conviction. Mr. Dratel also represented Sami Omar Al-Hussayen, who was acquitted in federal court in Idaho of providing material support for terrorism based on the technical support he provided to web sites and discussion boards about terrorism and jihad.

132. In representing these and other clients, Mr. Dratel routinely engages in telephone and email communications with witnesses, foreign counsel, experts, journalists, and government officials in Israel, Germany, Australia, the United Kingdom, and elsewhere. He also routinely communicates with the family members of his clients, many of whom reside in other countries. These communications are essential to his effective representation of his clients.

133. In representing these and other clients, Mr. Dratel conducts research and accesses discussion boards on the Internet as an integral part of the investigatory process. This research often includes review of web sites that allegedly support terrorism and jihad, and/or discuss the issues, including qoqaz.com, azzam.com, alasr.ws, palestine-info.org, islamway.com, and cageprisoners.com, among many others. Because of the charges against Sami Omar Al-Hussayen, Mr. Dratel reviewed hundreds of such web sites and discussion boards in preparation for trial. Mr. Dratel also engages in keyword searches using terms such as "Usama bin Laden," "Chechnya," "qoqaz," "Sheikh Safer al-Hawali," "Sheikh Salman al Odah," and "Hamas."

134. Because of the nature of his communications, the identities of people with whom he communicates, and the subject matter of his online research, Mr. Dratel

has a well-founded belief that his communications are being intercepted under the Program.

135. The Program has already inhibited communications between Mr. Dratel and individuals in other countries that are necessary to provide effective legal representation to his clients. Since learning of the Program, Mr. Dratel has ceased having certain kinds of discussions over the telephone or by email for fear that the government may be monitoring his communications.

Nancy Hollander

136. Nancy Hollander, a member and past President of NACDL, is a nationally recognized criminal defense lawyer in Albuquerque, New Mexico. Ms. Hollander is co-chair of NACDL's International Affairs Committee and also in charge of recruiting volunteers to represent prisoners at Guantanamo.

137. Ms. Hollander currently represents organizations and individuals who have been accused by the federal government of terrorism-related crimes. For example, Ms. Hollander represents Holy Land Foundation and its Executive Director Shukri Abu Baker, who are currently under indictment in Dallas, Texas charged with providing material support to a terrorist organization. She also represents Mohammedou Ould Salahi, who the federal government has declared an enemy combatant and who has been detained at Guantanamo Bay since 2002. She also represented Fawaz Damrah, who was charged and convicted in Ohio of naturalization crimes but whom the federal government attempted to link to Sami Al-Arian, a professor accused and recently acquitted in Florida of terrorism-related crimes.

138. The nature of Ms. Hollander's legal practice requires her to communicate regularly by email and telephone with individuals outside the United States. These communications are essential in providing effective representation to her clients. For example, in representing these and other clients, Ms. Hollander routinely communicates by telephone and email with witnesses, foreign counsel, experts, journalists, government officials and political figures in Israel, Gaza, the West Bank, Egypt, and other countries in the Middle East, as well as in Mauritania.

139. In representing these and other clients, Ms. Hollander also conducts research on the Internet about terrorism, religion, and politics in the Middle East and South Asia, and also participates in Internet discussions on these topics. Ms. Hollander routinely searches web sites using key words such as "Hamas," "Palestianian Islamic Jihad," "muhajadin," and "suicide bomber." This research is a necessary component of the investigatory process.

140. Because of the nature of her communications, the identities of people with whom she communicates, and the subject matter of her online research, Ms. Hollander has a well-founded belief that his communications are being intercepted by the NSA under the Program.

141. The Program has already inhibited communications between Ms. Hollander and individuals in the Middle East that are necessary to provide effective legal representation to her clients. Since learning of the Program, Ms. Hollander has ceased having certain kinds of discussions over the telephone or by email for fear that the government may be monitoring her communications. Ms. Hollander has decided that she will no longer communicate by phone or email about any strategic or privileged

matters with her clients charged in terrorism related cases, or with witnesses, experts, potential experts and co-counsel outside the United States. In one current case, Ms. Hollander is planning an expensive trip to obtain information that she would have previously obtained via telephone and email.

William W. Swor

142. William W. Swor is a member of the NACDL, and a member of the Board of Directors of the Criminal Defense Attorneys of Michigan. He maintains a private practice of law in Detroit, Michigan. His practice is primarily in the areas of federal criminal defense and immigration law.

143. Mr. Swor has represented, currently represents and expects to represent in the future, individuals who were investigated and or prosecuted under one or more of the federal terrorism-related statutes. For example, Mr. Swor represents Abdel-Ilah Elmardoudi who was wrongfully accused by the United States of providing material aid in support of terrorism. Mr. Swor also represents Mahmoud Kourani who was accused by the United States of providing material aid to Hezbollah, in Lebanon. Mr. Swor has other matters pending, both criminal and immigration matters, in several federal districts in which his clients are being investigated or prosecuted under one or more of the federal terrorism-related statutes.

144. In representing these and other clients, Mr. Swor conducts research on the Internet about terrorism, religion and politics in the Middle East, Eastern Europe, Africa and the Caucasus Mountain region. This research includes review of sites that support terrorism and/or organizations that the United States has declared Foreign Terrorist Organizations (FTOs). This research is a necessary component of his

preparation of his cases. Based upon discovery provided by the United States in pending matters, he will continue to need to refer to these sites for information.

145. The nature of Mr. Swor's legal practice also requires him to communicate by telephone with individuals outside of the United States, including individuals whose communications are likely to have been intercepted under the Program. These individuals are witnesses, potential experts, journalists, and others who are located in the Middle East, e.g. Lebanon, and Jordan, as well as western European countries such as France and England. These communications are essential in providing effective representation to his clients.

146. Mr. Swor has a well-founded belief that his communications are being intercepted by the NSA under the program. The Program has already inhibited communications between Mr. Swor and individuals in the Middle East that are necessary to provide effective legal representation to his clients. Since learning of the Program, Mr. Swor has avoided having certain kinds of discussions over the telephone or email for fear that the government may be monitoring his communications. Mr. Swor believes that he will now have to schedule one or more trips overseas to interview witnesses and to obtain information that he would have previously been able to obtain via telephone and email communications.

**James Bamford**

147. Plaintiff James Bamford, of Washington, D.C., is an award-winning and bestselling author and journalist. He is one of the world's leading experts on U.S. intelligence generally and the National Security Agency specifically. Mr. Bamford is the author of A Pretext for War: 9/11, Iraq, and the Abuse of America's Intelligence

Agencies (Doubleday, 2004), Body of Secrets: Anatomy of the Ultra-Secret National Security Agency (Doubleday, 2001), and The Puzzle Palace: A Report on NSA, America's Most Secret Agency (Houghton Mifflin, 1982). Mr. Bamford has written extensively on national security issues for a range of newspapers and magazines, including investigative cover stories for The New York Times Magazine, The Washington Post Magazine, and The Los Angeles Times Magazine. From 1989 -1998, he was the Washington investigative producer for ABC's World News Tonight with Peter Jennings. In 2002, he was a distinguished visiting professor of National Security at the Goldman School of Public Policy, University of California, Berkeley.

148. As an expert on intelligence, Mr. Bamford has testified before committees of both the Senate and House of Representatives as well as the European Parliament in Brussels and the International Criminal Tribunal for the former Yugoslavia. He has also been a guest speaker at the Central Intelligence Agency's Senior Intelligence Fellows Program, the National Security Agency's National Cryptologic School, the Defense Intelligence Agency's Joint Military Intelligence College, the Pentagon's National Defense University and Air War College, and the Director of National Intelligence's National Counterintelligence Executive.

149. Mr. Bamford first experienced the impact of illegal NSA eavesdropping on Americans, and the lengths to which the U.S. government will go to prevent disclosure of its spying programs, thirty years ago. As Mr. Bamford was writing The Puzzle Palace, he discovered that the Justice Department in 1976, during the Ford administration, began a secret criminal investigation into widespread illegal domestic eavesdropping by the NSA. Mr. Bamford filed a request under the Freedom of

Information Act for documents dealing with that investigation. Several hundred pages of documents were eventually released to him in 1979. The documents showed that the FBI questioned senior NSA officials about the possibility of their having violated federal criminal laws by engaging in warrantless eavesdropping of American citizens. "The investigation," said the documents, "uncovered 23 different categories of questionable activities." However, because of the secrecy of the operations, and the fact that law was undefined in this area, the Justice Department decided against prosecution and instead recommended that new laws be created to outlaw this type of activity.

150. Shortly after President Ronald Reagan took office, the Justice Department, at the request of the NSA, notified Mr. Bamford that the documents had been "reclassified" as top secret and demanded their return. When Mr. Bamford refused, saying that they had been properly declassified and released to him by the Carter administration, he was threatened with prosecution. Mr. Bamford then cited the presidential executive order on secrecy which stated that once a document had been declassified, it *cannot* be reclassified. As a result, President Reagan changed the executive order to indicate that once a document has been declassified it *can* be reclassified. However, because the order could not be applied retroactively, the new executive order could not be applied to Mr. Bamford and the information was subsequently published in The Puzzle Palace.

151. During that period, sources necessary to Mr. Bamford's investigative journalism were much less willing to communicate with him due to the likelihood that his communications were being intercepted by the NSA. The NSA had previously placed another writer, David Kahn, on its watch list, and intercepted his communications, as he

was writing his history of cryptology, The Codebreakers. According to the Senate Select Committee on Intelligence, the agency also considered undertaking "clandestine service applications" against the author, which apparently meant anything from physical surveillance to conducting a "surreptitious entry" into Kahn's New York home.

152. Mr. Bamford's recent work has again made it likely that his communications are being intercepted by the NSA. For example, in the fall of 2001, Mr. Bamford received a book contract from Doubleday Publishing Company to write A Pretext for War, which documents the intelligence mistakes that led to the nation's failure to prevent the 9/11 attacks and the Bush administration's subsequent misuse of intelligence to sell preemptive war to the American people.

153. Since the fall of 2001, Mr. Bamford has also written more than two dozen articles, reviews and opinion pieces on intelligence, 9/11, and the wars in Iraq and Afghanistan. These include "Where Spying Starts and Stops" (The New York Times, January 2006), "The Agency That Could Be Big Brother" (The New York Times, December 2005), "The Labyrinthine Morass of Spying in the Cold War" (The New York Times, July 2003), "This Spy For Rent" (The New York Times, June 2004), "How To De-Centralize Intelligence" (The New York Times, November 2002), "War of Secrets" (The New York Times, September 2005), "Washington Bends The Rules" (The New York Times, September 2002), "A Former CIA Cowboy and his Disillusioning Ride" (The New York Times, September 2002), "We're Watching Them" (The Washington Post, February 2005), "Sowing the Whirlwind" (The Washington Post, February 2004), "A Look Over My Shoulder" (The Washington Post, April 2003), "Shadow Warriors" (The Washington Post, December 2002), "Strategic Thinking" (The Washington Post,

September 2002), "The Wrong Man" (The Washington Post, January 2002), "Intelligence Failures" (The Washington Post, June 2002), "Maintain CIA's Independence" (USA Today, October 2002), "Untested Administration Hawks Clamor for War" (USA Today, September 2002), "Bush Wrong to Use Pretext as Excuse to Invade Iraq" (USA Today, August 2002), "Linguist Reserve Corp Answers Terror Need" (USA Today, July 2002), "Secret Warriors: The Great Game" (The Los Angeles Times, May 2004), "Secrets on High" (The Los Angeles Times, March 2003), "The Man Who Sold The War" (Rolling Stone, December 2005) and "Breeding Terror: The Intelligence Community Analyzes a Counterproductive War" (The American Conservative, March 2005). Mr. Bamford also is a contributing editor for Rolling Stone and has served on the USA Today Board of Contributors.

154. Communicating with individuals in Iraq, Afghanistan, and elsewhere in the Middle East via email and telephone is a vital part of Mr. Bamford's work as an author and journalist. Mr. Bamford's sources in the Middle East include people working for the United States military and intelligence agencies, intelligence officials in other countries, intelligence experts, and foreign journalists specializing in writing on intelligence.

155. Mr. Bamford's email communications include discussions of the NSA, Central Intelligence Agency, military strategies related to the wars in Iraq and Afghanistan, and the 9/11 attacks and other terrorist attacks. The people with whom Mr. Bamford has communicated, the locations of people with whom he has communicated, and the content of his communications are all likely to have triggered scrutiny by the NSA under the Program.

156. Mr. Bamford also frequently communicates by telephone and email with journalists in the Middle East, both as part of his research and because he is often interviewed as an expert on U.S. intelligence. For example, he has appeared several times on Al-Jazeera, the leading television network in the Arab world.

157. As part of his research, Mr. Bamford also frequently visits web sites that are likely to trigger NSA scrutiny. For example, Mr. Bamford has researched web sites about terrorism, jihad, Osama bin Laden, al Qaeda, Islamic fundamentalism, Saddam Hussein, weapons of mass destruction, and signals intelligence. One web site, Jihad Unleashed, includes translations of Osama bin Laden's communications. Some of these web sites express support for terrorism.

158. Mr. Bamford's ability to research and write about the NSA, intelligence, and the war on terror is seriously compromised by the Program. Because the Program substantially increases the likelihood that his communications are being intercepted by the NSA, Mr. Bamford is less able to communicate freely and candidly in his international calls and emails. In addition, because of the Program, Mr. Bamford believes that sources who have first-hand knowledge about intelligence failures and abuses are less willing to engage in communications with him.

**Larry Diamond**

159. Larry Diamond is a senior fellow at the Hoover Institution, Stanford University, and founding coeditor of the Journal of Democracy. He is also codirector of the International Forum for Democratic Studies of the National Endowment for Democracy. At Stanford University, he is professor by courtesy of political science and sociology and coordinates the democracy program of the Center on Democracy,

Development, and the Rule of Law. During 2002–03, he served as a consultant to the U.S. Agency for International Development (USAID) and was a contributing author of its report Foreign Aid in the National Interest. Currently he serves as a member of USAID's Advisory Committee on Voluntary Foreign Aid. Professor Diamond has also advised and lectured to the World Bank, the United Nations, the State Department, and other governmental and nongovernmental agencies dealing with governance and development.

160. During the first three months of 2004, Professor Diamond served as a senior adviser on governance to the Coalition Provisional Authority in Baghdad. He is now lecturing and writing about the challenges of post-conflict state building in Iraq, and the challenges of developing and promoting democracy around the world, with a particular focus on the Middle East and Africa. Professor Diamond has worked with a group of Europeans and Americans to produce the Transatlantic Strategy for Democracy and Human Development in the Broader Middle East, published in 2004 by the German Marshall Fund of the United States. During 2004–5, he has been a member of the Council on Foreign Relations' Independent Task Force on United States Policy Toward Arab Reform.

161. Professor Diamond is the author of numerous books, including Squandered Victory: The American Occupation and the Bungled Effort to Bring Democracy to Iraq (Times Books, 2005). His recent edited books include Islam and Democracy in the Middle East (with Marc F. Plattner and Daniel Brumberg) and Assessing the Quality of Democracy (with Leonardo Morlino).

162. Professor Diamond's work requires him to communicate by email, and occasionally by telephone, with advocates of democracy in the Middle East, Asia, and

Africa. For example, Professor Diamond corresponds by email with Saad Eddin Ibrahim, a leading advocate of democratic reform in Egypt, and with Professor Maye Kassem, a political scientist at the American University in Cairo. Professor Diamond corresponds with Adel Abdellatif of the United Nations Development Program in Beiruit. Professor Diamond also corresponds with advocates for democratic reform in many other countries, including Iran, the Palestinian Authority, Pakistan, China, the Philippines, Nigeria, Kenya, and Uganda.

163. Professor Diamond has a well-founded belief that his communications are being intercepted by the Program.

164. Some of Professor Diamond's correspondence with individuals in the Middle East and Asia concerns political and human rights issues that are extremely sensitive. For example, Professor Diamond has corresponded with Sana Baloch, a Pakistani Senator, about human rights issues in Baluchistan. Professor Diamond believes that Senator Baloch would not have provided him with this information had he believed that communications with Professor Diamond were monitored by the United States government. Professor Diamond believes that the existence of the Program makes it less likely that individuals in Afghanistan, Pakistan, Egypt, China, and elsewhere in the Middle East and Asia will provide him with sensitive information over email or by telephone in the future.

165. Because Professor Diamond is a well-known scholar of democratic reform, he is occasionally contacted unsolicited by individuals who live under repressive governments and have complaints about their governments' policies. Professor Diamond believes that the Program makes it substantially less likely that such individuals will

contact him. Professor Diamond believes that this is particularly true of individuals who live under repressive governments that have close relations with the United States, such as Pakistan, Egypt, and Kazakhstan, because these individuals will reasonably fear that their communications may ultimately be provided by the United States to their own governments.

166. Professor Diamond's ability to advocate and advise on democratic reform in the Middle East and Asia depends in part on the willingness of political dissidents to contact him, to consult with him, and to provide him with information about their own governments' policies. Professor Diamond believes that the Program inhibits the exchange of information and ideas among advocates of democratic reform and the victims of human rights abuses and defenders of human rights, and thereby compromises his ability to study the progress of democratic reform and support those in the Middle East and Asia who advocate change.

167. Additionally, Professor Diamond is concerned about the implications of the program for academic freedom. He periodically has undergraduate and graduate students who travel to the Middle East, Asia, and Africa to conduct research on sensitive political questions and who need to be in touch with him by email for advice and coordination while in the field. For example, this past summer, one of his Stanford undergraduate advisees, Omar Shakir, worked for him as a research assistant in Egypt interviewing opposition activists, intellectuals, and advocates of democratic change. Shakir sent weekly reports back to Professor Diamond and they communicated by email while he was in Egypt. Professor Diamond believes the Program inhibits the conduct and coordination of overseas research and the supervision of student research by impairing

the ability to communicate freely and responsibly with his students and assistants overseas, who often give their interviewees pledges of strict confidentiality.

**Christopher Hitchens**

168. Christopher Hitchens is a reporter and author based in Washington, D.C. He is a prominent and controversial commentator who is vocal in his support for the military interventions in Iraq and Afghanistan. Mr. Hitchens writes frequently on the politics of the Middle East. Many of his articles focus on understanding the role and influence of Islamic fundamentalism in the region. He also probes the success of United States policy in assuaging the threat to security posed by Muslim terrorists harbored in the Middle East and West Asia.

169. Mr. Hitchens' reportage and analysis appear in numerous publications. He has published in Harpers, The Spectator, The Nation, New York Newsday, and Atlantic Monthly. He currently is a frequent contributor to Slate and Vanity Fair. Mr. Hitchens writes a regularly featured column for Slate called Fighting Words, which he used to voice his strong support for the allied military actions in Iraq and Afghanistan. He has traveled throughout the Middle East on behalf of Vanity Fair in order to write a series of articles describing the political climate in various countries. Mr. Hitchens is also a best-selling author of several books. In 2003, he published A Long Short War: The Postponed Liberation of Iraq, a collection of essays analyzing arguments for and against the war in Iraq. In 2005, he contributed an essay to Thomas Cushman's compilation A Matter of Principle: Humanitarian Arguments for War in Iraq.

170. Mr. Hitchens' work requires him to maintain frequent contact with sources in the Middle East and Western Asia. Such communications were necessary for

him to research his Vanity Fair articles on political conditions in various Middle East states. These articles include "On the Frontier of Apocalypse" on Pakistan (January 2002), "The Maverick Kingdom" on Qatar (December 2002), "Saddam's Long Good-Bye" on Kuwait (June 2003), "A Prayer for Indonesia" (January 2004), "Afghanistan's Dangerous Bet" (November 2004), and "Iran's Waiting Game" (July 2005). Mr. Hitchens' upcoming book and continuing journalism will involve contact with, and visits to, the Middle East and Western Asia.

171. As part of his work, Mr. Hitchens regularly exchanges emails and telephone calls with individuals in Iraq, Iran, Afghanistan, Pakistan, India, Indonesia, Qatar and Kuwait. In a typical week, Mr. Hitchens hears from individuals in several of these countries. For example, Mr. Hitchens has spoken with Dr. Masuda Jalal, the only woman who ran for president of Afghanistan; Hossein Khomeini, a cleric whose grandfather overthrew the Iranian monarchy in 1979; Ali Mohmmed Kamal, a TV marketing director for Al Jazeera; and Sardar Sikander Hayat Khan, the prime minister of Pakistani Kashmir. Mr. Hitchens' communications to the Middle East and Western Asia include contacting journalists of a variety of nationalities and individuals in the United States military and diplomatic corps. He also contacts those who are actively hostile to the United States military intervention in Iraq and Afghanistan and the United States more generally. Because of the subject matter of his reporting, many of Mr. Hitchens' communications involve discussions of Islamic fundamentalism, terrorism, jihad, Osama bin Laden, al Qaeda, and Saddam Hussein.

172. Since well before 2001, but more regularly and frequently since then, Mr. Hitchens' work has required him to travel to the Middle East and Western Asia.

Since 2001, the countries he has visited include Iraq, Iran, Afghanistan, Pakistan, India, Indonesia, Qatar and Kuwait. Travel is an important element of Mr. Hitchens' work, as his reporting offers detailed, first-hand accounts of conditions in countries few Westerners have an opportunity to visit. For instance, Mr. Hitchens traveled throughout Iran to prepare "Iran's Waiting Game" (July 2005 Vanity Fair). He visited Tehran, Qom, and Mashhad to gain a sense of life under Iran's theocratic government. In researching "Afghanistan's Dangerous Bet" (November 2004 Vanity Fair), Mr. Hitchens ventured from Kabul to the provincial capital of Herat to witness the run-up to Afghanistan's first democratic elections from different vantage points. Mr. Hitchens visited Qatar to report on its relatively free society, a report in which he devoted much attention to Qatar-based media outlet Al Jazeera (The Maverick Kingdom, December 2002 Vanity Fair). While traveling, Mr. Hitchens communicates regularly by telephone and email with colleagues, editors, and sources in the United States.

173. Because of the nature of his communications with people in the Middle East, the identities of those with whom he communicates, and the subject matter of his online research, Mr. Hitchens has a well-founded belief that his communications are being intercepted by the NSA under the Program. Mr. Hitchens believes that free and open communication with his sources is an essential element of his work as a journalist. Given the sensitive nature of his work, Mr. Hitchens must assure some of his sources that their communications are kept in strict confidentiality. The Program undermines Mr. Hitchens' ability to make that assurance. As a result, individuals are less forthcoming in their conversations with him, and may cut off communications completely. In addition, the likelihood that Mr. Hitchens' international communications are being intercepted by

the NSA under the spying program impinges his own ability to communicate freely and candidly with his sources and others, to the detriment of his effectiveness as an investigative journalist.

**Tara McKelvey**

174. Plaintiff Tara McKelvey is a senior editor at The American Prospect and a contributing editor to Marie Claire. Her articles have appeared in those two magazines as well as in The Nation, USA Today, Chicago Tribune, and The New York Times.

175. Ms. McKelvey has written extensively about the Middle East, including articles about Iraqi detainees held in United States custody, about women's issues in Iraq, and about the United States military in Iraq. She is working on a book about U.S. legal efforts to fight torture and is editing an upcoming anthology about women and torture.

176. Communicating with individuals in Iraq, Jordan, and Syria via telephone and email is a vital part of Ms. McKelvey's work as a journalist. Since October 2004, Ms. McKelvey regularly emails people in Iraq and Jordan as part of her research. For example, she made frequent calls to individuals in Iraq, Jordan, and Syria during November and December 2004 and January, November, and December 2005. Ms. McKelvey's sources in the Middle East include individuals working for the United States military, Iraqi soldiers, nongovernmental agencies, bankers, school administrators, journalists, activists, human-rights workers, and others.

177. Among Ms. McKelvey's many sources in the Middle East are individuals she believes are likely to have been the targets of United States government surveillance because they have been arrested or investigated by United States or coalition

forces, have been suspected of aiding insurgents, have ties to the former Iraqi regime, or are critical of the United States presence in Iraq.

178. For example, in December 2004, for an article for The American Prospect, Ms. McKelvey interviewed by telephone Khadeja Yassen in Baghdad. Yassen was a ranking member of the Baath Party and is the sister of former vice president Taha Yassin Ramadan, who in turn was included in the United States military's playing card deck of the 55 most wanted Iraqis. Yassen had her house raided by United States forces in 2003 and was thereafter arrested.

179. Also in December 2004, for an article for The American Prospect, Ms. McKelvey interviewed Saja, an engineer in her thirties, by telephone at her home in Damascus. Ms. McKelvey also emailed her. Saja is, according to an American spokesman for coalition forces in Iraq, believed to be a former mistress of Saddam Hussein.

180. As part of her journalistic research, Ms. McKelvey visits numerous websites hosted in the Middle East that include aggressive anti-American propaganda.

181. Because of her journalistic contacts with individuals in Iraq who have been arrested or investigated by United States or coalition forces, who have been suspected of aiding insurgents, who have ties to the former Iraqi regime, or who are critical of the United States presence in Iraq, Ms. McKelvey has a well-founded belief that her international communications are being intercepted by the NSA under the Program.

182. The Program substantially impairs Ms. McKelvey's ability to communicate openly with sources in the Middle East that are essential to her work as a

journalist. Many of Ms. McKelvey's most important sources have spoken to her in the past only with great trepidation: they fear that other Iraqis will kill them for speaking with an American and, at the same time, they fear being arrested (in some cases, re-arrested) by United States or coalition forces who suspect them of being involved in insurgent activities. Ms. McKelvey believes that the Program is diminishing the willingness of her sources to communicate with her and may deter them from communicating with her altogether for fear that their communications may be intercepted.

**Barnett R. Rubin**

183. Barnett R. Rubin is Director of Studies and Senior Fellow at the New York University Center on International Cooperation ("CIC"). The CIC promotes policy research and international consultations on multilateral responses to transnational problems. He is the chair of the Conflict Prevention and Peace Forum (CPPF), a program of the Social Science Research Council in New York, that provides the United Nations with confidential consultations with experts on issues related to conflict and peace around the world. He is also a member of the board of Gulestan Ariana Ltd., a commercial company registered in Afghanistan to manufacture essential oils, hydrosols, and related proeducts, with offices and operations in Kabul and Jalalabad. Previously Professor Rubin was the Director of the Center for Preventive Action of the Council on Foreign Relations, of which he is now an advisory board member. He was a member of the UN delegation to the UN Talks on Afghanistan in Bonn, Germany, in November-December 2001. Professor Rubin advised the United Nations in Afghanistan during the process of drafting the constitution of the Islamic Republic of Afghanistan in 2003. Professor Rubin

is a member of the advisory board of the Central Eurasia Program of the Open Society Institute, overseeing programs in the Caucasus, Central Asia, Afghanistan, Iran, and Pakistan.

184. Professor Rubin's work and research concerns conflict prevention and peace building in Afghanistan and the surrounding region. Professor Rubin is regularly consulted as an expert on Afghanistan, Central Asia, and South Asia and regularly works in collaboration with officials of Afghanistan, the United Nations, the United States, and other governments and international organizations on development and institution-building projects. In his work with CPPF he works on issues related to conflict prevention in Central Asia and travels to the area. As a board member of Gulestan, he communicates with individuals in Kabul and Jalalabad, and travels to inspect the company's operations in Jalalabad and elsewhere in Nangarhar province, including some areas close to Tora Bora. He has authored and edited numerous books and articles about Afghanistan and conflict prevention, including The Fragmentation of Afghanistan (New Haven: Yale University Press, 2002 (second edition), 1995 (first edition)), The Search for Peace in Afghanistan (New Haven: Yale University Press, 1995), and Blood on the Doorstep: The Politics of Preventing Violent Conflict (New York: The Century Foundation and the Council on Foreign Relations, 2002).

185. Professor Rubin communicates by email and telephone with individuals in Afghanistan almost every day. Professor Rubin frequently communicates by telephone with Afghan government officials in Kabul. In connection with Gulestan's activities he speaks to individuals in Jalalabad. In connection with his work for CPPF and OSI, Professor Rubin communicates with individuals in Central Asia. Professor Rubin

communicates regularly by telephone with Amrullah Saleh, the Director of the National Directorate of Security (Afghanistan's intelligence agency); with Ishaq Nadiri, President Hamid Karzai's Minister Advisor of Economic Affairs; with Adib Farhadi, Director of the Afghanistan Reconstruction and Development Services; with Ali Ahmad Jalali, when he was Minister of the Interior of Afghanistan; with Dr. Ashraf Ghani, Chancellor of Kabul University and former Minister of Finance of Afghanistan; with engineer Mohammad Eshaq, former director of Afghan Radio and Television; and with many others.

186. Professor Rubin also communicates frequently by telephone with United Nations officials in Kabul, including Lakhdar Brahimi, when he was the United Nations Special Representative of the Secretary General for Afghanistan (SRSG); Jean Arnault, the current SRSG; Ameerah Haq, Deputy SRSG; Chris Alexander, Deputy SRSG; and Eckart Schwieck, Mr. Arnault's Executive Assistant.

187. In connection with his work on Afghanistan and South Asia, Rubin frequently communicates by email and telephone with colleagues such as Ahmed Rashid, a journalist and author residing in Lahore, Pakistan. He frequently communicated in the past several years with a Pakistani journalist named Abubaker Saddique, who worked for the International Crisis Group, the Integrated Regional Information Network (Central Asia) of the United Nations and who also worked for CIC as a consultant. These communications concerned particularly sensitive matters, such as the Afghan-Pakistani border areas, a project on which they are now working together.

188. In connection with his work for CPPF and OSI, Professor Rubin has traveled to Tajikistan and other Central Asian countries and engages in email and

telephone communications with journalists in the area as well as with OSI staff, such as Zuhra Halimova, director of the OSI office in Dushanbe, Tajikistan.

189. In connection with his work, Professor Rubin also frequently communicates with Afghan government officials and others by email. For example, between August 2005 and the present, Professor Rubin has exchanged numerous emails with Afghan government officials who are drafting the Afghan National Development Strategy, on which Professor Rubin works as an advisor. Professor Rubin has also communicated by email with Amrullah Saleh, the Director of the Afghan intelligence agency. On occasion, Professor Rubin has also exchanged emails with individuals, including government officials, in Iran. These have included former deputy foreign minister Abbas Malcki, editor of the Hamshahri newspaper and director of the Caspian Studies Institute; and Dr. Sayed Kazem Sajjadpour, former director of the Institute for Political and International Studies; and Kian Tadjbakhsh, Senior Research Fellow, Cultural Research Bureau, Tehran. Rubin traveled to Tehran for a conference in December 2003, and in conjunction with that trip made numerous telephone calls and emails.

190. Because of the nature of Professor Rubin's communications, and the identities and locations of those with whom he communicates, Professor Rubin has a well-founded belief that his communications are being intercepted by the NSA under the Program.

191. Professor Rubin believes that free and open communication with individuals in Afghanistan and elsewhere in the Middle East and Asia is essential to his work as a scholar. A large part of Professor Rubin's work involves exchanging ideas and

information with people in Afghanistan and elsewhere in the Middle East and Asia. The ideas are sometimes controversial and the information is sometimes sensitive. Professor Rubin believes that the Program inhibits the free exchange of controversial ideas and sensitive information and thereby compromises his ability to engage in scholarship and to work collaboratively with individuals in Afghanistan and elsewhere in the Middle East and Asia.

## CAUSES OF ACTION

192. The Program violates plaintiffs' free speech and associational rights guaranteed by the First Amendment.

193. The Program violates plaintiffs' privacy rights guaranteed by the Fourth Amendment.

194. The Program violates the principle of separation of powers because it was authorized by President Bush in excess of his Executive authority under Article II of the United States Constitution and is contrary to limits imposed by Congress.

195. The Program violates the Administrative Procedures Act because the NSA's actions under the Program exceed statutory authority and limitations imposed by Congress through FISA and Title III; are not otherwise in accordance with law; are contrary to constitutional right; and are taken without observance of procedures required by law.

## PRAYER FOR RELIEF

WHEREFORE plaintiffs respectfully requests that the Court:

1. Declare that the Program is unconstitutional under the First and Fourth Amendments;

2. Declare that the Program violates the principle of separation of powers;

2. Declare that the Program violates the Administrative Procedures Act;

3. Permanently enjoin defendants from utilizing the Program;

4. Award Plaintiff fees and costs pursuant to 28 U.S.C. § 2412;

5. Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

Ann Beeson / MJS

ANN BEESON
*Attorney of Record*
JAMEEL JAFFER
MELISSA GOODMAN (*admission pending*)
CATHERINE CRUMP (*admission pending*)
National Legal Department
American Civil Liberties Union
Foundation
125 Broad Street, 18th Floor
New York, NY 10004-2400
(212) 549-2500

MICHAEL J. STEINBERG
KARY L. MOSS
American Civil Liberties Union Fund
of Michigan
60 West Hancock
Detroit, MI 48201-1343
(313) 578-6814

January 17, 2006

(Rev. 11/04) **CIVIL COVER SHEET** County in which this action arose Wayne 26163

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

American Civil Liberties Union, American Civil Liberties Union of Michigan, et al. (See attached caption for complete list of plaintiffs.)

(b) County of Residence of First Listed Plaintiff: New York, NY & Wayne, MI
(EXCEPT IN U.S. PLAINTIFF CASES)

88888

(c) Attorney's (Firm Name, Address, and Telephone Number)
Ann Beeson; ACLU Foundation; 125 Broad St., 18th Floor, New York, NY 10004
(See attached caption for complete list of plaintiffs' attorneys.)

## DEFENDANTS

National Security Agency/Central Security Service and Lieutenant General Keith B. Alexander (Director)

County of Residence of First Listed Defendant: Anne Arundel County, MD
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Select One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☑ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Select One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Select One Box Only)

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

PERSONAL INJURY
- ☐ 362 Personal Injury - Med. Malpractice
- ☐ 365 Personal Injury - Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ■ 440 Other Civil Rights

**PRISONER PETITIONS**
- ☐ 510 Motions to Vacate Sentence

Habeas Corpus:
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**FORFEITURE/PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt.Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes

440

## V. ORIGIN (Select One Box Only)

☑ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify) ☐ 6 Multidistrict Litigation ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (**Do not cite jurisdictional statutes unless diversity**):
First and Fourth Amendments to the U.S. Constitution; 18 U.S.C. sec. 2510 et seq.; 50 U.S.C. sec. 1801 et seq.

Brief description of cause:
Challenge to the warrantless surveillance program of the National Security Agency

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

**DEMAND $** Declaration, Injunction

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☐ Yes ☑ No

## VIII. RELATED CASE(S) IF ANY

(See instructions): JUDGE ____ DOCKET NUMBER ____

DATE: January 17, 2006

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # ____ AMOUNT ____ APPLYING IFP ____ JUDGE ____ MAG. JUDGE ____

PURSUANT TO LOCAL RULE 83.11

1. Is this a case that has been previously dismissed?

☐ Yes
☑ No

If yes, give the following information:

Court: ____________________

Case No.: ____________________

Judge: ____________________

2. Other than stated above, are there any pending or previously discontinued or dismissed companion cases in this or any other court, including state court? (Companion cases are matters in which it appears substantially similar evidence will be offered or the same or related parties are present and the cases arise out of the same transaction or occurrence.)

☐ Yes
☑ No

If yes, give the following information:

Court: ____________________

Case No.: ____________________

Judge: ____________________

Notes :