# Exhibit E

Dockets.Justia.com

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 1:04cr385 |
| v. | ) | Count 1: 18 USC §§ 2 and 924(n) Inducing Others to Conspire to Use Firearms |
| ALI AL-TIMIMI | ) | Count 2: 18 USC § 373 Soliciting Others to Levy War |
| | ) | Count 3: 18 USC §§ 2 and 2384 Inducing Others to Conspire to Levy War |
| | ) | Count 4: 50 USC § 1705 Attempting to Contribute Services to the Taliban |
| | ) | Count 5: 18 USC § 2 and 50 USC § 1705 Inducing Others to Aid the Taliban |
| | ) | Count 6: 18 USC §§ 2 and 371 Inducing Others to Conspire to Violate the Neutrality Act |
| | ) | Counts 7-8: 18 USC §§ 924(c) and 2 Inducing Others to Use Firearms |
| | ) | Counts 9 -10: 18 USC §§ 844(h) and 2 Inducing Others to Carry Explosives |

## SUPERSEDING INDICTMENT

February 2005 Term - At Alexandria

### General Allegations

THE GRAND JURY CHARGES THAT:

1. As used in this Superseding Indictment, "jihad" describes a religious obligation of Muslims to struggle or strive for the defense of and advancement of Islam, and "mujahideen" describes warriors engaged in violent jihad.

2. The Taliban, at all times relevant to this Superseding Indictment until early 2002, was the political/military entity headquartered in Kandahar, Afghanistan, that exercised de facto control over the territory of Afghanistan until its defeat in late 2001 and early 2002 by a multinational coalition that included the United States.

3. Al-Qaeda, at all times relevant to this Superseding Indictment, was an international terrorist group founded by Usama bin Laden and others, dedicated to opposing the United States and many other governments with force and violence. Bin Laden declared a violent jihad against the United States and its citizens, which he carried out through al-Qaeda and its affiliated organizations. Beginning in or about 1996, bin Laden and others operated al-Qaeda from Afghanistan, and forged close relations with the Taliban.

4. Lashkar-e-Taiba, also known as "LET," is the military wing of an organization in Pakistan known as Markaz Dawa Wa'al Irshad, which was founded to organize Pakistani mujahideen participating in the violent jihad against the Russians in Afghanistan. Since the Russians left Afghanistan, the primary - - but not exclusive - - focus of Lashkar-e-Taiba has been on conducting violent jihad against the Government of India. Lashkar-e-Taiba operates training camps for individuals from around the world seeking to be mujahideen, and claims to have trained thousands to fight in Afghanistan, Kashmir, Chechnya, Bosnia, Kosovo, and elsewhere.

5. On July 4, 1999, President Clinton declared a national emergency to deal with the threat posed by Al-Qaeda and the Taliban. In Executive Order 13129, President Clinton prohibited, among other things, United States persons from making or receiving any contribution of funds, goods, or services to or for the benefit of the Taliban. On June 30, 2000, the national emergency with respect to the Taliban was continued. One year later, the national emergency

was again continued, pursuant to a finding by President Bush that "[t]he Taliban continues to allow territory under its control in Afghanistan to be used as a safe haven and base of operations for Usama bin Laden and the al-Qaida organization who have committed and threaten to continue to commit acts of violence against the United States and its nationals."

6. On September 11, 2001, terrorists hijacked four commercial airplanes. They flew two of the planes into the World Trade Center towers in Manhattan, and one into the Pentagon in Virginia. The fourth plane crashed in Pennsylvania. Thousands of victims were killed or injured, and there was enormous destruction of property.

7. By September 13, 2001, newspapers reported that the Bush Administration won NATO support for a possible strike against Usama bin Laden and his supporters in Afghanistan, and was pressuring Pakistan for intelligence and logistical backing. That same day, newspapers further reported that the Taliban was bracing for an imminent attack by the United States and sent its top leader Mullah Mohammad Omar into hiding.

8. In response to the September 11, 2001, attacks, the United States demanded that the Taliban turn over bin Laden. After the Taliban refused those demands, the United States and allied forces entered Afghanistan and engaged the Taliban in combat to prevent it from allowing al-Qaeda to use Afghanistan as a base for terrorist acts against the United States and around the world.

9. American troops started the ground war against the Taliban on or about October 20, 2001. On or about November 10, 2001, the Taliban lost the key city of Mazar-e-Sharif, and three northern provincial capitals. By November 11, 2001, the Taliban was being routed through northern Afghanistan. On or about November 13, 2001, the Taliban withdrew from the Afghan

capital of Kabul and Northern Alliance forces allied with the United States took control of the city. By November 15, Taliban forces had retreated to Kandahar.

10. From in or about 2000 to on or about September 11, 2001, defendant ALI AL-TIMIMI, was the primary lecturer at the Dar al Arqam Islamic Center, also known as the Center for Islamic Information and Education, an organization in Falls Church, Virginia, that focused on teaching in the English language about Islamic faith, practice, and civilization. Defendant AL-TIMIMI was highly respected by the students at the Dar al Arqam Islamic Center as a scholar who had lectured around the world on topics related to Islam.

## COUNT 1

### Counseling and Inducing A Conspiracy to Use Firearms in Furtherance of Crimes of Violence

THE GRAND JURY FURTHER CHARGES THAT:

1. The Grand Jury realleges and incorporates by reference the General Allegations listed in this Superseding Indictment.

2. Between on or about September 16, 2001, and continuing thereafter up to on or about May 2003, within Fairfax County in the Eastern District of Virginia and elsewhere, defendant ALI AL-TIMIMI did unlawfully and knowingly aid, abet, counsel, and induce Masoud Khan, Randall Royer, Yong Kwon, Muhammad Aatique, Khwaja Hasan, Donald Surratt, and others known and unknown to the grand jury, to combine, conspire, confederate, and agree together and with others known and unknown to the grand jury to use, carry, possess, and discharge firearms during, in relation to, and in furtherance of crimes of violence for which he and they may be

prosecuted in a court of the United States, in violation of Title 18, United States Code, Section 924(c), and did procure the commission of such offense.

Overt Acts

In furtherance of the conspiracy the commission of which the defendant procured, and to accomplish the objects of the conspiracy, the defendant and the conspirators he aided, abetted, counseled, and induced, committed overt acts in the Eastern District of Virginia, and elsewhere, including but not limited to the following:

1. On or about September 16, 2001, ALI AL-TIMIMI came to the house of Yong Kwon in Fairfax, Virginia, to speak about the events of 9/11 to a group of Muslim men who had trained for violent jihad and most of whom possessed AK-47-style firearms.

2. On or about September 16, 2001, at Kwon's house, ALI AL-TIMIMI told Kwon, Randall Royer, Masoud Khan, Hammad Abdur-Raheem, Caliph Basha Ibn Abdur-Raheem, Muhammed Aatique, and Khwaja Hasan that the time had come for them to go abroad to join the mujahideen engaged in violent jihad in Afghanistan.

3. On or about September 16, 2001, at Kwon's house, ALI AL-TIMIMI told his listeners that American troops likely to arrive in Afghanistan would be legitimate targets of the violent jihad in which his listeners had a duty to engage.

4. On or about September 16, 2001, the individuals gathered at Kwon's house discussed obtaining military-style training from Lashkar-e-Taiba in order to join the mujahideen expected to engage in violent jihad against American troops in Afghanistan.

5. On or about September 16, 2001, at Kwon's house, ALI AL-TIMIMI told the gathered individuals considering whether to obtain military-style training from Lashkar-e-Taiba in Pakistan that the organization was on the correct path.

6. On or about September 16, 2001, at the meeting at Kwon's house, ALI AL-TIMIMI told the conspirators that what he said at the meeting must be kept secret.

7. On or about September 17, 2001, ALI AL-TIMIMI advised Yong Kwon and Khwaja Hasan how to reach the Lashkar-e-Taiba camp undetected.

8. On or about September 17, 2001, Yong Kwon and Khwaja Hasan traveled to the Pakistani Embassy in Washington, D.C., to apply for visas to travel to Pakistan.

9. On or about September 18, 2001, Masoud Khan traveled to the Pakistani Embassy in Washington, D.C., to apply for a visa to travel to Pakistan.

10. On or about September 18, 2001, Yong Kwon and Khwaja Hasan drove Masoud Khan to Pennsylvania to spend the night at the home of Muhammed Aatique.

11. On or about September 19, 2001, Muhammed Aatique and Masoud Khan traveled from JFK Airport in New York, to Karachi, Pakistan.

12. On or about September 20, 2001, Yong Kwon and Khwaja Hasan traveled to Dulles Airport to board their flights for Pakistan via New York and Manchester, England.

13. On or about September 20, 2001, Muhammed Aatique and Masoud Khan arrived in Karachi, Pakistan.

14. On or about September 22, 2001, Yong Kwon and Khwaja Hasan arrived in Karachi, Pakistan.

5. On or about September 16, 2001, at Kwon's house, ALI AL-TIMIMI told the gathered individuals considering whether to obtain military-style training from Lashkar-e-Taiba in Pakistan that the organization was on the correct path.

6. On or about September 16, 2001, at the meeting at Kwon's house, ALI AL-TIMIMI told the conspirators that what he said at the meeting must be kept secret.

7. On or about September 17, 2001, ALI AL-TIMIMI advised Yong Kwon and Khwaja Hasan how to reach the Lashkar-e-Taiba camp undetected.

8. On or about September 17, 2001, Yong Kwon and Khwaja Hasan traveled to the Pakistani Embassy in Washington, D.C., to apply for visas to travel to Pakistan.

9. On or about September 18, 2001, Masoud Khan traveled to the Pakistani Embassy in Washington, D.C., to apply for a visa to travel to Pakistan.

10. On or about September 18, 2001, Yong Kwon and Khwaja Hasan drove Masoud Khan to Pennsylvania to spend the night at the home of Muhammed Aatique.

11. On or about September 19, 2001, Muhammed Aatique and Masoud Khan traveled from JFK Airport in New York, to Karachi, Pakistan.

12. On or about September 20, 2001, Yong Kwon and Khwaja Hasan traveled to Dulles Airport to board their flights for Pakistan via New York and Manchester, England.

13. On or about September 20, 2001, Muhammed Aatique and Masoud Khan arrived in Karachi, Pakistan.

14. On or about September 22, 2001, Yong Kwon and Khwaja Hasan arrived in Karachi, Pakistan.

15. In or about late September 2001, Muhammed Aatique traveled to a Lashkar-e-Taiba camp near Muzafrabad, Pakistan.

16. In or about early October 2001, Yong Kwon, Khwaja Hasan, and Masoud Khan traveled to a Lashkar-e-Taiba camp near Muzafrabad, Pakistan.

17. In or about early October 2001, at Lashkar-e-Taiba's Masada camp near Muzafrabad, Pakistan, Muhammed Aatique fired an AK-47 automatic rifle and a machine gun.

18. In or about early October 2001, at Lashkar-e-Taiba's Ibn Masood camp near Muzafrabad, Pakistan, Muhammed Aatique fired an antiaircraft gun and a rocket-propelled grenade.

19. On or about October 15, 2001, at a meeting at his home in Fairfax, Virginia, ALI AL-TIMIMI told Donald Surratt, Ibrahim Al-Hamdi, Hammad Abdur-Raheem, Caliph Abdur-Raheem, Unindicted Conspirator #2, and others that America was at war with Islam and would soon attack the Taliban in Afghanistan.

20. On or about October 15, 2001, during the meeting, ALI AL-TIMIMI told Donald Surratt, Ibrahim Al-Hamdi, Hammad Abdur-Raheem, Caliph Abdur-Raheem, Unindicted Conspirator #2, and others that they were obligated to help the Taliban in the face of an attack by the United States.

21. On or about October 21, 2001, ALI AL-TIMIMI counseled an associate that they were obligated to support the Taliban, Mullah Omar, and "the Arabs with them" by "body, wealth and word even if some find that distasteful."

22. In or about mid-October 2001, at Lashkar-e-Taiba's Masada camp near Muzafrabad, Pakistan, Masoud Khan, Khwaja Hasan, and Yong Kwon each fired AK-47-style automatic rifles and machine guns.

23. In or about late October 2001, at Lashkar-e-Taiba's Ibn Masood camp near Muzafrabad, Pakistan, Masoud Khan, Khwaja Hasan, and Yong Kwon each fired AK-47-style automatic rifles, machine guns, an antiaircraft gun, and a rocket-propelled grenade.

24. In or about November 2001, Masoud Khan, Yong Kwon, Khwaja Hasan, and Unindicted Conspirator #2 traveled to a Lashkar-e-Taiba office in Lahore, Pakistan.

25. On February 1, 2003, ALI AL-TIMIMI provided the following message to his followers:

> This morning, the world heard news about the crash of the space shuttle. There is no doubt that Muslims were overjoyed because of the adversity that befell their greatest enemy. Upon hearing the news, my heart felt certain good omens that I liked to spread to my brothers.
>
> **First: The Name of the Shuttle:** "Columbia" is the name of the shuttle, called after the name of "Columbus," the sailor who discovered the American Continent in 1492 after the fall of Grenada, the last Islamic stronghold in Andalusia. Historians know that, after discovering the two American Continents, the Romans (the Christians of Europe) exploited their wealth in order to be able to control the Islamic World. The Columbia crash made me feel, and God is the only One to know, that this is a strong signal that Western supremacy (especially that of America) that began 500 years ago is coming to a quick end, God Willing, as occurred to the shuttle.
>
> **Second: The Shuttle Crew:** The Israeli Ambassador to the UN described the Israeli astronaut as someone carrying all the hopes and ambitions of the Israeli people. And so, God Willing, all these hopes and ambitions were burnt with the crash and the burning of the shuttle and one of its astronauts, the Israeli.
>
> **Third: The Crash Location:** As soon as CNN announced the crash of the space shuttle nearby the city of Palestine, in Texas, I said to myself "God is Great". This way, God Willing, America will fall and disappear (nearby Palestine). The State of Texas is also the state of the foolish, obeyed President Bush the son. And

so we hope, God Willing, similar to the crash of the shuttle on his state, his nation would fall upon his head due to his foolish policy. **Fourth: The President's Condolences to the American People:** In the words that President Bush used to console his people, he referred to the Book of Isiah where there is a praise to God's creation, His stars and planets. I said to myself, Praise the Lord, in this same Book of Isiah there are news about the coming of Prophet Muhammad and a warning of the destruction of the Jews at the end of time. [A citation from the Koran follows].

And so, there are other signs that would take a long time to recount. For example, every time the Americans believe that they control the whole earth and the skies, and act as they wish, there comes a sign that reminds us that God, Almighty, is greater than his creatures, sitting on His Chair, handling everything, and that His angels act according to His commands. And so, he whoever will try to raise the Jews, who are a nation that God covered with humiliation and deserved God's wrath, will be afflicted with divine humiliation and wrath as much as he supports them.

As I mentioned earlier, these are all ideas that came to me when I heard of the accident, and hopes that I wish God would fulfill, and God is the only One to know.

26. On or about May 8, 2003, in Gaithersburg, Maryland, Masoud Khan possessed an AK-47-style rifle, a document entitled "The Terrorist's Handbook" containing instructions regarding how to manufacture and use explosives and chemicals as weapons, and a fatwa from Usama bin Laden from October 2001, that declared, in part:

> So here is America, Allah has struck it in one of its vital points, so He destroyed her greatest of buildings. And unto Allah is all praise and He has favored us with this blessing.
>
> And here is America filled with terror from its north to its south, from its east to its west. And unto Allah is all praise and He has favored us with this blessing.

(In violation of Title 18, United States Code, Sections 2 and 924(n).)

## COUNT 2

## Solicitation to Levy War Against the United States

THE GRAND JURY FURTHER CHARGES THAT:

1. The Grand Jury realleges and incorporates by reference the General Allegations and the overt acts listed in Count 1 of this Superseding Indictment.

2. Between on or about September 16, 2001, and continuing up to on or about October 21, 2001, in Fairfax County, in the Eastern District of Virginia, defendant ALI AL-TIMIMI, with intent that another person engage in conduct constituting a felony that has as an element the use, attempted use or threatened use of physical force against property or the person of another in violation of the laws of the United States, and under circumstances strongly corroborative of that intent, did knowingly and unlawfully, solicit, command, induce, and otherwise endeavor to persuade Masoud Khan, Yong Kwon, Khwaja Hasan, Muhammed Aatique, Randall Royer, Hammad Abdur-Raheem, Donald Surratt, Unindicted Conspirator #2, Caliph Basha Ibn Abdur-Raheem and others known and unknown to the grand jury, to levy war against the United States and adhere to their enemies, while owing allegiance to the United States, giving aid and comfort to the Taliban in the United States and Afghanistan and elsewhere, in violation of Title 18, United States Code, Section 2381.

(In violation of Title 18, United States Code, Section 373.)

## COUNT 3

### Counseling and Inducing A Conspiracy To Levy War Against the United States

THE GRAND JURY FURTHER CHARGES THAT:

1. The Grand Jury realleges and incorporates by reference the General Allegations and the overt acts listed in Count 1 of this Superseding Indictment.

2. Between on or about September 16, 2001, and continuing thereafter up to in or about May 2003, within Fairfax County in the Eastern District of Virginia and elsewhere, defendant ALI AL-TIMIMI did unlawfully and knowingly aid, abet, counsel, and induce Masoud Khan, Randall Royer, Yong Kwon, Muhammad Aatique, Donald Surratt, Unindicted Conspirator #2, and Khwaja Hasan and others known and unknown to the grand jury to combine, conspire, confederate and agree together and with others known and unknown to the grand jury, to levy war against the United States, and did procure the commission of such offense.

(In violation of Title 18, United States Code, Sections 2 and 2384.)

Count 4

Attempt to Contribute Services to the Taliban

THE GRAND JURY FURTHER CHARGES THAT:

1. The Grand Jury realleges and incorporates by reference the General Allegations and the overt acts listed in Count 1 of this Superseding Indictment.

2. Between on or about September 16, 2001, and on or about October 21, 2001, in Fairfax County in the Eastern District of Virginia, and elsewhere, defendant ALI AL-TIMIMI did unlawfully, knowingly, and willfully violate a regulation issued under Chapter 35 of Title 50, United States Code, in that defendant attempted to supply services to the Taliban, to the territory of Afghanistan controlled by the Taliban, and to persons whose property and interests in property were blocked pursuant to Title 31, Code of Federal Regulations, Section 545.204.

(In violation of Title 50, United States Code, Section 1705(b), Title 18, United States Code, Section 2, Title 31, Code of Federal Regulations, Sections 545.204 and 545.206, Executive Order No. 13224, 66 Fed. Reg. 49079 (2001); 65 Fed. Reg. 41549 (2000); Executive Order 13129, 64 Fed. Reg. 36759 (1999).)

## COUNT 5

Counseling and Inducing An Attempt to Aid the Taliban

THE GRAND JURY FURTHER CHARGES THAT:

1. The Grand Jury realleges and incorporates by reference the General Allegations and the overt acts listed in Count 1 of this Superseding Indictment.

2. Between on or about September 16, 2001, and on or about October 21, 2001, within Fairfax County in the Eastern District of Virginia and elsewhere, defendant ALI AL-TIMIMI did unlawfully and knowingly aid, abet, counsel, and induce Masoud Khan, Randall Royer, Yong Kwon, Muhammad Aatique, Donald Surratt, Unindicted Conspirator #2, and Khwaja Hasan and others known and unknown to the grand jury to attempt to violate a regulation issued under Chapter 35 of Title 50, United States Code, by willfully and unlawfully attempting to supply services to the Taliban, to the territory of Afghanistan controlled by the Taliban, and to persons whose property and interests in property were blocked pursuant to Title 31, Code of Federal Regulations, Section 545.204, in violation of Title 50, United States Code, Section 1705, and did procure the commission of such offense.

(In violation of Title 50, United States Code, Section 1705(b), Title 18, United States Code, Section 2, and Title 31, Code of Federal Regulations, Sections 545.204 and 545.206, Executive Order No. 13224, 66 Fed.Reg. 49079 (2001); 65 Fed. Reg. 41549 (2000); Executive Order 13129, 64 Fed. Reg. 36759 (1999).)

## COUNT 6

Counseling and Inducing A Conspiracy to Violate the Neutrality Act

THE GRAND JURY FURTHER CHARGES THAT:

1. The Grand Jury realleges and incorporates by reference the General Allegations and the overt acts listed in Count 1 of this Superseding Indictment.

2. Between on or about September 16, 2001, and May 2003, within Fairfax County in the Eastern District of Virginia and elsewhere, defendant ALI AL-TIMIMI did unlawfully and knowingly aid, abet, counsel, and induce Masoud Khan, Randall Royer, Yong Kwon, Muhammad Aatique, Donald Surratt, Unindicted Conspirator #2, Khwaja Hasan, and others known and unknown to the grand jury to combine, conspire, confederate and agree together and with others known and unknown to the grand jury, to begin, provide for, prepare a means for, and take part in military expeditions and enterprises to be carried on from the United States against the territory and dominion of foreign states, districts and peoples with whom the United States was at peace, in violation of Title 18, United States Code, Section 960, and did procure the commission of such offense.

(In violation of Title 18, United States Code, Sections 2 and 371.)

## COUNTS 7 - 8

### Use of Firearms in Connection with a Crime of Violence

THE GRAND JURY FURTHER CHARGES THAT:

1. The Grand Jury realleges and incorporates by reference the General Allegations and the overt acts listed in Count 1 of this Superseding Indictment.

2. Between on or about September 16 and on or about September 18, 2001, in Fairfax County in the Eastern District of Virginia, defendant ALI AL-TIMIMI did unlawfully and knowingly aid, abet, counsel, induce, and procure the commission of an offense against the United States, namely, the discharge of firearms including automatic weapons classified as machine guns under Title 18, United States Code, Sections 921(a)(23) and 924(c)(1)(B)(ii), as identified below, by Khwaja Hasan and Yong Kwon in Pakistan during, in relation to, and in furtherance of crimes of violence for which the defendant, Hasan, and Kwon may be prosecuted in a court of the United States, including the conspiracy alleged in Count 1 of this Superseding Indictment, as described below:

| Count | Principal | Date | Firearm | Lashkar Camp |
|---|---|---|---|---|
| 7 | Kwon | mid-October | light machine gun | Masada |
| 8 | Hasan | Early November | AK-47-style automatic rifle | Ibn Masood |

(In violation of Title 18, United States Code, Sections 924(c) and 2(a).)

## COUNTS 9 - 10

### Carrying an Explosive During Commission of a Felony

THE GRAND JURY FURTHER CHARGES THAT:

1. The Grand Jury realleges and incorporates by reference the General Allegations and the overt acts listed in Count 1 of this Superseding Indictment.

2. Between on or about September 16 and on or about September 18, 2001, in Fairfax County in the Eastern District of Virginia, defendant ALI AL-TIMIMI did unlawfully and knowingly aid, abet, counsel, induce, and procure the commission of offenses against the United States, namely, the carrying of explosives, to wit, rocket-propelled grenades, by Khwaja Hasan and Yong Kwon near Muzafrabad, Pakistan, during the commission of felonies which may be prosecuted in a court of the United States, including the conspiracy alleged in Count 1 of this Superseding Indictment, as described below:

| Count | Principal | Date | Explosive | Lashkar Camp |
|---|---|---|---|---|
| 9 | Kwon | Mid-October | rocket-propelled grenade | Aqsa |
| 10 | Hasan | Early November | rocket-propelled grenade | Ibn Masood. |

(In violation of Title 18, United States Code, Sections 844(h)(2) and 2(a).)

A TRUE BILL:

____________________________
FOREPERSON

Paul J. McNulty
United States Attorney

By: ____________________________
Robert Spencer
Assistant United States Attorney
Chief, Criminal Division

____________________________
Gordon D. Kromberg
Assistant United States Attorney

____________________________
John T. Gibbs
Department of Justice Trial Attorney

# Exhibit F

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

FILED
April 25, 2006

No. 05-4761
CR-04-385

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

ALI AL-TIMIMI

Defendant - Appellant

# O R D E R

Appellant has filed a motion to vacate his appeal and remand his case for further proceedings before the trial court. Previously, this Court granted a motion to stay the briefing schedule pending resolution of outstanding issues.

The motion to vacate and to remand raises appellant's concern, based on recent developments, that the government may have undisclosed intercepts of either the appellant or various individuals material to his trial. While this is the main purpose of the requested order, appellant has also raised questions relating to alleged violations of attorney-client communications and access to evidence claimed as classified by the government.

Appellee, the United States, has consented to the motion while emphasizing that its consent to the motion does not reflect its views

on the merits of Al-Timimi's contentions, or its views on the jurisdiction of the district court in the Eastern District of Virginia over Al-Timimi's allegations regarding conditions of his incarceration.

Having considered the motion and positions of the parties, IT IS HEREBY ORDERED

(1) Appellant's motion to vacate and to remand his case pending further proceedings is GRANTED.

(2) IT IS FURTHER ORDERED, without ruling on the government's jurisdictional question regarding the prison conditions, that the district court may consider upon remand issues raised by appellant and order whatever relief or changes in the case, if any, that it considers appropriate.

(3) IT IS FURTHER ORDERED that, following a final order by the district court, appellant may timely file without prejudice a new notice of appeal with this Court.

This order is entered at the direction of Judge Widener, with the concurrences of Judge Michael and Judge Hamilton, and with the agreement of the parties.

For the Court,

/s/ Patricia S. Connor

CLERK

# Exhibit G

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-vs-

YASSIN AREF and
MOHAMMAD HOSSAIN

Crim. No. 04-CR-402
(Hon. Thomas J. McAvoy)

U.S DISTRICT COURT
N.D. OF N.Y.
FILED

MAR 10 2006

LAWRENCE K. BAERMAN, CLERK
ALBANY

**Order Denying Defendants' Motion for Reconsideration**

THIS MATTER is before the Court pursuant to Defendants' Motion for Reconsideration seeking orders suppressing all evidence as tainted by illegal electronic surveillance, dismissing the indictment, and directing the government to affirm or deny the existence of electronic surveillance pursuant to 18 U.S.C. § 3504.

In response to Defendants' Motion, the government filed, on March 10, 2006, its *in camera, ex parte* classified response.

Having considered the government's submission and entered a classified Order on it, it is hereby

ORDERED that the defendants' motion for reconsideration is denied.

ENTERED at Albany, New York this 10th day of March, 2006.

Thomas J. McAvoy
THE HON. THOMAS J. McAVOY
United States District Judge
Northern District of New York

cc: U.S. Attorney's Office
Defense Counsel

# Exhibit H

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

- v -

02-CR-255-S

MOHAMED ALBANNA, et al.,

Defendants.

**ORDER**

THIS MATTER is before the Court pursuant to Defendants' demand for eavesdropping information, first articulated in a letter, dated January 4, 2006, from Philip M. Marshall, counsel for Mohamed Albanna, to Assistant United States Attorney Timothy Lynch, and subsequently joined by the other defendants before the Court.

In response to the demand, the government filed, on March 13, 2006, its *in camera, ex parte* classified response, which the Court has now considered.

IT IS HEREBY ORDERED, that Defendants' demand for information as to whether the government, without judicial authority, engaged in any eavesdropping in which the defendants were a subject of the eavesdropping or that resulted directly or indirectly in the obtaining of evidence concerning the defendants is denied.

DATED: March 21, 2006
Buffalo, New York

WILLIAM M. SKRETNY
United States District Judge

# Exhibit I

FILED WITH COURT SECURITY OFFICER
DATE 3/31/2006

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

- v -

Case No.: CR. NO. S-05-240-GEB

HAMID HAYAT and
UMER HAYAT

Defendants.

FILED

APR - 3 2006

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY DEPUTY CLERK

**ORDER**

THIS MATTER is before the Court pursuant to Defendants' Joint Motion To Compel Discovery dated January 13, 2006 which included a demand for "any and all documents, records, or recordings reflecting the use and information obtained through National Security Agency wiretaps related to the Defendants."

In response to this motion, the government filed a response dated January 23, 2006, and on March 31, 2006, its *in camera, ex parte* classified response, which the Court has now considered.

IT IS HEREBY ORDERED, that Defendants' Motion to Compel Discovery reflecting the use and information obtained through National Security Agency wiretaps related to the defendants is DENIED.

DATED: April 3, 2006
Sacramento, California

GARLAND E. BURRELL, JR.
United States District Judge

# Exhibit J

the White House
President George W. Bush

Click to Print this document

For Immediate Release
Office of the Press Secretary
December 19, 2005

# Press Briefing by Attorney General Alberto Gonzales and General Michael Hayden, Principal Deputy Director for National Intelligence

James S. Brady Briefing Room

8:30 A.M. EST

MR. McCLELLAN: Good morning, everybody. I've got with me the Attorney General and General Hayden here this morning to brief you on the legal issues surrounding the NSA authorization and take whatever questions you have for them on that. The Attorney General will open with some comments and then they'll be glad to take your questions.

And with that, I'll turn it over to General Gonzales.

ATTORNEY GENERAL GONZALES: Thanks, Scott.

The President confirmed the existence of a highly classified program on Saturday. The program remains highly classified; there are many operational aspects of the program that have still not been disclosed and we want to protect that because those aspects of the program are very, very important to protect the national security of this country. So I'm only going to be talking about the legal underpinnings for what has been disclosed by the President.

The President has authorized a program to engage in electronic surveillance of a particular kind, and this would be the intercepts of contents of communications where one of the -- one party to the communication is outside the United States. And this is a very important point -- people are running around saying that the United States is somehow spying on American citizens calling their neighbors. Very, very important to understand that one party to the communication has to be outside the United States.

Another very important point to remember is that we have to have a reasonable basis to conclude that one party to the communication is a member of al Qaeda, affiliated with al Qaeda, or a member of an organization affiliated with al Qaeda, or working in support of al Qaeda. We view these authorities as authorities to confront the enemy in which the United States is at war with -- and that is al Qaeda and those who are supporting or affiliated with al Qaeda.

What we're trying to do is learn of communications, back and forth, from within the United States to overseas with members of al Qaeda. And that's what this program is about.

Now, in terms of legal authorities, the Foreign Intelligence Surveillance Act provides -- requires a court order before engaging in this kind of surveillance that I've just discussed and the President announced on Saturday, unless there is somehow -- there is -- unless otherwise authorized by statute or by Congress. That's what the law requires. Our position is, is that the authorization to use force, which was passed by the Congress in the days following September 11th, constitutes that other authorization, that other statute by Congress, to engage in this kind of signals intelligence.

Now, that -- one might argue, now, wait a minute, there's nothing in the authorization to use force that specifically mentions electronic surveillance. Let me take you back to a case that the Supreme Court reviewed this past -- in 2004, the Hamdi decision. As you remember, in that case, Mr. Hamdi was a U.S. citizen who was contesting his detention by the United States government. What he said was that there is a statute, he said, that specifically prohibits the detention of American citizens without permission, an act by Congress -- and he's right, 18 USC 4001a requires that the United States government cannot detain an American citizen except by an act of Congress.

We took the position -- the United States government took the position that Congress had authorized that detention in the authorization to use force, even though the authorization to use force never mentions the word "detention." And the Supreme Court, a plurality written by Justice O'Connor agreed. She said, it was clear and unmistakable that the Congress had authorized the detention of an American citizen captured on the battlefield as an enemy combatant for the remainder -- the duration of the hostilities. So even though the authorization to use force did not mention the word, "detention," she felt that detention of enemy soldiers captured on the battlefield was a fundamental incident of waging war, and therefore, had been authorized by Congress when they used the words, "authorize the President to use all necessary and appropriate force."

For the same reason, we believe signals intelligence is even more a fundamental incident of war, and we believe has been authorized by the Congress. And even though signals intelligence is not mentioned in the authorization to use force, we believe that the Court would apply the same reasoning to recognize the authorization by Congress to engage in this kind of electronic surveillance.

I might also add that we also believe the President has the inherent authority under the Constitution, as Commander-in-Chief, to engage in this kind of activity. Signals intelligence has been a fundamental aspect of waging war since the Civil War, where we intercepted telegraphs, obviously, during the world wars, as we intercepted telegrams in and out of the United States. Signals intelligence is very important for the United States government to know what the enemy is doing, to know what the enemy is about to do. It is a fundamental incident of war, as Justice O'Connor talked about in the Hamdi decision. We believe that -- and those two authorities exist to allow, permit the United States government to engage in this kind of surveillance.

The President, of course, is very concerned about the protection of civil liberties, and that's why we've got strict parameters, strict guidelines in place out at NSA to ensure that the program is operating in a way that is consistent with the President's directives. And, again, the authorization by the President is only to engage in surveillance of communications where one party is outside the United States, and where we have a reasonable basis to conclude that one of the parties of the communication is either a member of al Qaeda or affiliated with al Qaeda.

Mike, do you want to -- have anything to add?

GENERAL HAYDEN: I'd just add, in terms of what we do globally with regard to signals intelligence, which is a critical part of defending the nation, there are probably no communications more important to what it is we're trying to do to defend the nation; no communication is more important for that purpose than those communications that involve al Qaeda, and one end of which is inside the homeland, one end of which is inside the United States. Our purpose here is to detect and prevent attacks. And the program in this regard has been successful.

Q General, are you able to say how many Americans were caught in this surveillance?

ATTORNEY GENERAL GONZALES: I'm not -- I can't get into the specific numbers because that information remains classified. Again, this is not a situation where -- of domestic spying. To the extent that there is a moderate and heavy communication involving an American citizen, it would be a communication where the other end of the call is outside the United States and where we believe that either the American citizen or the person outside the United States is somehow affiliated with al Qaeda.

Q General, can you tell us why you don't choose to go to the FISA court?

ATTORNEY GENERAL GONZALES: Well, we continue to go to the FISA court and obtain orders. It is a very important tool that we continue to utilize. Our position is that we are not legally required to do, in this particular case, because the law requires that we -- FISA requires that we get a court order, unless authorized by a statute, and we believe that authorization has occurred.

The operators out at NSA tell me that we don't have the speed and the agility that we need, in all circumstances, to deal with this new kind of enemy. You have to remember that FISA was passed by the Congress in 1978. There have been tremendous advances in technology --

Q But it's been kind of retroactively, hasn't it?

ATTORNEY GENERAL GONZALES: -- since then. Pardon me?

Q It's been done retroactively before, hasn't it?

ATTORNEY GENERAL GONZALES: What do you mean, "retroactively"?

Q You just go ahead and then you apply for the FISA clearance, because it's damn near automatic.

ATTORNEY GENERAL GONZALES: If we -- but there are standards that have to be met, obviously, and you're right, there is a procedure where we -- an emergency procedure that allows us to make a decision to authorize -- to utilize FISA, and then we go to the court and get confirmation of that authority.

But, again, FISA is very important in the war on terror, but it doesn't provide the speed and the agility that we need in all circumstances to deal with this new kind of threat.

Q But what -- go ahead.

GENERAL HAYDEN: Let me just add to the response to the last question. As the Attorney General says, FISA is very important, we make full use of FISA. But if you picture what FISA was designed to do, FISA is designed to handle the needs in the nation in two broad categories: there's a law enforcement aspect of it; and the other aspect is the continued collection of foreign intelligence. I don't think anyone could claim that FISA was envisaged as a tool to cover armed enemy combatants in preparation for attacks inside the United States. And that's what this authorization under the President is designed to help us do.

Q Have you identified armed enemy combatants, through this program, in the United States?

GENERAL HAYDEN: This program has been successful in detecting and preventing attacks inside the United States.

Q General Hayden, I know you're not going to talk about specifics about that, and you say it's been successful. But would it have been as successful -- can you unequivocally say that something has been stopped or there was an imminent attack or you got information through this that you could not have gotten through going to the court?

GENERAL HAYDEN: I can say unequivocally, all right, that we have got information through this program that would not otherwise have been available.

Q Through the court? Because of the speed that you got it?

GENERAL HAYDEN: Yes, because of the speed, because of the procedures, because of the processes and requirements set up in the FISA process, I can say unequivocally that we have used this program in lieu of that and this program has been successful.

Q But one of the things that concerns people is the slippery slope. If you said you absolutely need this program, you have to do it quickly -- then if you have someone you suspect being a member of al Qaeda, and they're in the United States, and there is a phone call between two people in the United States, why not use that, then, if it's so important? Why not go that route? Why not go further?

GENERAL HAYDEN: Across the board, there is a judgment that we all have to make -- and I made this speech a day or two after 9/11 to the NSA workforce -- I said, free peoples always have to judge where they want to be on that spectrum between security and liberty; that there will be great pressures on us after those attacks to move our national banner down in the direction of security. What I said to the NSA workforce is, our job is to keep Americans free by making Americans feel safe again. That's been the mission of the National Security Agency since the day after the attack, is when I talked -- two days after the attack is when I said that to the workforce.

There's always a balancing between security and liberty. We understand that this is a more -- I'll use the word "aggressive" program than would be traditionally available under FISA. It is also less intrusive. It deals only with international calls. It is generally for far shorter periods of time. And it is not designed to collect reams of intelligence, but to detect and warn and prevent about attacks. And, therefore, that's where we've decided to draw that balance between security and liberty.

Q Gentlemen, can you say when Congress was first briefed, who was included in that, and will there be a leaks investigation?

ATTORNEY GENERAL GONZALES: Well of course, we're not going to -- we don't talk about -- we try not to talk about nvestigations. As to whether or not there will be a leak investigation, as the President indicated, this is really hurting national security, this has really hurt our country, and we are concerned that a very valuable tool has been compromised. As to whether or not there will be a leak investigation, we'll just have to wait and see.

And your first question was?

Q When was Congress first briefed --

ATTORNEY GENERAL GONZALES: I'm not going to -- I'm not going to talk about -- I'll let others talk about when Congress was rst briefed. What I can say is, as the President indicated on Saturday, there have been numerous briefings with certain key nembers of Congress. Obviously, some members have come out since the revelations on Saturday, saying that they hadn't een briefed. This is a very classified program. It is probably the most classified program that exists in the United States overnment, because the tools are so valuable, and therefore, decisions were made to brief only key members of Congress. We ave begun the process now of reaching out to other members of Congress. I met last night, for example, with Chairman Specter and other members of Congress to talk about the legal aspects of this program.

And so we are engaged in a dialogue now to talk with Congress, but also -- but we're still mindful of the fact that still -- this is still a very highly classified program, and there are still limits about what we can say today, even to certain members of Congress.

Q General, what's really compromised by the public knowledge of this program? Don't you assume that the other side thinks we're listening to them? I mean, come on.

GENERAL HAYDEN: The fact that this program has been successful is proof to me that what you claim to be an assumption is certainly not universal. The more we discuss it, the more we put it in the face of those who would do us harm, the more they will respond to this and protect their communications and make it more difficult for us to defend the nation.

Q Mr. Attorney General --

Q -- became public, have you seen any evidence in a change in the tactics or --

ATTORNEY GENERAL GONZALES: We're not going to comment on that kind of operational aspect.

Q You say this has really hurt the American people. Is that based only on your feeling about it, or is there some empirical evidence to back that up, even if you can't --

ATTORNEY GENERAL GONZALES: I think the existence of this program, the confirmation of the -- I mean, the fact that this program exists, in my judgment, has compromised national security, as the President indicated on Saturday.

Q I'd like to ask you, what are the constitutional limits on this power that you see laid out in the statute and in your inherent constitutional war power? And what's to prevent you from just listening to everyone's conversation and trying to find the word "bomb," or something like that?

ATTORNEY GENERAL GONZALES: Well, that's a good question. This was a question that was raised in some of my discussions last night with members of Congress. The President has not authorized -- has not authorized blanket surveillance of communications here in the United States. He's been very clear about the kind of surveillance that we're going to engage in. And that surveillance is tied with our conflict with al Qaeda.

You know, we feel comfortable that this surveillance is consistent with requirements of the 4th Amendment. The touchstone of the 4th Amendment is reasonableness, and the Supreme Court has long held that there are exceptions to the warrant requirement in -- when special needs outside the law enforcement arena. And we think that that standard has been met here. When you're talking about communications involving al Qaeda, when you -- obviously there are significant privacy interests implicated here, but we think that those privacy interests have been addressed; when you think about the fact that this is an authorization that's ongoing, it's not a permanent authorization, it has to be reevaluated from time to time. There are additional safeguards that have been in place -- that have been imposed out at NSA, and we believe that it is a reasonable application of these authorities.

Q Mr. Attorney General, haven't you stretched --

Q -- adequate because of technological advances? Wouldn't you do the country a better service to address that issue and fix it, instead of doing a backdoor approach --

ATTORNEY GENERAL GONZALES: This is not a backdoor approach. We believe Congress has authorized this kind of surveillance. We have had discussions with Congress in the past -- certain members of Congress -- as to whether or not FISA could be amended to allow us to adequately deal with this kind of threat, and we were advised that that would be difficult, if not impossible.

Q If this is not backdoor, is this at least a judgment call? Can you see why other people would look at it and say, well, no, we don't see it that way?

ATTORNEY GENERAL GONZALES: I think some of the concern is because people had not been briefed; they don't understand the specifics of the program, they don't understand the strict safeguards within the program. And I haven't had a discussion -- an opportunity to have a discussion with them about our legal analysis. So, obviously, we're in that process now. Part of the reason for this press brief today is to have you help us educate the American people and the American Congress about what we're doing and the legal basis for what we're doing.

Q Al, you talk about the successes and the critical intercepts of the program. Have there also been cases in which after listening

in or intercepting, you realize you had the wrong guy and you listened to what you shouldn't have?

GENERAL HAYDEN: That's why I mentioned earlier that the program is less intrusive. It deals only with international calls. The time period in which we would conduct our work is much shorter, in general, overall, than it would be under FISA. And one of the true purposes of this is to be very agile, as you described.

If this particular line of logic, this reasoning that took us to this place proves to be inaccurate, we move off of it right away.

Q Are there cases in which --

GENERAL HAYDEN: Yes, of course.

Q Can you give us some idea of percentage, or how often you get it right and how often you get it wrong?

GENERAL HAYDEN: No, it would be very -- no, I cannot, without getting into the operational details. I'm sorry.

Q But there are cases where you wind up listening in where you realize you shouldn't have?

GENERAL HAYDEN: There are cases like we do with regard to the global SIGIN system -- you have reasons to go after particular activities, particular communications. There's a logic; there is a standard as to why you would go after that, not just in a legal sense, which is very powerful, but in a practical sense. We can't waste resources on targets that simply don't provide valuable information. And when we decide that is the case -- and in this program, the standards, in terms of re-evaluating whether or not this coverage is worthwhile at all, are measured in days and weeks.

Q Would someone in a case in which you got it wrong have a cause of action against the government?

ATTORNEY GENERAL GONZALES: That is something I'm not going to answer, Ken.

Q I wanted to ask you a question. Do you think the government has the right to break the law?

ATTORNEY GENERAL GONZALES: Absolutely not. I don't believe anyone is above the law.

Q You have stretched this resolution for war into giving you carte blanche to do anything you want to do.

ATTORNEY GENERAL GONZALES: Well, one might make that same argument in connection with detention of American citizens, which is far more intrusive than listening into a conversation. There may be some members of Congress who might say, we never --

Q That's your interpretation. That isn't Congress' interpretation.

ATTORNEY GENERAL GONZALES: Well, I'm just giving you the analysis --

Q You're never supposed to spy on Americans.

ATTORNEY GENERAL GONZALES: I'm just giving the analysis used by Justice O'Connor -- and she said clearly and unmistakenly the Congress authorized the President of the United States to detain an American citizen, even though the authorization to use force never mentions the word "detention" --

Q -- into wiretapping everybody and listening in on --

ATTORNEY GENERAL GONZALES: This is not about wiretapping everyone. This is a very concentrated, very limited program focused at gaining information about our enemy.

Q Now that the cat is out of the bag, so to speak, do you expect your legal analysis to be tested in the courts?

ATTORNEY GENERAL GONZALES: I'm not going to, you know, try to guess as to what's going to happen about that. We're going to continue to try to educate the American people and the American Congress about what we're doing and the basis -- why we believe that the President has the authority to engage in this kind of conduct.

Q Because there are some very smart legal minds who clearly think a law has been broken here.

ATTORNEY GENERAL GONZALES: Well, I think that they may be making or offering up those opinions or assumptions based on very limited information. They don't have all the information about the program. I think they probably don't have the information about our legal analysis.

Q Judge Gonzales, will you release then, for the reasons you're saying now, the declassified versions of the legal rationale for this from OLC? And if not, why not? To assure the American public that this was done with the legal authority that you state.

ATTORNEY GENERAL GONZALES: We're engaged now in a process of educating the American people, again, and educating the Congress. We'll make the appropriate evaluation at the appropriate time as to whether or not additional information needs to be provided to the Congress or the American people.

Q You declassified OLC opinions before, after the torture -- why not do that here to show, yes, we went through a process?

ATTORNEY GENERAL GONZALES: I'm not confirming the existence of opinions or the non-existence of opinions. I've offered up today our legal analysis of the authorities of this President.

Q Sir, can you explain, please, the specific inadequacies in FISA that have prevented you from sort of going through the normal channels?

GENERAL HAYDEN: One, the whole key here is agility. And let me re-trace some grounds I tried to suggest earlier. FISA was built for persistence. FISA was built for long-term coverage against known agents of an enemy power. And the purpose involved in each of those -- in those cases was either for a long-term law enforcement purpose or a long-term intelligence purpose.

This program isn't for that. This is to detect and prevent. And here the key is not so much persistence as it is agility. It's a quicker trigger. It's a subtly softer trigger. And the intrusion into privacy -- the intrusion into privacy is significantly less. It's only international calls. The period of time in which we do this is, in most cases, far less than that which would be gained by getting a court order. And our purpose here, our sole purpose is to detect and prevent.

Again, I make the point, what we are talking about here are communications we have every reason to believe are al Qaeda communications, one end of which is in the United States. And I don't think any of us would want any inefficiencies in our coverage of those kinds of communications, above all. And that's what this program allows us to do -- it allows us to be as agile as operationally required to cover these targets.

Q But how does FISA --

GENERAL HAYDEN: FISA involves the process -- FISA involves marshaling arguments; FISA involves looping paperwork around, even in the case of emergency authorizations from the Attorney General. And beyond that, it's a little -- it's difficult for me to get into further discussions as to why this is more optimized under this process without, frankly, revealing too much about what it is we do and why and how we do it.

Q If FISA didn't work, why didn't you seek a new statute that allowed something like this legally?

ATTORNEY GENERAL GONZALES: That question was asked earlier. We've had discussions with members of Congress, certain members of Congress, about whether or not we could get an amendment to FISA, and we were advised that that was not likely to be -- that was not something we could likely get, certainly not without jeopardizing the existence of the program, and therefore, killing the program. And that -- and so a decision was made that because we felt that the authorities were there, that we should continue moving forward with this program.

Q And who determined that these targets were al Qaeda? Did you wiretap them?

GENERAL HAYDEN: The judgment is made by the operational work force at the National Security Agency using the information available to them at the time, and the standard that they apply -- and it's a two-person standard that must be signed off by a shift supervisor, and carefully recorded as to what created the operational imperative to cover any target, but particularly with regard to those inside the United States.

Q So a shift supervisor is now making decisions that a FISA judge would normally make? I just want to make sure I understand. Is that what you're saying?

GENERAL HAYDEN: What we're trying to do is to use the approach we have used globally against al Qaeda, the operational necessity to cover targets. And the reason I emphasize that this is done at the operational level is to remove any question in your mind that this is in any way politically influenced. This is done to chase those who would do harm to the United States.

Q Building on that, during --

Q Thank you, General. Roughly when did those conversations occur with members of Congress?

ATTORNEY GENERAL GONZALEZ: I'm not going to get into the specifics of when those conversations occurred, but they have occurred.

Q May I just ask you if they were recently or if they were when you began making these exceptions?

ATTORNEY GENERAL GONZALEZ: They weren't recently.

MR. McCLELLAN: The President indicated that those -- the weeks after September 11th.

Q What was the date, though, of the first executive order? Can you give us that?

GENERAL HAYDEN: If I could just, before you ask that question, just add -- these actions that I described taking place at the operational level -- and I believe that a very important point to be made -- have intense oversight by the NSA Inspector General, by the NSA General Counsel, and by officials of the Justice Department who routinely look into this process and verify that the standards set out by the President are being followed.

Q Can you absolutely assure us that all of the communications intercepted --

Q Have you said that you -- (inaudible) -- anything about this program with your international partners -- with the partners probably in the territories of which you intercept those communications?

ATTORNEY GENERAL GONZALEZ: I'm not aware of discussions with other countries, but that doesn't mean that they haven't occurred. I simply have no personal knowledge of that.

Q Also, is it only al Qaeda, or maybe some other terrorist groups?

ATTORNEY GENERAL GONZALEZ: Again, with respect to what the President discussed on Saturday, this program -- it is tied to communications where we believe one of the parties is affiliated with al Qaeda or part of an organization or group that is supportive of al Qaeda.

Q Sir, during his confirmation hearings, it came out that now-Ambassador Bolton had sought and obtained NSA intercepts of conversations between American citizens and others. Who gets the information from this program; how do you guarantee that it doesn't get too widely spread inside the government, and used for other purposes?

Q And is it destroyed afterwards?

GENERAL HAYDEN: We report this information the way we report any other information collected by the National Security Agency. And the phrase you're talking about is called minimization of U.S. identities. The same minimalizationist standards apply across the board, including for this program. To make this very clear -- U.S. identities are minimized in all of NSA's activities, unless, of course, the U.S. identity is essential to understand the inherent intelligence value of the intelligence report. And that's the standard that's used.

Q General, when you discussed the emergency powers, you said, agility is critical here. And in the case of the emergency powers, as I understand it, you can go in, do whatever you need to do, and within 72 hours just report it after the fact. And as you say, these may not even last very long at all. What would be the difficulty in setting up a paperwork system in which the logs that you say you have the shift supervisors record are simply sent to a judge after the fact? If the judge says that this is not legitimate, by that time probably your intercept is over, wouldn't that be correct?

GENERAL HAYDEN: What you're talking about now are efficiencies. What you're asking me is, can we do this program as efficiently using the one avenue provided to us by the FISA Act, as opposed to the avenue provided to us by subsequent legislation and the President's authorization.

Our operational judgment, given the threat to the nation that the difference in the operational efficiencies between those two sets of authorities are such that we can provide greater protection for the nation operating under this authorization.

Q But while you're getting an additional efficiency, you're also operating outside of an existing law. If the law would allow you to stay within the law and be slightly less efficient, would that be --

ATTORNEY GENERAL GONZALEZ: I guess I disagree with that characterization. I think that this electronic surveillance is within the law, has been authorized. I mean, that is our position. We're only required to achieve a court order through FISA if we don't have authorization otherwise by the Congress, and we think that that has occurred in this particular case.

Q Can you just give us one assurance before you go, General?

ATTORNEY GENERAL GONZALEZ: It depends on what it is. (Laughter.)

Q Can you assure us that all of these intercepts had an international component and that at no time were any of the intercepts purely domestic?

GENERAL HAYDEN: The authorization given to NSA by the President requires that one end of these communications has to be outside the United States. I can assure you, by the physics of the intercept, by how we actually conduct our activities, that one end of these communications are always outside the United States of America.

END 9:02 A.M. EST

**Return to this article at:**
http://www.whitehouse.gov/news/releases/2005/12/20051219-1.html

**Click to Print this document**