Trone et al v. Peanut Corporation of America

Doc. 115 Att. 2

# Tab 3

Dockets.Justia.com

# DANIEL ELLSBERG, ET AL., APPELLANTS v. JOHN N. MITCHELL, ET AL.

No. 82-1085

UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

*228 U.S. App. D.C. 225; 709 F.2d 51; 1983 U.S. App. LEXIS 28129; 36 Fed. R. Serv. 2d (Callaghan) 367*

November 22, 1982, Argued
May 10, 1983, Decided

**SUBSEQUENT HISTORY:** [**1]

Cert. denied, *465 U.S. 1038, 104 S. Ct. 1316, 79 L. Ed. 2d 712 (1984).*

**PRIOR HISTORY:** Appeal from the United States District Court for the District of Columbia.

**COUNSEL:**

Gordon J. Johnson and Lawrence Teeter, with whom Leonard B. Boudin was on the brief, for Appellants.

R. Joseph Sher, Department of Justice, with whom Stanley S. Harris, United States Attorney, and Barbara L. Herwig, Department of Justice, were on the brief, for Appellees.

**JUDGES:**

MacKinnon and Edwards, Circuit Judges, and Swygert, * Senior Circuit Judge, United States Court of Appeals for the Seventh Circuit.

* Sitting by designation pursuant to 28 U.S.C. § 294(d) (Supp. V 1981).

**OPINIONBY:**

EDWARDS

**OPINION:** [*52]

Edwards, Circuit Judge:

At issue in this appeal is the validity of the District Court's treatment of one aspect of a constitutional tort action, in which the plaintiffs seek compensation for injuries sustained through their exposure to warrantless electronic surveillance. Two questions are presented: Did the District Court err in upholding a formal claim of "state secrets" privilege entered by the United States in opposition to the plaintiffs' motions to compel discovery? Was it proper for the District Court [**2] to dismiss those aspects of the suit affected by the government's claim of privilege, on the theory that the plaintiffs would be unable to make out a *prima facie* case?

We conclude that, while the District Court's accession to the government's state secrets privilege claim was proper for the most part, the court erred in one important respect: it improperly upheld the government's refusal to disclose the identities of the Attorneys General who authorized the wiretaps, despite the absence of any explanation of how the revelation of such information might affect national security. This error was highlighted during the oral argument before this court, when government counsel frankly conceded that there is nothing in the documents or other submissions received by the trial court or this court justifying a refusal by the government to disclose the identities of the responsible Attorneys General. When the District Court's ruling is modified to require disclosure of the names of the officials who ordered the surveillance, it becomes evident that the dismissal of the relevant portions of the suit cannot stand. We thus reverse the judgment and remand the case for further proceedings. [**3]

I. BACKGROUND

The plaintiffs in this case were the defendants and their attorneys and advisors in the "Pentagon Papers" criminal prosecution. n1 In the course of that proceeding, [*53] they learned that one or more of them had been the subject of warrantless electronic surveillance by the federal government. They subsequently brought this damage action against all persons and agencies they thought might be responsible. n2

n1 *United States v. Russo & Ellsberg*, Crim. No. 9373 (C.D. Cal. dismissed May 11, 1973). The suit was dismissed because of governmental misconduct.

n2 The defendants sued for damages in their individual capacities were: John N. Mitchell; Richard Kleindienst; L. Patrick Gray, III; John E. Ingersoll; Vernon D. Acree; James J. Rowley; Johnnie M. Walters; William Rogers; Melvin Laird; and Richard Helms. The last nine were also sued in their official capacities as heads of the following agencies: Department of Justice; Federal Bureau of Investigation; Bureau of Narcotics and Dangerous Drugs; Bureau of Customs; Secret Service; Internal Revenue Service; Department of State; Department of Defense; and Central Intelligence Agency. Also named as defendants were persons "as yet unknown to the plaintiffs, . . . who have directed, authorized or participated in electronics surveillance on behalf of the other defendants."

[**4]

After filing their complaint, the plaintiffs submitted interrogatories to each individual defendant, asking for detailed information regarding the wiretaps. n3 The defendants' responses to the plaintiffs' allegations (and specifically to their request for information) occurred in two phases, separated by approximately four years. In the first phase, the defendants admitted to two wiretaps -- one on "one of plaintiffs' attorneys or consultants" n4 and one by the FBI on the telephone [*54] at the residence of Morton Halperin, in the course of which "conversations of plaintiff Daniel Ellsberg were incidentally overheard." n5 The defendants refused to respond to any of the plaintiffs' remaining allegations or questions on the ground that all other relevant information was "privileged." n6 Their refusal was buttressed by a formal claim of privilege made on behalf of the United States by then Attorney General (and defendant) Richard Kleindienst. The principal support for Kleindienst's claim was contained in a sealed exhibit, submitted to the District Court for *in camera* inspection, which contained "records of the intercepted conversations and the identity and location of the [**5] premises which were the subjects of the surveillance." n7 That submission -- and the inferences to which it assertedly gave rise -- were described in a brief public affidavit, the relevant portions of which are reprinted in the margin. n8

n3 Because the kinds of information sought by these interrogatories are crucial to this appeal, the questions ae reprinted in full below:

> 1. State whether you, your agents or employees, or the agents or employees of the department or agency which you direct, have, since June 19, 1968, authorized, procured, conducted, or received any electronic surveillance or other overhearing of wire or oral communications made by or to any of the following persons: [the plaintiffs (except for Russo and Ellsberg) were listed here].
>
> 2. If the response to Interrogatory 1 or to any part thereof is in the affirmative, please respond to the following additional interrogatories with respect to each instance of electronic surveillance or other overhearing indicated.
>
> a. State the date of such electronic surveillance or other overhearing.
>
> b. State the precise location of the electronic devise [sic] by means of which the overhearing was accomplished.
>
> c. State the name of the person or the address of the establishment at which the electronic surveillance or other overhearing was directed.
>
> d. State whether such electronic surveillance or other overhearing was conducted pursuant to a court order.
>
> e. If such electronic surveillance or other overhearing was conducted pursuant to a court order, state the name of the judge who signed the order and the date of its issuance.
>
> f. If such electronic surveillance or other overhearing was not conducted pursuant to a court order, state by what other form of authority such surveillance was conducted, and if in written form, state the name of the person who

signed the authorization, the date of its issuance, and the name and address of its present custodian.

g. State the method by which such electronic surveillance or other overhearing was accomplished.

h. State the precise location of the electronic device by means of which the electronic surveillance or other overhearing was accomplished.

i. State the names, positions of employment, and present addresses if known, of all persons who participated in each such instance of electronic surveillance or other overhearing.

j. State whether logs, memoranda, transcription, or any other form of record relating to such electronic surveillance or other overhearing were prepared, and, if so, state the names and addresses of the custodians of each such record, and the precise whereabouts of each such record.

k. State the names of all persons or agencies who have access to each such record.

l. State the names, positions of employment, and present addresses of the persons within your department or agency who are responsible for searching the files and records to determine, in response to appropriate inquiry, whether surveillance of a named person or at a specified location has been conducted.

First Interrogatories of Plaintiffs to Defendants Kleindeinst [sic], Gray, Ingersoll, Acree, Rowley, Walters, Rogers, Laird and Helms, Record ("R.") 4. The interrogatories submitted to defendant Mitchell and the subsequent interrogatories pertaining to surveillance of Russo and Ellsberg were identical. R. 3, 27.

[**6]

n4 Amended Answer to Complaint, Jan. 26, 1973, at 7, *reprinted in* Appendix ("App.") 25. (The complaint and answer do not make clear whether this was a tap on one of the plaintiffs or a tap on someone else, through which a conversation of one of the plaintiffs was overheard.) It was this surveillance that, when disclosed to the court in *United States v. Russo & Ellsberg*, had initially prompted the plaintiffs to bring their action.

n5 Answer to Amendment to Complaint, June 29, 1973, at 1, *reprinted in* App. 33.

n6 Amended Answer to Complaint at 7, *reprinted in* App. 25; Answer to Amendment to Complaint at 1, *reprinted in* App. 33; Defendants' Objections to Plaintiffs' First Interrogatories, Jan. 26, 1973, at 2-3, R. 11.

n7 Affidavit of the Attorney General of the United States para. 2, May 8, 1973, *reprinted in* App. 28-29.

n8

3. These surveillances were expressly authorized and approved by the President of the United States, acting through the then Attorney General of the United States, in the exercise of his authority relating to the Nation's foreign affairs and were deemed essential to protect the Nation against actual or potential attack or other hostile acts of foreign powers, to obtain foreign intelligence information deemed essential to the security of the United States and to protect national security information against foreign intelligence activities. The authorizations for such surveillances were in response to requests of the then Director of the Federal Bureau of Investigation. It is apparent from the logs of the overheard conversations and the description of the premises which were the subjects of the surveillances that neither the plaintiffs nor any premises in which they had an interest were the subjects of the surveillances and that the surveillances were

> conducted and maintained solely for the purposes stated;
>
> 4. I certify that it would be a practical impossibility to submit to the Court all of the facts, circumstances and other considerations upon which these authorizations were based. I further certify that it would prejudice the national interest to disclose the particular facts contained in the sealed exhibit concerning these surveillances other than to the Court, *in camera*.

*Id.* at 29.

[**7]

On August 2, 1973, relying on Kleindienst's exhibit and affidavit, the District Court denied the plaintiffs' motion for an order compelling the defendants to answer their interrogatories. Surprisingly, however, the court rested its ruling not on a finding that the government's claim of privilege was proper, but on its conclusions that the two "overhearings" admitted by the defendants were "legal and not violative of any provision of the Constitution of the United States . . . or of any Federal statute" and that the plaintiffs had failed specifically to allege any other injuries sufficient to give them "standing." n9 For purposes relevant to this appeal, that order effectively halted litigation. n10

n9 Order, Aug. 2, 1973, at 2, *reprinted in* App. 36.

n10 On November 27, 1973 (after the entrance of the District Court's original order), Acting Attorney General Robert H. Bork submitted an affidavit and an *in camera* exhibit similar to Kleindienst's, claiming on behalf of the United States a privilege with regard to "the telephone surveillance of Dr. Morton H. Halperin." App. 37-39. Those submissions were subsequently withdrawn when it was learned that the information in question had been revealed to the public in another context. Withdrawal of Affidavit and In Camera Submission, Nov. 22, 1977, R. 83A. The validity of the claim of privilege made therein is not before us.

[**8]

The second phase of this suit began on March 29, 1977. On that date, the plaintiffs moved for reconsideration of the District Court's 1973 order, supporting their motion with a memorandum challenging the legal basis of the court's conclusion that they lacked "standing," and submitted a "Request for Production of Documents" relating to the alleged wiretaps. The District [*55] Court responded by approving a "stipulation" by the parties, whereby the defendants agreed to recheck their files and make "Fresh Responses" to the plaintiffs' interrogatories. The responses subsequently submitted by the Attorney General, the FBI, the Internal Revenue Service, the Secret Service, the Secretary of State, the Director of Central Intelligence, and the Secretary of Defense went significantly further than the defendants' first set of answers. They admitted that the plaintiffs had been overheard during a number of "domestic intelligence" wiretaps. n11 More importantly for present purposes, they acknowledged "overhears" of five of the plaintiffs -- Daniel Ellsberg, Robert Scheer, Leonard B. Boudin, Stanley K. Sheinbaum, and Richard Falk -- on "foreign intelligence" taps. n12 In addition, the [**9] defendants conceded "foreign intelligence" surveillance of "one or more of the plaintiffs," thus leaving open the possibility that others in the plaintiff class had been overheard. n13 Beyond that, however, the defendants insisted that all other information would be "the subject of a claim of privilege by the head of the appropriate Department or agency." n14

n11 Because the defendants have not asserted any privilege concerning the "domestic intelligence" surveillance of the plaintiffs, claims arising out of that group of taps are not before us.

n12 The defendants also acknowledged surveillance of a sixth member of the original group of plaintiffs, Thomas Hayden. However, because the District Court has since dealt separately with Hayden's claims, Order, Nov. 5, 1981, R. 104, and has not yet entered final judgment thereon, his case is not before us.

n13 The plaintiffs who are in this category (and who appear as appellants before this court) are: Anthony Joseph Russo, Jr.; Charles R. Nesson; Arthur I. Berman; Dolores A. Donovan; Leonard I. Weinglass; H. Peter Young; Jeffrey B. Kupers; Barrett S. Litt; Michael P. Balaban; Barry Portman; and Adam Bennion.

The defendants admitted, moreover, that information obtained in the course of these various "overhears" was "shared" amongst several federal agencies: the State Department; the Justice Department; the Defense Department; the Secret

Service; and the Internal Revenue Service. App. 52, 65, 73, 79, 85-86.

[**10]

n14 *E.g.*, Fresh Response by Defendant Director, Federal Bureau of Investigation at 4, *reprinted in* App. 47.

Four formal claims of privilege were entered in order to explain and justify the defendants' position concerning the "foreign intelligence" surveillance. On August 12, 1977, Attorney General Griffin Bell submitted an *in camera* exhibit containing information relevant to "the overhearings of plaintiffs Leonard B. Boudin, Thomas Hayden, and Robert Scheer," along with a brief supportive public affidavit. n15 Like the Kleindienst affidavit, on which it appears to have been modeled, the Bell affidavit acknowledged that the taps were "authorized by the Attorney General" but did not indicate which Attorney General was responsible. n16 Subsequently, the Director of Central Intelligence and the Secretary of Defense submitted a total of three *in camera* affidavits with accompanying exhibits in support of their privilege claims; these latter claims were not, however, accompanied with any public explanation of the nature [*56] of the materials or arguments presented to the court. [**11] n17

n15 Affidavit and Claim of Privilege of the Attorney General of the United States PP3-4, *reprinted in* App. 42:

> 3. The electronic surveillances contained in the sealed Exhibit were authorized by the Attorney General pursuant to the power delegated to him by the President of the United States in the exercise of his authority relating to the Nation's foreign affairs as described in *18 U.S.C. § 2511*(3), to obtain counterintelligence as well as foreign intelligence information deemed essential to the security of the United States and/or to protect national security information against foreign intelligence activities. The decisions to authorize the surveillances were based upon information contained in the requests of the Director of the Federal Bureau of Investigation, which were considered in conjunction with other intelligence information available to the Attorney General of the United States.
>
> 4. I certify that it would prejudice the national interest to disclose the particular facts contained in the sealed Exhibit and concerning the surveillance other than to the Court, *ex parte, in camera.*

[**12]

n16 Because the dates of the taps have never been disclosed, the identity of the responsible Attorney(s) General cannot be determined indirectly.

n17 The Secretary of Defense submitted two such affidavits -- on Aug. 13 and Dec. 19, 1977; the Director of Central Intelligence submitted one on Aug. 10, 1977. The only public records of these representations are two brief "Notice[s] of *In Camera* Submission," filed on Dec. 22, 1977 and Sept. 30, 1977. R. 85, 79.

The plaintiffs then sought an order compelling fuller responses by the defendants. After reviewing *in camera* the various affidavits and exhibits submitted by representatives of the government and considering the plaintiffs' objections thereto, n18 the District Court concluded that disclosure of the information requested "would reveal sensitive governmental matters related to the national defense and the international relations of the United States" and accordingly denied the motion. n19 On September 2, 1981, the defendants filed a motion *in limine*, requesting dismissal of those of the plaintiffs' claims that pertain to [**13] surveillance of their foreign communications. After hearing argument, the District Court granted the motion and subsequently certified its decision as a partial final judgment subject to review by this court. n20 This appeal followed.

n18 In their memorandum opposing the claim of privilege, the plaintiffs expressly argued that the Attorney General's affidavit contained insufficient detail, that they were entitled to "further information with respect to the overhears sought to be withheld so that meaningful opposition to the claim may be made," that the "actual

authorization" of the taps should be set forth, and that their counsel were entitled to participate in any *in camera* proceedings. R. 74. Thus, we find meritless the defendants' argument that the plaintiffs failed to raise these issues below and therefore somehow "waived" their right to object on appeal.

n19 The trial court's findings and ruling were embodied in two separate orders. The first, entered on Nov. 23, 1977, upheld the claims of privilege made by: Attorney General Kleindienst, *see* notes 7-8 *supra*; Acting Attorney General Bork (the validity of which is not before us, *see* note 10 *supra*); Attorney General Bell, *see* note 15 *supra*; and the Director of Central Intelligence, *see* note 17 *supra*. The second, entered on Feb. 8, 1978, upheld the two claims made by the Secretary of Defense, *see* note 17 *supra*. Both orders contained the language quoted in the text. App. 91, 95.

[**14]

n20 The District Court's determination was made pursuant to *FED. R. CIV. P. 54(b)*, which allows for final adjudication (and appeal) of fewer than all of the claims involved in an action if the District Court expressly finds that "there is no just reason for delay" and directs entry of judgment on those claims.

II. THE PRIVILEGE CLAIMS

A.

It is now well established that the United States, by invoking its state secrets privilege, may block discovery in a lawsuit of any information that, if disclosed, would adversely affect national security. Prior to World War Two, the government rarely had occasion to exercise this prerogative, and, consequently, the scope of the privilege remained somewhat in doubt. n21 In recent years, however, the state secrets privilege has been asserted in a growing number of cases, and the resultant bevy of judicial decisions assessing the legitimacy of its invocation has brought its lineaments into reasonably sharp focus. The following principles may be distilled from the case law.

n21 Various early decisions alluded to some such evidentiary privilege, *see, e.g., United States v. Burr, 25 F. Cas. 30, 37 (C.C.D. Va. 1807)* (No. 14,692d) (Marshall, C.J.), but none attempted to prescribe any comprehensive doctrine regarding the circumstances in which it might legitimately be invoked. Full-scale treatment of the privilege had to await the decision of the Supreme Court in *United States v. Reynolds, 345 U.S. 1, 97 L. Ed. 727, 73 S. Ct. 528 (1953)*. For a discussion of the evolution of the doctrine, see Note, *The Military and State Secrets Privilege: Protection for the National Security or Immunity for the Executive*?, *91 YALE L.J. 570, 571-73 (1982)*.

[**15]

The privilege may be asserted only by the government itself; neither a private party nor an individual official may seek its aid. n22 Furthermore, in order to invoke it, "there must be a formal claim of [*57] privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer." n23 Possibly because the state secrets doctrine pertains generally to *national security* concerns, the privilege has been viewed as both expansive and malleable. n24 The various harms, against which protection is sought by invocation of the privilege, include impairment of the nation's defense capabilities, n25 disclosure of intelligence-gathering methods or capabilities, n26 and disruption of diplomatic relations with foreign governments. n27

n22 *United States v. Reynolds, 345 U.S. at 7.*

n23 *Id. at 7-8* (footnotes omitted). *See also Halkin v. Helms [Halkin II], 223 U.S. App. D.C. 254, 690 F.2d 977, 991 (D.C. Cir. 1982); Kinoy v. Mitchell, 67 F.R.D. 1, 8-10 (S.D.N.Y. 1975)* (refusing to accept Attorney General's privilege claim in the absence of "an explicit representation" that he personally reviewed the material).

[**16]

n24 *See Jabara v. Kelley, 75 F.R.D. 475, 483 n.25 (E.D. Mich. 1977)* ("Although the term 'military or state secrets' is amorphous in nature, it should be defined in the light of 'reason and experience, ' much in the same way that the term 'national defense ' has been defined in *18 U.S.C. § 793: i.e.*, a 'generic concept of broad connotations, referring to the military and naval establishments and the related activities of national preparedness. '"); VIII WIGMORE, EVIDENCE (McNaughton rev. 1961) § 2378(2), at 794 (The privilege protects "matters relating to international relations, military affairs and public security."); Zagel, *The State Secrets Privilege, 50*

*MINN. L. REV. 875, 880-85 (1966); The Military and State Secrets Privilege, supra* note 21, at 574.

n25 *See United States v. Reynolds, 345 U.S. at 6-7, 10.*

n26 *See Halkin II, 690 F.2d at 993; Halkin v. Helms [Halkin I], 194 U.S. App. D.C. 82, 598 F.2d 1, 8-9 (D.C. Cir. 1978).*

n27 *See Halkin II, 690 F.2d at 990 n.53, 993; Republic of China v. National Union Fire Ins. Co., 142 F. Supp. 551, 556 (D. Md. 1956).*

[**17]

When properly invoked, the state secrets privilege is absolute. No competing public or private interest can be advanced to compel disclosure of information found to be protected by a claim of privilege. n28 However, because of the broad sweep of the privilege, the Supreme Court has made clear that "it is not to be lightly invoked." n29 Thus, the privilege may not be used to shield any material not strictly necessary to prevent injury to national security; and, whenever possible, sensitive information must be disentangled from nonsensitive information to allow for the release of the latter. n30

n28 *See United States v. Reynolds, 345 U.S. at 11; Halkin II, 690 F.2d at 990; Halkin I, 598 F.2d at 7; Kinoy v. Mitchell, 67 F.R.D. at 9.*

n29 *United States v. Reynolds, 345 U.S. at 7; accord Halkin II, 690 F.2d at 990.*

n30 *See Jabara v. Kelley, 75 F.R.D. at 492;* 2 D. LOUISELL & C. MUELLER, FEDERAL EVIDENCE § 226, at 709 (1978).

It has been argued that certain limitations on the [**18] capacity of the judicial branch safely and reliably to evaluate invocations of the state secrets privilege should induce the courts to renounce any role in this area, n31 *i.e.*, to accept without question a [*58] privilege claim made by a ranking executive officer. Such an extreme solution, however, would have grave drawbacks. As noted by Professor McCormick:

> The head of an executive department can appraise the public interest of secrecy as well (or perhaps in some cases better) than the judge, but his official habit and leaning tend to sway him toward a minimizing of the interest of the individual. Under the normal administrative routine the question will come to him with recommendations from cautious subordinates against disclosure and in the press of business the chief is likely to approve the recommendation about such a seemingly minor matter without much independent consideration. n32

Sensitive to these concerns, the Supreme Court has declared that "judicial control over the evidence in a case cannot be abdicated to the caprice of executive officers." n33 Thus, to ensure that the state secrets privilege is asserted no more frequently and sweepingly [**19] than necessary, it is essential that the courts continue critically to examine instances of its invocation.

n31 There are at least three serious problems facing a judge who is attempting to assess a claim of privilege under the state secrets doctrine. First, the government often is unable publicly to demonstrate the likelihood of harm without revealing the very information sought to be shielded. Second, the procedure that might be employed to deal with the foregoing problem -- *ex parte, in camera* examination of the requested material by the trial judge -- is not entirely safe.

> It is not to slight judges, lawyers or anyone else to suggest that any such disclosure carries with it serious risk that highly sensitive information may be compromised. In our own chambers, we are ill equipped to provide the kind of security highly sensitive information should have.

*Clift v. United States, 597 F.2d 826, 829 (2d Cir. 1979)* (quoting *Alfred A. Knopf, Inc. v. Colby, 509 F.2d 1362, 1369* (4th Cir.), *cert. denied, 421 U.S. 992, 44 L. Ed. 2d 482, 95 S. Ct. 1999 (1975)).*

Third, the probability that a particular disclosure will have an adverse effect on national security is difficult to assess, particularly for a judge with little expertise in this area. In *Halkin I, 598 F.2d at 8-9,* we identified the factors that limit judicial competence to evaluate the executive's predictions of the harms likely to result from disclosure of particular materials:

It requires little reflection to understand that the business of foreign intelligence gathering in this age of computer technology is more akin to the construction of a mosaic than it is to the management of a cloak and dagger affair. Thousands of bits and pieces of seemingly innocuous information can be analyzed and fitted into place to reveal with startling clarity how the unseen whole must operate. As the Fourth Circuit Court of Appeals has observed:

> The significance of one item of information may frequently depend upon knowledge of many other items of information. What may seem trivial to the uninformed, may appear of great moment to one who has a broad view of the scene and may put the questioned item of information in its proper context. The courts, of course, are ill-equipped to become sufficiently steeped in foreign intelligence matters to serve effectively in the review of secrecy classifications in that area. *United States v. Marchetti, 466 F.2d 1309, 1318* (4th Cir.), *cert. denied, 409 U.S. 1063, 34 L. Ed. 2d 516, 93 S. Ct. 553 (1972).*

*See also Halkin II, 690 F.2d at 993 & n.57.*
[**20]

n32 MCCORMICK'S HANDBOOK OF THE LAW OF EVIDENCE 235 (E. Cleary ed. 1972) (footnote omitted).

n33 *United States v. Reynolds, 345 U.S. at 9-10. See also ACLU v. Brown, 619 F.2d 1170, 1173 (7th Cir. 1980)* (en banc); *Jabara v. Kelley, 75 F.R.D. at 484; Kinoy v. Mitchell, 67 F.R.D. at 9-10.* Congressional support for the position taken by the courts is indicated by the reaction to Proposed Federal Rule of Evidence 509. Fear that adoption of the rule would effectively eliminate judicial scrutiny of executive assertions of the privilege contributed substantially to the congressional repudiation of the rule. *See* D. LOUISELL & C. MUELLER, *supra* note 30, at 694-99, 708.

Although there can be no abdication of a judicial role in connection with proposed applications of the state secrets doctrine, it is nevertheless frequently noted that the trial judge should accord considerable deference to recommendations from the executive department. n34 Moreover, it is recognized that the government need not demonstrate that injury to the national interest will inevitably result from disclosure; [**21] a showing of "reasonable danger" that harm will ensue is sufficient. n35 Finally, when assessing claims of a state secrets privilege, a trial judge properly may rely on affidavits and other secondary sources more often than he might when evaluating assertions of other evidentiary privileges. n36

n34 *See Halkin II, 690 F.2d at 996; Halkin I, 598 F.2d at 9; Jabara v. Kelley, 75 F.R.D. at 492.*

n35 *United States v. Reynolds, 345 U.S. at 10. See also Halkin I, 598 F.2d at 9* (quoting this phrase and the passage in which it appears). Other courts have used different language to describe the required probability of injury. *See, e.g., Halkin II, 690 F.2d at 990* ("reasonably could be seen as a threat to the military or diplomatic interests of the nation"); *Jabara v. Kelley, 75 F.R.D. at 484* ("reasonable possibility that military or state secrets would be revealed"). The crucial aspect of each formulation of the test is the willingness to credit relatively speculative projections of adverse consequences.

n36 *Compare United States v. Reynolds, 345 U.S. at 10* ("We will not go so far as to say that the court may automatically require a complete disclosure to the judge before the claim of privilege will be accepted in any case."), *with, e.g., Black v. Sheraton Corp., 184 U.S. App. D.C. 46, 564 F.2d 531, 544 (D.C. Cir. 1977)* (In evaluating a claim of a "law enforcement evidentiary privilege," the trial judge ordinarily *should* examine the documents *in camera* -- provided "no military or diplomatic secrets are involved.").

[**22]

Whether (and in what spirit) the trial judge in a particular case should examine the materials sought to be withheld depends upon two critical considerations. First, the more compelling a litigant's showing of need for the information in question, the [*59] deeper "the court should probe in satisfying itself that the occasion for

invoking the privilege is appropriate." n37 Second, the more plausible and substantial the government's allegations of danger to national security, in the context of all the circumstances surrounding the case, the more deferential should be the judge's inquiry into the foundations and scope of the claim. n38 Neither of these two factors can affect the judge's response, however, if he is "ultimately satisfied" that disclosure of the material *would* damage national security. n39

n37 *United States v. Reynolds, 345 U.S. at 11.* The Court continued: "Where there is a strong showing of necessity, the claim of privilege should not be lightly accepted. . . ." *Id. See also Halkin II, 690 F.2d at 990; ACLU v. Brown, 619 F.2d at 1173; Halkin I, 598 F.2d at 9; Jabara v. Kelley, 75 F.R.D. at 484; Kinoy v. Mitchell, 67 F.R.D. at 8-9.* A "showing of need" for these purposes consists of a demonstration that the information is relevant to a material aspect of the litigant's case and that the litigant is unable to obtain the crucial data (or adequate substitute) from any other source.

When a litigant must lose if the claim is upheld and the government's assertions are dubious in view of the nature of the information requested and the circumstances surrounding the case, careful *in camera* examination of the material is not only appropriate, *see Jabara v. Kelley, 75 F.R.D. at 486; Kinoy v. Mitchell, 67 F.R.D. at 9* (dicta), but obligatory, *see ACLU v. Brown, 619 F.2d at 1173.*

[**23]

n38 *See United States v. Reynolds, 345 U.S. at 9; Halkin II, 690 F.2d at 991-93; Jabara v. Kelley, 75 F.R.D. at 484.* The "circumstances" most relevant in this context are the nature of the information requested and its "self-evident" importance to the nation's current military capabilities and diplomatic relations. *See Halkins II, 690 F.2d at 992-93.*

When the litigant requesting the information has made only a trivial showing of need for it and the circumstances of the case point to a significant risk of serious harm if the information is disclosed, the trial judge should evaluate (and uphold) the privilege claim solely on the basis of the government's public representations, without an *in camera* examination of the documents. *See United States v. Reynolds, 345 U.S. at 10; Kinoy v. Mitchell, 67 F.R.D. at 9* (dicta); *Pan American World Airways v. Aetna Casualty & Surety Co., 368 F. Supp. 1098, 1140-41 (S.D.N.Y. 1973), aff'd on other grounds, 505 F.2d 989 (2d Cir. 1974); Republic of China v. National Union Fire Ins. Co., 142 F. Supp. at 557.*

n39 *See United States v. Reynolds, 345 U.S. at 11* ("Even the most compelling necessity cannot overcome the claim of privilege if the court is ultimately satisfied that military secrets are at stake.").

[**24]

B.

With these principles in mind, we turn to the objections made by the plaintiffs to the positions taken by the defendants, the government, and the District Court. The plaintiffs' first argument -- a challenge to the scope of the privilege claim -- is necessarily somewhat vague. Ignorant of what in fact has been withheld, they are able to say only that "too much" has been shielded. The tasks of posing and answering more specific questions therefore devolve on us.

We have examined all of the various affidavits and exhibits submitted to the District Court for *in camera* inspection. For the most part, the documents contained therein indicate what the defendants' responses to the plaintiffs' interrogatories would be, and why such responses cannot be made public. n40 With regard to almost all of the material, we find that the District Court was correct in concluding that invocation of the state secrets privilege was proper. In other words, we conclude that there is a "reasonable danger" that revelation of the information in question would either enable a sophisticated analyst to gain insights into the nation's intelligence-gathering methods and capabilities or would disrupt [**25] diplomatic relations with foreign governments. n41

n40 The documents consist of affidavits submitted by the heads of the departments and agencies that participated in the surveillance, descriptions of the premises surveyed, and records of the "overhears" relevant to this action.

n41 We are, of course, unable publicly to explain our conclusion in any more detail. It is one of the unfortunate features of this area of the law that open discussion of how the general principles apply to particular facts is impossible. *See Farnsworth Cannon, Inc. v. Grimes, 635 F.2d 268, 278 (4th Cir. 1980)* (Phillips, J., dissenting from the original panel opinion).

In one important respect, however, we find that the government and the District [*60] Court went too far. In their interrogatories, the plaintiffs requested the defendants to state, among other things, "by what . . . form of authority such surveillance was conducted, and if in written form, . . . the name of the person who signed the authorization." n42 [**26] In their public affidavits submitted in support of the government's privilege claims, Kleindienst and Bell acknowledged that the wiretaps were "authorized by the Attorney General pursuant to the power delegated to him by the President." n43 However, albeit without justification, neither the defendants nor the representatives of the United States have been willing to specify *which* Attorneys General authorized the surveillance.

n42 First Interrogatories at para. 2f, *reprinted in* note 3 *supra.*

n43 Affidavit of Attorney General Bell at para. 3, *reprinted in* note 15 *supra.* Kleindienst's affidavit contained similar language. *See* note 8 *supra.*

By their terms, these two public affidavits expressly pertain only to the "overhears" of plaintiffs Boudin, Hayden, and Scheer, but all parties take for granted the fact that similar acknowledgments are made in the three *in camera* affidavits submitted by the Secretary of Defense and Director of Central Intelligence, which pertain to the remaining plaintiffs. The acceptability of the government's failure to make these admissions on the public record is considered in Part II.C. *infra.*

[**27]

At oral argument, counsel for the defendants conceded that none of the *in camera* exhibits or accompanying public affidavits submitted by the government explain why the identities of the authorizing officials must be concealed. n44 After examining all the materials presented to the District Court, we agree that the government's concession is fully warranted; further, we can think of no reason why such information should be withheld. The defendants have admitted (indeed insisted) that each tap was authorized by an Attorney General. We cannot see, and the government does not even purport to explain, how any further disruption of diplomatic relations or undesirable education of hostile intelligence analysts would result from naming the responsible officials.

n44 Nor have the defendants made any attempt to remedy that omission; in their brief to this court, they oppose the plaintiffs' challenge to the basis of the government's refusal to reveal who authorized the taps only with a recitation of the general principle that courts must "give 'utmost deference ' to executive assertions of state secrets privilege." Appellees' Brief at 19. The defendants fail to recognize that it is equally well established that court must not abdicate "to the caprice of executive officers" their control over the evidence submitted in a case. *See* note 33 *supra* and accompanying text.

[**28]

C.

The plaintiffs' second argument is that the *procedures* used by the District Court to test the validity of the government's privilege claims were improper. They point out that two of the privilege claims upheld by the District Court were accompanied with no public explanation whatsoever; the affidavits and supporting exhibits submitted by the Director of Central Intelligence and Secretary of Defense were seen only by the trial judge. Additionally, the plaintiffs point out that the brief affidavits submitted on the public record by Attorneys General Kleindienst and Bell allege only that the "national interest" would be "prejudice[d]" by release of the requested materials; n45 what that "interest" consists of and how it might be damaged are not specified. The plaintiffs insist that, confronted with these meager public justifications by the government, the trial judge should have acted in one of two ways. Either he should have permitted the plaintiffs' counsel to participate in the examination of the *in camera* exhibits or he should have insisted that the government provide a fuller public account of why disclosure of the information would harm national security. At [**29] the very least, the plaintiffs maintain, the court should [*61] have compelled the government to explain on the public record why a more specific description of the anticipated adverse consequences would itself damage national security.

n45 *See* notes 8, 15 *supra.*

The first of the plaintiffs' alternative proposals may be disposed of summarily. It is well settled that a trial judge called upon to assess the legitimacy of a state secrets privilege claim should not permit the requester's counsel to participate in an *in camera* examination of putatively privileged material. *Halkin v. Helms [Halkin I], 194 U.S. App. D.C. 82, 598 F.2d 1, 7 (D.C. Cir. 1978); Jabara v. Kelley, 75 F.R.D. 475, 486-87 (E.D. Mich. 1977).* The rationale for this rule is that our nation's security is too important to be entrusted to the good

faith and circumspection of a litigant's lawyer (whose sense of obligation to his client is likely to strain his fidelity to his pledge of secrecy) or to the coercive power of [**30] a protective order.

The plaintiffs' second suggestion makes a good deal more sense. To assess it, we look first to the context in which the District Court was called upon to select a procedure for evaluating the government's privilege claim. We observe that there was a substantial chance that upholding the claim in its entirety would be fatal to the plaintiffs' case. Indeed the District Court subsequently so held. Next, we note that the circumstances surrounding the case certainly did not make it obvious that serious harm to national security would be likely to result from disclosure of the material at issue. This was particularly true at the time the court was evaluating the second set of privilege claims. n46 By then, over five years had elapsed since the last of the wiretaps. More importantly, an official inquiry in the intervening years had resulted in public disclosure not only of the fact that, during the period covered by the suit, our intelligence agencies engaged in very extensive electronic surveillance of both domestic and foreign communications, but of much of the technology whereby such surveillance was effected. n47 Against that background, the harm likely to [**31] result from responses to many of the plaintiffs' interrogatories was far from "self-evident."

n46 For a description of the posture of the case at this stage, see notes, 11-19 *supra* and accompanying text.

It is clear that, in evaluating the propriety of the court's decision upholding the government's claim, the relevant "circumstances" are those extant when the court rendered its decision, not when either the wiretaps took place or the privilege was first asserted. *United States v. Ahmad, 499 F.2d 851, 854-55 (3d Cir. 1974); Jabara v. Kelley, 75 F.R.D. at 488.* "The passage of time has a profound effect upon such matters, and that which is of utmost sensitivity one day may fade into nothing more than interesting history within weeks or months." *Ahmad, 499 F.2d at 855.*

n47 *See* SENATE SELECT COMM. TO STUDY GOVERNMENTAL OPERATIONS WITH RESPECT TO INTELLIGENCE ACTIVITIES, FINAL REPORTS, S. REP. NO. 755, 94th Cong., 2d Sess. Bks. I-IV, VI (1976).

References to these intervening public disclosures is in no way precluded by our recent decisions in the two *Halkin* cases. While, as we indicated there, the revelation in one context of a body of information does not prevent the government in another arena from invoking the state secrets privilege to shield a closely related body of information, *see Halkin II, 690 F.2d at 994; Halkin I, 598 F.2d at 9,* such selective dissemination certainly detracts from the government's ability to rely on inferences drawn from the "surrounding circumstances" in justifying its privilege claim.

[**32]

In short, the plaintiffs, made a compelling showing of need for the information in question and the surrounding circumstances did not make apparent the likelihood that disclosure would lead to serious injury. As indicated above, under such conditions, a judge is required to examine carefully a claim of privilege to satisfy himself of its legitimacy. The question then becomes: does such judicial scrutiny require the judge to insist that the government make as complete as possible a *public* defense of its claims?

Unfortunately, this is one of those procedural issues to which the case law provides no clear solution. Only three decided cases bear on the matter. The two that are directly relevant are flatly inconsistent with one another. *Compare Kinoy v. Mitchell, 67 F.R.D. 1, 8 (S.D.N.Y. 1975)* (holding that the person claiming the privilege "must set [*62] forth, with enough particularity to enable the Court to make an informed decision, the nature of the material withheld and of the threat to the national security should it be revealed"), n48 *with Jabara v. Kelley, 75 F.R.D. at 488* (ruling that a general allegation that disclosure "would 'prejudice ' the national [**33] security" was sufficient when supported with secret exhibits). The illumination generated by the third germane case, *Halkin I*, is weak. Language in the court's opinion provides some slight support for the notion that a requester may demand a full public justification of a privilege claim, *598 F.2d at 6;* however, the decision of the court in *Halkin I* upheld the District Court's refusal to compel the defendants to respond to the plaintiffs' interrogatories seeking to elicit such an explanation. n49

n48 The force of this holding was reduced, however, by some qualifying language later in the opinion. The court characterized its finding as "preliminary" and seemed to suggest that the Attorney General was free to reject the ruling, in which case the court would be willing to proceed on the basis of the *in camera* submissions alone. *Id.* at 10.

n49 The two articulated rationales for the decision in *Halkin I* not to overturn the lower court's

action -- (i) that question submitted to the defendants by the court constituted an adequate substitute for the plaintiffs' queries and (ii) that the plaintiffs would have been unable, in any event, to overcome the obstacle created by the defendants' refusal to identify the plaintiffs who had been overheard -- do provide a ready basis for distinguishing that case from the problem before us and thus leave open the possibility that the government in the instant case was legally obliged to provide a fuller explanation on the public record. Nevertheless, the disposition of the appeal certainly diminishes the precedential force of the language hinting at the existence of a duty of full public disclosure.

Though a few comments in *Halkin II* might appear to have some bearing on the issue before us, upon examination they prove inapposite. The tenor of the court's discussion of the applicability of doctrine developed in Freedom of Information Act cases regarding the need for a detailed public justification, *690 F.2d at 995-97,* is generally hostile to the position taken by the plaintiffs in the instant case, but when the court directly confronted a challenge comparable to that presented here, it ruled: "Because we find the Director's public affidavit adequate to support the district court's decision to uphold the claim of privilege we need not . . . consider appellants' claim that the court should have required a more complete articulation of the Director's claim on the public record in order to permit full adversary development of the issue of its adequacy." *Id.* at 994-95. Similarly, the apparent pertinence of the comments in *Nixon v. Sirica, 159 U.S. App. D.C. 58, 487 F.2d 700 (D.C. Cir. 1973)* (en banc) (per curiam), suggesting that the executive need not submit, in that case, a detailed public explanation for its claim of privilege with regard to materials "relate[d] to national defense or foreign policy," *id.* at 721, dissipates when one takes into account the court's ruling that the Special Prosecutor was "entitled to inspect the claim and showing and may be heard thereon, in chambers," *id.*

[**34]

In the absence of controlling precedent, we must look for insight to judicial experience in related fields, leavening the doctrine developed in those contexts with an appreciation of the important interests at stake when state secrets are alleged to be threatened. In dealing with other evidentiary privileges, courts have acknowledged the utility of a detailed public explanation of the basis of the claim, as a supplement to *in camera* submission of the requested materials themselves. In *Black v. Sheraton Corp., 184 U.S. App. D.C. 46, 564 F.2d 531 (D.C. Cir. 1977),* for example, we suggested that the proper procedure to be used in evaluating the invocation of a "law enforcement evidentiary privilege" would be to request the government to supply "an index correlating indexed items with particular claims of privilege . . . [along with] an analysis containing descriptions specific enough to identify the basis of the particular claim or claims." *Id.* at 545. After the plaintiff had been afforded an opportunity "to see this analysis and take issue with its conclusions," the court could examine the materials themselves *in camera* and make its "final determination." *Id.* [**35] n50

n50 *See also Nixon v. Sirica, 487 F.2d at 720-21* (The proper procedure for assessing a claim of executive privilege would be for the President to submit, prior to an *in camera* hearing or examination, "more particular claims of privilege, . . . accompanied by an analysis in manageable segments. Without compromising the confidentiality of the information, the analysis should contain descriptions specific enough to identify the basis of the particular claim or claims." The *Vaughn* indexing procedures [*see* note 51 *infra*] should be observed for all material not related to "national defense or foreign relations."); *International Paper Co. v. Fibreboard Corp., 63 F.R.D. 88, 94 (D. Del. 1974)* ("A proper claim of [an attorney-client] privilege requires a specific designation and description of the documents within its scope as well as precise and certain reasons for preserving their confidentiality. . . . Nor will submitting a batch of documents to the Court *in camera* provide an adequate or suitable substitute. . . .").

[**36]

[*63] The considerations underlying this practice are readily apparent. The more specific the public explanation, the greater the ability of the opposing party to contest it. The ensuing arguments assist the judge in assessing the risk of harm posed by dissemination of the information in question. This kind of focused debate is of particular aid to the judge when fulfilling his duty to disentangle privileged from non-privileged materials -- to ensure that no more is shielded than is necessary to avoid the anticipated injuries. n51

n51 The area in which these considerations have been given greatest sway is judicial administration of the Freedom of Information Act, *5*

*U.S.C. § 552* (1976 & Supp. V 1981) ("FOIA"). There, sensitivity to the advantages of adversarial testing of claims of exemptions has led to the creation of a detailed and strictly enforced set of procedural requirements, designed to ensure the creation of "as complete a public record as is possible" before any *in camera* proceedings. *Phillippi v. CIA, 178 U.S. App. D.C. 243, 546 F.2d 1009, 1013 (D.C. Cir. 1976). See also Founding Church of Scientology v. National Security Agency, 197 U.S. App. D.C. 305, 610 F.2d 824, 832-33 (D.C. Cir. 1979); Ray v. Turner, 190 U.S. App. D.C. 290, 587 F.2d 1187, 1204-05, 1210-12 (D.C. Cir. 1978)* (Wright, J., concurring); *Vaughn v. Rosen, 157 U.S. App. D.C. 340, 484 F.2d 820, 826-28 (D.C. Cir. 1973), cert. denied, 415 U.S. 977, 39 L. Ed. 2d 873, 94 S. Ct. 1564 (1974).*

[**37]

Returning to the case before us, we observe that considerable time and resources might have been saved by adherence to the principle that *in camera* proceedings should be preceded by as full as possible a public debate over the basis and scope of a privilege claim. Had they been afforded an opportunity to contest a detailed justification for the government's claim, the plaintiffs most likely would have been able to demonstrate, at trial, rather than on appeal, the *conceded* absence of any basis for the refusal to disclose the names of the Attorneys General who authorized the taps. The net result would have been the avoidance of needless delay in the prosecution of the suit.

The foregoing considerations, however, are partially offset by others. Specifically, two concerns prevent us from adopting a strict rule that the trial judge must compel the government to defend its claim publicly before submitting materials *in camera*. First, it is imperative that the procedure used to evaluate the legitimacy of a state secrets privilege claim not force "disclosure of the very thing the privilege is designed to protect." n52 Fear lest an insufficient public justification result [**38] in denial of the privilege entirely might induce the government's representatives to reveal some material that, in the interest of national security, ought not to be uncovered. Second, as was noted at the outset, there is considerable variety in the situations in which a state secrets privilege may be fairly asserted. We would not wish to hobble district courts in designing procedures appropriate to novel cases.

n52 *United States v. Reynolds, 345 U.S. at 8.*

Balancing these various factors, we conclude that, in situations in which close examination of the government's assertions is warranted, n53 the trial judge should insist (1) that the formal claim of privilege be made on the public record and (2) that the government either (a) publicly explain in detail the kinds of injury to national security it seeks to avoid and the reason those harms would result from revelation of the requested information or (b) indicate why such an explanation would itself endanger [*64] national security. We wish to make [**39] clear the limitations of our ruling: The government's public statement need be no more (and no less) specific than is practicable under the circumstances. We reiterate our holding in *Halkin v. Helms [Halkin II], 223 U.S. App. D.C. 254, 690 F.2d 977, 995-97 (D.C. Cir. 1982),* that the trial judge is not bound to adhere to the strict procedural guidelines developed in the judicial decisions interpreting the Freedom of Information Act, *see* note 51 *supra.* n54 Moreover, we do not wish to discourage procedural innovation. We hold simply that, before conducting an *in camera* examination of the requested materials, the trial judge should be sure that the government has justified its claim in as much detail as is feasible (and would be helpful) without undermining the privilege itself.

n53 As indicated above, such close examination of the basis of a privilege claim is required when a litigant has shown a strong need for the requested information and the surrounding circumstances do not render "self-evident" the harms likely to follow from disclosure. A corollary of our holding in this case is that the weaker the requester's demonstration of need and the greater the support lent the government's assertions by the surrounding circumstances, the less specificity should be demanded of the government's public justification of its claim.

[**40]

n54 Our decision not to import into the present context the elaborate body of law governing the processing of FOIA requests is reinforced by the fact that, in dealing with state secrets, we do not have any special statutory mandate to conduct a searching *de novo* review of any claim of a right to withhold information. Cf. *5 U.S.C. § 552*(a)(4)(B) (1976) (establishing such a duty in the FOIA context).

III. THE PARTIAL DISMISSAL

Having reversed portions of the District Court's handling of the privilege claims, we might simply remand the case for further proceedings and specifically for reconsideration of the defendants' motion *in limine* for dismissal of those aspects of the suit pertaining to the "foreign intelligence" wiretaps. To reduce the likelihood of yet another unnecessary appeal, however, we consider it prudent to address briefly some of the problems the trial court will confront on remand. n55

n55 The District Court's order granting the defendants' motion *in limine* only hints at the rationale for the court's decision:

> It appears to the Court that the plaintiffs' claims with respect to alleged electronic surveillance of their foreign communications . . . tenders [sic] to the Court issues for litigation which deal necessarily with matters this Court has already determined to be state secrets privileged from disclosure.

App. 97. The brevity of the court's explanation and some of the language contained therein raise the possibility that the court did not even consider whether the plaintiffs were capable of making out a *prima facie* case without the privileged information. As we explain below, it was incumbent on the District Court to do at least that much before dismissing the relevant portions of the suit.

[**41]

A.

The effect of the government's successful invocation of the state secrets privilege, when the government is not itself a party to the suit in question, is well established: "The result is simply that the evidence is unavailable, as though a witness had died, and the case will proceed accordingly, with no consequences save those resulting from the loss of the evidence." n56 Likewise, it is now settled that, when the government is a defendant in a civil suit, its invocation of the privilege results in no alteration of pertinent substantive or procedural rules; the effect is the same, in other words, as if the government were not involved in the controversy. n57 The rationale for this doctrine is that the United States, while waiving its sovereign immunity for many purposes, has never consented to an *increase* in its exposure to liability when it is compelled, for reasons of national security, to refuse to release relevant evidence. n58

n56 MCCORMICK, *supra* note 32, at 233. This principle was taken for granted in the Advisory Committee's Notes pertaining to proposed Federal Rule of Evidence 509(e). *See 56 F.R.D. 183, 254 (1973);* 2 J. WEINSTEIN & M. BERGER, WEINSTEIN'S EVIDENCE para. 509[10] (1982). The proposed rule was rejected by Congress for reasons unrelated to the Committee's recognition of the principle.

[**42]

n57 *See Clift v. United States, 597 F.2d at 830; Halkin I, 598 F.2d at 10-11; Kinoy v. Mitchell, 67 F.R.D. at 15 & n.50.* For less straightforward endorsements of this principle, see *United States v. Reynolds, 345 U.S. at 12* (refusing to penalize the government when, appearing as a civil defendant, it invoked the privilege -- in a case in which the plaintiffs could obtain the evidence they needed from other sources); *Halkin II, 690 F.2d at 991* (accepting as "the law of the case" the principle that the parties' burdens should not be altered).

n58 *See United States v. Reynolds, 345 U.S. at 12.*

[*65] In a somewhat related context, at least one circuit has held that, when one private party brings a civil action against another, and the government asserts a privilege with regard to information *in the plaintiff's possession*, a ruling that the privilege is valid must be accompanied with a dismissal of the suit. n59 The asserted reason for this seemingly harsh doctrine is that the plaintiff, tempted by the advantages to be gained by as full as possible a disclosure [**43] of what he knows, is likely to tread too close to the line drawn by a protective order and occasionally to overstep it.

> In an attempt to make out a prima facie case during an actual trial, the plaintiff and its lawyers would have every incentive to probe as close to the core secrets as the trial judge would permit. Such probing in open court would inevitably be revealing. n60

Outside of this one special context, however, the uniform rule governing civil suits brought by private parties is that the effect of invocation of a state secrets privilege is simply to remove from the case the material in question.

n59 *See Farnsworth Cannon, Inc. v. Grimes, 635 F.2d 268, 281 (4th Cir. 1980)* (en banc) (per curiam).

n60 *Id.* A similar argument was advanced by the Supreme Court as an alternative rationale for its decision in *Totten v. United States, 92 U.S. 105, 107, 23 L. Ed. 605 (1875):*

> It may be stated as a general principle, that public policy forbids the maintenance of any suit in a court of justice, the trial of which would inevitably lead to the disclosure of matters which the law itself regards as confidential, and respecting which it will not allow the confidence to be violated.

Relying partly on this principle, the Court affirmed dismissal of a suit brought to enforce a secret contract between the plaintiff and President Lincoln, whereby the plaintiff had agreed to conduct espionage in the Confederate states in return for a prescribed salary. The other stated ground for the Court's decision was its inference that the contract itself contained an implied term that forbade the parties ever to disclose its contents; the act of bringing the suit thus constituted a breach of the agreement and defeated the action. *Id. at 106.*

[**44]

B.

The instant case is a civil action, brought by private parties against various individual defendants and several agencies of the federal government. The information asserted to be privileged is not currently in the plaintiffs' possession. The general principle described above therefore obtains. Under these conditions, dismissal of the relevant portion of the suit would be proper only if the plaintiffs were manifestly unable to make out a *prima facie* case without the requested information. Are the plaintiffs thus incapacitated?

With regard to those whom the government has not admitted overhearing, the answer is clearly yes. An essential element of each plaintiff's case is proof that he himself has been injured. Membership in a group of people, "one or more" members of which were exposed to surveillance, is insufficient to satisfy that requirement. Dismissal of the claims of those parties was therefore proper.

With regard to the five plaintiffs whom the government has conceded overhearing, the answer is far less obvious. Unlike their colleagues, they can demonstrate injury to themselves. On remand, they will be informed (pursuant to our order today) of the identities [**45] of the Attorneys General who authorized the taps during which they were overheard. And the defendants have acknowledged that none of those taps was instituted pursuant to a warrant. Is this complex of facts sufficient to establish a *prima facie* case of violation of the plaintiffs' constitutional rights?

The defendants argue that the surveillance at issue *might* have been constitutional. They point out that all courts that have squarely confronted the issue have concluded that warrantless electronic surveillance of foreign agents does not violate the Fourth Amendment provided its primary purpose is not to gather evidence for a criminal prosecution. n61 The defendants concede that the constitutional status of [*66] such surveillance has never been determined by the Supreme Court n62 and that the issue remains unresolved in this circuit. n63 But they argue persuasively that, without any developed factual record, it would be inappropriate for us, at least at this stage of the instant case, to try to decide whether or when wiretaps on foreign governments, their agents, or collaborators require prior judicial approval. n64 The plaintiffs respond that the defendants have [**46] failed to prove that the taps were in fact directed at foreign agents and were not designed primarily to gather evidence for use in criminal cases, and so have failed to bring themselves within the supposed exception to the warrant requirement. Indeed, the plaintiffs conjecture that it is likely that the taps fell into the category now denominated "domestic security surveillance," which even the defendants admit violates the Fourth Amendment if conducted without a warrant. n65

n61 *See United States v. Truong Dinh Hung, 629 F.2d 908, 913-16 (4th Cir. 1980), cert. denied, 454 U.S. 1144, 71 L. Ed. 2d 296, 102 S. Ct. 1004 (1982); United States v. Buck, 548 F.2d 871, 875* (9th Cir.), *cert. denied, 434 U.S. 890, 54 L. Ed. 2d 175, 98 S. Ct. 263 (1977); United States v. Butenko, 494 F.2d 593, 605-06* (3d Cir.) (en banc), *cert. denied, 419 U.S. 881, 95 S. Ct. 147, 42 L. Ed. 2d 121 (1974); United States v. Brown, 484 F.2d 418, 426 (5th Cir. 1973), cert. denied,*

*415 U.S. 960, 39 L. Ed. 2d 575, 94 S. Ct. 1490 (1974).* In *United States v. Ajlouny, 629 F.2d 830, 839-40 (2d Cir. 1980) cert. denied, 449 U.S. 1111, 66 L. Ed. 2d 840, 101 S. Ct. 920 (1981),* the Second Circuit expressly avoided the issue.

[**47]

n62 In *Katz v. United States, 389 U.S. 347, 358 n.23, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967),* and *United States v. United States District Court [Keith], 407 U.S. 297, 308-09, 321-22, 32 L. Ed. 2d 752, 92 S. Ct. 2125 (1972),* the Court expressly reserved the question. A few justices have ventured their individual views on the subject; their positions differ. *Compare Katz v. United States, 389 U.S. at 364* (White, J., concurring), *with id. at 359-60* (Douglas, J., joined by Brennan, J., concurring).

n63 The plurality opinion in *Zweibon v. Mitchell, 170 U.S. App. D.C. 1, 516 F.2d 594 (D.C. Cir. 1975)* (en banc), *cert. denied, 425 U.S. 944, 96 S. Ct. 1684, 96 S. Ct. 1685, 48 L. Ed. 2d 187 (1976),* contained some dicta suggesting that, "absent exigent circumstances, *all* warrantless electronic surveillance is unreasonable and therefore unconstitutional," *id.* at 613-14 (emphasis added), but this court has never so held. *See Halkin II, 690 F.2d at 1000 n.82; Chagnon v. Bell, 206 U.S. App. D.C. 280, 642 F.2d 1248, 1258-59 (D.C. Cir. 1980), cert. denied, 453 U.S. 911, 69 L. Ed. 2d 994, 101 S. Ct. 3142 (1981).*

n64 *Cf. Halkin II, 690 F.2d at 1000-01* (declining to reach the issue in a similar context for similar reasons).

[**48]

n65 *See United States v. United States District Court [Keith], 407 U.S. at 323-24; Zweibon v. Mitchell, 516 F.2d at 614.*

In sum, the wiretaps at issue might or might not be unconstitutional (and the evidence necessary to resolve the question cannot be publicly disclosed). Whether this uncertainty dooms the plaintiffs' claims depends on which of the parties bears the burden of persuasion regarding the excusability of the defendants' failure to obtain a warrant. To resolve that question, we must venture briefly into the tangled body of doctrine out of which the (as yet incomplete) law governing electronic surveillance has grown. n66

n66 The enactment of the Foreign Intelligence Surveillance Act, Pub. L. No. 95-511, 92 Stat. 1783 (1978) (codified at *50 U.S.C. § § 1801*-1811 (Supp. IV 1980)), establishing a special set of procedural requirements that must be observed in any such "foreign security" surveillance, seems likely to result in indefinite postponement of definitive resolution of the constitutional challenge. *See United States v. Megahey, 553 F. Supp. 1180, 1195-1200 (E.D.N.Y. 1982); United States v. Falvey, 540 F. Supp. 1306, 1312-13 (E.D.N.Y. 1982); see generally* Note, *The Foreign Intelligence Surveillance Act: Legislating a Judicial Role in National Security Surveillance, 78 MICH. L. REV. 1116, 1135-52 (1980).*

[**49]

The general principle that infuses most decisions dealing with the Fourth Amendment is that, in the absence of special circumstances, the approval of a neutral judicial officer must be obtained *before* any search or seizure is conducted in a place subject to a reasonable expectation of privacy.

> The most basic constitutional rule in this area is that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions." The exceptions are "jealously and carefully drawn" and there must be "a showing by those who seek [*67] exemption . . . that the exigencies of the situation made that course imperative."

*Coolidge v. New Hampshire, 403 U.S. 443, 454-55, 29 L. Ed. 2d 564, 91 S. Ct. 2022 (1971)* (footnotes omitted). n67 One of the corollaries of that principle is that "the burden is on those seeking [an] exemption to show the need for it." *United States v. Jeffers, 342 U.S. 48, 51, 96 L. Ed. 59, 72 S. Ct. 93 (1951).* n68

n67 *See also 403 U.S. at 474-75; United States v. Jeffers, 342 U.S. 48, 51, 96 L. Ed. 59, 72 S. Ct. 93 (1951).*

[**50]

n68 *See also Coolidge v. New Hampshire, 403 U.S. at 455* (quoting the same sentence).

The reasons in favor of the warrant requirement are, by now, familiar:

> We are not dealing with formalities. The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals. Power is a heady thing; and history shows that the police acting on their own cannot be trusted. And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home. We cannot be true to that constitutional requirement and excuse the absence of a search warrant without a showing by those who seek exemption from the [**51] constitutional mandate that the exigencies of the situation made that course imperative.

*McDonald v. United States, 335 U.S. 451, 455-56, 93 L. Ed. 153, 69 S. Ct. 191 (1948).* n69

n69 *See also Johnson v. United States, 333 U.S. 10, 13-14, 92 L. Ed. 436, 68 S. Ct. 367 (1948).*

As the foregoing passage suggests, judicial insistence upon an affirmative demonstration in each case of the necessity for a relaxation of the warrant requirement has been most marked in the context of physical "searches and seizures that take place on a man's property -- his home or office." *Coolidge v. New Hampshire, 403 U.S. at 474-75.* Yet, strong considerations also support compliance with the warrant requirement in connection with electronic surveillance. The risk that well-meaning but overly zealous law enforcement officials will either conduct such surveillance without adequate justification or will transgress the bounds of "reasonableness" is at least as great as the danger that they will exceed their authority [**52] breaking into homes. And the potential for impingement upon citizens' legitimate expectations of privacy (particularly in view of the fact that, unlike a homeowner, the victim of a wiretap is not even informed of the fact that a "search" is being conducted) n70 is at least as serious. n71 Sensitivity to these concerns has prompted the Supreme Court, in its two seminal decisions dealing with wiretapping, to extend the warrant requirement first to taps used in the course of routine criminal investigations, *Katz v. United States, 389 U.S. 347, 359, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967),* and then to taps on "domestic organizations" designed to protect "national security," *United States v. United States District Court [Keith], 407 U.S. 297, 308-09, 323-24, 32 L. Ed. 2d 752, 92 S. Ct. 2125* [*68] *(1972).*

n70 *See Katz v. United States, 389 U.S. at 355 n.16; United States v. Vielguth, 502 F.2d 1257, 1259 n.4 (9th Cir. 1974)* (per curiam).

n71 *Cf. Berger v. New York, 388 U.S. 41, 63, 18 L. Ed. 2d 1040, 87 S. Ct. 1873 (1967)* ("Few threats to liberty exist which are greater than that posed by the use of eavesdropping devices."). The invasions of privacy inherent in such surveillance are exacerbated by the potential for infringement of important interests shielded by the First Amendment; awareness that one's conversations may be being overheard and recorded is likely to have a chilling effect on one's willingness to speak freely. *See United States v. United States District Court [Keith], 407 U.S. at 313-14; Zweibon v. Mitchell, 516 F.2d at 633-36.*

[**53]

It is possible, as several courts have concluded, *see* note 61 *supra*, that the importance of preserving the power of the executive to act swiftly and vigorously to protect national security may override, in the context of taps on foreign agents, the potent considerations underlying the warrant requirement. But those considerations themselves are in no way diminished. Accordingly, even assuming that the warrant requirement may give way in this special context, there is no reason to relieve those who authorize and conduct such taps of the burden of showing that they come within the exemption.

That conclusion is reinforced by analysis of the probable effects of the alternative rule -- namely, that, upon allegation by the government that the wiretaps were on foreign agents and therefore did not require judicial

approval, the burden shifts to the victims of the taps to disprove the government's contention. In many such situations, the government would be able (as it has been here) to refuse to disclose any details of the circumstances surrounding the surveillance by invoking its state secrets privilege. The result would be to deny the plaintiffs access to all of the information [**54] they need to dispute the government's characterization of the nature and purpose of the surveillance. And the net effect would be to immunize, not only all wiretaps legitimately falling within the hypothesized "foreign agent" exemption, but all other surveillance conducted with equipment or under circumstances sufficiently sensitive to permit assertion of the state secrets privilege. We find such consequences unacceptable. n72

n72 Indeed, such consequences might call into question the very existence of the foreign agent exemption. It is noteworthy that the Third Circuit, in justifying its decision to suspend the warrant requirement in this special context, stressed the availability of post-surveillance civil and criminal remedies. "The sanctions for illegal surveillances incident to post-search criminal or civil litigation," the court argued, would "deter abuse" of the exemption. *United States v. Butenko, 494 F.2d at 605-06.*

In summary, we see no reason in the present context to suspend the general [**55] rule that the burden is on those seeking an exemption from the Fourth Amendment warrant requirement to show the need for it. Accordingly, to make out a *prima* facie case of a constitutional violation, the plaintiffs need not disprove the defendants' allegation that their actions are excused by the "foreign agent" exemption; rather, the defendants must prove their contention. As the defendants have not yet made such a showing in the instant case, dismissal of the claims of the five plaintiffs whom the defendants have acknowledged overhearing would be improper. n73

n73 In their brief, the defendants contend that, even if we conclude that (some of) the plaintiffs are capable of making out a *prima facie* case, we should affirm the decision below on the ground that all defendants are entitled to "qualified immunity" from liability. They argue that, despite the fact that the immunity issue has not yet been considered by the District Court, we should address and resolve it (in their favor) on appeal. We decline the invitation. A decision on this matter will require some factual findings concerning the purposes of and circumstances surrounding the taps. Determinations of that order should be made in the first instance by the District Court. (In Part III.C. *infra*, we venture some suggestions regarding the procedures the court might use, if necessary, in making the foregoing judgments.)

The defendants also argue vigorously that they are all entitled to "absolute immunity" from liability for conduct of the sort at issue in this case and that, indeed, the scope of that immunity is sufficiently broad to render unnecessary any further inquiry by the District Court into the purposes of and circumstances surrounding the wiretaps. Especially in view of the thinness of the record before us, we decline to consider the defendants' argument that an ambiguous reference, in dictum, in *Harlow v. Fitzgerald, 457 U.S. 800, 102 S. Ct. 2727, 2735, 73 L. Ed. 2d 396 & n.18 (1982),* requires repudiation of our holding in *Halperin v. Kissinger, 196 U.S. App. D.C. 285, 606 F.2d 1192, 1208 (D.C. Cir. 1979), aff'd by an equally divided Court, 452 U.S. 713, 101 S. Ct. 3132, 69 L. Ed. 2d 367 (1981),* that even an Attorney General authorizing wiretaps to protect the national security is not entitled to absolute immunity from liability in damages.

[**56]

C.

The foregoing result does give rise to a potential problem: in cases like the present [*69] one, the defendant officials who authorized and conducted the surveillance are no more able to use the privileged information in litigation than are the plaintiffs. Enforcement of the rule that the officials bear the burden of proving that they are entitled to an exemption to the warrant requirement thus might lead to serious injustice. Deprived of the ability in practice to adduce the evidence necessary to mount a defense to the plaintiffs' *prima facie* case, the defendants could be held liable in damages for what in fact was wholly blameless conduct. Such a result not only would be patently inequitable, n74 but might have an unfortunate long-run impact on the recruitment and behavior of government officials. n75

n74 The inequity (as well as its associated adverse impact on officials' incentives) would, however, be mitigated by a policy whereby the United States indemnified defendants caught in this kind of trap. At present, there is no such general policy, but indemnification or its equivalent does seem to occur in a significant number of cases. *See* Schuck, *Suing Our Servants: The*

*Court, Congress, and the Liability of Public Officials for Damages, 1980 SUP. CT. REV. 281, 332-33.*

[**57]

n75 *See* Schuck, *supra* note 74, at 311-15; Whitman, *Constitutional Torts, 79 MICH. L. REV. 5, 51 (1980); cf. Wood v. Strickland, 420 U.S. 308, 319-20, 43 L. Ed. 2d 214, 95 S. Ct. 992 (1975)* ("The imposition of monetary costs for mistakes which were not unreasonable in the light of all the circumstances would undoubtedly deter even the most conscientious school decision-maker from exercising his judgment independently, forcefully, and in a manner best serving the long-term interest of the school and the students. The most capable candidates for school board positions might be deterred from seeking office if heavy burdens upon their private resources from monetary liability were a likely prospect during their tenure.") (footnote omitted).

Fortunately, recent developments in the law governing government officials' immunity from liability provides a way out of this dilemma. Whether a defendant is entitled to "qualified immunity" is now to be determined solely on the basis of an "objective" test:

> Government officials performing discretionary functions generally are shielded [**58] from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

*Harlow v. Fitzgerald, 457 U.S. 800, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982).* n76 To a much greater extent than previously, determination of a defendant's immunity will thus turn upon questions of law. Some factual judgments will still be required, but they will be more circumscribed and manageable. Once an official's conduct has been ascertained, the determinative question will be what rules were "clearly established" at the time he acted.

n76 *See also McSurely v. McClellan, 225 U.S. App. D.C. 67, 697 F.2d 309, 320 (D.C. Cir. 1982).*

It seems to us that, without serious risk of error, the aforementioned questions could be resolved by the trial judge through use of appropriate *in camera* procedures. n77 *In camera* exhibits submitted in support of the government's privilege claim would, in most instances, [**59] make clear the nature of the defendants' activities. The judge would thus need only to determine whether clearly established doctrine proscribed such conduct at the time it was undertaken. Such a determination would seem to be possible without the aid of arguments of counsel. And the judge's decision would, of course, be subject to appellate review. n78

n77 The legitimacy of recourse to such procedures, when feasible and otherwise unavoidable, is beyond dispute. *Cf. United States v. Lemonakis, 158 U.S. App. D.C. 162, 485 F.2d 941, 963 (D.C. Cir. 1973), cert. denied, 415 U.S. 989, 39 L. Ed. 2d 885, 94 S. Ct. 1586 (1974)* (approving, in a criminal case, *in camera* determination of the legality of an instance of foreign intelligence electronic surveillance).

n78 We emphasize, however, that this procedure should be used only as a last resort. *Ex parte, in camera* resolution of dispositive issues should be avoided whenever possible. Thus, in this case and in future cases, if the District Court is able, without relying on *in camera* submissions, to determine fairly the defendants' entitlement to immunity or to dispose of the case on some other grounds, it should do so.

Our sense that *in camera* procedures should be used only when absolutely necessary reinforces our decision not to consider the defendants' immunity defenses at this juncture, *see* note 73 *supra*. It might be argued that, having seen the *in camera* materials, we should simply rule that the defendants are (or are not) entitled to immunity (absolute or qualified) as a matter of law. However, as counsel for the defendants conceded at oral argument, on remand the defendants might be able to submit on the public record materials sufficient to demonstrate that their behavior violated no clearly established law. As long as that remains a possibility, we are loathe to dispose of the case on the basis of our *sua sponte* examination of the secret documents.

[**60] [*70]

In sum, the practicability of *in camera* resolution of the immunity issue eliminates the possibility that the

defendants -- in this case or in future cases -- will be trapped by the government's assertion of its state secrets privilege. And that result, in turn, alleviates any qualms we might have concerning the result we reach today.

CONCLUSION

For the foregoing reasons, the decision of the District Court is reversed. The case is remanded for proceedings not inconsistent with this opinion.

**CONCURBY:**

MacKINNON (In Part)

**DISSENTBY:**

MacKINNON (In Part)

**DISSENT:**

MACKINNON, Circuit Judge (concurring in part and dissenting in part):

I concur in the court's holding that the district court properly acceded, in all important respects, n1 to the government's claims of state secrets privilege. However, after full consideration of all the arguments and upon close examination of all the *in camera* classified material, I am unable to agree with my colleagues' decision to remand the case. Under the Supreme Court's recent decision in *Harlow v. Fitzgerald, 457 U.S. 800, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982),* defendants, in my opinion, are entitled to qualified immunity as [**61] a matter of law with respect to all claims relevant to *this appeal.* n2 Accordingly, I would affirm the district [*71] court's decision granting summary judgment to defendants.

n1 The Court's decision modifies the district court's ruling on the privilege claims only by requiring disclosure of the identities of the Attorneys General who authorized the electronic surveillance here at issue. I would note, however, that the majority has mischaracterized defense counsel's concession at oral argument regarding those identities: counsel did concede that the *in camera* exhibits contain no *explanation* for withholding the names, but counsel did not concede the absence of any *basis* for doing so. *See* maj. op. at 52, 26. Nonetheless, I concur in the modifications.

But the majority leaps from that modification to the unwarranted conclusion that, having obtained the names of specific defendants, plaintiffs can now make out a *prima facie* case that their constitutional rights under the Fourth Amendment have been violated. To buttress that conclusion, the majority, like appellants, relies exclusively on *criminal* cases like *Coolidge v. New Hampshire, 403 U.S. 443, 29 L. Ed. 2d 564, 91 S. Ct. 2022 (1971),* for the proposition that warrantless searches are *per se* unreasonable absent "'a showing by those who seek exemption . . . that the exigencies of the situation made that course imperative. '" *Id. at 455* (footnote omitted) (quoting *Katz v. United States, 389 U.S. 347, 357, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967).*

I have grave doubts that the Attorney General should bear the burden of demonstrating the legality of warrantless foreign intelligence surveillance. In any event, appellants' reliance on criminal cases is misplaced. First, this is a civil case, where the exclusionary rule plays no part and where fears of imprisoning a defendant on the basis of illegally obtained evidence have no force. Second, the "exigent circumstances" cases may be entirely inapposite to foreign intelligence surveillance, to which concepts derived from the criminal law -- like probable cause, for example -- have dubious relevance. *See Zweibon v. Mitchell, 170 U.S. App. D.C. 1, 516 F.2d 594, 706-07 (D.C. Cir. 1975)* (en banc) (MacKinnon, J., concurring in part and dissenting in part). Third, whatever the legal contours of a tap conducted under the foreign agent exception, it is not self-evident that its legality would even turn on a showing of exigent circumstances. It is at least as likely that "foreign intelligence surveillance" refers to a whole category of activities *exempted* from the warrant requirement, rather than to an *exception* dependent on a specific showing of exigency in each particular case.

The task of assigning evidentiary burdens in such cases necessarily turns on a complex balancing of competing concerns touching on the scope of individual liberties, the security of the nation, and our constitutional structure. I would not suggest a glib solution to such a weighty issue when summary judgment is so manifestly appropriate on the ground of immunity.

[**62]

n2 Still before the district court are claims based on warrantless "domestic intelligence" surveillance of plaintiffs; as to these claims, the government has not asserted the state secret privilege.

While the district court has not yet addressed the immunity issues, a reviewing court may rest its affirmance on any ground for which the record is sufficient to permit the necessary findings of fact and law. *Dandridge v. Williams, 397 U.S. 471, 475-76, 25 L. Ed. 2d 491, 90 S. Ct. 1153 n.6 (1970); Lew v. Suffridge, 125 U.S. App. D.C. 241, 370 F.2d 487, 488 & n.1 (D.C. Cir. 1966).* Having carefully perused the *in camera* exhibits offered by the government in support of its privilege claims, the panel now has before it a record sufficient to permit such findings concerning the purposes of and the circumstances surrounding these wiretaps.

My own examination of the relevant material leaves no room to doubt that these warrantless surveillances fall within the putative "foreign agent exception" to the warrant requirement of the Fourth Amendment. The materials do not suggest that defendants' [**63] foreign intelligence surveillance claims are merely a pretext for politically or prosecutorially motivated surveillance. *See Chagnon v. Bell, 206 U.S. App. D.C. 280, 642 F.2d 1248, 1260-61 (D.C. Cir. 1980), cert. denied, 453 U.S. 911, 69 L. Ed. 2d 994, 101 S. Ct. 3142 (1981); Halperin v. Kissinger, 196 U.S. App. D.C. 285, 606 F.2d 1192, 1204-05 (D.C. Cir. 1979), aff'd by an equally divided Court, 452 U.S. 713, 101 S. Ct. 3132, 69 L. Ed. 2d 367 (1981).* Nor were appellants, or any premises in which they had an interest, the targets of the surveillances. Affidavit of Attorney General of the United States para. 2, May 8, 1973 (JA 29); *see United States v. Lemonakis, 158 U.S. App. D.C. 162, 485 F.2d 941, 963 (D.C. Cir. 1973), cert. denied, 415 U.S. 989, 39 L. Ed. 2d 885, 94 S. Ct. 1586 (1974).* And the exhibits establish beyond question that the taps were strictly within the framework of executive authorization of foreign intelligence gathering. *See United States v. Lemonakis, supra, 485 F.2d at 963.*

Having established that the surveillances do fall within the foreign agent exception to the warrant requirement, the *in camera* materials compel the conclusion [**64] that defendants are immune from liability for their part in conducting the surveillance. Under *Harlow*, officials are entitled to qualified immunity "insofar as their conduct does not violate clearly established statutory or constitutional rights." *102 S. Ct. at 2738.* Few areas of constitutional law are more conspicuously unsettled than the legality of warrantless wiretaps aimed at the activities of foreign powers or their agents. The existence of the foreign agent exception was expressly left open by the Supreme Court, *United States v. United States District Court, 407 U.S. 297, 321-22, 92 S. Ct. 2125, 32 L. Ed. 2d 752 (1972),* and several courts of appeals have actually approved such warrantless surveillance. *See United States v. Truong Dinh Hung, 629 F.2d 908, 914-15 (4th Cir. 1980), cert. denied, 454 U.S. 1144, 71 L. Ed. 2d 296, 102 S. Ct. 1004 (1982); United States v. Buck, 548 F.2d 871, 875* (9th Cir.), *cert. denied, 434 U.S. 890, 54 L. Ed. 2d 175, 98 S. Ct. 263 (1977); United States v. Butenko, 494 F.2d 593, 605* (3d Cir.) (en banc), *cert. denied, 419 U.S. 881, 95 S. Ct. 147, 42 L. Ed. 2d 121 (1974); United States v. Brown, 484 F.2d 418, 426* [**65] *(5th Cir. 1973), cert. denied, 415 U.S. 960, 39 L. Ed. 2d 575, 94 S. Ct. 1490 (1974). But see Zweibon v. Mitchell, 170 U.S. App. D.C. 1, 516 F.2d 594, 615-27 (D.C. Cir. 1975)* (en banc) (dictum) (plurality opinion), *cert. denied, 425 U.S. 944, 96 S. Ct. 1684, 48 L. Ed. 2d 187 (1976).* And in the immunity context, this court has explicitly held that there is no "clearly established" law on the legality of warrantless foreign intelligence taps. *Chagnon v. Bell, supra, 642 F.2d at 1256-63* (Edwards, J.).

Given the celebrated uncertainty of the law in this area, I am mystified by the majority's reluctance to resolve the immunity question at this juncture. The majority predicates its declination on the truism that "*ex parte, in camera* resolution of dispositive issues should be avoided whenever possible." n3 Maj. op. at 39 n.78. With that [*72] salutary proposition I have no quarrel. Yet because the claims of state secrets privilege have been sustained, I can envision no scenario whatsoever in which the district court could resolve on the public record the factual question whether these taps fall within the foreign agent exception. All facts critical to the question [**66] are now subject to the privilege. n4 That being the case, the majority can justify its refusal to rule on the issue by adverting to nothing more convincing than the stale observation that "determinations of that order should be made in the first instance by the District Court." *Id.* at 68 n.73.

n3 The majority concedes that resolution of immunity issues could be resolved by the *trial court* upon an examination of the *in camera* materials. Maj. op. at 39. Indeed, the majority views the legitimacy of such procedures as "beyond dispute." *Id.* at 39 n.77. Since the majority also concedes that such a determination might be made without the aid of arguments by counsel, *id.* at 39, there exists no good reason why *this court* cannot make the identical findings and draw the same conclusions from the *in camera* materials. As the immunity issues have been briefed and argued, this panel is as qualified as the trial judge to decide them.

n4 The majority also adverts to an ambiguous concession made by counsel for defendants at oral argument that defendants on remand might be able to submit on the public record materials sufficient to demonstrate that their behavior vio-

lated no clearly established law. *Id.* at 39-40 n.78. Defendants are, quite simply, wrong, and the majority advances its argument not at all by accepting without analyzing such a "possibility." Only by impermissibly disclosing highly classified materials could such a finding be made on the public record.

[**67]

Such reticence might be understandable had the Supreme Court not felt compelled in *Harlow* to make an "adjustment" of the standard for qualified immunity in order to permit summary disposition of meritless claims against government officials. *102 S. Ct. at 2737.* The Court observed that the subjective element of the qualified immunity defense "frequently has proved incompatible with our admonition in *Butz [v. Economou, 438 U.S. 478, 507-08, 57 L. Ed. 2d 895, 98 S. Ct. 2894 (1978),]* that insubstantial claims should not proceed to trial." *Id.* To facilitate the rapid weeding out of such claims, the Court severed the subjective element from the defense: if an official's conduct did not violate "clearly established" law, he is entitled to summary judgment. *Id. 102 S. Ct. at 2738-39.* The Court characterized the defense as a "threshold immunity question" and insisted that discovery should not be allowed before the question has been resolved. *Id.* at 2739. A remand at this point, merely to resolve a threshold legal question on the basis of documentary evidence already considered by this court in resolving the privilege question, is contrary to the entire thrust of [**68] the *Harlow* decision. The valuable resources of the Executive and Judicial branches are not to be greatly encumbered by lengthy judicial hearings, appeals and remands. *Cf. Briscoe v. Lahue, 460 U.S. 325, 103 S. Ct. 1108, 1120, 75 L. Ed. 2d 96 (1983)* ("Even the processing of a complaint that is dismissed before trial consumes a considerable amount of time and resources.") (footnote omitted).

Several courts of appeals appear to agree with the above view of a reviewing court's role after *Harlow*, for they have not hesitated to apply *Harlow* to immunity issues first raised on appeal. For example, in *Silverman v. Ballantine, 694 F.2d 1091 (7th Cir. 1982),* the district court had granted defendants' motion for summary judgment on the issue whether plaintiff had been unlawfully denied assistance of counsel upon his arrest. On appeal, the court assumed without deciding that disputed issues of fact remained on that question, but the court nonetheless affirmed the judgment because the law was unsettled as to whether an arrest is a "critical stage" at which point the right to counsel attaches. *Id. at 1096.* Similarly, in *Ward v. Johnson, 690 F.2d 1098 (4th Cir. 1982)* [**69] (en banc), a panel of the court had reversed a trial court's finding that a prisoner's procedural due process rights had not been violated by an evidentiary ruling made by defendant at a disciplinary hearing. After reargument, *en banc*, the court assumed the correctness of the panel's conclusion that a violation had occurred, but found that the defendant was entitled to immunity. *See also Hall v. United States, 704 F.2d 246,* slip op. at 3-7 (6th Cir. 1983) (After the district court had improperly [*73] held that defendant was entitled to *absolute* immunity, the court of appeals affirmed the grant of summary judgment because defendant was entitled to *qualified* immunity under Harlow.); *Sampson v. King, 693 F.2d 566, 569-70 (5th Cir. 1982)* (summary calendar) (alternative holding) (Where a magistrate had failed to consider the immunity issue in holding appellants liable, the appellate court reversed *and dismissed* the damage claims.); *Wolfel v. Sanborn, 691 F.2d 270, 272 (6th Cir. 1982)* (per curiam) (Weick, J., dissenting) (Dissenting from the panel's decision to remand for reconsideration in light of *Harlow*, Judge Weick noted that defendants were entitled [**70] to immunity and opined that "it is time that this prolonged litigation be brought to a close as it has no merit."), *cert. denied, 459 U.S. 1115, 103 S. Ct. 751, 74 L. Ed. 2d 969 (1983).*

I have no doubt that the parties on remand will once again go through the motions of briefing and arguing the immunity issues, that the district court will once again slog through the *in camera* materials, and that the court will come to the inescapable conclusion that defendants are entitled to immunity on these claims. Given the Supreme Court's simple exhortation that threshold questions be resolved at the threshold, I would be very surprised if the court on remand even attempted to apply the muddled dicta and novel procedures that comprise Parts II and III of the majority opinion.

In the end, the majority's disposition squanders judicial, executive and adversarial resources; it also frustrates the Supreme Court's attempt, through changes in the immunity standard, to speed resolution of meritless suits against government officials. Having examined precisely the evidence the district court will have to examine in order to resolve the immunity issue, we ought to resolve the question ourselves. [**71] The wide-ranging discussion of the majority is thus unnecessary. I respectfully dissent.