Trone et al v. Peanut Corporation of America
Doc. 115 Att. 4

# Tab 5

Dockets.Justia.com

LEXSEE 244 F.3D 1356

**MONARCH ASSURANCE P.L.C. and THOMAS PATRICK DENTON TAYLOR, Plaintiffs-Appellants, v. UNITED STATES, Defendant-Appellee.**

**99-5052**

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

*244 F.3d 1356; 2001 U.S. App. LEXIS 5641*

**April 5, 2001, Decided**

**SUBSEQUENT HISTORY:** [**1] Rehearing and Rehearing En Banc Denied August 9, 2001, Reported at: *2001 U.S. App. LEXIS 18954.*

**PRIOR HISTORY:** Appealed from: United States Court of Federal Claims. Judge Eric Bruggink.

**DISPOSITION:** AFFIRMED-IN-PART, VACATED-IN-PART, and REMANDED.

**COUNSEL:** Raphael S. Moore, Law Office of Raphael Moore, of Davis, California, argued for plaintiffs-appellants.

Thomas D. Dinackus, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief was David M. Cohen, Director. Of counsel on the brief was John L. McPherson, Assistant General Counsel, Office of General Counsel, Central Intelligence Agency.

**JUDGES:** Before BRYSON, Circuit Judge, SMITH * and PLAGER, ** Senior Circuit Judges.

* Senior Circuit Judge Smith, who died on March 22, 2001, did not participate in this decision.
** Judge Plager assumed senior status on November 30, 2000.

**OPINION:** [*1357]

PER CURIAM.

In this contract action, plaintiffs allege that they lent a secret agent of the United States money to support a clandestine CIA operation, and have not been paid for their efforts. The United States denies responsibility, and invokes the state secrets privilege to avoid responding to plaintiffs' demands for discovery. The United States Court of Federal Claims [**2] concluded that, even if the individual alleged to be a secret agent was in fact such an agent, there was an insufficient showing that the agent had authority to contract on behalf of the United States. The court granted summary judgment for the United States. *Monarch Assurance P.L.C. v. United States, 42 Fed. Cl. 258 (1998).*

On appeal, plaintiffs argue that the trial court improperly applied the state secrets privilege, abused its discretion in curtailing [*1358] discovery, and erred by granting summary judgment for the United States because sufficient evidence had been submitted to support a prima facie finding of actual authority to contract.

I. Background

The facts of the case, or at least the allegations made by plaintiffs, the responses by the United States (hereafter "Government") thereto, and the trial court's findings, read rather more like a plot for a made-for-TV movie than a typical contract dispute heard in the federal courts. Nevertheless, this is the story the record reveals.

Plaintiffs are Thomas Patrick Denton Taylor, a resident of the Isle of Man and the Chief Executive and Managing Director of Monarch Assurance P.L.C., an organization headquartered on [**3] the Isle of Man and operating under the laws of England (collectively "Monarch"). In the fall of 1989, plaintiffs were approached by a British solicitor, Charles J. Deacon, who presented a business proposition on behalf of one John Patrick Savage. Mr. Savage was supposedly a high level agent of the United States' Central Intelligence Agency (hereafter "CIA" or "Agency"), operating in Europe. The CIA needed money to support certain covert projects being undertaken in Europe, code named "Ultima" and "Bluebook," but for undisclosed reasons could not use its own funds directly. Mr. Savage wished to borrow money in order to fund his activities on behalf of the United States Government.

Following subsequent negotiations, Monarch in October 1989 paid to Savage and Deacon $ 5 million, and in April 1990 a further $ 3 million. On April 26, 1990, in consideration for the $ 8 million received, Savage issued a promissory note to pay plaintiffs $ 35 million on or before April 30, 1990. Although there were certain indications that Deacon independently guaranteed the note, the only issuer named on the promissory note was Savage. The note made no mention of the CIA, the United States, or any other [**4] third party.

Perhaps unsurprisingly, neither Mr. Savage, Mr. Deacon, nor the CIA paid the note when it became due. Monarch later sued Deacon in the English courts for fraud and won a $ 35 million judgment. However, Monarch was not able to collect on the judgment. Monarch then brought suit in 1994 in the United States Court of Federal Claims against the United States, one count claiming breach of contract for the $ 35 million, and an additional count claiming just compensation under a Fifth Amendment taking theory for appropriation of the $ 8 million dollars lent to Savage.

II. The 1996 Decision (Judge Andewelt)

The Government responded to Monarch's complaint with a motion to dismiss or, in the alternative, for summary judgment. The Government supported this motion by arguing that the facts suggested that Savage was not a CIA agent, but a con man. The Government argued further that Savage's alleged relationship with the CIA was not relevant, since under *Totten v. United States, 92 U.S. 105, 23 L. Ed. 605 (1875),* the court could not entertain a suit alleging a breach of contract involving secret CIA actions. The Government submitted affidavits from Government officials [**5] in support of its motion.

In due course, the trial court denied both the Government's motion to dismiss and a subsequent renewal of the motion for summary judgment. The latter was accompanied by two affidavits from then CIA Director John M. Deutch. The first, for the public record, explained why to promote national security the CIA had a firm policy of not disclosing any information that would tend to either confirm or deny the existence or nonexistence of any relationships or contacts between individuals and the CIA. The affidavit invoked the common-law state secrets privilege, as well as certain statutory privileges. The second affidavit from Director Deutch, submitted in camera for the exclusive use of [*1359] the trial judge, addressed the question of whether any relationship existed between Savage and the CIA, and described in detail why disclosing any information about whether Savage was or was not an employee of the CIA, and then litigating any resulting issues, would compromise national security. The second affidavit reiterated the Government's invocation of the privilege with regard to any discovery by plaintiffs.

In *United States v. Reynolds, 345 U.S. 1, 97 L. Ed. 727, 73 S. Ct. 528 (1953),* [**6] the Supreme Court explained the steps necessary for the Government to invoke the state secrets privilege:

> There must be formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer. The court itself must determine whether the circumstances are appropriate for the claim of privilege, and yet do so without forcing a disclosure of the very thing the privilege is designed to protect.

*Id. at 7-8* (footnotes omitted).

Plaintiffs objected to the Government's invocation of the state secrets privilege. In evaluating whether the circumstances were appropriate for the claim of privilege, the trial court gave special consideration to an affidavit, entered into the record by Monarch, of Lloyd N. Cutler, a well-known Washington lawyer who served as special counsel to Presidents Carter and Clinton. Mr. Taylor, Monarch's chief executive, had contacted Mr. Cutler through a British lawyer, seeking help with his case and in particular in establishing whether Savage was connected with the CIA. Mr. Cutler made some inquiries of persons who "were then or had been" officials of the [**7] CIA. In his affidavit, Mr. Cutler attested that he had been told that "one John Patrick Savage had had a relationship with the Agency in recent years," but that he had not been advised "whether the relationship was that of a full-time official or a contractual employee," or whether the relationship was still continuing.

The trial court considered the Cutler affidavit the one piece of evidence most strongly militating against sustaining the claim of privilege, since the apparent ease with which Mr. Cutler obtained information for his client about a CIA operative seemed inconsistent with Director Deutch's claim that the Agency never revealed such information. But after reviewing all the evidence and particularly the second Deutch affidavit, the court concluded that under the circumstances the Government properly invoked the state secrets privilege.

In considering the consequences of the Government's invocation of the state secrets privilege, the court, on the facts before it, rejected the Government's argu-

ment that Totten dictated a dismissal of the case in its entirety, but agreed that the Government need not respond to any discovery requests relating to the extent of any relationship [**8] between Savage and the CIA. The court further determined that when the Government, having successfully invoked the state secrets privilege, resists a discovery request that seeks disclosure of the secret information, no inference arises against the Government with regard to the matter at issue. Rather, the question then is whether the plaintiff, without such discovery, can make a prima facie case that it is entitled to relief on its claim. See *Zuckerbraun v. Gen. Dynamics Corp., 935 F.2d 544, 547 (2d Cir. 1991)* (citing *Halkin v. Helms, 223 U.S. App. D.C. 254, 690 F.2d 977, 998-99 (D.C. Cir. 1982),* and *Farnsworth Cannon, Inc. v. Grimes, 635 F.2d 268, 281 (4th Cir. 1980)* (en banc)).

The trial judge examined plaintiffs' evidence in that regard. Monarch had submitted into evidence the declaration of the British solicitor, Charles Deacon, stating that Savage had represented to him that he was "with the United States Central Intelligence Agency." As examples of Savage's representations, Deacon cited two letters that Savage wrote to him. These letters were written on what appeared to be CIA letterhead. In a letter written to [*1360] Deacon on January 26, 1990, Savage [**9] signed the letter with the title, "Assistant Deputy Director, European Operations." In a second letter written February 7, 1990, Savage indicated his affiliation with the CIA was with "Global Affairs." Neither letter contained any description of Savage's job responsibilities with the CIA, nor shed any light as to exactly what he did for the CIA.

Monarch also submitted other declarations from persons who apparently believed that Savage was with the CIA because of comments he made, or in one instance because of his conduct in never allowing the individual to see the contents of his briefcase. The trial court concluded that the submissions were sufficient to make a prima facie showing that John Patrick Savage was an employee of the CIA. The court noted that, although the Government did not admit that the documents were authentic, it did not deny that the documents constituted prima facie proof of the employment.

Importantly, the court further noted that employment by the Government was not enough. It was also necessary that plaintiffs establish that Savage had actual authority to enter into the contract on behalf of the Government. The court pointed out that the Government's successful [**10] invocation of the state secrets privilege may very well prevent plaintiffs from making the necessary showing, but went on to opine that "it is at least possible that through discovery plaintiffs may be able to gather unprivileged information that, when combined with their other evidence, is sufficient to establish a prima facie case of authority." *36 Fed. Cl. at 329.*

We conclude that for the reasons given, the trial court correctly accepted the Government's invocation of the state secrets privilege. We, along with the trial court, have reviewed both affidavits submitted by Director Deutch, and we find them to comply in all respects with the requirements of Reynolds, and to be sufficient to justify the Government's immunity from discovery regarding a relationship, if any, between the CIA and a John Patrick Savage.

Further, we agree with the trial court that the key question in the case, even assuming the alleged agent Savage was an employee of the CIA, is did he have actual authority to contract in the manner he did on behalf of the United States Government. The United States Government employs close to three million civilian employees. n1 If all Government employees [**11] could, of their own volition, enter into contracts obligating the Government, then federal expenditures would be wholly uncontrollable. *City of El Centro v. United States, 922 F.2d 816, 820 (Fed. Cir. 1990).* Thus, to avoid such a situation, the law requires that a Government agent who purports to enter into or ratify a contractual agreement that is to bind the United States have actual authority to do so. See *Trauma Serv. Group v. United States, 104 F.3d 1321, 1325 (Fed. Cir. 1997).* The corollary is that any party entering into an agreement with the Government accepts the risk of correctly ascertaining the authority of the agents who purport to act for the Government:

> Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority. The scope of this authority may be explicitly defined by Congress or be limited by delegated legislation, properly exercised through the rule-making power. And this is so even though, as here, the agent himself may have been unaware of [**12] the limitations upon his authority.

[*1361]

*Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384, 92 L. Ed. 10, 68 S. Ct. 1 (1947).*

n1 U.S. Office of Personnel Mgmt., The Fact Book, 2000 Edition, Federal Civilian Workforce Statistics 8 (2000).

In light of this, the trial court concluded its review of the case by stating that "the court will afford plaintiffs an opportunity to gather any unprivileged information that may establish a prima facie showing that John Patrick Savage had the requisite authority to bind the government in contract." *36 Fed. Cl. at 329.* The Government's motion for summary judgment was suspended pending further proceedings.

III. The 1998 Decision (Judge Bruggink)

After further proceedings, focused primarily on discovery matters, and with the case now assigned to a different judge, the trial court in 1998 granted the Government's motion for summary judgment. At first blush, summary judgment may seem to be an inappropriate ruling, since it is clear that the [**13] parties strongly dispute a genuine issue of material fact. But a dismissal under Rule 12(b)(4) of the Rules of the Court of Federal Claims for failure to state a claim upon which relief can be granted, equivalent to a dismissal under *Rule 12(b)(6) of the Federal Rules of Civil Procedure*, seems equally inappropriate, because the complaint does state a claim for relief under notice pleading rules. See *Zuckerbraun, 935 F.2d at 547.* Here, if, because of the Government's invocation of the state secrets privilege, the plaintiff cannot meet its burden to show that there are genuine factual issues for trial, a grant of summary judgment under Rule 56 seems appropriate. See id.; R.C.F.C. 56(f); *Fed. R. Civ. P. 56(e).*

As the court explained, the primary argument by the Government asserted in support of its motion was that the plaintiffs have been unable to put forward prima facie proof that any authorized agent of the United States executed the promissory note. The court reviewed the evidence before it based on the limited discovery permitted, a matter to be considered further below.

In addition to the affidavits and declarations previously mentioned, the court reviewed [**14] certain declarations that were before the court at the time of the earlier 1996 decision. This included the declaration of Axel Karlshoj, managing director of Nordisk Industries. Mr. Karlshoj stated that he was approached to serve as a conduit between Savage and certain investors, such as plaintiffs, who were owed money as a result of the dealings of Savage. He stated that an intermediary, one Lee Morris, represented that Savage was "acting on behalf of the [CIA]." *42 Fed. Cl. at 261.* The declaration of Edgar Reynolds, a friend of Savage, was also in the file. Reynolds stated that he had the distinct impression that Savage was an important person within the CIA.

The court also reviewed excerpts from interviews conducted by law enforcement officials in Britain with Savage. Because Mr. Savage died a few days after Monarch filed its case in the Court of Federal Claims, Monarch never did have the opportunity to depose him. During interviews conducted by Detective William Hulse of the Staffordshire Police Department in the United Kingdom before Savage's death, and attended by a representative of the Internal Revenue Service, Savage stated, "I have never been an employee [**15] of the . . . [CIA]." When he was asked, "But you never worked for the CIA, did you?", he answered "No, no." Savage also stated that he had "no warrant of authority" for the Agency.

The court then reviewed the further evidence proffered by Monarch, obtained following the 1996 decision. This consisted primarily of the statements of three persons, Boris Z. Sielicki-Korczak, Lee Morris, and Raphael Moore.

Mr. Korczak attested that he was an "access agent" for the CIA gathering raw intelligence on behalf of the Agency. Based upon his alleged dealings with the CIA, Mr. Korczak declared the following regarding authority granted by the CIA:

> [*1362]
> 5. A person titled "Assistant Deputy Director European Operations" would have the requisite authority to enter into transactions and agreements described in . . . the complaint filed in this case.
>
> 6. An example of the type of authority that may be held by an individual working on behalf of the CIA (the "Individual"), is the case where the Individual is required to carry out a specific task on behalf of the CIA. That task may be, for instance, the securing of specific information from others, or the soliciting of financial backers for whatever [**16] purpose (a purpose which may or may not be known to the Individual). In order to carry out the assigned task, the Individual would be authorized by the CIA to claim to have a title or affiliation which would convince others to put faith in the Individual. Likewise, the Individual would be authorized to make promises which would make it more likely that the end task assigned would be achieved. Such promises may be done by entering into contracts.
>
> 7. In choosing a title, the Individual will ordinarily choose one which is not equivalent to a top most ranking, but rather a lesser and more believable ranking. That is, the Individual will not claim to be the "Director" of any known de-

partment, but rather a lower ranking person, such as a deputy or assistant, of a department that is not commonly known. In the above captioned case, the title of Assistant Deputy Director European Operations is a prime example. It is more believable, and harder to refute, than the title of "the" Director European Operations. Similarly, the stated affiliation with "Global Affairs" is sufficiently broad and non-descript to make it more likely to be believable.

Lee Morris, mentioned in the declarations [**17] of both Deacon and Karlshoj, is a retired officer of the United States Navy. In his deposition, Mr. Morris discussed a project he helped coordinate in Japan. In addition, he mentioned that funds from that project would have been used to pay the debts incurred by the "Savage situation" had the project gone through.

In an affidavit by Monarch's counsel, Raphael S. Moore, Mr. Moore stated that he had conversations with one George Willis who lived in Northern Ireland. Willis had lost money to Savage, and believed that Savage "was with the [CIA]." Willis also told Moore that he, Willis, had called the CIA and had been told by someone in the Director's office that Savage was not an agent, but that if Willis could prove that Savage was such an agent, they would pay him his loss.

On the basis of the evidence before it, the trial court concluded that plaintiffs had failed to carry their burden of establishing a prima facie case of authority by Savage to contract with Monarch on behalf of the United States. The court agreed with the Government's characterization that there was a serious shortcoming in plaintiffs' evidence: "plaintiffs are left with nothing more than Savage's own actions [**18] as evidence of his duties or authority." *42 Fed. Cl. at 264.* The court, finding the statements in Mr. Moore's affidavit incredible, also concluded that the Government had not waived the state secrets privilege. Id.

We find no error in the court's conclusions that the evidence before it was insufficient to establish even a prima facie showing of authority, and that the state secrets privilege had not been waived by any alleged conversations with officials in the Director's office. We are, however, concerned about the possible unfairness that may have crept into the proceedings as a result of certain rulings made with regard to the scope of discovery by plaintiffs.

Following the 1996 decision and the court's invitation to plaintiffs to pursue discovery with non-government witnesses, Monarch renewed its request, submitted [*1363] earlier but denied, for letters rogatory for two Britons, Mr. Sima Malkowich and Mr. N.J. North, and requested letters rogatory for three other overseas witnesses, Detective William Hulse, Mrs. Sarah Savage, and Mr. Clive Smith. n2 In addition, Monarch sought to subpoena Mr. Cutler, Mr. Boris Z. Sielicki-Korczak, Senator Charles Grassley, Woodrow [**19] Leon (Lee) Morris, and Mr. Marshall Jacobs.

n2 Letters rogatory are formal communications sent by a court in which an action is pending to a court of a foreign country, requesting the foreign court to take the testimony of a witness resident within that court's jurisdiction and transmit a transcript to the issuing court. Black's Law Dictionary 916-17 (7th ed. 1999); see also R.C.F.C. 28 (issuance of letters rogatory for the taking of depositions in a foreign country).

In a hearing on December 4, 1996, the trial court heard Monarch's arguments as to why they thought the depositions of Mr. Malkowich, Detective Hulse, Mrs. Savage, Mr. Cutler, Mr. Korczak, and Senator Grassley would be necessary. Monarch stated that it would no longer be pursuing the depositions of Mr. North, Mr. Jacobs, and Mr. Smith.

At the hearing, Monarch explained that Mr. Malkowich, thought to be a member of British Intelligence, had told Monarch that he could identify a United States Senator who was aware of the contract between Savage [**20] and Monarch and who had attempted to bring settlement of the alleged breach of contract. Monarch, although acknowledging that the Senator would have more direct knowledge of Mr. Savage's authority, did not however include the Senator on its subpoena list. It was noted that even though Malkowich had been very cooperative, Monarch had not pursued the route of obtaining an affidavit from him rather than requesting a letter rogatory to depose him.

Monarch also explained to the trial court that despite having already obtained substantial transcripts from Detective Hulse's interview of Mr. Savage from other sources, it wanted a letter rogatory to depose Detective Hulse.

In addition, Monarch argued that it needed a letter rogatory to depose Mrs. Savage, who was now living in Europe. Monarch reasoned that simply by being Mr. Savage's wife, she would have information regarding whether the CIA had delegated contracting authority to her husband.

Further, Monarch argued that it needed to subpoena Mr. Cutler even though he had already submitted a written declaration. Monarch explained that when it last ap-

proached Mr. Cutler, he had stated that he was not willing to say any more than was in his [**21] declaration, and that he would only state more if he was required to under oath. Monarch reasoned that because Mr. Cutler and a partner in his law firm were very closely connected to the CIA, they must have further information regarding Savage's relationship with the CIA.

Monarch also argued that it needed to subpoena Mr. Korczak. According to Monarch, Mr. Korczak was an undercover operative for the CIA who would give information about the authority held by individuals with specific ranks and titles in the CIA. In addition, Monarch explained that it needed to depose Senator Grassley solely for the purpose of corroborating the fact that Korczak was with the CIA.

With respect to Mr. Morris, Monarch stated to the trial court that Mr. Morris told Monarch that he was with the CIA, stated that he had information about delegations of authority within the CIA and had direct knowledge of the transaction in which Mr. Savage was involved. According to Monarch, Mr. Morris was Mr. Savage's supervisor in the CIA.

Throughout the hearing, the trial court made it clear that it would only allow further discovery on the limited issue of whether the CIA had delegated contracting authority to Savage. [**22] After hearing the parties' arguments regarding the letters rogatory and the subpoenas, the trial court allowed only the depositions of Mr. Korczak [*1364] and Mr. Morris, and suspended further consideration of the letters rogatory. See Monarch Assurance P.L.C. v. United States, No. 94-518C (Fed. Cl. Dec. 11, 1996) (Order). The two depositions were allowed with the express understanding that questioning would be limited to whether Savage had the requisite authority to bind the Government. Subsequently, Monarch obtained Mr. Korczak's declaration and deposed Mr. Morris, as discussed above.

After the trial court concluded, on the basis of the evidence before it, that the plaintiffs had failed to carry their burden of establishing a prima facie case of authority, the court also adopted an alternative rationale for its grant of summary judgment. The court considered the arguments by the parties regarding the consequences of what would result if there had been sufficient evidence of authority. Plaintiffs' view was that the problem was the Government's--if it chose not to come forward with its evidence, then Monarch should win. The Government responded that the court should make an independent [**23] determination of the facts, taking into account the in camera affidavit of Director Deutch, even though plaintiffs had no opportunity to review or rebut the representations made therein.

The court, after discussing various alternative scenarios for resolving the dilemma, and reviewing some of the cases that had considered the matter, concluded that even if Savage was an agent of the Government authorized to make the contract, the plaintiffs must lose if permitting the suit to continue would irreparably damage national interests. The court further concluded that the Deutch declaration "demonstrates a complete defense which the court will not permit the plaintiffs to examine further." *Id. at 266.*

We believe the court was premature in its resolution of the difficult issue regarding the circumstances under which national security compels a total bar of an otherwise valid suit. As the Government cogently argues, there are strong policy reasons why courts should generally refrain from such a merits review. To do so risks the appearance of impropriety because plaintiffs are unable to participate in the decision. Furthermore, such a merits review risks compromising the [**24] secret, since it may suggest that the Government has a particular defense to this suit, whereas in other cases an opposite result may suggest otherwise. We believe it is preferable to decide the case at this stage of the proceedings on the issue of whether plaintiffs can establish actual authority. If the case can be resolved properly on the evidentiary ground, without having to rely on non-record information, we believe that is a preferable route to its resolution.

On that issue, we are of the view that the trial court's conclusion that the evidence was insufficient to establish authority rests on an unduly limited scope of discovery. The evidentiary decision the trial court made in its 1996 decision--denying direct discovery from official government sources but allowing further discovery from other sources--struck an appropriate balance between the security needs of the Government and the rights of litigants under established evidentiary rules and procedures to develop and present their case. To maintain that balance, however, required the court to give a fair amount of leeway to plaintiffs in building their case from non-government sources. In responding to plaintiffs' request [**25] for discovery orders, the trial court limited plaintiffs' discovery to only two of the persons requested. On appeal, Monarch contends that it should have been allowed discovery from four additional persons: Mr. Malkowich, Detective Hulse, Mr. Cutler, and Mrs. Savage. We think that under the circumstances here, when plaintiffs were already severely constrained in their discovery effort, the trial court abused its discretion by not allowing discovery of those four witnesses.

Admittedly, the likelihood that plaintiffs can cobble together enough evidence to persuade the trial court that Savage had [*1365] actual authority to enter into this contract on behalf of the United States seems quite re-

mote. Admittedly, the likelihood that some of the witnesses named could or would provide useful evidence is also problematic--the affidavits and depositions already before the trial court consist largely of innuendo and second and third hand hearsay, and plaintiffs' representations about the further evidence it seeks suggest that much of that will be similar. Nevertheless, on balance, the possible harm or inconvenience to the witnesses, and the additional effort to be entailed by the Government and the [**26] court, do not seem to outweigh the possible harm to plaintiffs and the appearance of unfairness consequent to denying them full opportunity to make their case from the four identified non-government witnesses.

Having said that, we wish to make clear to plaintiffs and their counsel that the trial court is not expected to, nor should it, simply allow plaintiffs to embark on a wide-ranging fishing expedition in hopes that there may be gold out there somewhere, or worse, in hopes that the Government will get tired of litigating and settle an otherwise unprovable case. Our decision goes only so far as to indicate that the plaintiffs are entitled to a reasonably liberal scope of discovery of the non-government witnesses; on the record before us we do not believe they have had that. Beyond that, we remind the parties that, in addition to monitoring plaintiffs' discovery activities to ensure it is not abused, the trial court is fully empowered to insist that plaintiffs have a sufficient basis for pursuing specific leads, and to use its authority under the rules, including the sanctions of Rule 11, to enforce its orders.

In summary, we find no error in the trial court's approval of the Government's [**27] invocation of the state secrets privilege, thus denying access to Government witnesses. However, because the trial court also severely limited plaintiffs' opportunity for discovery of non-government witnesses, we conclude that the trial court unduly constrained plaintiffs' right to discovery as provided by federal rules, and thus their ability possibly to prove authority to contract. In so doing, the trial court abused its discretion. We vacate the judgment in the Government's favor, and remand the matter to the trial court for further proceedings consistent with this opinion. Since the same problem of authority to act for the Government exists with regard to the count for a taking as for the count for breach of contract, this disposition of the case moots the other issues raised by plaintiffs on appeal.

CONCLUSION

AFFIRMED-IN-PART, VACATED-IN-PART, and REMANDED.