Trone et al v. Peanut Corporation of America Doc. 145

# EXHIBIT A

Dockets.Justia.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **KHALED EL-MASRI,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:05cv1417** |
| | ) | |
| **GEORGE TENET, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

# ORDER

Plaintiff in this civil suit claims to be an innocent victim of the United States' "extraordinary rendition" program[1] and seeks redress from the former Director of the Central Intelligence Agency (CIA), private corporations allegedly involved in the program, and unknown employees of both the CIA and the private corporations. At issue is whether the assertion of the state secrets privilege by the United States is valid, and, if so, whether this privilege prevents this case from proceeding.

## I.

### A. Facts[2]

Plaintiff Khaled El-Masri is a German citizen of Lebanese descent. His allegations begin

[1]The complaint alleges that since the early 1990s the CIA has been operating interrogation centers in countries where the United States believes legal safeguards do not constrain efforts to interrogate suspected terrorists. This practice is commonly known as "extraordinary rendition."

[2]As appropriate when considering a motion to dismiss pursuant to Rule 12(b)(6), Fed.R.Civ.P., the facts recited here are derived from the complaint and assumed true. *Randall v. United States*, 30 F.3d 518, 522 (4th Cir.1994) (plaintiff's version of facts accepted as true at threshold dismissal stage).

on New Years Eve 2003 when he claims he was seized by Macedonian authorities while attempting to cross the border between Serbia and Macedonian. Following his abduction, El-Masri alleges the Macedonian authorities imprisoned him in a Skopje hotel room for 23 days, refusing to let him contact a lawyer, a German consular officer, a translator or his wife, and interrogating him continuously about his alleged association with Al Qaeda, an association he consistently denied. After thirteen days of this treatment, El-Masri alleges he commenced a hunger strike to protest his detention, and he did not eat again in Macedonia.

On January 23, 2004, El-Masri claims several men in civilian clothes entered his hotel prison room. They forced El-Masri to make a statement that he had not been mistreated by his captors, and would shortly be flown back to Germany. After his captors videotaped this statement, El-Masri states he was blindfolded and driven to what sounded like an airstrip approximately one hour from Skopje. Still blindfolded, he alleges he was led to a building where he was beaten, stripped of his clothing, and sodomized with a foreign object. He further alleges he was dragged naked to a corner of the room where his captors removed his blindfold only for him to be blinded again by a camera's flash. When he regained his sight, he claims he saw seven or eight men dressed in black and wearing black ski masks. El-Masri contends that these men were members of a CIA "black renditions" team, operating pursuant to unlawful CIA policies at the direction of defendant Tenet. These men, he alleges, dressed him in a diaper, a tracksuit and earmuffs. He claims he was then blindfolded, shackled and dragged to an airplane where his captors injected him with a sedative that rendered him nearly unconscious. In this drugged state, he states he was secured inside the aircraft and thereafter only dimly remembers the airplane landing once and taking off again before finally depositing him in a place that El-Masri knew from the air temperature was not Germany. Indeed, El-Masri was to discover later that he had

been flown to Kabul, Afghanistan.[3]

Upon reaching Kabul, El-Masri claims he was again beaten and then placed in a small, cold cell. He contends this prison was a CIA-run facility known as the "Salt Pit," an abandoned brick factory north of the Kabul business district. El-Masri alleges he was detained in the "Salt Pit" for the next four months, during which time he was repeatedly interrogated about his alleged association with terrorists, including September 11 conspirators Mohammed Atta and Ramzi Binalshibh. He points out that although the prison facility was nominally run by Afghans, two of his interrogators identified themselves as Americans. He claims he repeatedly beseeched his captors to contact the German government on his behalf, but these requests were denied.

In March, El-Masri contends he and several other inmates commenced another hunger strike to protest their continued confinement. After 27 days without food, El-Masri states he was brought before two unmasked persons he believes were CIA agents in charge of the "Salt Pit." These men refused to accede to El-Masri's demands to release him, to charge him with a crime, or to allow him to contact a German official. Although the American official denied these requests, El-Masri contends the official conceded to El-Masri that El-Masri's detention was a mistake, but that he could not agree to El-Masri's release without permission from Washington. At this point, El-Masri states he was returned to his cell where he continued his hunger strike. After ten more days without nourishment, El-Masri asserts his captors fed him forcibly by

[3]In his complaint, El-Masri alleges that documentary evidence supports his recollection. He claims aviation documents show that late on the evening of January 23, 2004 a Boeing business jet owned by defendant Premier Executive Transport Services, Inc. (PETS) and operated by defendant Aero Contractors Limited (ACL) flew from Skopje, Macedonia to Kabul, Afghanistan with a brief stop in Baghdad, Iraq. This documentary evidence is attached to the plaintiff's memorandum of points and authorities in opposition to the United States' motion to dismiss.

inserting tubes into his nose and his mouth through which they pumped liquid sustenance. Soon thereafter, El-Masri states he was given canned food and books to read. El-Masri alleges that his hunger strike had a deleterious effect on his health; he lost sixty pounds over the course of his detention.

El-Masri contends that the CIA had determined soon after his arrival in Afghanistan that they were detaining an innocent man. Further, he contends that Tenet knew this fact by April 2004 and that Secretary of State Condoleeza Rice knew by early May that El-Masri was the victim of mistaken identity.[4] Nonetheless, El-Masri says he remained imprisoned in Kabul until May 28, 2004, after which he was flown in a private jet, again blindfolded, from Kabul to Albania, where he was deposited by his captors on the side of an abandoned road. With the assistance of Albanian authorities, El-Masri eventually made his way back to his home in Germany only to find that his wife and four children, believing he had abandoned them, had left Germany to live in Lebanon. El-Masri asserts that he remains deeply traumatized by his abduction and treatment during his detention.

**B. Proceedings**

The complaint in this case was filed on December 6, 2005, naming the following defendants: (1) former Director of the CIA George Tenet, (2) certain unknown agents of the CIA (John Does 1-10) (3) PETS, (4) ACL, (5) Keeler and Tate Management (KTM),[5] (6) and certain

---

[4]El-Masri also intimates that the German government was aware of his captivity. In addition to his American interrogators, El-Masri describes meeting a German speaker who identified himself only as “Sam.” “Sam” asked El-Masri many of the same questions as his American interrogators, but ultimately informed him that he would be released only if he agreed never to discuss what had happened over the last five months.

[5]According to El-Masri, the aircraft used in his transfer from Macedonia to Afghanistan was sold by PETS to KTM on or about November 14, 2004, shortly after reports of the aircraft’s

unknown employees of the defendant corporations (John Does 11-20). Tenet is sued in his individual capacity for authorizing the unknown CIA agents' actions with actual or constructive knowledge that such actions were illegal, and John Does 1-10 are sued for their actual participation in El-Masri's treatment. El-Masri sues the American corporations PETS, ACL and KTM, as well as their employees, for their participation in the CIA's "extraordinary rendition" that victimized El-Masri. El-Masri contends that these corporate defendants are liable for authorizing the use of aircraft they owned or operated for the transfer of suspected terrorists to detention facilities despite the corporate defendants' knowledge that the suspected terrorists, including El-Masri, would be detained incommunicado, tortured and subjected to other cruel treatment.

El-Masri asserts three separate causes of action. The first claim is brought against Tenet and the unknown CIA agents pursuant to the cause of action recognized by the Supreme Court in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), for violations of El-Masri's Fifth Amendment right to due process. Specifically, El-Masri contends that Tenet and John Does 1-10 violated the Due Process Clause's prohibition against anyone acting under color of U.S. law (1) to subject any person held in U.S. custody to treatment that "shocks the conscience," or (2) to deprive any person of liberty in the absence of legal process. El-Masri's second cause of action is brought against all defendants pursuant to the Alien Tort Statute (ATS) for violations of international legal norms prohibiting prolonged

---

involvement in the "extraordinary rendition" program. El-Masri contends that this transfer was fraudulent because it was done to avoid potential liability for PETS' acts. El-Masri contends that KTM is the successor to PETS, carrying on the same business and operations and utilizing the same personnel and assets as PETS.

arbitrary detention.[6] Likewise, El-Masri's final cause of action is brought pursuant to the ATS for each defendant's violation of international legal norms prohibiting cruel, inhuman, or degrading treatment.

On March 8, 2006, the United States filed a statement of interest and a formal claim of the state secrets privilege. In support of its formal claim of privilege the United States submitted both an unclassified and a classified *ex parte* declaration of the Director of the CIA (DCI). Thereafter, on March 13, 2006, the United States moved to intervene in the suit pursuant to Rule 24(a), Fed.R.Civ.P. in order to protect its interests in preserving its state secrets. The motion was granted on March 21, 2006. *El-Masri v. Tenet*, Case No. 1:05cv1417 (E.D.Va. March 21, 2006). Concurrent with the motion to intervene, the United States moved for dismissal or for summary judgment on the ground that maintenance of the suit would invariably lead to disclosure of its state secrets. The parties presented oral argument on this motion on May 12, 2006.

**II.**

The United States' dismissal motion and the plaintiff's opposition raise important threshold issues, the resolution of which requires a two step analysis. First, it is necessary to determine whether the United States' assertion of the state secrets privilege is valid in this case. If not, the inquiry is over and the United States' dismissal motion must be denied. On the other hand, if the assertion of the privilege is valid, then the second step in the analysis requires

---

[6]Codified at 28 U.S.C. § 1350, the ATS provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." The Supreme Court in *Sosa v. Alvarez Machain*, 542 U.S. 692 (2004), has interpreted this statute as providing district courts jurisdiction over civil suits brought by aliens for violations of a limited set of well-recognized norms of international law. *Id.* at 724. The Supreme Court did not identify precisely which well-recognized norms of international law are actionable under the ATS.

determining whether dismissal is required or whether the case may nonetheless proceed in some fashion that adequately safeguards any state secrets.

**A.**

Determining whether the state secrets privilege has been validly asserted requires an understanding of the nature and purpose of the privilege and of who may assert it. The state secrets privilege is an evidentiary privilege derived from the President's constitutional authority over the conduct of this country's diplomatic and military affairs and therefore belongs exclusively to the Executive Branch. *See United States v. Reynolds*, 345 U.S. 1., 7-8 (1953). As such, it must be formally asserted by the head of the Executive Branch agency with control over the state secrets at issue, and then only after that person has personally considered the matter. *See id.* If validly asserted the state secrets privilege permits the government to "block discovery in a lawsuit of any information that, if disclosed, would adversely affect national security." *Ellsberg v. Mitchell*, 709 F.2d 51, 56 (D.C.Cir. 1983). More particularly, "the various harms, against which protection is sought by invocation of the privilege, include impairment of the nation's defense capabilities, disclosure of intelligence-gathering methods or capabilities, and disruption of diplomatic relations with foreign governments." *In re Under Seal*, 945 F.2d 1285, 1287 n.2 (4th Cir. 1991) (quoting *Ellsberg v. Mitchell*, 709 F.2d 51, 57 (D.C.Cir.1983)); *see also Sterling v. Tenet*, 416 F.3d 338, 346 (4th Cir. 2005). Given the vitally important purposes it serves, it is clear that while the state secrets privilege is commonly referred to as "evidentiary" in nature, it is in fact a privilege of the highest dignity and significance.

As noted, the privilege belongs solely to the Executive Branch and must be formally asserted by the head of the Executive Branch agency with responsibility for, and control over, the state secrets involved. Once it is determined that the appropriate officer has invoked the

privilege, the next step in the judicial inquiry into the validity of the assertion is to determine whether the information for which the privilege is claimed qualifies as a state secret. Importantly, courts must not blindly accept the Executive Branch's assertion to this effect, but must instead independently and carefully determine whether, in the circumstances, the claimed secrets deserve the protection of the privilege. *Reynolds*, 345 U.S. at 10. This determination requires a court to consider whether "a responsive answer . . . or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." *Sterling*, 416 F.3d at 343 (quoting *Reynolds*, 345 U.S. at 9). In other words, this part of the inquiry focuses on whether the United States has made an adequate showing that disclosure of claimed privileged material would injure national security.

How searching the judicial inquiry must be depends on the particular circumstances of the case, for it is well-settled that the depth of a court's inquiry increases relative to the adverse party's need for the information the government seeks to protect. *Reynolds*, 345 U.S. at 11; *Sterling*, 416 F.3d at 343. If the information is peripheral to the adverse party's claims, the court's inquiry need not be as searching as it must be in cases where the claimed state secrets are at the core of the suit. In those cases where the claimed state secrets are at the core of the suit and the operation of the privilege may defeat valid claims, courts must carefully scrutinize the assertion of the privilege lest it be used by the government to shield "material not strictly necessary to prevent injury to national security." *Ellsberg*, 709 F.2d at 58. But, in undertaking this inquiry, courts must also bear in mind the Executive Branch's preeminent authority over military and diplomatic matters and its greater expertise relative to the judicial branch in

predicting the effect of a particular disclosure on national security.[7] Accordingly, the judiciary must accept the executive branch's assertion of the privilege whenever its independent inquiry discloses a "*reasonable danger* that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged." *Reynolds*, 345 U.S. at 10 (emphasis added). Importantly, once the court is satisfied that any disclosure of the putative secrets "might have a deleterious effect on national security, 'the claim of the privilege will be accepted without requiring further disclosure.'" *Id.* (quoting *Reynolds*, 345 U.S. at 9).

Finally, it is important to note that, unlike other privileges, the state secrets privilege is absolute and therefore once a court is satisfied that the claim is validly asserted, the privilege is not subject to a judicial balancing of the various interests at stake.[8] Thus, the adverse party's need for privileged information affects only the depth of the judicial inquiry into the validity of the assertion and not the strength of the privilege itself, for "even the most compelling necessity cannot overcome the claim of privilege if the court is ultimately satisfied that military secrets are at stake." *Reynolds*, 345 U.S. at 11.

Given these governing principles, there is no doubt that the state secrets privilege is validly asserted here. To begin with, the privilege has been formally asserted by the appropriate

---

[7]*See United States v. Nixon*, 418 U.S. 683, 710 (1974) (claims of privilege for military or diplomatic secrets "traditionally shown the utmost deference."); *see also C. & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948) ("The President, both as Commander-in-Chief and as the Nation's organ for foreign affairs, has available intelligence services whose reports are not and ought not to be published to the world. It would be intolerable that courts, without the relevant information, should review and perhaps nullify actions of the Executive taken on information properly held secret.").

[8]*See In re Under Seal*, 945 F2d 1285, 1288 (4th Cir. 1991) ("the privilege is absolute when properly invoked"); *United States v. Halkin*, 690 F.2d 977, 990 (D.C.Cir. 1982) ("[S]ecrets of state—matters the revelation of which reasonably could be seen as a threat to the military or diplomatic interests of the nation—are absolutely privileged from disclosure in the courts.").

Executive Branch official, the DCI, who has done so by submitting an *ex parte* classified declaration labeled "JUDGE'S EYES ONLY," and also an unclassified declaration for the public record. The latter document states in general terms that damage to the national security could result if the defendants in this case were required to admit or deny El-Masri's allegations. The former is a detailed explanation of the facts and reasons underlying the assertion of the privilege. It is, of course, inappropriate to reveal here the substance of the DCI's classified *ex parte* declaration, for to do so would compromise "the very thing the privilege is designed to protect." *Reynolds*, 345 U.S. at 8. It is enough to note here that the substance of El-Masri's publicly available complaint alleges a clandestine intelligence program, and the means and methods the foreign intelligence services of this and other countries used to carry out the program. And, as the public declaration makes pellucidly clear, any admission or denial of these allegations by defendants in this case would reveal the means and methods employed pursuant to this clandestine program and such a revelation would present a grave risk of injury to national security. This conclusion finds firm support in the details disclosed in the DCI's classified *ex parte* declaration.

Plaintiff's argument that government officials' public affirmation of the existence of a rendition program[9] undercuts the claim of privilege misses the critical distinction between a general admission that a rendition program exists, and the admission or denial of the specific facts at issue in this case. A general admission provides no details as to the means and methods

---

[9] *See* Declaration of Stephen Macpherson Watt in Support of Plaintiff's Opposition to the United States' Motion to Dismiss or, in the Alternative, for Summary Judgment ("Watt Decl.") Exh. A.

employed in these renditions, or the persons, companies or governments involved.[10] Nor is the government's assertion of the privilege here intended to protect from disclosure this general information. Instead, the government seeks to protect from disclosure the operational details of the extraordinary rendition program, and these details are validly claimed as state secrets. Accordingly, El-Masri's argument that generalized public admissions somehow undercut the government's right to protect the specific details of the "extraordinary rendition" program are unavailing.

Nor is the strength of the government's privilege somehow diminished by either El-Masri's complaint or the numerous media, government or other reports discussing renditions, often relying largely on El-Masri's allegations.[11] It is self-evident that a private party's allegations purporting to reveal the conduct of the United States' intelligence services overseas are entirely different from the official admission or denial of those allegations. Furthermore, neither the United States' claim of privilege, nor a judicial acceptance of that claim is tantamount to an admission that El-Masri's factual allegations are true. The applicability of the state secrets privilege is wholly independent of the truth or falsity of the complaint's allegations. While a public admission of the alleged facts would obviously reveal sensitive means and methods of the country's intelligence operations, a denial of the alleged facts would also be damaging, as it may raise an inference of veracity in those cases where the government does not deny similarly

---

[10]This distinction between the general and the particular is exemplified by Secretary of State Rice's public comments concerning El-Masri's claims in which she affirmed the existence of the program but declined to comment on the specific facts alleged by El-Masri. *See* Watt Decl. Exh. B. Although not revealing any details about the program, she did say in response to a question about El-Masri's allegations that "when and if mistakes are made, we work very hard to rectify them." *Id.*

[11]*See generally id.*

sensitive allegations but asserts the state secrets privilege instead. For this reason, the CIA has appropriately adopted the policy of neither admitting nor denying allegations regarding the means, methods, persons, entities or countries used in its foreign intelligence operations. In light of this sensible policy, and on the basis of the DCI's public and classified *ex parte* declarations, the Court finds the United States' privilege is validly asserted in this case.

**B.**

If a court finds that the state secrets privilege has been validly asserted, it must then determine whether the case must be dismissed to prevent public disclosure of those secrets, or whether special procedural mechanisms may be adequate to prevent disclosure of the state secrets. Resolution of this issue will depend on the centrality of the privileged material to the claims or defenses asserted by either party. As the Fourth Circuit has recently put it, "when the very subject of the litigation is itself a state secret," and where there is "no way [the] case could be tried without compromising sensitive military secrets, a district court may properly dismiss the plaintiff's case." *Sterling*, 416 F.3d at 347-48 (quoting *Fitzgerald v. Penthouse Int'l., Ltd.*, 776 F.2d 1236, 1243 (4th Cir. 1985)) (internal quotations omitted). Thus, while it is well-settled that "dismissal is appropriate only when no amount of effort and care on the part of the court and the parties will safeguard privileged material," it is equally well-settled that "where the very question on which a case turns is itself a state secret, or the circumstances make clear that sensitive military secrets will be so central to the subject matter of the litigation that any attempt to proceed will threaten disclosure of the privileged matters, dismissal is the appropriate remedy." *Id.* at 348 (internal quotations and citations omitted). In sum, the question is whether El-Masri's claims could be fairly litigated without disclosure of the state secrets absolutely protected by the United States' privilege.

In the instant case, this question is easily answered in the negative. To succeed on his claims, El-Masri would have to prove that he was abducted, detained, and subjected to cruel and degrading treatment, all as part of the United States' extraordinary rendition program.[12] As noted above, any answer to the complaint by the defendants risks the disclosure of specific details about the rendition argument. *See* Rule 8(b), Fed.R.Civ.P. ("A party shall state in short and plain terms the party's defenses to each claim asserted and shall admit or deny the averments upon which the adverse party relies."). These threshold answers alone would reveal considerable detail about the CIA's highly classified overseas programs and operations.

Finally, the fact that any answer to the complaint would potentially disclose information protected by the privilege refutes El-Masri's argument that special procedures short of dismissal would be adequate to protect the government's validly asserted privilege. To be sure, special procedures, such as clearing defense counsel for access to classified information and the application of the Classified Information Procedures Act (CIPA), 18 U.S.C. App. 3, could be, and indeed have been, used effectively in appropriate circumstances in other cases. These are not appropriate circumstances. Such procedures are plainly ineffective where, as here, the entire aim of the suit is to prove the existence of state secrets. As the Fourth Circuit recognized in *Sterling*, where "the whole object of the suit and of the discovery is to establish a fact that is a state secret" special procedures are inadequate. 416 F.3d at 348. Precisely this is the case here. Further, even

---

[12]For purposes of the present analysis it is appropriate to assume that El-Masri has stated a cognizable claim; the strength or weakness of his legal claims is immaterial to the resolution of the state secrets privilege dismissal motion. It is nonetheless worth noting that El-Masri's legal claims are novel and might well be vulnerable to dismissal pursuant to Rule 12(b)(6), Fed.R.Civ.P., quite apart from the application of the state secrets privilege. *See generally* Scott J. Borrowman, *Sosa v. Alvarez-Machain and Abu Ghraib – Civil Remedies for Victims of Extraterritorial Torts by U.S. Military Personnel and Civilian Contractors*, 2005 B.Y.U.L.Rev. 371 (2005).

assuming some mechanism might be used to avoid disclosure of state secrets in the answer, it is clear that the use of special procedures during discovery and trial would be wholly inadequate to preserve the United States' privilege. The Fourth Circuit also addressed this point in *Sterling* where it noted that:

> Such procedures, whatever they might be, still entail considerable risk. Inadvertent disclosure during the course of a trial – or even *in camera* – is precisely the sort of risk that *Reynolds* attempts to avoid. At best, special accommodations give rise to added opportunity for leaked information. At worst, that information would become public, placing covert agents and intelligence sources alike at grave personal risk.

*Sterling*, 416 F.3d 338. Thus, while dismissal of the complaint deprives El-Masri of an American judicial forum for vindicating his claims, well-established and controlling legal principles require that in the present circumstances, El-Masri's private interests must give way to the national interest in preserving state secrets. The United States' motion to dismiss must therefore be granted.

**C.**

The United States' dismissal motion also argues that the recently reaffirmed so-called *Totten* bar renders this case non-justiciable. *See Tenet v. Doe*, 125 S.Ct. 1230, 1237 (2005). This argument is problematic in certain respects, but in the end need not be reached.

The *Totten* bar is quite distinct from the state secrets privilege; it is not a privilege or a rule of evidence; it is instead a rule of non-justiciability that deprives courts of their ability to hear "suits against the Government based on covert espionage agreements" even in the absence of a formal claim of privilege. *Id.* at 1233. It is properly invoked only in those cases "where success depends upon the existence of [a] secret espionage relationship with the government," or where the government cannot openly "admit or deny [a] fact that [is] central to the suit." *Id.* at 1236-37.

In *Totten*, the Supreme Court forbade the suit of a self-proclaimed Civil War secret agent attempting to enforce the secret espionage agreement he claimed he had negotiated with President Lincoln on the ground that "public policy forbids the maintenance of any suit in a court of justice, the trial of which would inevitably lead to the disclosure of matters which the law itself regards as confidential." *See Totten v. United States*, 92 U.S. 105, 107 (1876). *See also Weinberger v. Catholic Action of Ha./Peace Ed. Project*, 454 U.S. 139, 146-47 (1981) (holding that whether the Navy had complied with the National Environmental Policy Act (NEPA) with respect to its storage of nuclear materials was "beyond judicial scrutiny"). In *Tenet*, the Supreme Court applied the *Totten* bar to a suit brought by former Soviet double agents seeking to enforce their agreement with the CIA, but made clear that the bar was not limited to contract actions, but applies whenever a party's "success depends upon the existence of [a] secret espionage relationship with the government." *Tenet*, 125 S.Ct. at 1236.

It is debatable whether the *Totten* bar would apply to the present case. It is true that El-Masri's allegations here concern the existence of several "secret espionage relationships" between the United States and both certain foreign governments and the corporate defendants, but it is also true that El-Masri himself was not a party to any of these secret espionage agreements or relationships. There is, therefore, some doubt whether *Totten* speaks to the circumstances at bar. In any event, because the valid assertion of the state secrets privilege presents an adequate and independent ground for dismissal of this case, it is unnecessary to reach and decide the applicability of the *Totten* bar to the facts of this case.

**D.**

It is important to emphasize that the result reached here is required by settled, controlling law. It is in no way an adjudication of, or comment on, the merit or lack of merit of El-Masri's complaint. Nor does this ruling comment or rule in any way on the truth or falsity of his factual allegations; they may be true or false, in whole or in part. Further, it is also important that nothing in this ruling should be taken as a sign of judicial approval or disapproval of rendition programs; it is not intended to do either. In times of war, our country, chiefly through the Executive Branch, must often take exceptional steps to thwart the enemy. Of course, reasonable and patriotic Americans are still free to disagree about the propriety and efficacy of those exceptional steps. But what this decision holds is that these steps are not proper grist for the judicial mill where, as here, state secrets are at the center of the suit and the privilege is validly invoked.

Finally, it is worth noting that putting aside all the legal issues, if El-Masri's allegations are true or essentially true, then all fair-minded people, including those who believe that state secrets must be protected, that this lawsuit cannot proceed, and that renditions are a necessary step to take in this war, must also agree that El-Masri has suffered injuries as a result of our country's mistake and deserves a remedy. Yet, it is also clear from the result reached here that the only sources of that remedy must be the Executive Branch or the Legislative Branch, not the Judicial Branch.

Accordingly, and for the reasons stated from the bench,

It is hereby **ORDERED** that the United States' claim of the state secrets privilege is **VALID**.

It is further **ORDERED** that given the application of the privilege to this case, the United

States' motion to dismiss must be, and hereby is, **GRANTED**.

The Clerk is directed to send a copy of this Order to all counsel of record and to place this matter among the ended causes.

__/s/____________________
T.S. Ellis, III
United States District Judge

Alexandria, Virginia
May 12, 2006