ELECTRONIC FRONTIER FOUNDATION
CINDY COHN (145997)
cindy@eff.org
LEE TIEN (148216)
tien@eff.org
KURT OPSAHL (191303)
kurt@eff.org
KEVIN S. BANKSTON (217026)
bankston@eff.org
CORYNNE MCSHERRY (221504)
corynne@eff.org
JAMES S. TYRE (083117)
jstyre@eff.org
454 Shotwell Street
San Francisco, CA 94110
Telephone: 415/436-9333
415/436-9993 (fax)

TRABER & VOORHEES
BERT VOORHEES (137623)
bv@tvlegal.com
THERESA M. TRABER (116305)
tmt@tvlegal.com
128 North Fair Oaks Avenue, Suite 204
Pasadena, CA 91103
Telephone: 626/585-9611
626/ 577-7079 (fax)
Attorneys for Plaintiffs

[Additional counsel appear following the signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TASH HEPTING, GREGORY HICKS, CAROLYN JEWEL and ERIK KNUTZEN on Behalf of Themselves and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>AT&T CORP., AT&T INC. and DOES 1-20, inclusive,<br><br>Defendants. | No. C-06-0672-VRW<br><br>CLASS ACTION<br><br>DECLARATION OF MARK KLEIN IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION<br><br>Date: June 8, 2006<br>Time: 2:00 p.m.<br>Court: Courtroom 6, 17th Floor<br>Judge: The Hon. Vaughn R. Walker, Chief United States District Judge |

**[REDACTED]**



Dockets.Justia.com

I, Mark Klein, declare under penalty of perjury that the following is true and correct:

1. I am submitting this Declaration in support of Plaintiffs' Motion for a Preliminary Injunction. I have personal knowledge of the facts stated herein, unless stated on information and belief, and if called upon to testify to those facts I could and would competently do so.

2. For over 22 years I worked as a technician for AT&T Corporation ("AT&T"), first in New York and then in California. I started working for AT&T in November 1981 as a Communications Technician.

3. From January 1998 to October 2003, I worked as a Computer Network Associate III at an AT&T facility on [redacted] Street in [redacted].

4. From October 2003 to May 2004 I worked as a Communications Technician at an AT&T facility [redacted] (the "[redacted] Facility").

5. Previously, I worked as an AT&T Communications Technician from November 1981 to January 1998. I was assigned to AT&T facilities in New York, New York (November 1981 to December 1990), White Plains, NY (December 1990 to March 1991), Pleasanton, CA (March 1991 to May 1993 and March 1994 to January 1998) and Point Reyes, CA (June 1993 to March 1994).

6. I retired from AT&T in May 2004.

7. AT&T Corp. (now a subsidiary of AT&T Inc.) maintains domestic telecommunications facilities over which millions of Americans' telephone and Internet communications pass every day. These facilities allow for the transmission of interstate or foreign electronic voice and data communications by the aid of wire, fiber optic cable, or other like connection between the point of origin and the point of reception.

8. Between 1998 and 2003 I worked in an AT&T office located on [redacted] in [redacted] as one of [redacted] Computer Network Associates in the office. The site manager was a management-level technician with the title of [redacted] (hereinafter referred to as FSS #1). Two other FSS people (FSS #2 and FSS #3) also operated from this office.

9. During my service at the [redacted] facility, the office provided WorldNet Internet service, international and domestic Voice Over IP (voice communications transmitted over the Internet), and data transport service to the Asia/Pacific region.

10. While I worked in the [redacted] facility in 2002, FSS #1 told me to expect a visit from a National Security Agency ("NSA") agent. I and other technicians also received an email from higher management [redacted]. FSS #1 told me the NSA agent was to interview FSS #2 for a special job. The NSA agent came and met with FSS #2. FSS #1 later confirmed to me that FSS #2 was working on the special job, and that it was at the [redacted] Facility.

11. In January 2003, I, along with others, toured the [redacted] Facility. The [redacted] Facility consists of [redacted] floors of a building that was then operated by SBC Communications, Inc. (now known as AT&T Inc.).

12. While on the January 2003 tour, I saw a new room being built [redacted] room. The new room was near completion. I saw a workman apparently working on the door lock for the room. I later learned that this new room being built was referred to in AT&T documents as the "[redacted] Room" (hereinafter the "[redacted] Room"). The [redacted] Room was room number [redacted], and measures approximately [redacted].

13. The 4ESS switch room is a room that contains a 4ESS switch, a type of electronic switching system that is used to direct long-distance telephone communications. AT&T uses the 4ESS switch in this room to route the public's telephone calls that transit through the [redacted] Facility.

14. FSS #2, the management-level technician whom the NSA cleared and approved for the special job referenced above, was the person working to install equipment in the [redacted] Room.

15. In October 2003, the company transferred me to the AT&T [redacted] Facility to oversee the [redacted] room, as a Communications Technician.

16. In the Fall of 2003, FSS #1 told me that another NSA agent would again visit

our office at [redacted] to talk to FSS #1 in order to get the latter's evaluation of FSS #3's suitability to perform the special job that FSS #2 had been doing. The NSA agent did come and speak to FSS #1. By January 2004, FSS #3 had taken over the special job as FSS #2 was forced to leave the company in a downsizing.

17. The regular AT&T technician workforce was not allowed in the [redacted] Room. To my knowledge, only employees cleared by the NSA were permitted to enter the [redacted] Room. To gain entry to the [redacted] Room required both [redacted]. To my knowledge, only FSS #2, and later FSS #3, had both the [redacted]. [redacted]. We were not given either [redacted] for the [redacted] Room. On one occasion, when FSS #3 was retrieving a circuit card for me from the [redacted] Room, he invited me into the room with him for a couple of minutes while he retrieved the circuit card from a storage cabinet and showed me some poorly installed cable.

18. The extremely limited access to the [redacted] Room was highlighted by one incident in 2003. FSS #1 told me that the large industrial air conditioner in the [redacted] Room was leaking water through the floor and onto [redacted] equipment downstairs, but FSS #2 was not immediately available to provide servicing, and the regular technicians had no access, so the semi-emergency continued for some days until FSS #2 arrived.

19. AT&T provides dial-up and DSL Internet services to its customers through its WorldNet service. The [redacted] room included large routers, racks of modems for AT&T customers' WorldNet dial-in services, and other telecommunications equipment. The equipment in the [redacted] room was used to direct emails, web browsing requests and other electronic communications sent to or from the customers of AT&T's WorldNet Internet service.

20. In the course of my employment, I was responsible for troubleshooting problems on the fiber optic circuits and installing new fiber optic circuits.

21. The fiber optic cables used by AT&T typically consist of up to [redacted] optical fibers, which are flexible thin glass fibers capable of transmitting communications through light signals.

22. Within the [redacted] room, high speed fiber optic circuits connect to routers for AT&T's WorldNet Internet service and are part of the AT&T WorldNet's "Common Backbone" (CBB). The CBB comprises a number of major hub facilities, such as the [redacted] Facility, connected by a mesh of high-speed (OC3, OC12, OC48 and some even higher speed) optical circuits].

23. Unlike traditional copper wire circuits, which emit electromagnetic fields that can be tapped into without disturbing the circuits, fiber optic circuits do not "leak" their light signals. In order to monitor such communications, one has to physically cut into the fiber and divert a portion of the light signal to access the information.

24. A fiber optic circuit can be split using splitting equipment to divide the light signal and to divert a portion of the signal into each of two fiber optic cables. While both signals will have a reduced signal strength, after the split both signals still contain the same information, effectively duplicating the communications that pass through the splitter.

25. In the course of my employment, I reviewed two "[redacted]" documents dated [redacted], which instructed technicians on how to connect the already in-service circuits to a [redacted] from the WorldNet Internet service's fiber optical circuits to the [redacted] Room.

26. A true and correct copy of the "[redacted]" documents are attached hereto as Exhibits A and B. Exhibit A is the [redacted] document, and Exhibit B is the [redacted] document.

27. The light signals from the WorldNet Internet service's [redacted] into the [redacted] Room. The AT&T location code of the "[redacted]" is [redacted], which denotes the [redacted].

28. In the course of my employment, I reviewed a document entitled "[redacted]

[redacted]" dated [redacted] authored by [redacted]. A true and correct copy of this document is attached hereto as Exhibit C. This document described the connections from the [redacted] Room on the [redacted] floor to the [redacted] room on the [redacted] floor, and provided diagrams on [redacted].

29. The circuits that were listed in the [redacted] document dated [redacted] connect the WorldNet Internet network to national and international Internet networks of non-AT&T telecommunications companies.

30. [redacted].

31. Starting in February 2003, [redacted] contained the communications in transit to and from AT&T's [redacted] with the following Internet networks and Internet exchange points: [redacted].

32. MAE-West is an Internet nodal point and one of the largest "Internet exchange points" in the United States. PAIX, the Palo Alto Internet Exchange, is another significant Internet exchange point.

33. Internet exchange points are facilities at which large numbers of major Internet service providers interconnect their equipment in order to facilitate the exchange of communications among their respective networks.

34. Through the "[redacted]," the content of all of the electronic voice and data communications going across the [redacted] mentioned in paragraphs 29 to 31 was transferred from the [redacted] room's fiber optical circuits into the [redacted] Room.

35. The document "[redacted], listed the equipment installed in the [redacted] Room, including such equipment as [redacted]

[redacted]."

36. In the course of my employment, I was required to connect new circuits to the "[redacted]" and get them up and running. While working on a particularly difficult one with another AT&T technician, I learned that other such "[redacted]" were being installed in other cities, including [redacted].

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

DATED: March 28, 2006

Mark Klein

CERTIFICATE OF SERVICE

I hereby certify that on March __, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

REED R. KATHREIN

LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
100 Pine Street, 26th Floor
San Francisco, CA 94111
Telephone: 415/288-4545
415/288-4534 (fax)
E-mail: