telephone company is subject to close scrutiny by the courts to ensure that the subscriber is not subjected to an unreasonable and overbroad investigation." *Goldstein*, 532 F.2d at 1311. Subscribers of AT&T's WorldNet Internet service are entitled to the same protection.

**3. Defendants' Warrantless Surveillance Violates the Fourth Amendment**

While Title III provides the simplest route to a preliminary injunction here, and while this Court need not reach the constitutional issue because plaintiffs have demonstrated serious questions about whether Title III has been violated, AT&T's assistance to the Program also violates the Fourth Amendment, and does so even if Title III is satisfied.

The government has stated that surveillance under the Program is conducted without any judicial authorization, and that NSA shift supervisors decide whom to surveil. RJN at ¶¶4-9. Plaintiffs' evidence shows that AT&T is sweeping enormous amounts of private communications into the [redacted] Room in [redacted] (and likely elsewhere) on behalf of the government. Surveillance under the Program thus occurs without any, much less prior, judicial authorization and lacks particularity, completely flouting basic Fourth Amendment principles and law. In short, the Program's suspicionless dragnet surveillance of communications is the 21st-century version of the long-vilified general searches that the Fourth Amendment was intended to eradicate. *See Berger*, 388 U.S. at 56-60.

**a. By Assisting the Program, Defendants Are Acting as Agents of the Government**

Because AT&T is acting as the agent of the government here, its actions violate the Fourth Amendment. Where a private party such as AT&T "acts as an 'instrument or agent' of the state in effecting a search or seizure, fourth amendment interests are implicated." *United States. v. Walther*, 652 F.2d 788, 792 (9th Cir. 1981) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 487 (1971)). The two critical factors in determining whether the defendants were acting as the "instrument[s] or agent[s]" of the government are: (1) whether the government knew of and acquiesced in the intrusive conduct; and (2) whether the party performing the search intended to assist law enforcement efforts instead of furthering his own ends. *United States v. Miller*, 688 F.2d 652, 657 (9th Cir. 1982). Both of these factors are met here.



Dockets.Justia.com

On these facts, there can be no serious doubt that the government knew of and acquiesced in defendants' design and implementation of the Surveillance Configuration to capture millions of private communications traversing AT&T's backbone network. First, NSA agents personally interviewed and cleared two of defendants' technicians to install equipment in the [redacted], and AT&T controlled access to the room in an effort to prevent ordinary AT&T technicians from entering. *See* Klein Decl., ¶¶10, 14, 16-18.

Second, the available facts indicate not only that the government is highly likely to have access to the communications captured by the Surveillance Configuration, Marcus Decl., ¶¶39, 88-89 but that it is highly unlikely that defendants had any independent reason to implement the Surveillance Configuration. *See* Marcus Decl. ¶¶128-39.

Third, media reports independently indicate that AT&T is among the major U.S. telecommunications companies assisting with the Program. Cohn Decl., Exs. A & B (Leslie Cauley and John Diamond, *Telecoms Let NSA Spy on Calls*, USA Today (Feb. 6, 2006) and Dionne Searcey, Shawn Young and Amol Sharma, *Wiretapping Flap Puts Phone Firms Under Fire*, Wall St. J., Feb. 7, 2006, at B3).

Finally, by building a special room, routing communications into it and assisting in specially clearing their technicians to install equipment into the room, the level of involvement between AT&T and the government here is far more extensive than in the ordinary case where a telephone company or telecommunications carrier merely carries out surveillance authorized by a court. *Compare, e.g., Goldstein*, 532 F.2d at 1311 n.6 (telephone company not state actor) ("This is not a case in which the FBI, by secretly (or even unintentionally but effectively) deputizing the telephone company and its investigator, attempted to avoid the restrictions against wiretapping." (citation and internal quotation marks omitted)).

#### b. Plaintiffs Have a Reasonable Expectation of Privacy in Their Internet Communications

After *Katz*, the Fourth Amendment "now shields private speech from unreasonable surveillance." *Keith*, 407 U.S. at 313 ("the broad and unsuspected governmental incursions into conversational privacy which electronic surveillance entails necessitate the application of Fourth

Amendment safeguards." (footnote omitted)). "[T]he Fourth Amendment protects people, not places." *Katz*, 389 U.S. at 351.

Because Title III provides statutory protection for privacy of electronic communications, few courts have had occasion to apply Fourth Amendment standards to Internet transmissions like e-mail. In *United States v. Maxwell*, 45 M.J. 406 (C.A.A.F. 1996), however, the Court of Appeals for the Armed Forces found that "the transmitter of an e-mail message enjoys a reasonable expectation that police officials will not intercept the transmission without probable cause and a search warrant." *Id.* at 418. While the sender bears the risk that "an employee of the company will read e-mail against company policy . . . this is not the same as the police commanding an individual to intercept the message." *Id.*

Importantly, *Katz* did not frame the protections of the Fourth Amendment strictly in terms of privacy, but also in terms of speech. It recognized that "one is surely entitled to assume that the words he utters into the mouthpiece will not be broadcast to the world. To read the Constitution more narrowly is to ignore the vital role that the public telephone has come to play in private communication." *Katz*, 389 U.S. at 352; *cf. Stanford v. Texas*, 379 U.S. 476, 485 (1965) (Fourth Amendment requirements apply with "most scrupulous exactitude" when speech at issue); *Ex parte Jackson*, 96 U.S. 727, 733 (1878) (Fourth Amendment protects letters from search and bars government from conditioning use of postal service on assent to search).

Today, millions of people send and receive e-mail with their friends and loved ones and use the Internet to manage their private financial transactions and learn about political, religious, cultural and health issues. Plaintiffs are AT&T customers who use its electronic communications services to take advantage of this global marketplace of ideas – to read and learn, and to speak to and associate with others. For example, plaintiff Jewel uses defendants' services to send and receive private correspondence about personal matters, including banking, medical, and family matters. Jewel Decl., ¶5. She also uses her AT&T WorldNet service to correspond with individuals in foreign countries, including England, Germany, and Indonesia. *Id.*, ¶4. She reasonably expected and expects these communications to be private. *Id.*, ¶7. She and the AT&T WorldNet customers she represents are surely entitled to assume that the words they type on a computer keyboard and send

over the Internet will only be read by their correspondents, not broadcast to the world or delivered to government agents, just as they expect privacy in the words they speak into a telephone mouthpiece. To read the Constitution to exclude these communications from Fourth Amendment protections is to deny the vital role that the Internet plays in private communication today.

#### c. Plaintiffs Are Harmed by Defendants' Participation in the Program

AT&T's participation in the Program clearly violates plaintiffs' reasonable expectation of privacy in their communications. As an agent of the government, AT&T's wholesale copying of vast amounts of communications carried by its WorldNet Internet service through the Surveillance Configuration is itself a search and seizure of those communications subject to the Fourth Amendment's strictures. *Berger*, 388 U.S. at 51 (holding that "'conversation' [i]s within the Fourth Amendment's protections, and . . . the use of electronic devices to capture it [i]s a 'search' within the meaning of the Amendment"); *id.* at 59 (unconstitutional state eavesdropping statute authorized "roving commission to 'seize' any and all conversations").

It should also be clear that the Program, putatively grounded in the government's zeal to protect national security, places speech in great jeopardy. "The Bill of Rights was fashioned against the background of knowledge that unrestricted power of search and seizure could also be an instrument for stifling liberty of expression. For the serious hazard of suppression of innocent expression inhered in the discretion confided in the officers authorized to exercise the power." *Marcus*, 367 U.S. at 729.

Thus, the Fourth Amendment harm here includes not only the actual search and seizure of communications, but also the chilling effect on speech from plaintiffs' fear of unauthorized surveillance. "It is characteristic of the freedoms of expression in general that they are vulnerable to gravely damaging yet barely visible encroachments." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66 (1963). The danger of unauthorized official surveillance parallels the danger of official censorship, which lies "not merely in the sporadic abuse of power by the censor but the pervasive threat inherent in its very existence." *Thornhill v. Alabama*, 310 U.S. 88, 97 (1940).

For example, plaintiff Jewel is currently deterred in her use of defendants' services precisely because of this fear. Until the Program was revealed, she expected that her use of defendants' services was private and that her communications would not be revealed to the government absent appropriate legal process. Jewel Decl., ¶7. Now, she is wary of how she uses the Internet. As an author, she researches subjects she intends to write about, but she now will not use the Internet to research weapons, arms, and military and paramilitary operations for action novels and futuristic romance novels. *Id.*, ¶8. Recently, after receiving e-mail from a Muslim correspondent in Indonesia, she chose not to respond openly to religious questions about Islam or political questions about U.S. foreign policy. *Id.*, ¶8. Her self-censorship is a perfect example of how "fear of unauthorized official eavesdropping" may "deter vigorous citizen dissent and discussion of Government action in private conversation." *Keith*, 407 U.S. at 314.

#### d. The Fourth Amendment Prohibits Dragnet, Suspicionless Searches of the Type Present Here

The Fourth Amendment was specifically adopted to prohibit invasions of privacy by indiscriminate, suspicionless searches of the kind that the English Crown had practiced through its infamous use of "general warrants" and "writs of assistance." "It is familiar history that indiscriminate searches and seizures conducted under the authority of 'general warrants' were the immediate evils that motivated the framing and adoption of the Fourth Amendment." *Payton v. New York*, 445 U.S. 573, 583 (1980). "These warrants . . . often gave the most general discretionary authority." *Marcus*, 367 U.S. at 726. "An even broader form of general warrant was the writ of assistance, which met such vigorous opposition in the American Colonies prior to the Revolution." *Id.* at 729 n.22.

"The central objectionable feature of both warrants was that they provided no judicial check on the determination of the executing officials that the evidence available justified an intrusion into any particular home." *Steagald v. United States*, 451 U.S. 204, 220 (1981). "Moreover, in addition to authorizing search without limit of place, they had no fixed duration. In effect, complete discretion was given to the executing officials; in the words of James Otis, their use placed 'the liberty of every man in the hands of every petty officer.'" *Marcus*, 367 U.S. at 729 n.22.

The Supreme Court has recognized that "[i]t was in the context of . . . general warrants that the battle for individual liberty and privacy was finally won – in the landmark cases of *Wilkes v. Wood* and *Entick v. Carrington*." *Stanford*, 379 U.S. at 483. In *Entick*:

> [Lord] Camden expressly dismissed the contention that such a warrant could be justified on the grounds that it was "necessary for the ends of government to lodge such a power with a state officer. . . ." He declared that these warrants . . . amounted to a "discretionary power given to [Crown officers] to search wherever their suspicions may chance to fall. If such a power is truly invested in a secretary of state, and he can delegate this power, it certainly may affect the person and property of every man in this kingdom, and is totally subversive of the liberty of the subject."

*Marcus*, 367 U.S. at 728-29.

On these foundations, the Fourth Amendment erected an absolute prohibition to general searches of the private writings and communications of an individual. Thus, it is long and well settled that the Fourth Amendment absolutely prohibits indiscriminate, general searches:

> General warrants, of course, are prohibited by the Fourth Amendment. "[T]he problem [posed by the general warrant] is not that of intrusion per se, but of a general, exploratory rummaging in a person's belongings. . . . [The Fourth Amendment addresses the problem] by requiring a "'particular description' of the things to be seized." This requirement "'makes general searches . . . impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.'"

*Andresen v. Maryland*, 427 U.S. 463, 482 (1976) (citations omitted) (alterations in original). The surveillance described here, an automated "rummaging" through the millions of private communications passing over AT&T's fiber optic network at the discretion of NSA staff, is wholly inconsistent with the Fourth Amendment's clear prohibitions.

#### e. The Program's Sweeping Dragnet Surveillance Cannot Be Reconciled with the Fourth Amendment

The Fourth Amendment's "basic purpose . . . is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Camara v. Municipal Court*, 387 U.S. 523, 528 (1967). The crucial Fourth Amendment protection against such arbitrariness is prior judicial authorization, based on probable cause, and specifying the scope of the search with particularity. In *Katz*, the Supreme Court explained that "bypassing a neutral determination of the scope of a search leaves individuals secure from Fourth Amendment violations only in the discretion of the police." *Katz*, 389 U.S. at 358-59 (internal quotation and citation omitted); *Keith*, 407 U.S. at

318 (“post-surveillance review would never reach the surveillances which failed to result in prosecutions. Prior review by a neutral and detached magistrate is the time-tested means of effectuating Fourth Amendment rights”) (citation omitted).

Accordingly, the government’s admission that no judicial authorization has been or will be sought for surveillance under the Program, RJN, ¶¶5-7, is sufficient to render AT&T’s assistance in searching and seizing plaintiffs’ communications unconstitutional.

In addition to lacking prior judicial authorization, the sweeping, dragnet surveillance at issue here is wholly bereft of the particularity and reliability required by the Fourth Amendment. In *Berger*, the Supreme Court condemned the state eavesdropping statute at issue, even though it required prior judicial approval, precisely because it authorized “indiscriminate use of electronic devices” and “actually permits general searches by electronic devices.” 388 U.S. at 58. “The need for particularity and evidence of reliability in the showing required when judicial authorization of a search is sought is especially great in the case of eavesdropping,” which “[b]y its very nature . . . involves an intrusion on privacy that is broad in scope.” *Id.* at 56, 57 (heightened scrutiny triggered when surveillance is undertaken as “a series or a continuous surveillance” rather than as “one limited intrusion.”).

Here, the dragnet of the Surveillance Configuration captures countless communications without a sliver of particularity, much less evidence of reliability. When communications are captured wholesale in order to sift out possibly suspicious communications, the search is not particularized with respect to any person or communication surveilled and no showing of reliability has been or can be made.

The surveillance of plaintiffs’ communications here is the kind of indiscriminate, suspicionless search condemned throughout the history of the Fourth Amendment. But it is also far worse. General searches in the physical world are visible; the general searches under the Program are invisible to the public and the judiciary. General searches aimed at uncovering crime will ultimately be brought to trial, where defendants can challenge the admissibility of evidence; the general searches under the Program are aimed at further covert surveillance that may never see the light of day, much less a courtroom. We only know about warrantless surveillance when the

government decides to tell us about it, and only as much as it decides to tell us. All of the problems of unaccountable arbitrariness posed by general searches in the physical world are magnified with electronic surveillance of the kind that is occurring here.

### C. The Balance of Hardships Tilts Sharply in Favor of Plaintiffs

The balance of hardships tilts decidedly toward the plaintiffs here because plaintiffs face irreparable harm to their constitutional and statutory privacy rights from ongoing dragnet surveillance, and AT&T faces no harm from restoring privacy to its customers. This determination reduces the showing that plaintiffs must make on the merits in order to obtain a preliminary injunction, meaning that plaintiffs need only demonstrate that "serious questions" exist, a test easily met here. "The critical element in determining the test to be applied is the relative hardship to the parties. If the balance of harm tips decidedly toward the plaintiff, then the plaintiff need not show as robust a likelihood of success on the merits as when the balance tips less decidedly." *Benda v. Grand Lodge of the Int'l Ass'n of Machinists*, 584 F.2d 308, 315 (9th Cir. 1978), *cert. denied*, 441 U.S. 937 (1979).

#### 1. The Plaintiffs Face Irreparable Harm

##### a. Plaintiffs Face Irreparable Harm to Their Constitutional Rights

AT&T, acting on behalf of the government, has intercepted plaintiffs' private communications and searched or enabled the government to search their contents, with neither judicial oversight nor prior judicial scrutiny. As demonstrated above, AT&T's warrantless interceptions of private communications on behalf of the government violate the Fourth Amendment. Indeed, the very purpose of the Fourth Amendment is to prevent unreasonable governmental intrusions into one's privacy. The harm to the individual's privacy "is fully accomplished by the original search without probable cause." *United States v. Calandra*, 414 U.S. 338, 354 (1974). The Fourth Amendment harm of unreasonably intercepting conversations, particularly in the interest of national security, comes at the price of "a dread of subjection to an unchecked surveillance power." *Keith*, 407 U.S. at 313-14.

The Ninth Circuit has repeatedly held that where a constitutional violation is part of a "pattern or policy," the irreparable harm prong of the injunctive relief analysis has been satisfied. *Gomez v. Vernon*, 255 F.3d 1228, 1129-30 (9th Cir. 2001) (injunctive relief necessary in light of past pattern of unconstitutional retaliation); *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1500-1501 (9th Cir. 1996) (government misconduct that "flowed from a policy or plan" justified injunctive relief); *Int'l Molders' and Allied Workers' Local Union No. 164 v. Nelson*, 799 F.2d 547, 551 (9th Cir. 1986) (injunctive relief proper where district court found an "evident systematic policy and practice of fourth amendment violations"); *Conner v. City of Santa Ana*, 897 F.2d 1487, 1493-94 (9th Cir. 1990) (government's prior warrantless entry into private yard justified injunctive relief).

Here, the government has repeatedly stated that it will continue its surveillance program unchanged. RJN, ¶3. A governmental policy or plan that violates the Fourth Amendment and that the government has declared it intends to continue makes substantial and immediate irreparable injury not just a likelihood, but a certainty. As the government's agent in carrying out this policy, AT&T must be enjoined from assisting in its implementation.

**b. Irreparable Harm Is Presumed Because AT&T Is Violating Title III**

Irreparable harm is presumed for violation of statutes, like Title III, that provide for injunctions. *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001); *Smallwood v. Nat'l Can Co.*, 583 F.2d 419, 420 (9th Cir. 1978) (for Title VII claim, holding that where an "injunction [is] issued in response to a statutory provision . . . irreparable harm is presumed from the fact of the violation of the Act"); *Burlington N. R.R. Co. v. Dep't of Revenue*, 934 F.2d 1064, 1074 (9th Cir. 1991) ("When the evidence shows that the defendants are engaged in, or about to be engaged in, the act or practices prohibited by a statute which provides for injunctive relief to prevent such violations, irreparable harm to the plaintiffs need not be shown.").

Pursuant to Title III, this Court is specifically authorized to provide "such preliminary and other equitable or declaratory relief as may be appropriate." 18 U.S.C. §2520. Injunctive relief is necessary because "invasion of privacy, like injury to reputation, inflicts damage which is both difficult to quantify and impossible to compensate fully with money damages." *Williams v. Poulos*,

801 F. Supp. 867, 874 (D. Me. 1992). Accordingly, irreparable injury is presumed upon plaintiffs' showing, set forth above, that AT&T has violated Title III.

### 2. AT&T Faces No Harm from a Preliminary Injunction

As discussed above, the plaintiffs face significant and irreparable harm from the continuation of the warrantless eavesdropping program. At the same time, there is little if any hardship to AT&T from an injunction requiring it to stop its illegal diversion of Internet traffic to the NSA. Such an injunction would not cause it to incur any direct expenses, nor would it prevent AT&T from providing any services to its customers. "Enforced inaction" generally does not create a threat of harm to be considered in the preliminary injunction context. *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1125 (9th Cir. 2002) (finding that enforced inaction would not threaten harm to the plaintiffs seeking the injunction). Accordingly, the balance of harm tilts sharply toward plaintiffs.

## D. A Preliminary Injunction Serves the Public's Interest

"[A]lthough Title III authorizes invasions of individual privacy under certain circumstances, the protection of privacy was an overriding congressional concern." *Gelbard v. United States*, 408 U.S. 41, 48 (1972); *see also Williams*, 801 F. Supp. at 874 ("There is [a] strong public interest in protecting the privacy and security of communications in a society so heavily dependent on information."). As the Supreme Court noted:

> The Senate committee report that accompanied Title III underscores the congressional policy: "Title III has as its dual purpose (1) protecting the privacy of wire and oral communications, and (2) delineating on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized. To assure the privacy of oral and wire communications, Title III prohibits all wiretapping and electronic surveillance by persons other than duly authorized law enforcement officers engaged in the investigation or prevention of specified types of serious crimes, and only after authorization of a court order obtained after a showing and finding of probable cause."

*Gelbard v. United States*, 408 U.S. at 48 (quoting S. Rep. No. 90-1097, at 66 (1968)). Accordingly, the public interest is best served by an injunction prohibiting AT&T's cooperation in any wiretapping and electronic surveillance without the authorization of a court order obtained after a showing and finding of probable cause.

To be clear, plaintiffs do not seek the cessation of AT&T's assistance with lawful surveillance conducted pursuant to the proper statutory requirements and judicial authorization. Rather, the injunctive relief sought would simply forbid the massive divulgence of the communications of millions of AT&T customers to the government, while allowing that appropriate targeted domestic eavesdropping be conducted with appropriate judicial oversight, in accordance with constitutional and statutory requirements.

The government has stated that its domestic eavesdropping program serves the interest of national security. *See*, *e.g.*, RJN, Attachment 1. It has long been recognized that, in national security cases, "the investigative duty of the executive may be stronger," but also that such cases involve "greater jeopardy to constitutionally protected speech." *Keith*, 407 U.S. at 313. The warrant requirements of the Fourth Amendment, and the specific provisions for warrants under FISA and Title III, provide a balance between the investigative duties of the executive and the need to protect the liberties of the public. As the Supreme Court has noted, "[t]he historical judgment, which the Fourth Amendment accepts, is that unreviewed executive discretion may yield too readily to pressures to obtain incriminating evidence and overlook potential invasions of privacy and protected speech." *Keith*, 407 U.S. at 317.

Where the government has probable cause to believe that the target of surveillance is an agent of a foreign power, AT&T can insist upon a warrant from the FISA court, and the government can provide it. The interest in national security may thus be served, without unnecessarily jeopardizing privacy or protected speech.

Accordingly, the proposed injunctive relief serves the public interests which led to Title III and FISA, as well as assuring the pubic that the courts will preserve and defend their constitutionally guaranteed freedoms of speech and association, and their right to be free from unreasonable searches and seizures. At the same time, our national security interests are preserved by the availability of legal surveillance under FISA and Title III.

## IV. AMOUNT OF BOND

Whether to require an injunction bond before issuing a preliminary injunction is within the sound discretion of this Court. Fed. R. Civ. Proc. 65(c); *Barahona-Gomez v. Reno*, 167 F.3d 1228,

1237 (9th Cir. 1999). As discussed above, the balance of hardships is overwhelmingly in favor of plaintiffs, who are facing harm to the fundamental rights guaranteed by the Constitution, while AT&T faces neither harm from stopping compliance with the illegal program, nor risk of monetary loss. Accordingly, a bond is unnecessary because there is "no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003).

## V. CONCLUSION

For the reasons stated above, plaintiffs respectfully request that this Court grant their motion for a preliminary injunction.

DATED: April 5, 2006

ELECTRONIC FRONTIER FOUNDATION
CINDY COHN
LEE TIEN
KURT OPSAHL
KEVIN S. BANKSTON
CORYNNE MCSHERRY
JAMES S. TYRE

/s/ CINDY COHN
CINDY COHN

454 Shotwell Street
San Francisco, CA 94110
Telephone: 415/436-9333
415/436-9993 (fax)

TRABER & VOORHEES
BERT VOORHEES
THERESA M. TRABER
128 North Fair Oaks Avenue, Suite 204
Pasadena, CA 91103
Telephone: 626/585-9611
626/577-7079 (fax)

LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
REED R. KATHREIN
JEFF D. FRIEDMAN
SHANA E. SCARLETT
MARIA V. MORRIS
100 Pine Street, Suite 2600
San Francisco, CA 94111
Telephone: 415/288-4545
415/288-4534 (fax)

LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
ERIC ALAN ISAACSON
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

LAW OFFICE OF RICHARD R. WIEBE
RICHARD R. WIEBE
425 California Street, Suite 2025
San Francisco, CA 94104
Telephone: 415/433-3200
415/433-6382 (fax)

Attorneys for Plaintiffs

<u>DECLARATION OF SERVICE BY HAND-DELIVERY</u>

I, the undersigned, declare:

1. That declarant is and was, at all times herein mentioned, a resident of the United States and employed in the City and County of San Francisco, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 100 Pine Street, Suite 2600, San Francisco, California 94111.

2. That on April 5, 2006, declarant served by Hand-Delivery the PLAINTIFFS' AMENDED NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION to the parties listed on the attached Service List.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 5th day of April, 2006, at San Francisco, California.

__________________________________

MARZENA PONIATOWSKA