Trone et al v. Peanut Corporation of America Doc. 264

communications traversing those cables into the [redacted] Room. Klein Decl., ¶¶ 19, 25-28. The "split" circuits contain domestic and international communications in transit to and from AT&T's [redacted] with the following internet networks and internet exchange points: [redacted]. Klein Decl., ¶¶ 29-34.

Based on his experience, and on his review and analysis of the Klein declaration and its exhibits, Plaintiffs' expert concludes that "**<u>all or substantially all</u>**" of AT&T's [redacted] traffic in San Francisco – communications between AT&T customers and non-AT&T customers – was copied into the [redacted] Room. Declaration of J. Scott Marcus in Support of Plaintiffs' Motion for Preliminary Injunction, dated March 29, 2006 ("Marcus Decl."), ¶ 104; *see id.*, ¶ 108 ("significant traffic to and from the plaintiffs (especially those in the San Francisco Bay Area)"). He also concludes the [redacted] Room acquires a substantial amount of domestic internet traffic. *Id.*, ¶¶ 109-113.

**The Capabilities Of The Equipment In The [redacted] Room**

The [redacted] Room contains at least one [redacted], which is designed to analyze large volumes of communications at high speed, and can be programmed to analyze the contents and traffic patterns of communications according to user-defined rules. *Id.*, ¶¶ 75, 78-85. The room also contains a [redacted]. *Id.*, ¶ 75 & n. 29. As Mr. Marcus explains, this equipment is powerful: "the [redacted] system is well suited to process huge volumes of data, including user content, in real time. It is thus well suited to the capture and analysis of large volumes of data for purposes of surveillance." *Id.*, ¶ 83; *see id.*, ¶ 75 ("surveillance is one of the system's primary functions").

**The [redacted] Backbone Network**

Mr. Marcus's assessment of the surveillance capability of the [redacted] Room is also based on the presence of a second backbone network. The [redacted] Room contains computer equipment and internet routers. Klein Decl, ¶ 35 ([redacted])). It is connected to an [redacted] backbone network, separate from AT&T's Common



Dockets.Justia.com

Backbone, apparently operating at very fast speeds. Marcus Decl., *Id.*, ¶¶ 76-77, 86-87; Klein Exh. C, pp. 6, 12, 42. Mr. Marcus explains it is highly likely that "while the [redacted] Room is connected to the [Common Backbone] (from which it receives communications), it is also connected to another network, and signals can be sent out of or into the [redacted] Room over the [redacted] backbone." *Id.*, ¶ 76; *id.* at 16 (Fig. 2).

AT&T, assisting the government, may send and receive data via the [redacted] backbone network to and from the equipment in the [redacted] Room. Marcus Decl., ¶¶ 76-77. This additional network would be unnecessary if AT&T were merely using the equipment in the [redacted] Room for ordinary business purposes, because such analytical results could, and logically would, be transmitted over the Common Backbone. *Id.*, ¶¶ 76-77, 86-89.

**AT&T's Other [redacted] Rooms**

The evidence indicates that AT&T implemented Surveillance Configurations in cities other than San Francisco. Klein Decl., ¶ 36 ([redacted]); Marcus Decl., ¶¶113-18. For instance, Exhibit A to the Klein Declaration refers to a site in [redacted]. *Id.*, ¶ 118. A fully deployed set of Surveillance Configurations would capture a substantial fraction – likely well over half – of AT&T's purely domestic traffic, representing substantially all of the AT&T traffic peered to and from other providers. This comprises about 10% of all purely domestic internet communications in the United States. Marcus Decl., ¶¶ 119-126.

**Warrantless Surveillance By The Government Using AT&T Facilities**

No one contests that, shortly after the 9/11 terrorist attacks, the President directed the NSA to conduct a covert program of warrantless surveillance of telephone and internet communications within the United States. Request for Judicial Notice, filed April 5, 2006 ("RJN") at ¶¶ 1, 2; *see also* Declaration of Cindy Cohn, filed April 5, 2006 ("Cohn Decl."), Exs. C and J. The NSA surveillance program, in which AT&T's conduct allegedly plays a part, operates without judicial authorization. RJN at ¶¶ 6-7. The only review process is authorization by an NSA "shift supervisor" to review or listen to particular individuals' communication. RJN at ¶ 9. As General Hayden, Principal Deputy Director for National Intelligence, put it, the

NSA's program "is a more ... 'aggressive' program than would be traditionally available under FISA," in part because "[t]he trigger is quicker and a bit softer than it is for a FISA warrant." RJN at ¶ 10.

Additionally, the Directors of National Intelligence and the NSA have publicly admitted that the NSA's surveillance program covers at least "one-end foreign" (and thus by implication one-end domestic) communications. Declaration of John D. Negroponte ("Negroponte Decl."), at 5; Declaration of Lieutenant General Keith B. Alexander ("Alexander Decl."), at 3. The government has never denied the existence of a broader program that intercepts or collects records regarding purely domestic communications. Plaintiffs have alleged and provided evidence of such a broader program, which has also been widely reported in the press.

Homeland Security Secretary Michael Chertoff confirmed that the government has employed "'data-mining' – collecting vast amounts of international communications data, running it through computers to spot key words and honing in on potential terrorists." Cohn Decl., Ex. G. The President similarly acknowledged the existence of the call detail collection program by saying that Congress had been briefed in response to a question about the reports that the NSA compiles data. *See* Markman Decl., Ex. 2. And Senate Majority Leader Frist acknowledged that he was briefed. Markman Decl., Ex. 3. Numerous media reports have discussed the data-mining and internet interception aspects of the surveillance. *See, e.g.,* Cohn Decl. Exs. A-F; Scarlett Decl., filed April 5, 2006, Ex. 1.

## ARGUMENT

### I. THE STATE SECRETS PRIVILEGE DOES NOT WARRANT DISMISSAL ABSENT EXTRAORDINARY CIRCUMSTANCES NOT PRESENT HERE

#### A. The State Secrets Privilege Does Not Provide The Basis For Dismissing This Case

The government urges outright dismissal of this case between private litigants at the pleadings stage based on an unconstitutional and extreme view of a narrow evidentiary privilege. Absent truly extraordinary circumstances not present here, Article III courts consider assertions of the state secrets privilege in the context of specific categories of evidence.

### 1. The State Secrets Privilege Does Not Confer Immunity

The common law state secrets privilege does not grant absolute immunity from suit to private litigants whenever the government asserts that prosecution of the suit will risk the disclosure of unnamed state secrets. Rather, "[t]he state secrets privilege is a common law evidentiary privilege that allows the government to deny discovery of military secrets." *Kasza v. Browner*, 133 F.3d 1159, 1165 (9th Cir. 1998) (emphasis added).[2]

Ninth Circuit precedent requires that if the Court does determine that the privilege applies to a particular piece of evidence, "[t]he plaintiff's case then goes forward based on evidence not covered by the privilege." *Id.* at 1166 (emphasis added). Only "[i]f, after further proceedings, the plaintiff cannot prove the *prima facie* elements of her claim with nonprivileged evidence" may the Court "dismiss her claim as it would with any plaintiff who cannot prove her case." *Id.* at 1166 (emphasis added). Here, the plaintiffs can prove their *prima facie* case based on a wealth of non-privileged evidence. *See* Section II, *infra.*

Plaintiffs have found no case in which dismissal was based on the mere possibility that state secrets might be sought in discovery. The existing law is to the contrary. For example, the D.C. Circuit rejected a similar attempt by the government to divorce the state secrets privilege from specific and ripe discovery disputes. *In re United States*, 872 F.2d 472, 477-79 (D.C. 1989). There, the plaintiff claimed injuries based on FBI intelligence activities. *Id.* at 473. Without answering, and divorced from the context of any discovery request, the government moved to dismiss based on the state secrets privilege. *Id.* at 473-74. As in this case, the

---

[2] *See also United States v. Reynolds*, 345 U.S. 1, 6-7 (1953) ("[T]he privilege against revealing military secrets ... is well established in the law of evidence"); *Monarch Assur. P.L.C. v. U.S.*, 244 F.3d 1356 (Fed. Cir. 2001) (using the term "common-law state secrets privilege"); *Zuckerbraun v. General Dynamics Corp.*, 935 F.2d 544, 546 (2d Cir. 1991) ("The state secrets privilege is a common law evidentiary rule"); *In re United States*, 872 F.2d 472, 474 (D.C. Cir. 1989) (same); *Bosaw v. Nat'l Treasury Employees Union*, 887 F. Supp. 1199, 1213 (S.D. Ind. 1995) ("[T]he government may invoke common law privileges, such as the deliberative process, investigative files, or state secrets privileges, which enable it to protect information from discovery"); *Black v. U.S.*, 900 F. Supp. 1129, 1133 (D. Minn. 1994).

government argued that "continuation of plaintiff's action will inevitably result in disclosure of information that will compromise current foreign intelligence and counterintelligence investigative activities." *Compare id.* at 478. (emphasis added) *with* Gov't Br. at 16 ("Further litigation would inevitably risk the disclosure of state secrets").

The D.C. Circuit rejected the government's premise. The court reiterated that "[t]he state secrets privilege is a common law evidentiary rule that protects information from discovery when disclosure would be inimical to the national security." *Id.* at 474. While "[o]nce successfully invoked, the effect of the privilege is completely to remove the evidence from the case," *id.* at 476, "[d]ismissal of a suit, and the consequent denial of a forum without giving the plaintiff her day in court ... is indeed draconian." *Id.* at 477. Holding that "broad application of the privilege to all of [the government's] information, before the relevancy of that information has even been determined, was inappropriate at this early stage of the proceedings," the D.C. Circuit refused to dismiss the case. *Id.* at 478.

"[T]he court is the final arbiter of the propriety" of invoking the privilege. *In re Under Seal*, 945 F.2d 1285, 1288 (4th Cir. 1991). It is empowered to determine whether illegal *ultra vires* actions prevent the government from invoking the state secrets privilege. *Black v. United States*, 62 F.3d 1115, 1119-20 (8th Cir. 1995) (assessing whether illegal actions barred the government from invoking privilege and concluding the conduct at issue was legal). Indeed, an Executive Order expressly bars the government from designating materials as classified in order to, *inter alia*, "conceal violations of law," or to "prevent embarrassment to a person, organization, or agency." Exec. Order No. 13292 (2003) (amending Exec. Order No. 12958) (attached as Markman Decl., Ex. 7).

Now, in the face of the unanimous recognition by the courts that "[t]he state secrets privilege is a common law evidentiary privilege," *Kasza*, 133 F.3d at 1165, the government attempts to cloak it in the garb of a constitutionally enshrined Executive power.[3] *See, e.g.*, Gov't

---

[3] The government rightly conceded at oral argument that the state secrets privilege is a common law evidentiary privilege. Markman Decl., Ex. 4 at 35:3-11. While the government argued that

Mem. at 8 (citing *United States v. Nixon*, 418 U.S. 683, 710 (1974)); Gov't Br. of May 24, 2006 at 12-13. The Court in *Nixon*, however, nowhere stated that the privilege is enshrined in the Constitution. Rather, the Court merely stated that in that case, the President "d[id] not place his claim of privilege on the ground they are military or diplomatic secrets. As to these areas of Art. II duties the courts have traditionally shown the utmost deference to Presidential responsibilities." 418 U.S. at 710. In *Reynolds*, which the government also invokes, the Court pointedly refused to enshrine the privilege in the Constitution, holding only that this position "ha[d] constitutional overtones which we find it unnecessary to pass upon, there being a narrower ground for decision." 345 U.S. at 6.

This common law privilege can be preempted by Act of Congress. *See* Section I.B.1, *infra.* It does not abrogate the Court's power and responsibility to provide a forum for cases and controversies. *See Reynolds*, 418 U.S. at 709-10 ("Judicial control over the evidence in a case cannot be abdicated to the caprice of executive officers"); *In re Grand Jury Subpoena Dated Aug. 9, 2000*, 218 F. Supp. 2d 544, 560 (S.D.N.Y. 2002) ("[T]he contours of the privilege for state secrets are narrow, and have been so defined in accord with uniquely American concerns for democracy, openness, and separation of powers"). And this common law privilege does not grant private litigants broad immunity from suit at the pleadings stage merely because the government claims that unwritten discovery requests might ultimately seek state secrets.

**2. The Exceptional Authority To Dismiss A Case Where Its Subject Matter Is A State Secret Does Not Exist Here**

This is not a case where early dismissal is required because "the 'very subject matter of the action' is a state secret." *Kasza*, 133 F.3d at 1166 (citing *Totten*, 92 U.S. 105 (1875) (2 Otto) at 107). The courts have only imposed the draconian sanction of dismissal on the grounds of the state secrets privilege in extraordinary circumstances, when "the <u>whole object</u> of the suit and of the discovery is to <u>establish a fact that is a state secret</u>." *Molerio v. FBI*, 749 F.2d 815, 821 (D.C.

---

this privilege is "constitutionally based," *id.*, Ex. 4 at 35:24-25, it is not a Constitutional right or power. Congress can amend, clarify, or modify it by statute.

Cir. 1984) (emphasis added). Here, AT&T's participation in the government's program is already well-established by record evidence that is not a state secret: *inter alia,* the testimony and documents of Mr. Klein proving that AT&T diverted its customers' communications to a secure room to which only those with NSA security clearances had access, and the expert testimony of Mr. Marcus concluding that this operation was only consistent with surveillance activities. *See* Statement of Facts, *supra.* The central issue in this case is simply whether these actions by AT&T, Inc. and AT&T Corp. – private defendants – violated well-defined statutory and Constitutional prohibitions against intercepting and disclosing customers' communications. This is without regard to how, why, when, or where the government might use those communications (or not) in its domestic spying program. Plaintiffs' case, therefore, is unlike the small handful of cases in which a court dismissed an action at the pleading stage.

For example, in *Totten*, the plaintiff alleged that he had contracted with President Lincoln himself to engage in secret spying activities during the Civil War. 92 U.S. at 105. The only issue in the case was whether or not "a contract for secret services" existed between him and the government. *Id.* at 107. The Court dismissed the lawsuit because "the existence of a contract of that kind" – that is, a secret contract for secret services – "is itself a fact not to be disclosed." *Id.* In contrast, this is not a case requiring the establishment of a contract for secret services. The Fourth Amendment, FISA, and similar laws are not secret; Plaintiffs' claims under them require only the establishment of AT&T's interception and disclosure of its customers' communications – facts already established by the record evidence. *See* Section II, *infra.*

This case is also unlike those lower court cases in which the consideration of otherwise garden-variety privacy disputes required probing into details regarding classified government weapons systems or intelligence programs. For example, this case is unlike *Sterling v. Tenet*, 416 F.3d 338 (4th Cir. 2005), in which a CIA agent sued under Title VII, alleging racial discrimination in the form of disparate treatment. *Id.* at 341. There, the plaintiff's claims would have required him to present evidence regarding "the relative job performance of [CIA] agents, details of how such performance is measured, and the organizational structure of CIA

intelligence gathering." *Id.* at 347. Here, Plaintiffs need not inquire into the details of the government's work to prove its case against AT&T.[4]

For the same reasons, this case is wholly different from *Zuckerbraun v. General Dynamics Corp.*, 935 F.2d 544 (2d Cir. 1991). There, the estate of a sailor killed when his ship was fired on by foreign aircraft sued defense contractors for negligence, claiming that the ship's weapons systems were negligently designed, manufactured, and tested. *Id.* at 546. The court dismissed the case because the subject matter of the suit – the alleged negligent design of weapons systems – required discovery of the specifications for the weapons and defense systems aboard the ship as well as the procedures governing their use. *Id.* All of these details were state secrets. *Id.* Further, the plaintiff "ha[d] not designated any sources of reliable evidence on the factual issues going to liability." *Id.* at 548. Here, Plaintiffs need not probe into such details regarding the government's program to make its case.

*Fitzgerald v. Penthouse*, 776 F.2d 1236 (4th Cir. 1985), was a libel suit for damages between two private parties. One party wanted to use in the litigation classified evidence to which it had no constitutional or statutory right of access to support its claim that the statements were true, and so not libelous. *Id.* at 1238. He attempted "to call expert witnesses with knowledge of relevant military secrets" to do so. *Id.* at 1243. Since "truth or falsity of a defamatory statement is the very heart of a libel action," *id.* at 1243 n.11, state secrets were central to the case. *Id.* at 1243. Here, Plaintiffs' claims are directed at AT&T's activities, not the government's program. Moreover, unlike here, in *Fitzgerald* there was no claim challenging the constitutionality of ongoing executive action or contending that the defendant had participated in a violation of the plaintiff's constitutional or statutory rights.

Finally, this case is also unlike a recent decision from the Eastern District of Virginia, cited by the government in its response to the Court's May 17 minute order, which dismissed a

---

[4] Unlike *Sterling v. Tenet, Edmonds v. United States DOJ*, 323 F. Supp. 2d 65, 69 (D.D.C. 2004), and *Tilden v. Tenet*, 140 F. Supp. 2d 623, 626 (E D. Va. 2000), which were all claims based on employment relationships with intelligence agencies.

lawsuit brought by a German citizen against the Director of the CIA. *El-Masri v. Tenet*, 2006 WL 1391390 at *1-3 (E.D. Va. May 12, 2006). In *El Masri*, the plaintiff alleged constitutional and statutory violations following his abduction by CIA operatives in an "extraordinary rendition" program. El Masri's claims required him to establish specific treatment to which he was subjected by the CIA in the course of an alleged clandestine intelligence operation. *Id.* at 5. According to the court, the whole object of the suit was not merely to establish the existence of the rendition program but to establish "the means and methods the foreign intelligence services of this and other countries used to carry out the program," requiring dismissal. *Id.* at 5.

In contrast, Plaintiffs' claims here do not require proof of the reasons or methods of interception, or what the government did with the communications and data once AT&T provided them. Nor do Plaintiffs' claims require discovery of the criteria the government employs to select targets for further review of a communication after AT&T has unlawfully intercepted or disclosed it. The only focus of Plaintiffs' claims is on AT&T's activities – the act of intercepting and disclosing customer information to the government. And Plaintiffs will prove these key facts on the basis of non-classified information. *See* Section II.B and C, *infra*.

It bears emphasis that the Supreme Court has never used the *Totten* bar to dismiss claims alleging an ongoing violation of an individual constitutional liberty like the Fourth Amendment. The rights at issue in the *Totten* and *Tenet* cases were rights that arose from an employment relationship created between the plaintiff and the executive, not substantive restrictions on executive action contained in the Constitution.[5] *Tenet* repeatedly makes clear the *Totten* rule is limited to claims arising out of a secret espionage relationship: "the longstanding rule, announced more than a century ago in *Totten*, prohibiting suits against the Government based on covert espionage agreements," *id.* at 3; "*Totten* precludes judicial review in cases such as

---

[5] Although the *Tenet* plaintiffs raised due process claims as well, these claims were entirely derivative of the alleged employment agreement and would not exist if there was no agreement, as the Supreme Court recognized. *Tenet*, 544 U.S. at 8. Plaintiffs' Fourth Amendment rights at issue here, by contrast, are substantive rights created by the Constitution, and do not arise out of an agreement with the government.

respondents' where success depends upon the existence of their secret espionage relationship with the Government," *id.* at 8; "*Totten's* broader holding that lawsuits premised on alleged espionage agreements are altogether forbidden," *id.* at 9; "*Totten's* core concern [is] . . . preventing the existence of the plaintiff's relationship with the Government from being revealed." *Id.* at 10.[6]

**B. Congress Has Limited The State Secrets Privilege In The Context Of Electronic Surveillance**

The government skirts two foundational truths: that the Constitution gives Congress the power to delimit the scope of the state secrets privilege, and that Congress has in fact exercised that power in the area of telecommunications surveillance through the FISA statute. In particular, Congress has crafted <u>private rights of action</u> to prevent unlawful electronic surveillance, as well as specific statutory provisions addressing how purported state secret information should be handled so as not to extinguish those explicit rights.

**1. Congress Has The Power To Limit The Government's Ability To Invoke The State Secrets Privilege**

While the government suggests that Congress cannot limit the common law state secrets privilege without violating the separation of powers, Gov't May 24, 2006 Br. at 13, that is manifestly not the case. *See Tenet v. Doe*, 544 U.S. 1, 11 (2005) (Stevens, J., concurring) ("Congress can modify the federal common-law rule announced in *Totten*"). In the *Kasza* decision, relied upon for much of the government's argument, the Ninth Circuit considered whether the Resource Conservation and Recovery Act of 1976 (RCRA), 42 U.S.C. § 6001, preempts the common law state secrets privilege. *Kasza*, 133 F.3d at 1167. Far from determining that Congress cannot limit the state secrets privilege, the Court engaged in a searching analysis of the statutory scheme of the RCRA to assess its implications for the state

---

[6] Similarly, as noted above, the lower court cases the government relies on did not concern constitutional challenges.

secrets privilege. Ultimately, the Court held that the environmental statute did not speak to the common law state secrets privilege.

Ignoring authority that includes Congress' War Powers under Article 1, Section 8 of the Constitution, the government envisions a regime of executive power in which Congress ostensibly has no role in legislating in areas of national security. The authorities cited by the government are inapposite. Both *Dep't of the Navy v. Egan*, 484 U.S. 518 (1988), and *Dorfmont v. Brown*, 913 F.2d 1399 (9th Cir. 1990), discuss the discretion to approve security clearances, which is not governed by statute (and is not solely within the authority of the executive). *See Egan*, 484 U.S. at 530 (basing its holding on the absence of a pertinent statute: "unless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs"). Neither case considered the statutes at issue here – 50 U.S.C. §§ 1806(f), 1825(g), 1845(f), or 18 U.S.C. § 2511(2)(a)(ii)(B). As explained below, these Acts of Congress speak directly to, and curtail, the applicability of the state secrets privilege.

### 2. Congress Has Directly Spoken To The Application Of The State Secrets Privilege In Electronic Surveillance Cases

In the area of electronic surveillance, Congress has narrowed the common law state secrets privilege by a statute that "speaks directly to the question otherwise answered by federal common law." *Kasza*, 133 F.3d at 1167 (quoting *County of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 236-37 (1985) (quoting *City of Milwaukee v. Ill.*, 451 U.S. 304, 315 (1981))) (quotation marks and brackets omitted). In particular, Congress created FISA as the "exclusive means by which electronic surveillance ... may be conducted." 18 U.S.C. 2511(2)(f) (emphasis added).

In the context of FISA and other statutes, Congress created private rights of action against telephone companies (and others) conducting illegal electronic surveillance, directing the Court to use a particular procedure to carefully determine the applicability of the state secrets privilege, and empowering the Court to take appropriate "safeguards" to protect national security

during the Court's oversight of the adversary process. The government's view of the state secrets privilege amounts to a *de facto* elimination of those statutory rights.

**a. Congress created private rights of action to enforce strict rules governing electronic surveillance**

Under FISA, a federal officer acting on behalf of the President, through the Attorney General, may obtain a court order "approving electronic surveillance of a foreign power or an agent of a foreign power for the purpose of obtaining foreign intelligence information." 50 U.S.C. § 1802(b). In adopting FISA, Congress provided:

> the procedures in this chapter or chapter 121 or 206 of this title [18 USCS §§ 2510 et seq., or 2701 et seq., or 3121 et seq.] and the Foreign Intelligence Surveillance Act of 1978 [50 USCS §§ 1801 et seq.] shall be the <u>exclusive means</u> by which electronic surveillance, as defined in section 101 of such Act [50 USCS § 1801], and the interception of domestic wire, oral, and electronic communications may be conducted.

18 U.S.C. § 2511(2)(f) (emphasis added). Otherwise stated, Congress adopted FISA "to curb the practice by which the executive branch may conduct warrantless electronic surveillance on its own unilateral determination that national security justifies it." S. Rep. No. 95-604(I), at 8, 1978 U.S.C.C.A.N. at 3910.

As part of this statutory regime, Congress has unquestionably created rights and authorized the United States District Courts to try them. Congress specifically created several private rights of action for illegal electronic surveillance:

- "An aggrieved person, other than a foreign power or an agent of a foreign power ... who has been subjected to an electronic surveillance or about whom information obtained by electronic surveillance of such person has been disclosed or used in violation of section 1809 [50 USCS § 1809] of this title shall have a cause of action against any person who committed such violation...." 50 U.S.C. § 1810.

- "Except as provided in section 2511(2)(a)(ii) [18 USCS § 2511(2)(a)(ii)], any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter [18 USCS §§ 2510 et seq.] may in a civil action recover from the person or entity, other than the United States, which engaged in that violation such relief as may be appropriate." 18 U.S.C. § 2520(a) (Section 2511(2)(a)(ii) allows the disclosure of information in response to court order or FISA certification).

- “Except as provided in section 2703(e) [18 USCS § 2703(e)], any provider of electronic communication service, subscriber, or other person aggrieved by any violation of this chapter [18 USCS §§ 2701 et seq.] in which the conduct constituting the violation is engaged in with a knowing or intentional state of mind may, in a civil action, recover from the person or entity, other than the United States, which engaged in that violation such relief as may be appropriate.” 18 U.S.C. § 2707(a) (Section 2703(e) allows the disclosure of information in response to a warrant or governmental subpoena).

- “Any person aggrieved by any [unauthorized publication or use of communications] may bring a civil action in a United States district court or in any other court of competent jurisdiction.” 47 U.S.C. § 605(e)(3)(A).

Congress knew when it adopted these private causes of action that, by their very nature, the trial of cases involving secret electronic surveillance will involve matters within the scope of the common law state secrets privilege. Nevertheless, Congress created them – demonstrating that Congress intended the Courts to hear such cases. As the Second Circuit observed in a state secrets case against the government involving a patent with military application that was withheld under a secrecy order:

> Unless Congress has created rights which are completely illusory, existing only at the mercy of government officials, the act [providing a private cause of action] must be viewed as waiving the privilege. Of course, any such waiver is dependent upon the availability and adequacy of other methods of protecting the overriding interest of national security during the course of a trial.

*Halpern v. U.S.*, 258 F.2d 36, 43 (2d Cir. 1958) (emphasis added).

Congress adopted FISA one hundred and three years after the Supreme Court first recognized the state secrets privilege in *Totten*, 92 U.S. at 107, and twenty-four years after the *Reynolds* decision relied on by the government. *See* FISA, P.L. 95-511, Title I, § 106, 92 Stat. 1793 (Oct. 25, 1978). It cannot be said to have been unaware of the state secrets privilege when creating these private rights. By the same token, the government cannot use the common law state secrets privilege to squelch Congressionally mandated rights regarding violations of the electronic surveillance statutes.

### b. Congress provided for disclosure of the existence of electronic surveillance through "legal process"

Section 2511(2)(a)(ii) directly addresses disclosures regarding the existence of electronic surveillance or the devices used in such activity. The provision requires:

> No provider of wire or electronic communication service, officer, employee, or agent thereof, or landlord, custodian, or other specified person shall disclose the existence of any interception or surveillance or the device used to accomplish the interception or surveillance with respect to which the person has been furnished a court order or certification under this chapter, ***except as may otherwise be required by legal process*** and then only after prior notification to the Attorney General or to the principal prosecuting attorney of a State or any political subdivision of a State, as may be appropriate.

18 U.S.C. § 2511(2)(a)(ii) (emphasis added).

In this subsection, Congress signaled that information regarding the existence of surveillance, and the means used to implement it, should be confidential. Congress, however, also recognized that such disclosures could be required by "legal process".

The government and AT&T contend that the term "legal process" empowers the Executive to invoke the state secrets privilege to prevent any disclosure. But that interpretation of "legal process" is so broad it eviscerates the disclosure that Section 2511(2)(a)(ii) authorizes. Gov't May 24, 2006 Br. at 17 n.10; AT&T May 24, 2006 Br. at 17-18. Rather, the statute's reference to disclosure subject to "legal process" effectuates the Congressional purpose of establishing private causes of action to enforce FISA rights. Without that provision, the unchecked proclivity of the executive to bar all information regarding the invasion of such rights could render such a private claim a nullity. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) ("[I]n construing a statute we are obliged to give effect, if possible, to every word Congress used"). Whatever disclosure subject to "legal process" may mean, it cannot mean that, on the whim of an official (even a high placed one), there be no disclosure and therefore no rights of action.

The more logical and Constitutionally consistent construction derives from reading this provision against the backdrop of ordinary discovery procedures, subject to safeguards available to the Court in the form of protective orders providing for limited access to sensitive information.

That interpretation balances the two concerns that Congress was directly addressing in the statute: the need to make sure that security was protected, and the need to make sure that the rights created by FISA were not eliminated though excessive deference to the executive.

**c. Congress provided for discovery of classified materials pertinent to the legality of the surveillance in 50 U.S.C. §§ 1806(f) and 1845(f)**

Congress has also enacted provisions governing disclosures where the state secrets privilege is applicable and even where the government believes the disclosure would harm national security. 50 U.S.C.§ 1806(f). The law provides:

> Whenever any motion or request is made by an aggrieved person ... to discover or obtain applications or orders or other materials relating to electronic surveillance ... the United States district court ... shall, notwithstanding any other law, if the Attorney General files an affidavit under oath that disclosure or an adversary hearing would harm the national security of the United States, review in camera and *ex parte* the application, order, and such other materials relating to the surveillance as may be necessary to determine whether the surveillance of the aggrieved person was lawfully authorized and conducted. In making this determination, the court may disclose to the aggrieved person, under appropriate security procedures and protective orders, portions of the application, order, or other materials relating to the surveillance only where such disclosure is necessary to make an accurate determination of the legality of the surveillance.

*Id.* (emphasis added).

Through this provision, Congress enacted a FISA discovery procedure that is to be followed "notwithstanding any other law" – which necessarily includes the common law state secrets privilege. The Conference Report for FISA noted that "the conferees also agree that the standard for disclosure in the Senate bill adequately protects the rights of the aggrieved person, and that the provision for security measures and protective orders ensures adequate protection of national security interests." H.R. Conf. Rep. No. 95-1720, 1978 U.S.C.C.A.N. 4048, 4061 (Oct. 5, 1978); *see also* S. Rep. No. 95-701, 1978 U.S.C.C.A.N. 3973, 4032-33 (Mar. 14, 1978) (calling Section 1806(f) "a reasonable balance between an entirely in camera proceeding ... and mandatory disclosure, which might occasionally result in the wholesale revelation of sensitive foreign intelligence information.").

Further demonstrating its intent, Congress passed two laws adding provisions parallel to Section 1806(f) governing the use of pen registers and trap-and-trace devices, Intelligence Authorization Act for 1999, Pub. L. 95-511, Title IV, § 405, as added Pub. L. 105-272, Title VI, § 601(2), 112 Stat. 2408 (Oct. 20, 1998) (codified at 50 U.S.C. § 1845(f)), and physical searches. Intelligence Authorization Act For Fiscal Year 1995, Pub. L. 95-511, Title III, § 305, as added Pub. L. 103-359, Title VIII, § 807(a)(3), 108 Stat. 3449; (Oct. 26, 2001) (codified at 50 U.S.C. § 1825(g)). These provisions demonstrate Congress' specific intent that the government not be permitted merely to declare surveillance to be a "state secret" and thereby eliminate the possibility of judicial review.

As recently as October 2001, Congress reaffirmed its decision to provide for discovery regarding electronic surveillance notwithstanding the state secrets privilege. Even after the September 11 attacks, Congress maintained a private right of action against the United States for violations of one of the same electronic surveillance statutes under which Plaintiffs have sued AT&T here. *See* 18 U.S.C. § 2712(a). As part of the congressionally mandated process for litigating such claims against the United States, Congress directed, "[n]otwithstanding any other provision of law," that the procedures set forth in Section 1806(f), 1825(g), and 1845(f) are the "exclusive means by which certain materials may be reviewed." 18 U.S.C. § 2712(b)(4).

Where the alleged secret in some way implicates the legality of the surveillance, the Court is empowered to direct disclosure of the classified material – subject to appropriate safeguards. Any other result would indeed render the statute's private rights of action "completely illusory, existing only at the mercy of government officials." *Halpern,* 258 F.2d at 43. FISA reduced any Presidential authority in this area to its "lowest ebb." H.R. Conf. Rep. 95-1720 (1978) at 35, reprinted in 1978 U.S.C.C.A.N. 4048, 4064 (quoting *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 635 (1952) (Jackson, J., concurring)).

### d. The government cannot manufacture immunity from the statutory disclosure requirements by disregarding FISA altogether

In the face of FISA's unambiguous language, the government and AT&T assert – without the support of statutory text or any interpretative authority – that Section 1806(f) cannot apply unless the government has used FISA to authorize the electronic surveillance. June 6, 2006 Order at 6:15-21 (quoting Gov't May 24, 2006 Br. at 11; AT&T May 24, 2006 Br. at 10). Otherwise stated, they argue that electronic surveillance conducted outside FISA is not subject to Section 1806(f). But the government's (and AT&T's) argument runs afoul of the express statutory language that FISA constitutes the "exclusive means by which electronic surveillance ... may be conducted." The government and AT&T did not have the choice simply to ignore FISA and the legal safeguards established by Congress, nor are actions taken in violation of FISA to be treated as "outside the statute."[7]

The plain language demonstrates that the discovery authorized by Section 1806(f) applies beyond FISA surveillance. Specifically, Section 1806(f) broadly applies "whenever any motion or request is made … [1] to discover or obtain applications or orders or other materials relating to electronic surveillance or [2] to discover, obtain, or suppress evidence or information obtained or derived from electronic surveillance under this Act...." 50 U.S.C.§ 1806(f)(emphasis added). The limitation "under this Act" only applies to the last antecedent "electronic surveillance." *See Anhydrides & Chemicals, Inc. v. United States*, 130 F.3d 1481, 1483 (Fed. Cir. 1997) ("Referential and qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent, which consists of the last word, phrase, or clause that can be made an antecedent without impairing the meaning of the sentence"). Thus, Congress adopted two clauses, one for "electronic surveillance" and the other for "electronic surveillance under this Act." This plain language interpretation is consistent with the reason Congress enacted Section

---

[7] The government also has taken the position that Plaintiffs must first prove that they are "aggrieved persons" before they can have access to the secret materials under Section 1806(f). Gov't May 24, 2006 Br. at 11. Plaintiffs have done so, as discussed in Section II.B.

1806(f) – to permit the courts to assess the legality of particular electronic surveillance – an important component of which is whether the surveillance complies with FISA. Section 1806(f) applies to electronic surveillance, whether that surveillance satisfies FISA or not.

AT&T also incorrectly implies that FISA does not apply in civil cases. *See* AT&T May 24, 2006 Br. at 10. This contradicts the language of the statute and Congress' express purpose in adopting it. One of the three events that can trigger a disclosure is a civil motion to compel – demonstrating that Section 1806(f) is not limited to warrants against individuals under FISA. 18 U.S.C. § 1806(f). The legislative history confirms that Section 1806(f) applies with equal force in civil proceedings: "The conferees agree that an in camera and ex parte proceeding is appropriate for determining the lawfulness of electronic surveillance in both criminal and civil cases." H.R. Conf. Rep. No. 95-1720, 1978 U.S.C.C.A.N. 4048, 4061 (Oct. 5, 1978).

AT&T further contends that "the great weight of authority interpreting the FISA sections plaintiffs cite mandates that 'even ordinary FISA surveillance information over which no formal state secrets claim has been asserted' should not be disclosed." AT&T May 24, 2006 Br. at 11. The cited cases, however, do not hold that disclosure to the aggrieved party is inappropriate, as AT&T implies. In *United States v. Belfield*, 692 F.2d 141 (D.C. Cir. 1982), for example, the court merely rejected the argument "that in <u>every</u> case 'such disclosure is necessary to make an accurate determination of the legality of the surveillance.'" *Id.* at 147 (emphasis added). AT&T's cases all recognize that courts do have the power to disclose the information to the aggrieved person. *See, e.g., ACLU Found. of S. Cal. v. Barr*, 952 F.2d 457, 462 (D.C. Cir. 1991). Those courts held merely that the particular facts of each individual case supported the conclusion that disclosure to the aggrieved person was not necessary.

### 3. Congress' General Directives To The NSA Do Not Change The Procedure For Discovery Regarding Electronic Surveillance

The government cites two general statutory provisions that provide for the authority of the NSA and the Director of National Intelligence, but do not address the specific electronic surveillance issues at issue here. *See* Gov't May 24, 2006 Br. at 12 n.6. Section 6 of the National Security Agency Act of 1959, 50 U.S.C. § 402, note, and Section 102A(i)(1) of the

Intelligence Reform and Terrorism Prevention Act of 2004, 50 U.S.C. § 403-1(i)(1), unremarkably provide for the protection of our country's national secrets. These two general statutes do not conflict with Sections 1806(f) and similar statutes. Section 6 protects the organization, function, and activities of the NSA – but it only protects those that are secret. For example, the NSA has a website (www.nsa.gov) that has extensive explanations of the NSA's organization, function, and activities. The NSA could not reasonably claim that this public information falls under Section 6.

In the same vein, Plaintiffs do not seek to discover secret information about the NSA or its activities. As discussed below, they intend to use information in the public domain and information that Congress has made discoverable under Sections 1806(f), 1845(f), and 2511(2)(a)(ii)(B). While the general statutes cited by the government require that the DNI "protect intelligence sources and methods <u>from unauthorized disclosure</u>," 50 U.S.C.§ 403-1(i)(1) (emphasis added), disclosure pursuant to Sections 1806(f), 1845(f), and 2511(2)(a)(ii)(B) are not only authorized but required by Congress.

Even if the general statutory provisions somehow did conflict with Section 1806(f), the latter must prevail. Two principles of statutory construction require this result. First, Section 1806(f) is a specific provision, and in a conflict with more general statutes the specific statute governs. *See Edmond v. U.S.*, 520 U.S. 651, 657 (1997). Second, "a specific policy embodied in a later federal statute should control our construction of the [earlier] statute, even though it has not been expressly amended." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000). "This is particularly so where the scope of the earlier statute is broad but the subsequent statutes more specifically address the topic at hand...." *Id.* (quoting *United States v. Estate of Romani*, 523 U.S. 517, 530-31 (1998)).

As shown above, Section 1806(f) specifically applies to the subject of this case: electronic surveillance. The statutes cited by the government do not. Both Section 6 and Section 102A(i)(1) merely discuss the general protection of the "information and activities" of the NSA and "intelligence sources and methods." None of the cases cited by the government find

otherwise. They merely prevent the use of the Freedom of Information Act to access various types of sensitive national security information and have no bearing on the electronic surveillance at issue here.

### C. The State Secrets Privilege Cannot Permit Dismissal Of Claims Seeking Relief From Ongoing Violations of Constitutional Rights

The judicial authority to consider claims arising under the Constitution further limits the state secrets privilege, rendering dismissal improper. No branch of government can waive or refuse to obey the limitations on government power set forth in the Fourth Amendment – or prevent another branch from enforcing those limitations. The Fourth Amendment depends entirely on the judiciary for its enforcement. "The effect of the Fourth Amendment is to put the courts of the United States and Federal officials, in the exercise of their power and authority, under limitations and restraints as to the exercise of such power and authority, and to forever secure the people, their persons, houses, papers and effects against all unreasonable searches and seizures under the guise of law." *Elkins v. United States*, 364 U.S. 206, 209 (1960). It has been established from the earliest days that the judiciary, as a coequal branch, has and must have the power to pass upon the legality of executive action, and the duty to do so when the issue is presented to it in a case or controversy. *Marbury v. Madison*, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is"). The executive is without authority to restrict the scope of the judicial power of this Court to consider the application of the Fourth Amendment.

The Supreme Court recently reaffirmed the continuing vitality of the judiciary as a co-equal branch of government which must stand ready to adjudicate individual rights notwithstanding assertions regarding national security. In *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), the habeas petitioner Hamdi was a citizen captured with enemy forces on a foreign field of battle and held as an "enemy combatant" without trial or charges in executive detention in the United States. The executive asserted that the Article III court could not exercise its habeas jurisdiction to adjudicate the factual basis of Hamdi's detention, *i.e.*, whether he was in fact an enemy combatant. The executive contended this fact was nonjusticiable and was exclusively within the power of the executive to determine, just as the executive claims here

that Plaintiffs' constitutional challenge to the alleged massive, warrantless executive searches and seizures is nonjusticiable.

In *Hamdi*, the Court rejected the notion that the executive's national security powers can restrict the scope of constitutional liberties or negate the power of the judiciary to adjudicate claims by citizens for invasions of those liberties. The four-justice plurality held that "we necessarily reject the Government's assertion that separation of powers principles mandate a heavily circumscribed role for the courts in such circumstances." *Hamdi*, 542 U.S. at 535. It noted that the claim of executive supremacy, no different than the one made by the government here:

> cannot be mandated by any reasonable view of separation of powers, as this approach serves only to condense power into a single branch of government. We have long since made clear that a state of war is not a blank check for the President when it comes to the rights of the Nation's citizens. *Youngstown Sheet & Tube*, 343 U.S., at 587. Whatever power the United States Constitution envisions for the Executive in its exchanges with other nations or with enemy organizations in times of conflict, it most assuredly envisions a role for all three branches when individual liberties are at stake.

*Hamdi*, 542 U.S. at 535-36 (plur. opn.) (first emphasis original, second emphasis added); *accord*, *Webster v. Doe*, 486 U.S. 592, 603 (1988) (a "'serious constitutional question' ... would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim"). Four other Justices were even more emphatic in their rejection of the executive's assertion that the courts were powerless to adjudicate the factual basis of Hamdi's constitutionally-created habeas corpus claim. *Hamdi*, 542 U.S. at 553 (conc. opn. of Souter, J.), 576 (dis. opn. of Scalia, J.).

"[I]t would turn our system of checks and balances on its head to suggest that a citizen could not make his way to court with a challenge to the factual basis for his detention by his government, simply because the Executive opposes making available such a challenge." *Hamdi*, 542 U.S. at 536-37. So too here, it would turn our constitutional system on its head to hold that Plaintiffs were barred from offering proof that AT&T is violating the Fourth Amendment by its program of warrantless, suspicionless mass searches and seizures under color of law, and barred

from seeking relief for those violations "simply because the Executive opposes making available such a challenge."[8]

## II. PLAINTIFFS' CLAIMS CANNOT BE DISMISSED ON THE GROUNDS OF THE STATE SECRETS PRIVILEGE BECAUSE THEY ARE BASED ON NON-SECRET INFORMATION

### A. The State Secrets Privilege Does Not Change the Standard of Review

The government's reliance on the state secrets privilege does not change the standard of review for determining whether to dismiss this case pursuant to Rule 12, or whether to grant summary judgment. Should the state secrets privilege apply to exclude evidence in this case, "[t]he plaintiff's case then goes forward based on evidence not covered by the privilege." *Kasza*, 133 F.3d at 1166. "[I]nvocation of the privilege results in no alteration of pertinent substantive or procedural rules…." *Ellsberg v. Mitchell*, 709 F.2d 51 (D.C. Cir. 1983); *see Molerio v. FBI*, 749 F.2d 815, 822 (D.C. Cir. 1984) (applying Rule 56 standard to decide summary judgment in state secrets case); *Black v. U.S.*, 900 F. Supp. 1129, 1135 (D. Minn. 1994) (same).

Accordingly, the Court should not grant the government's motion to dismiss "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim that would entitle it to relief." *Williamson v. Gen. Dynamics Corp.,* 208 F.3d 1144, 1149 (9th Cir. 2000). Plaintiffs' "allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party." *Burgert v. Lokelani Bernice Pauahi Bishop Trust,* 200 F.3d 661, 663 (9th Cir.2000). "Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the non-moving party." *Black*, 900 F. Supp. at

---

[8] The Supreme Court recently reiterated that litigation is strongly protected against government interference, not only on First Amendment grounds but also to protect the integrity of judicial review. *See generally Legal Services Corp. v. Velazquez*, 531 U.S. 533, 542, 545-550 (2001) (holding publicly funded legal services attorneys' representation of indigent clients was "private speech"). Courts depend on attorneys' freedom to speak in litigation "for the proper exercise of the judicial power." *Id.* at 545-46. The government is "seeking to prohibit the analysis of certain legal issues and to truncate presentation to the courts," which is "inconsistent with the proposition that attorneys should present all the reasonable and well-grounded arguments necessary for proper resolution of the case." *Id.* at 545. The courts "must be vigilant" when the government seeks in effect to insulate its own conduct "from legitimate judicial challenge." *Id.* at 548.

1135 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986)). "In determining whether summary judgment is appropriate, the evidence offered by the non-moving party is to be believed and all justifiable inferences therefrom are to be drawn in a light most favorable to that party." *Black*, 900 F. Supp. at 1135 (citations omitted).

### B. The Government Cannot Retroactively Transform Non-Secret Information Into A State Secret

The state secrets privilege does not bar from the courtroom information that already is in the public domain. *See Spock v. U.S.*, 464 F. Supp. 510, 518 (S.D.N.Y. 1978). In *Spock*, the plaintiff sued the government for unlawful interception of his oral, wire, telephone, and telegraph communications. *Id.* at 512. Just as it does here, the government in *Spock* argued that the case had to be dismissed because "defendants can neither admit nor deny the allegations of the complaint without disclosing state secrets." *Id.* at 519. The plaintiffs countered that "[t]his one factual admission or denial ... reveals no important state secret, particularly since the interception of Dr. Spock's communications was previously disclosed in an article in the *Washington Post*, dated October 13, 1975." *Id.* The court agreed with plaintiffs and declined to dismiss the case:

> [h]ere, where the only disclosure in issue is the admission or denial of the allegation that interception of communications occurred, an allegation which has already received widespread publicity, the abrogation of the plaintiff's right of access to the courts would undermine our country's historic commitment to the rule of law.

*Id.* at 520; *see also Capital Cities Media, Inc. v. Toole*, 463 U.S. 1303, 1306 (1983) (noting Court has not "permitted restrictions on the publication of information that would have been available to any member of the public"); *McGehee v. Casey*, 718 F.2d 1137, 1141 (D.C. Cir. 1983) (noting "[t]he government has no legitimate interest in censoring unclassified materials" or "information ... derive[d] from public sources").

The principle that the government cannot engage in after-the-fact reclassification of non-secret information as "state secrets" applies with even greater force in this case. Here, the key facts have not only been the subject of widespread publicity, but they are based on (1) the government's own statements, (2) the Klein testimony and documents from Mr. Klein that are of

record in this case, and (3) the expert testimony of Mr. Marcus, analyzing the evidence provided by Mr. Klein.

The state secrets privilege cannot strike from the record *ex post* the evidence already adduced by Plaintiffs in the form of the Klein Declaration and supporting exhibits (the "Klein Evidence"), or of the expert opinion of Mr. Marcus analyzing that evidence.[9] Mr. Klein came into possession of the Klein Evidence first-hand. He has never been an NSA employee. He did not become privy to this evidence as a result of any agreement with the government, or by virtue of any security clearance. The information learned first-hand by Mr. Klein – a private citizen with no government association – cannot possibly be "secret" in any relevant sense. *Cf. NSN Int'l Indus. v. E.I. Dupont de Nemours & Co.*, 140 F.R.D. 275 (S.D.N.Y. 1991) (holding state secrets privilege not waived where attorneys for defendant government contractor received security clearances before reviewing classified documents).[10]

Finally, it does not follow from the government's asserted inability to "confirm or deny" the facts set forth in the Klein Evidence that this case must be dismissed. The government can take any view it chooses of the substance of the Klein Evidence – that is its prerogative. What the government cannot do is remove that evidence from the record and seek to have this case adjudicated as if it did not exist.

---

[9] The specific manner in which the Klein Evidence establishes contents of the Klein Evidence establish Plaintiffs' *prima facie* case is discussed in Section II.B, *infra*.

[10] Even if the government could have invoked the state secrets privilege to prevent Plaintiffs from submitting the Klein Evidence to the Court, it affirmatively chose not to do so. Plaintiffs discussed the Klein Evidence with the Justice Department on March 30, 2006. Declaration of Lee Tien re Partial Filing of Documents in Support of Motion for Preliminary Injunction ("Tien PI Decl."), ¶¶ 9-12. At the Justice Department's request, Plaintiffs hand-delivered it copies of the Klein Evidence. *Id.,* ¶¶ 13-14. By letter of April 4, 2006, the Justice Department informed Plaintiffs that the government did not object to the filing of the Klein Evidence under the Court's normal sealing procedures. Declaration of Lee Tien in Support of Admin. Mots. to Extend Page Limit for Mot. for Preliminary Inj., ¶ 5; *id.,* Ex. A (April 4, 2006 Letter of Mr. Anthony J. Coppolino, Special Litigation Counsel, DOJ).

### C. Plaintiffs' Prima Facie Case Is Established Based On The Klein Evidence, Expert Analysis, and Government Admissions – It Does Not Require State Secrets

Plaintiffs' statutory claims can be grouped into two categories: (1) claims turning on AT&T's unlawful "interception" of either the contents of communications or non-content information relating to communications, and (2) claims turning on the "divulgence" or "disclosure" of the contents of communications or other customer information. The requirements of both sets of claims are satisfied by Plaintiffs' evidence.

#### 1. Plaintiffs' Interception Claims

Plaintiffs allege two statutory claims based principally on AT&T's acts of unlawful interception of either (i) the contents of communications, or (ii) non-content information relating to communications: Counts III and II of the Amended Complaint.[11]

##### a. Count III – Violation of 18 USC § 2511

*Count III* is based on AT&T's intentional interception of wire and electronic communications, barred by Title III, 18 U.S.C. § 2511(1)(a). The statute defines "intercept" as the "aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). "Contents" include "any information concerning the substance, purport, or meaning of [a] communication." 18 U.S.C. § 2510(8).

The Klein Declaration and its exhibits show that AT&T designed, installed, and implemented a system that copies massive quantities of electronic communications traversing its network, and shunted them into a secure room. Access to that room was restricted to AT&T employees cleared by the NSA. *See* Statement of Facts, *supra,* at 5-7.

When AT&T copies the communications into the Surveillance Configuration described in the Klein and Marcus declarations, those communications have been "intercepted" within the

[11] Plaintiffs discuss Count III (interception of electronic communications) before Count II (electronic surveillance) as first in logical order.

meaning of the statute. *United States v. Rodriguez*, 968 F.2d 130, 136 (2d Cir. 1992) (holding in context of telephone communications that "when the contents of a wire communication are captured or redirected in any way, an interception occurs at that time").[12] Internet traffic constitutes a "communication" within the meaning of the statute. *Id.* ("The phrase 'or other' was inserted into ... Title III to ensure privacy protection for new forms of communication such as electronic pagers, electronic mail, and computer-to-computer communications."); *see also Konop,* 302 F.3d at 878 (for transmission of website); *United States v. Councilman*, 418 F.3d 67, 79-80 (1st Cir. 2005) (for email).

**b. Count II – Violation of 50 U.S.C. §§ 1809-10**

*Count II* is based on AT&T's electronic surveillance, in violation of FISA, 50 U.S.C. §§ 1809-10. See 50 U.S.C. §§ 1809, 1810. FISA creates a private right of action against a person who:

> (1) engages in electronic surveillance under color of law except as authorized by statute; or
>
> (2) discloses or uses information obtained under color of law by electronic surveillance, knowing or having reason to know that the information was obtained through electronic surveillance not authorized by statute.

50 U.S.C. § 1809 (establishing criminal liability); 1810 (creating private right of action).[13]

---

[12] *See In re State Police Litigation,* 888 F. Supp. 1235 (D. Conn. 1995). There, the court found the interception of telephone communications despite the government's argument they listened to recorded tapes "only to the extent necessary." The court noted that "a telephone conversation that is recorded, but not necessarily listened to, is still an 'interception' under the Act." *Id.* It explained, "[t]he terms of the statute itself support plaintiffs' interpretation. If Congress had intended the phrase 'aural or other acquisition' to mean 'overheard,' it certainly could have employed the simpler term. The section's additional requirement that a conversation be acquired 'through the use of any electronic, mechanical, or other device' suggests that it is the act of diverting, and not the act of listening, that constitutes an 'interception.' * * * [W]hile the Act does not precisely define what an interception is, it must be deemed to have occurred 'when the contents of wire communications are captured or redirected in any way'" *Id.* (decision also gathers cases).

[13] Section 1810 specifically provides that "[a]n aggrieved person" (defined in § 1801(k) as "a person who is the target of an electronic surveillance or any other person whose communications or activities were subject to electronic surveillance") "other than a foreign power or an agent of a foreign power … who has been subjected to an electronic surveillance or about whom

These provisions of FISA apply to AT&T's conduct here. *First,* "electronic surveillance" includes the acquisition in the United States by surveillance device of the contents of wire communications to or from a person in the United States under circumstances where a warrant would be required for law enforcement purposes. 50 U.S.C. § 1801(f)(2). *Second,* "contents, when used with respect to a communication," include "any information concerning the identity of the parties to such communication or the existence, substance, purport, or meaning of that communication." 50 U.S.C. § 1801(n) (emphasis added). *Finally,* a "wire communication" is "any communication while it is being carried by a wire, cable, or other like connection furnished or operated by any person engaged as a common carrier in providing or operating such facilities for the transmission of interstate or foreign communications." 50 U.S.C. § 1801(l).[14]

The Klein Evidence, and the expert analysis of Mr. Marcus, establishes that AT&T has created a copy of the internet traffic that it handles. Not only did the "the traffic that was diverted represent[] all, or substantially all, of AT&T's [redacted] traffic in the San Francisco Bay Area", but the "traffic intercepted at the [redacted] facility probably represented a substantial fraction of AT&T's total national [redacted] traffic." Marcus Decl., ¶¶ 104, 107 (emphasis added). This traffic included purely domestic-to-domestic communications (*id.,* ¶¶ 109-112), was diverted wholesale by AT&T's [redacted] into the room controlled by the NSA (*id.*, ¶¶ 46, 49, 104-112) – and was accessible only to those performing or assisting in a governmental function (thereby acting under color of law). *See* Exec. Order No. 12968, §§ 1.1(g), (h), 1.2(a) (1995) (attached as Markman Decl., Ex. 1).[15] For its part, the government has admitted that it has not

---

information obtained by electronic surveillance of such person has been disclosed or used in violation of section 1809 of this title shall have a cause of action against any person who committed such violation ...." 50 U.S.C. § 1810.

[14] Under Title III, "wire communications" relate to "aural transfers" – telephone calls – while under FISA "wire communications" can include data.

[15] Any further doubts as to the fact of government involvement will be resolved when AT&T produces any government-issued certifications, which as explained below, are not protected by the state secrets privilege.

obtained a warrant authorizing this acquisition. *See* RJN at ¶¶ 6-7, 9. By any measure, this was an "acquisition" of the "contents" of a "wire communication" under the prohibitions of U.S.C. § 1809(a)(1).

By the same token, under 50 U.S.C. § 1806(f) and similar statutes (*see* Section I.B.2 *supra*), Plaintiffs are entitled to take discovery regarding AT&T's disclosure to the NSA of call detail records and the contents of telephone call. The mere fact of an enormous interception of the contents of telephone communications violates FISA, the SCA, and Section 2511 – regardless of whether or not the government chooses only to listen to targeted telephone calls (a question that is immaterial to Plaintiffs' claims).

**2. Plaintiffs' "Divulgence/Disclosure Claims"**

Plaintiffs' second set of claims is based on the divulgence, disclosure, or use of communications contents or other information. Each of these is described below.

**a. Count III – 18 U.S.C. §§ 2511(1)(c), (d), and (3)(a)**

Section 2511 goes beyond the act of "interception," discussed above in Section II.B.1.a. It also prohibits a range of conduct that includes divulgence and disclosure of electronic communications. The evidence supports Plaintiffs' Count III on these independent bases for liability without regard to anything that would be privileged as a "state secret."

*First,* Section 2511(1)(c) prohibits any person from "intentionally disclos[ing], or endeavor[ing] to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection." In other words, if AT&T knew or should have known that it had intercepted any domestic-to-domestic email or telephone call, and then intentionally disclosed that communication to the government, then AT&T faces liability.

*Second,* Section 2511(1)(d) prohibits any person from "intentionally us[ing], or endeavor[ing] to use, the contents of any … electronic communication" knowing that the information was intercepted in violation of the statute. As noted above, AT&T must have known

that it had intercepted vast numbers of communications. Klein Decl., ¶¶ 19, 25-34; Marcus Decl., ¶¶ 46, 49, 104-112. Whether or not the government reviewed the communication is legally irrelevant under Section 2511(1)(c) and (d) – what matters for assessing liability under Section 2511(1)(c) is AT&T's act of intentional disclosure, and under (1)(d) is AT&T's act of intentional use.

*Third,* Section 2511(3)(a) imposes special obligations on an "electronic communication service" like AT&T. When operating an electronic communications service, these entities must not "intentionally divulge the contents of any communication ... while in transmission on that service to any person or entity other than an addressee or intended recipient of such communication or an agent of such addressee or intended recipient."[16]

The evidence reveals that all three happened here. First, AT&T must have known it had intercepted the communications – that was the very purpose of the [redacted] that it instructed Mr. Klein to install. Klein Decl., ¶¶ 19, 25-29. And that cable unquestionably carried domestic-to-domestic communications. *Id.*, ¶¶ 29-31, 34. Second, the intentional act of shunting these communications off, on a separate cable (*id.*, ¶ 27), into a room controlled by the NSA (*id.,* ¶ 17) that included sophisticated data-mining software and hardware (*id.*, ¶ 35), was an actionable disclosure under Section 2511(1)(c). Third, AT&T gave the government the means to review the communications, resulting in a "use" under Section 2511(d) and in the "divulging" of the communications under Section 2511(3)(a). Indeed, the Klein and Marcus declarations show that

---

[16] Plaintiffs' claim for violation of 47 U.S.C. § 605 (Count IV) is an independent but substantially similar basis for liability. Section 605 prohibits "any person receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio" from "divulg[ing] or publish[ing] the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception," to anyone not authorized to see it. AT&T unquestionably transmits and assists in the transmission of "communications by wire." Klein Decl., ¶¶ 19, 25-29, 34. The record evidence also unquestionably shows that, at a minimum, AT&T divulged the existence of the emails received on its fiber-optic cable to the government via the [redacted] and cable into the [redacted] Room. *Id.*, ¶ 34. The President himself conceded at a press conference that the NSA program collects "lists" of communications, and the Director of Homeland Security has spoken to the issue of data-mining from large quantities of data about communications. Statement of Facts, *supra,* at 9.

the [redacted] Room contains sophisticated equipment such as the [redacted], which can analyze large amounts of communications traffic in real time. Klein Decl. ¶ 35; Marcus Decl. ¶¶ 78-90. On these facts, it is highly likely that the communications contents entering the [redacted] Room are being subjected to sophisticated computer analysis, and are thus being "used."

In addition, AT&T is known to maintain massive databases of call detail records (CDR) data. As an anonymous government source discussed with *USA Today*, AT&T disclosed this data to the government. Markman Decl., Exh. 5. Congress has empowered Plaintiffs, as aggrieved parties whose telephone communications and call data records were disclosed to the government, to take discovery about AT&T's surveillance. *See* Section I.B.2, *supra.*

**b. Counts V and VI – The Stored Communications Act (18 U.S.C. § 2702(A))**

Title 18 U.S.C. § 2702 sets out rules of conduct for "electronic communications services" and for "remote computer services." The basis for Count V – Section 2702(A)(1) – requires that "a person or entity providing an electronic communication service to the public shall not knowingly divulge to any person or entity the contents of a communication while in electronic storage by that service." 18 U.S.C. § 2702(a)(1).

Similarly, the basis for Count VI – Section 2702(A)(3) – requires that "a provider of ... electronic communications service to the public shall not knowingly divulge a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications covered by paragraph (1)( or (2)) to any governmental entity." 18 U.S.C. § 2702(A)(3). Sections 2702(A)(1) and (A)(3) compliment one another. While (A)(3) protects data relating to a customer and his or her communications, but not the content of the communications themselves, Section (A)(1) protects stored contents.

Again, the Klein and Marcus declarations, and government admissions, support liability under both prongs of this statutory regime. This evidence not only shows that AT&T "[redacted]" fiber-optic circuits so that the communications on those circuits were copied into the [redacted] Configuration, and that access to the [redacted] Room was controlled by the NSA, but also that AT&T