Trone et al v. Peanut Corporation of America Doc. 358

# EXHIBIT 1

Dockets.Justia.com

ELECTRONIC FRONTIER FOUNDATION
CINDY COHN (145997)
cindy@eff.org
LEE TIEN (148216)
tien@eff.org
KURT OPSAHL (191303)
kurt@eff.org
KEVIN S. BANKSTON (217026)
bankston@eff.org
CORYNNE MCSHERRY (221504)
corynne@eff.org
JAMES S. TYRE (083117)
jstyre@eff.org
454 Shotwell Street
San Francisco, CA 94110
Telephone: 415/436-9333
415/436-9993 (fax)

TRABER & VOORHEES
BERT VOORHEES (137623)
bv@tvlegal.com
THERESA M. TRABER (116305)
tmt@tvlegal.com
128 North Fair Oaks Avenue, Suite 204
Pasadena, CA 91103
Telephone: 626/585-9611
626/ 577-7079 (fax)
Attorneys for Plaintiffs

[Additional counsel appear following the signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TASH HEPTING, GREGORY HICKS, CAROLYN JEWEL and ERIK KNUTZEN on Behalf of Themselves and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>AT&T CORP., AT&T INC. and DOES 1-20, inclusive,<br><br>Defendants. | No. C-06-0672-VRW<br><br>CLASS ACTION<br><br>DECLARATION OF MARK KLEIN IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION<br><br>Date: June 8, 2006<br>Time: 2:00 p.m.<br>Court: Courtroom 6, 17th Floor<br>Judge: The Hon. Vaughn R. Walker, Chief United States District Judge |

**FILED UNDER SEAL PURSUANT TO CIVIL LOCAL RULE 79-S**

I, Mark Klein, declare under penalty of perjury that the following is true and correct:

1. I am submitting this Declaration in support of Plaintiffs' Motion for a Preliminary Injunction. I have personal knowledge of the facts stated herein, unless stated on information and belief, and if called upon to testify to those facts I could and would competently do so.

2. For over 22 years I worked as a technician for AT&T Corporation ("AT&T"), first in New York and then in California. I started working for AT&T in November 1981 as a Communications Technician.

3. From January 1998 to October 2003, I worked as a Computer Network Associate III at an AT&T facility on Geary Street in San Francisco, CA.

4. From October 2003 to May 2004 I worked as a Communications Technician at an AT&T facility at 611 Folsom St., San Francisco, CA (the "Folsom Street Facility").

5. Previously, I worked as an AT&T Communications Technician from November 1981 to January 1998. I was assigned to AT&T facilities in New York, New York (November 1981 to December 1990), White Plains, NY (December 1990 to March 1991), Pleasanton, CA (March 1991 to May 1993 and March 1994 to January 1998) and Point Reyes, CA (June 1993 to March 1994).

6. I retired from AT&T in May 2004.

7. AT&T Corp. (now a subsidiary of AT&T Inc.) maintains domestic telecommunications facilities over which millions of Americans' telephone and Internet communications pass every day. These facilities allow for the transmission of interstate or foreign electronic voice and data communications by the aid of wire, fiber optic cable, or other like connection between the point of origin and the point of reception.

8. Between 1998 and 2003 I worked in an AT&T office located on Geary Street in San Francisco as one of six Computer Network Associates in the office. The site manager was a management-level technician with the title of Field Support Specialist (hereinafter referred to as FSS #1). Two other FSS people (FSS #2 and FSS #3) also operated from this

office.

9. During my service at the Geary Street facility, the office provided WorldNet Internet service, international and domestic Voice Over IP (voice communications transmitted over the Internet), and data transport service to the Asia/Pacific region.

10. While I worked in the Geary Street facility in 2002, FSS #1 told me to expect a visit from a National Security Agency ("NSA") agent. I and other technicians also received an email from higher management advising us of the pending visit, and the email explicitly mentioned the NSA. FSS #1 told me the NSA agent was to interview FSS #2 for a special job. The NSA agent came and met with FSS #2. FSS #1 later confirmed to me that FSS #2 was working on the special job, and that it was at the Folsom Street Facility.

11. In January 2003, I, along with others, toured the Folsom Street Facility. The Folsom Street Facility consists of three floors of a building that was then operated by SBC Communications, Inc. (now known as AT&T Inc.).

12. While on the January 2003 tour, I saw a new room being built adjacent to the 4ESS switch room. The new room was near completion. I saw a workman apparently working on the door lock for the room. I later learned that this new room being built was referred to in AT&T documents as the "SG3 Secure Room" (hereinafter the "SG3 Secure Room"). The SG3 Secure Room was room number 641A, and measures approximately 24 by 48 feet.

13. The 4ESS switch room is a room that contains a 4ESS switch, a type of electronic switching system that is used to direct long-distance telephone communications. AT&T uses the 4ESS switch in this room to route the public's telephone calls that transit through the Folsom Street Facility.

14. FSS #2, the management-level technician whom the NSA cleared and approved for the special job referenced above, was the person working to install equipment in the SG3 Secure Room.

15. In October 2003, the company transferred me to the AT&T Folsom Street Facility to oversee the WorldNet Internet room, as a Communications Technician.

16. In the Fall of 2003, FSS #1 told me that another NSA agent would again visit our office at Geary Street to talk to FSS #1 in order to get the latter's evaluation of FSS #3's suitability to perform the special job that FSS #2 had been doing. The NSA agent did come and speak to FSS #1. By January 2004, FSS #3 had taken over the special job as FSS #2 was forced to leave the company in a downsizing.

17. The regular AT&T technician workforce was not allowed in the SG3 Secure Room. To my knowledge, only employees cleared by the NSA were permitted to enter the SG3 Secure Room. To gain entry to the SG3 Secure Room required both a physical key for the cylinder lock and a combination code number to be entered into an electronic keypad on the door. To my knowledge, only FSS #2, and later FSS #3, had both the key and the combination code. Regular technicians, including myself, had keys to every other door in the facility because we were often there working alone. We were not given either a key or the combination code for the SG3 Secure Room. On one occasion, when FSS #3 was retrieving a circuit card for me from the SG3 Secure Room, he invited me into the room with him for a couple of minutes while he retrieved the circuit card from a storage cabinet and showed me some poorly installed cable.

18. The extremely limited access to the SG3 Secure Room was highlighted by one incident in 2003. FSS #1 told me that the large industrial air conditioner in the SG3 Secure Room was leaking water through the floor and onto SBC's equipment downstairs, but FSS #2 was not immediately available to provide servicing, and the regular technicians had no access, so the semi-emergency continued for some days until FSS #2 arrived.

19. AT&T provides dial-up and DSL Internet services to its customers through its WorldNet service. The WorldNet Internet room included large routers, racks of modems for AT&T customers' WorldNet dial-in services, and other telecommunications equipment. The equipment in the WorldNet Internet room was used to direct emails, web browsing requests and other electronic communications sent to or from the customers of AT&T's WorldNet Internet service.

20. In the course of my employment, I was responsible for troubleshooting

problems on the fiber optic circuits and installing new fiber optic circuits.

21. The fiber optic cables used by AT&T typically consist of up to 96 optical fibers, which are flexible thin glass fibers capable of transmitting communications through light signals.

22. Within the WorldNet Internet room, high speed fiber optic circuits connect to routers for AT&T's WorldNet Internet service and are part of the AT&T WorldNet's "Common Backbone" (CBB). The CBB comprises a number of major hub facilities, such as the Folsom Street Facility, connected by a mesh of high-speed (OC3, OC12, OC48 and some even higher speed) optical circuits.

23. Unlike traditional copper wire circuits, which emit electromagnetic fields that can be tapped into without disturbing the circuits, fiber optic circuits do not "leak" their light signals. In order to monitor such communications, one has to physically cut into the fiber and divert a portion of the light signal to access the information.

24. A fiber optic circuit can be split using splitting equipment to divide the light signal and to divert a portion of the signal into each of two fiber optic cables. While both signals will have a reduced signal strength, after the split both signals still contain the same information, effectively duplicating the communications that pass through the splitter.

25. In the course of my employment, I reviewed two "Cut-In and Test Procedure" documents dated January 13, 2003 and January 24, 2003, which instructed technicians on how to connect the already in-service circuits to a "splitter cabinet," which diverted light signals from the WorldNet Internet service's fiber optical circuits to the SG3 Secure Room.

26. A true and correct copy of the "Cut-In and Test Procedure" documents are attached hereto as Exhibits A and B. Exhibit A is the January 13, 2003 document, and Exhibit B is the January 24, 2003 document.

27. The light signals from the WorldNet Internet service's optical circuits were split, with a portion of the light signal going through fiber optic cables into the SG3 Secure Room. The AT&T location code of the "splitter cabinet" is 070177.04, which denotes the 7th floor, aisle 177 and bay 04.

28. In the course of my employment, I reviewed a document entitled "Study Group 3, LGX/Splitter Wiring, San Francisco" dated December 10, 2002, authored by AT&T Labs' consultant Mathew F. Casamassima. A true and correct copy of this document is attached hereto as Exhibit C. This document described the connections from the SG3 Secure Room on the 6th floor to the WorldNet Internet room on the 7th floor, and provided diagrams on how the light signal was being split.

29. The circuits that were listed in the "Cut-in and Test Procedure" document dated January 24, 2003 are "Peering Links" that connect the WorldNet Internet network to national and international Internet networks of non-AT&T telecommunications companies.

30. The "Cut-In and Test Procedure" documents provided procedures to "cut-in" AT&T's Peering Links to the splitter and hence to the SG3 Secure Room.

31. Starting in February 2003, the "splitter cabinet" split (and diverted to the SG3 Secure Room) the light signals that contained the communications in transit to and from AT&T's Peering Links with the following Internet networks and Internet exchange points: ConXion, Verio, XO, Genuity, Qwest, PAIX, Allegiance, Abovenet, Global Crossing, C&W, UUNET, Level 3, Sprint, Telia, PSINet, and MAE-West.

32. MAE-West is an Internet nodal point and one of the largest "Internet exchange points" in the United States. PAIX, the Palo Alto Internet Exchange, is another significant Internet exchange point.

33. Internet exchange points are facilities at which large numbers of major Internet service providers interconnect their equipment in order to facilitate the exchange of communications among their respective networks.

34. Through the "splitter cabinet," the content of all of the electronic voice and data communications going across the Peering Links mentioned in paragraphs 29 to 31 was transferred from the WorldNet Internet room's fiber optical circuits into the SG3 Secure Room.

35. The document "Study Group 3, LGX/Splitter Wiring, San Francisco" dated December 10, 2002, listed the equipment installed in the SG3 Secure Room, including such

equipment as Sun servers and Juniper (M40e and M160) "backbone" routers. This list also included a Narus STA 6400, which is a "Semantic Traffic Analyzer."

36. In the course of my employment, I was required to connect new circuits to the "splitter cabinet" and get them up and running. While working on a particularly difficult one with another AT&T technician, I learned that other such "splitter cabinets" were being installed in other cities, including Seattle, San Jose, Los Angeles and San Diego.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

DATED: March 28, 2006

Mark Klein

Mark Klein